**UNITED STATES DISTRICT COURT**

**FOR THE MIDDLE DISTRICT OF FLORIDA**

**TAMPA DIVISION**

GP BRANDS, INC.                                )
    A Florida Corporation              )     Civil Action No. _____
        Plaintiff,                       )
                     )     **Complaint for damages**
                     )
GWINNETT POSTAL CENTER INC.    )     **Injunctive relief sought**
    A Georgia Corporation              )
        Defendant.                        )
                     )
_____)

### COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

COMES NOW, the Plaintiff, GP Brands, Inc., by and through the undersigned counsel, and files this Complaint for Damages and Injunctive Relief against Defendant, Gwinnett Postal Center, Inc., and in support thereof states as follows:

### NATURE OF THE ACTION

1.    Plaintiff is a Florida Corporation and Franchisor to the Goin' Postal franchise chain and owner of certain federally registered trademarks pertaining to the Goin' Postal franchise chain. Defendant is a Georgia Corporation owned and operated by a former Goin' Postal Franchisee who has knowingly and intentionally used and incorporated Plaintiff's trademarks without license or permission as its own with intent to cause confusion, mistake or to deceive. Defendant's actions have hindered Plaintiff from franchise sales in the locale and associated royalty revenue, has

damaged the Plaintiff's brand and goodwill and has caused confusion among consumers in the market place. Plaintiff seeks injunctive relief to prevent Defendant from engaging in further infringement, an accounting for profits, damages, treble damages and attorney's fees.

## PARTIES

2.     Plaintiff is a Florida Corporation with its principal place of business located in Pasco County at 4941 4th Street, Zephyrhills, Florida, 33542.

3.     Defendant is a Georgia Corporation with its principal place of business located in Gwinnett County at 3545 Cruse Road, Suite 309-C, Lawrenceville, Georgia, 30044.

## JURISDICTION AND VENUE

4.     Plaintiff re-alleges all preceding allegations.

5.     This claim arises under the Lanham Act (15 U.S.C. §§ 1114 & 1125) and this Court has jurisdiction under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338, and 2201. Venue is proper in the United States District Court for the Middle District of Florida under 28 U.S.C. § 1391.

## FACTS

6.     Plaintiff re-alleges all preceding allegations.

7.     The Plaintiff is the Franchisor to the Goin' Postal franchise chain, whose core business is the shipping of packages through various parcel shipping vendors including the U.S. Post Office, FedEx, DHL and UPS. Plaintiff owns multiple federally registered trademarks in connection with

said business (see Exhibit "A"). Plaintiff acquired ownership of the marks and all rights therein through assignment from the predecessor Franchisor, Goin' Postal Franchise Corporation (see Exhibit "B"). In addition to acting as the Franchisor to existing Goin' Postal franchise stores, Plaintiff also sells new franchise opportunities in the state of Georgia and nationwide. Plaintiff receives revenue from franchise locations in the form of monthly royalty payments.

8.      Defendant is a business opened on or about July 26, 2013, whose core business is the shipping of packages through various parcel shipping vendors including the U.S. Post Office, FedEx, DHL and UPS. Defendant Corporation is owned and operated by Eric Browne.

9.      Mr. Browne was formerly the sole owner and CEO of All Health Complete Care Inc. All Health Complete Care Inc. was a Franchisee to the Goin' Postal franchise chain from approximately November 2009 through August 2010. During this time All Health Complete Care, Inc. and Eric Browne operated a franchised Goin' Postal store in Lawrenceville, Georgia.

10.      Mr. Browne, acting for and on behalf of All Health Complete Care Inc., read the Goin' Postal Franchise Disclosure Documents and signed various contracts associated with the franchise relationship (see Exhibit "C"). The omnibus document contained extensive references and ascensions to the absolute ownership of the Goin' Postal trademarks and associated rights to the Goin' Postal Franchise Corporation along with specific instructions to return, destroy or otherwise cease all use of

Plaintiff's trademarks in the event of termination of the franchise relationship.

11. On or about August 2010, Mr. Browne prematurely closed his franchise location and went out of business, breaching and terminating the Franchise Agreement and severing the franchise relationship. Mr. Browne kept various printed materials of Plaintiff's trademark, including but not limited to large exterior signs and smaller interior signs.

12. On or about July 2013, Mr. Browne incorporated Gwinnett Postal Center Inc. At the time of this pleading, Plaintiff does not know if Gwinnett Postal Center Inc. or Mr. Browne conducted business as a shipping center prior to incorporation.

13. On or about September 22, 2015, a customer of the Plaintiff contacted the Plaintiff to inquire about an oddly altered Goin' Postal sign and directed the Plaintiff's attention to the Defendant's commercial Facebook webpage. The customer clearly recognized the sign as the Plaintiff's trademark.

14. Upon investigation Plaintiff discovered Defendant had slightly altered a large exterior Goin' Postal sign by replacing the letter "o" with a letter "w" forming a sign that displayed "Gwin' Postal." The sign was identical in all aspects aside from this minor alteration including font, design, layout, colors and color scheme, placement of the American Flag and the trademark slogan "Your friendly neighborhood shipping

center." Additional investigation further revealed an interior sign altered the same which also contained Plaintiff's trademark caricature and a box truck with the same slightly altered trademark affixed. (see Exhibit "D")

15.     The signs are by definition a colorable imitation as they are service marks similar enough to the Plaintiff's registered marks to be considered as a calculated attempt to deceive.

16.     Plaintiff immediately issued a cease and desist letter to the Defendant. At the time the cease and desist letter was issued, the Plaintiff did not know that the owner of the Defendant Corporation was a former Franchisee. (see Exhibit "E")

17.     Defendant has stated that the signs have since been removed but to date has not provided photographs or any other requested proof. The trademark continues to be displayed on the Defendant's Facebook webpage. By reason and belief, Plaintiff believes the trademarks continue to be displayed without consent.

18.     Plaintiff's franchise sales are restricted by territorial rights given to existing franchise locations. Therefore, a potential franchise purchaser would not be able to purchase a franchise in a location where one already exists.

19.     Defendant's infringing actions and confusion in the market place not only confuse patrons of franchise locations but also dissuade potential franchise purchasers.

20.    Defendant Corporation's use of the Plaintiff's trademark was both knowing and willful. Defendant's conduct is deliberate, intentional and specifically intended to enrich Defendants and harm and damage Plaintiff. Defendant's use of Plaintiff's trademark is likely to cause confusion, mistake and deceive third-parties as to the affiliation, connection or association of Defendant with Plaintiff and as to whether or not Plaintiff has anything to do with the origin, sponsorship, or approval of the goods, services or other commercial activities of Defendants.

## FIRST CLAIM FOR RELIEF –INJUNCTIVE RELIEF

21.    Plaintiff re-alleges all preceding allegations.

22.    Defendant's use of the above described marks are in violation of federal law. The Defendant has used in commerce a reproduction, counterfeit, copy, or colorable imitation of the Plaintiff's registered marks in connection with the sale, offering for sale, distribution or advertising of goods and services provided by Defendants without consent and in defiance of the trademark owner.

23.    Defendant's use of the marks were committed with knowledge and willfulness that the imitation was intended to cause confusion, mistake or to deceive.

24.    Plaintiff is entitled to injunctive relief. Without injunctive relief, Plaintiff will continue to suffer injuries for which no adequate remedy at law exists.

## SECOND CLAIM FOR RELIEF - DAMAGES

25.    Plaintiff re-alleges all preceding allegations.

26.    Defendant's actions have damaged the Plaintiff's goodwill, potential for past and future sales, caused confusion in the market and diluted the strength of Plaintiff's trademark/brand.

27.    Defendant's actions were willful, knowing and calculated. Under 15 U.S.C. § 1117, Plaintiff is entitled to: (1) Defendant's profits, (2) any damages sustained by the Plaintiff, and (3) the costs of the action.

## THIRD CLAIM FOR RELIEF – TREBLE DAMAGES

28.    Plaintiff re-alleges all preceding allegations.

29.    Pursuant to U.S.C. § 1117(b), Plaintiff is entitled to a judgment for three times such profits or damages, as the Defendant did intentionally use the Plaintiff's mark knowing such mark is a counterfeit, in connection with the sale, offering for sale, or distribution of goods or services.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays for relief, and request this Honorable Court to render judgment as follows:

1. Finding jurisdiction over the subject matter and parties hereto;

2. Granting Plaintiff preliminary and permanent injunctive relief against Defendant, prohibiting the use of any of the Plaintiff's marks, colorable imitations, counterfeits, copies or any such mark that may cause confusion as described herein above.

3. Award Plaintiff Defendant's profits, damages sustained by the Plaintiff, and the cost of the action.

4. Award Plaintiff treble damages of three times the profits or damages assessed, whichever is greater, together with a reasonable attorney's fee.

5. Award such other relief as it deems just and equitable.

Dated this 30th day of October, 2015.

Respectfully Submitted,

**Marty Beurmann, Esq.**
Trial Attorney for Plaintiff
Florida Bar No.: 98873
GP Brands, Inc.
4941 4th Street
Zephyrhills, FL 33542
Phone: 813-782-1500
Fax: 813-782-1599
Email: legal@gpbrands.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing will be service with process.

Marty Beurmann, Esq.

# Exhibit

# "A"

Schedule A



Our registered Marks are described and depicted as follows:



| | |
|---|---|
| **Word Mark** | **GOIN' POSTAL** YOUR FRIENDLY NEIGHBORHOOD SHIPPING CENTER |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Serial Number** | 78372054 |
| **Filing Date** | February 23, 2004 |
| **Registration Number** | 3083574 |
| **Registration Date** | April 18, 2006 |
| **Owner** | (REGISTRANT) Goin' Postal Inc CORPORATION FLORIDA 4941 4th Street, Zephyrhills FLORIDA 33542 |
| | (LAST LISTED OWNER) Goin' Postal Franchise Corporation, CORPORATION FLORIDA, 4941 4th Street, Zephyrhills, FLORIDA 33542 (Assignment Recorded) |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

# GOIN' POSTAL

| | |
|---|---|
| **Word Mark** | **GOIN' POSTAL** |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Numbers** | 78856562 (Class 16), |
| **Filing Date** | April 7, 2006 |
| **Registration Number** | 3274805 |

| Registration Date | August 7, 2007 |
|---|---|

**Owner** (REGISTRANT) Goin' Postal Franchise Corporation, CORPORATION FLORIDA 4941 4th Street Zephyrhills FLORIDA 33542 (Assignment Recorded)

**Type of Mark** TRADEMARK. SERVICE MARK
**Register** PRINCIPAL
**Live/Dead Indicator** LIVE

# GOIN' POSTAL

**Word Mark** GOIN' POSTAL

**Mark Drawing Code** (4) STANDARD CHARACTER MARK

**Serial Numbers** 78978228 (Class 25)
**Filing Date** April 7, 2006

**Registration Number** 3283156

**Registration Date** August 21, 2007

**Owner** (REGISTRANT) Goin' Postal Franchise Corporation, CORPORATION FLORIDA 4941 4th Street Zephyrhills FLORIDA 33542 (Assignment Recorded)

**Type of Mark** TRADEMARK. SERVICE MARK
**Register** PRINCIPAL
**Live/Dead Indicator** LIVE

# GOIN' POSTAL

**Word Mark**   **GOIN' POSTAL**

**Mark Drawing Code**   (4) STANDARD CHARACTER MARK

**Serial Numbers** 78978229 (Class 35)
**Filing Date**   April 7, 2006

**Registration Number**   3302660

**Registration Date**   October 2, 2007

**Owner**   (REGISTRANT) Goin' Postal Franchise Corporation, CORPORATION FLORIDA 4941 4th Street Zephyrhills FLORIDA 33542 (Assignment Recorded)

**Type of Mark**   TRADEMARK. SERVICE MARK
**Register**   PRINCIPAL
**Live/Dead Indicator**   LIVE



**Word Mark**   GP

**Mark Drawing Code**   (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS

**Serial Number**   78856614

| | |
|---|---|
| **Filing Date** | April 7, 2006 |
| **Registration Number** | 3279690 |
| **Registration Date** | August 14, 2007 |
| **Owner** | (REGISTRANT) Goin' Postal Franchise Corporation, CORPORATION FLORIDA 4941 4th Street Zephyrhills FLORIDA 33542 (Assignment Recorded) |
| **Description of Mark** | The mark consists of Delivery man carrying package. |
| **Type of Mark** | TRADEMARK. SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

# Delivering the Best of America

| | |
|---|---|
| **Word Mark** | DELIVERING THE BEST OF AMERICA |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 78856660 |
| **Filing Date** | April 7, 2006 |
| **Registration Number** | 3360732 |
| **Registration Date** | December 25, 2007 |
| **Owner** | (REGISTRANT) Goin' Postal Franchise Corporation, CORPORATION FLORIDA 4941 4th Street Zephyrhills FLORIDA 33542 (Assignment Recorded) |

**Type of Mark**   TRADEMARK. SERVICE MARK

**Register**   PRINCIPAL

**Live/Dead Indicator**   LIVE

# GOIN' POSTAL

**Word Mark** GOIN' POSTAL

**Goods and Services** IC 039. US 100 105 G & S: Transportation services, namely arranging and managing shipping and delivery of goods and parcels for others by air and motor vehicle; packing of goods for others for transport by air and motor vehicle; arranging and managing postal services, namely, arranging and managing mail and parcel delivery; arranging delivery of documents, packages, and other freight for others by air or motor vehicle; transportation and delivery services, namely, arranging and managing same day shipment services; private mailbox rental. FIRST USE: 20031001. FIRST USE IN COMMERCE: 20031001

**Mark Drawing Code** (4) STANDARD CHARACTER MARK

**Serial Number** 78978230

**Filing Date** April 7, 2006

**Registration Number** 3654805

**Registration Date** July 14, 2009

**Owner** (REGISTRANT) GOIN' POSTAL FRANCHISE CORPORATION, FLORIDA 4941 4th STREET ZEPHYRHILLS FLORIDA 33542 (Assignment Recorded)

**Type of Mark** SERVICE MARK

**Register** PRINCIPAL

**Live/Dead Indicator** LIVE

# Postage for Patriots

**Word Mark** POSTAGE FOR PATRIOTS

**Goods and Services**  IC 036. US 100 101 102. G & S: Charitable fundraising services, namely organizing and conducting fundraising events and clothing drives and using proceeds to provide free postage and shipping for sending packages and mail to military overseas.

**Mark Drawing Code**  (4) STANDARD CHARACTER MARK

**Serial Number**  77843152

**Filing Date**  October 7, 2009

**Registration Number**  3887679

**Registration Date**  December 7, 2010

**Owner**  (APPLICANT) Goin' Postal Franchise Corporation; CORPORATION FLORIDA 4941 4th Street Zephyrhills Florida 33542

**Type of Mark** SERVICE MARK

**Register**  PRINCIPAL

**Live/Dead Indicator**  LIVE

# GP Postal

| | |
|---|---|
| **Word Mark** | **GP POSTAL** |
| **Goods and Services** | IC 039. US 100 105. G & S: Packaging and parcelling of goods for transport purposes, namely, the packing of goods using sustainable or biodegradable packaging and shipping materials; Parcel shipping services. FIRST USE: 20141023. FIRST USE IN COMMERCE: 20150117 |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 86506904 |

| | |
|---|---|
| **Filing Date** | January 19, 2015 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Owner** | (APPLICANT) Goin' Postal Franchise Corporation CORPORATION FLORIDA 4941 4th Street Zephyrhills FLORIDA 33542 |
| **Attorney of Record** | Marty Beurmann |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

# Exhibit
# "B"

**Assignment of Trademarks**

WHEREAS, **Goin' Postal Franchise Corporation** having an address at 4941 4th Street, Zephyrhills, FL 33542, (hereinafter "Assignor") has used or has the bona-fide intent-to-use the trademarks and service marks attached hereto in **Schedule A**, under common law and/or for which applications have been made at state, federal, and/or foreign offices and/or registrations issued thereon (hereinafter referred to as "the marks"); and

WHEREAS, **GP Brands, Inc.** having an address at 4941 4th Street, Zephyrhills, FL 33542, (hereinafter "Assignee") has succeeded to the business, assets and appurtenant goodwill to which the marks pertain and is desirous of acquiring any and all rights that Assignor may have in and to the marks worldwide, together with the goodwill of the business in connection with which the marks are used and which is symbolized by the marks, along with the right to recover for damages and profits for past infringements thereof;

NOW, THEREFORE, for good and valuable consideration, receipt of which is hereby acknowledged, Assignor does hereby assign unto Assignee all right, title, and interest in and to the marks, together with the goodwill of the business in connection with which the marks are used and which is symbolized by the marks, along with the right to recover for damages and profits for past infringements thereof;

Assignor agrees to execute and deliver at the request of the Assignee, all papers, instruments, and assignments, and to perform any other reasonable acts the Assignee may require in order to vest all Assignor's rights, title, and interest in and to the marks in the Assignee and/or to provide evidence to support any of the foregoing in the event such evidence is deemed necessary by the Assignee, to the extent such evidence is in the possession or control of Assignor.

Date:  7/15/15

Assignor

**Goin' Postal Franchise Corporation**

By:

Name: MARCUS  PRICE
Title: CEO

Assignee

**GP Brands, Inc.**

By:

Name: MARCUS  PRICE
Title: CEO

# Exhibit

# "C"

# FRANCHISE DISCLOSURE DOCUMENT

Goin' Postal Franchise Corporation
a Florida Corporation
4941 4th Street
Zephyrhills, FL 33542
Telephone Number: (813) 782-1500
E-Mail: franchises@goinpostal.com
Website: www.goinpostal.com



Upon becoming a Goin' Postal franchisee, the franchisee will own and operate a Goin' Postal shipping Store. Through this Goin' Postal shipping Store, the franchisee will be operating a retail business which primarily involves the packaging and shipping of goods and parcels and related postal business services and supplies. We offer two (2) different variations of the Goin' Postal franchise, as more fully discussed in Item 5, Item 7 and elsewhere in this Disclosure Document: (i) a Standard Goin' Postal Franchise, and (ii) a Turn-Key Franchise. The total investment necessary to begin operation of a Standard Goin' Postal Franchise is between $48,784.00 and $96,284.00 (see Item 7 below). This includes the sum of $15,000.00 which must be paid to us as the franchisor for the Initial Franchise Fee. You must also pay to us the sum of $9,284.00 for the purchase of some mandatory start-up supplies and equipment for your Store, which includes two (2) Point of Sale Systems and miscellaneous required minimum purchases (see Item 5 below). The total investment necessary to begin operation of a Turn-Key Goin' Postal Franchise is between $129,000.00 and $135,500.00 (see Item 7 below). This includes the sum of $117,000.00 which must be paid to us as the franchisor (see Item 5 below).

This Disclosure Document summarizes certain provisions of your Franchise Agreement and other information in plain English. Read this Disclosure Document and all accompanying agreements carefully. You must receive this Disclosure Document at least 14 calendar-days before you sign a binding agreement with, or make any payment to, the franchisor or an affiliate in connection with the proposed franchise sale. **Note, however, that no governmental agency has verified the information contained in this document.**

You may have obtained this Franchise Disclosure Document and other disclosure documents by e-mail or other electronic format. You may wish to receive your Disclosure Document in another format that is more convenient for you. To discuss the availability of disclosures in different formats, contact either Marcus Price or M.J. Price at 4941 4th Street, Zephyrhills, Florida 33542 and (813) 782-1500.

The terms of your contract will govern your franchise relationship. Don't rely on the Disclosure Document alone to understand your contract. Read all of your contract carefully. Show your contract and this Disclosure Document to an advisor, like a lawyer or an accountant.

Buying a franchise is a complex investment. The information in this Disclosure Document can help you make up your mind. More information on franchising, such as "A Consumer's Guide to Buying a Franchise", which can help you understand how to use this Disclosure Document, is available from the Federal Trade Commission. You can contact the FTC at 1-877-FTC-HELP or by writing to the FTC at 600 Pennsylvania Avenue, NW, Washington, D.C. 20580. You can also visit the FTC's home page at www.ftc.gov for additional information. Call your state agency or visit your public library for other sources of information on franchising.

I                    Franchisee's Initials 

There may also be laws on franchising in your state.  Ask your state agencies about them.

You will need to follow the Instructions attached to this Disclosure Document as **Exhibit "G"** if you are interested in pursuing the purchase of a Goin' Postal Franchise.  If you reside in any State requiring registration, no offer or sale of a Goin' Postal franchise will be made to you until we have first complied with those registration laws. **If applicable, additional disclosures which may be required by your State are set forth in Exhibit "H" to this Disclosure Document.**

To simplify the language used in this Disclosure Document, the words "Goin' Postal Franchise Corporation", "GPFC", "we", "our" and "us", and the "Franchisor", all refer to Goin' Postal Franchise Corporation, the franchisor.  "You" and "your" means the person or entity who buys the Goin' Postal franchise from us.

Issuance/Effective Date: * _____ */0/16/09*_____

**\*See State Effective Date Exhibit   which follows immediately after the State Cover Page for Registration and Exemption State Effective Dates; in all other States the Issuance Date and Effective Date of this Disclosure Document is March 20, 2009.**

2        Franchisee's Initials ___ _EB___ ___

## STATE COVER PAGE

Your state may have a franchise law that requires a franchisor to register or file with a state franchise administrator before offering or selling in your state. REGISTRATION OF A FRANCHISE BY A STATE DOES NOT MEAN THAT THE STATE RECOMMENDS THE FRANCHISE OR HAS VERIFIED THE INFORMATION IN THIS DISCLOSURE DOCUMENT.

Call the state franchise administrator listed in **Exhibit "E"** for information about the franchisor, or about franchising in your state.

MANY FRANCHISE AGREEMENTS DO NOT ALLOW YOU TO RENEW UNCONDITIONALLY AFTER THE INITIAL TERM EXPIRES. YOU MAY HAVE TO SIGN A NEW AGREEMENT WITH DIFFERENT TERMS AND CONDITIONS IN·ORDER TO CONTINUE TO OPERATE YOUR BUSINESS. BEFORE YOU BUY, CONSIDER WHAT RIGHTS YOU HAVE TO RENEW YOUR FRANCHISE, IF ANY, AND WHAT TERMS YOU MIGHT HAVE TO ACCEPT IN ORDER TO RENEW.

Please consider the following RISK FACTORS before you buy this Franchise:

1.  THE FRANCHISE AGREEMENT REQUIRES YOU TO RESOLVE DISPUTES WITH US BY MEDIATION (AND IF UNSUCCESSFUL, LITIGATION) ONLY IN FLORIDA. OUT-OF-STATE MEDIATION AND LITIGATION MAY FORCE YOU TO ACCEPT A LESS FAVORABLE SETTLEMENT FOR DISPUTES. IT MAY ALSO COST YOU MORE TO MEDIATE AND LITIGATE WITH US IN FLORIDA THAN IN YOUR OWN STATE.

2.  THE FRANCHISE AGREEMENT STATES THAT FLORIDA LAW GOVERNS THE AGREEMENT, AND THIS LAW MAY NOT PROVIDE THE SAME PROTECTIONS AND BENEFITS AS LOCAL LAW. YOU MAY WANT TO COMPARE THESE LAWS.

3.  THERE MAY BE OTHER RISKS CONCERNING THIS FRANCHISE.

4.  IF APPLICABLE, ADDITIONAL DISCLOSURES AND RISK FACTORS WHICH MAY BE REQUIRED BY YOUR STATE ARE SET FORTH IN **EXHIBIT "H"** TO THIS DISCLOSURE DOCUMENT.

Effective Date: _10/16/09_

**\*See State Effective Date Exhibit  which follows immediately after this State Cover Page for Registration and Exemption State Effective Dates; in all other States the Issuance Date and Effective Date of this Disclosure Document is March 20, 2009.**

3          Franchisee's Initials _____

## STATE EFFECTIVE DATES EXHIBIT

The following States require that the Franchise Disclosure Document be registered or filed with the State, or be exempt from registration: California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Rhode Island, South Dakota, Virginia, Washington and Wisconsin.

This Franchise Disclosure Document is registered, on file, or exempt from registration in each of the following States having franchise registration and disclosure laws (or requiring an exemption notice under business opportunity laws), with the following effective date indicated for each individual State below:

| State | Registration Effective Date | Exemption Effective Date |
|---|---|---|
| California | April 8, 2008 [renewed] | |
| Florida | | May 10, 2000 [renewed] |
| Hawaii | April 7, 2009 [renewed] | |
| Illinois | October 20, 2008 [renewed] | |
| Indiana | March 27, 2009 [renewed] | |
| Maryland | November 13, 2008 | |
| Michigan | March 28, 2009 [renewed] | |
| Minnesota | October 4, 2005, as amended April 1, 2008 | |
| Nebraska | | August 19, 2005 |
| New York | August 18, 2005, as amended April 17, 2009 | |
| North Dakota | April 22, 2009 [renewed] | |
| Rhode Island | May 1, 2009 [renewed] | |
| South Dakota | March 27, 2009 [renewed] | |
| Texas | | May 10, 2005 |
| Utah | | June 28, 2008 [renewed] |
| Virginia | May 10, 2009 [renewal] | |
| Washington | May 27, 2008 [renewed] | |
| Wisconsin | June 5, 2008, | |

In all other States where filing for the registration or exemption of Goin' Postal franchises is not required, the effective date of this Disclosure Document is the issuance date of March 20, 2009.

4          Franchisee's Initials _____

## TABLE OF CONTENTS

ITEM                                                                                    PAGE

1    The Franchisor, and any Parents, Predecessors, and Affiliates                      6
2    Business Experience                                                                9
3    Litigation                                                                         11
4    Bankruptcy                                                                         11
5    Initial Fees                                                                       11
6    Other Fees                                                                         15
7    Estimated Initial Investment                                                       18
8    Restrictions on Sources of Products and Services                                   22
9    Franchisee's Obligations                                                           25
10   Financing                                                                          26
11   Franchisor's Assistance, Advertising, Computer Systems, and Training               26
12   Territory                                                                          49
13   Trademarks                                                                         52
14   Patents, Copyrights, and Proprietary Information                                   60
15   Obligation to Participate in the Actual Operation of the Franchise Business        61
16   Restrictions on What the Franchisee May Sell                                       61
17   Renewal, Termination, Transfer and Dispute Resolution                              62
18   Public Figures                                                                     65
19   Financial Performance Representations                                              65
20   Outlets and Franchisee Information                                                 66
21   Financial Statements                                                               83
22   Contracts                                                                          84
23   Receipts                                                                           85

## Exhibits

A.   Franchise Agreement                                                                87
B.   Non-Competition and Non-Solicitation Agreement                                     132
C.   Personal Data Disclosure and Franchisee Ownership Information Form                 137
D.   Credit Card and Designated Account Authorization Form                              140
E.   Listing of State Administrators, and Agents for
     Service of Process                                                                 141
F.   Pre-Approved Products and Services                                                 146
G.   Instructions                                                                       147
H.   State Specific Addendum (as applicable)                                            150
I.   Financial Statements                                                               169
J.   Turn-Key Store Agreement (as applicable)                                           209
K.   Continuing Personal Guaranty (as applicable)                                       221

Receipts:  Two Receipts appear at the end of this Disclosure Document

Franchisee's Initials _____ 𝓒𝓑 _____

## ITEM 1:    THE FRANCHISOR, AND ANY PARENTS, PREDECESSORS AND AFFILIATES

### The Franchisor and its Predecessor – General Information

Goin' Postal Franchise Corporation (often referred to in this Disclosure Document simply as "GPFC") is a Florida corporation which was incorporated in Florida on August 13, 2004. We maintain our principal place of business and corporate headquarters at 4941 4th Street in Zephyrhills, Florida 33542. We conduct business under the name Goin' Postal, which is part of the trademarks/service marks our predecessor, Goin' Postal, Inc. registered and filed for registration with the United States Patent and Trademark Office and which we purchased from Goin' Postal, Inc. in January, 2007 (see Item 13 of this Disclosure Document). In conjunction with two (2) separate franchise brands we offer and sale which are totally unrelated and not part of the Goin' Postal franchise you will own and operate pursuant to this Disclosure Document, we also conduct business under the names "einSigns" and "Hut No. 8" (the respective brand names of our separate and independent franchise offerings). We have a predecessor, Goin' Postal, Inc., which maintains the same principal business address that we do. We and our predecessor previously maintained our principal address at 38439 5th Avenue, Zephyrhills, Florida 33542. We are not a subsidiary of any entity and as such we do not have a parent.

Agent for service of process in the State of Florida:

Attorney Robert W Bible, Jr., Lopez, Kelly & Bible, PA., 4100 W. Kennedy Blvd., Suite 114, Tampa, Florida, 33609.

Agent for service of process in your State:

Various State regulatory agencies may require that we designate an agent for service of process in that particular State. In those instances, the specific agent will be reflected on the Item 23 RECEIPT and/or in the attached **Exhibit "E"**.

### The Franchisor's Business

A prior affiliate of ours, Goin' Postal Tampa Fowler, Inc. sold its franchised store located in Tampa, Florida, to an independent third party in early 2005, and has since dissolved as a Florida corporation. On January 2, 2007, we purchased all of the assets of a prior affiliate of ours, Goin' Postal Zephyrhills, Inc., consisting of the Goin' Postal shipping Store in Zephyrhills, Florida, which Goin' Postal Zephyrhills, Inc. operated since it was incorporated in January 2005. Goin' Postal Zephyrhills, Inc. was owned by the same individuals who own Goin' Postal Franchise Corporation. Goin' Postal Zephyrhills, Inc. was dissolved in mid-2007. The Goin' Postal shipping Store which we acquired from our former affiliate, Goin' Postal Zephyrhills, Inc., is now owned and operated by us and is a business of the type being franchised pursuant to this Disclosure Document. As a result of our acquisition of the Store previously owned and operated by Goin' Postal Zephyrhills, Inc., there are currently no affiliate owned Stores. We intend to expand our ownership of Goin' Postal Stores in the future.

On January 2, 2007, we purchased the assets of Life Size Greetings, Inc., a Florida corporation owned by our Chief Executive Officer (Marcus Price), our President (M.J. Price), and another of our employees (Robert Stephens).  Our acquisition of the assets and business of Life Size Greetings, Inc. resulted in our establishment of a merchandise production department for our Goin' Postal franchise chain. We also continue to conduct the online retail business we acquired from Life Size Greetings, Inc. (www.lifesizegreetings.com) consisting of the retail sale to the public of life sized yard decorations, greeting cards and stand-up photographs manufactured, produced and sold by our recently established LifeSize Greetings division.

6            Franchisee's Initials _____ 

We operate an online store for the sale of ink and toner and office supplies, and our website associated with this online store is (www.goinpostalsuppplies.com). These products are sold both to the general public and to our franchisees as an additional product line able to be sold at their Goin' Postal Stores (see Item 8 discussion below).

We presently own and operate one (1) retail sign business under our trademark "einSigns" which offers sign services from its business location to both businesses and consumers. We also presently own and operate one (1) retail consignment store under our trademark "Hut no. 8" which buys and resells barely used brand name clothing aimed at customers within an age range of 13 years through 40 years. Both of these businesses and the company-owned stores from which they operate form the respective business models we have used to initiate and offer for sale two separate independent franchise brands. These two separate franchise brands are offered for sale under separate Franchise Disclosure Documents and separate Franchise Agreements and no solicitation or offer for either of those separate and independent franchises is being made by or in this Goin' Postal Franchise Disclosure Document.

### Special Industry Regulation.

Various Federal, State, and local laws may govern or impact the operation of your business. Examples include but are not limited to: The United States Postal Service which requires several forms, including forms 1583 and 1583-A. Laws also regulate the shipment of certain items such as firearms, livestock, produce, alcohol and tobacco products. Notary services require training and bonds as regulated by your state of residence. Selling certain services such as money orders or taking credit cards may be impacted by your credit. While we continually negotiate with carriers on behalf of our franchisees, we cannot guarantee the continuation of any retail shipping program you may offer to national chains or on an individual basis.

### The Franchisee's Business

Goin' Postal Stores ("Stores") are retail service businesses which offer packaging, shipping and mailing services and various office services, all provided through a variety of carriers, vendors and service providers. Among the office services provided are fax, copying, notary and the sale of office supplies. Goin' Postal Stores are targeted at both business and private customers. With Goin' Postal's relationship with the major carriers, The United States Post Office, and various freight companies, Goin' Postal Stores can offer a wide variety of options for consumers.

The market for the services you will be selling is fairly developed and well established, and the goods and services you will offer will be sold to the general public. You will have to compete for a share of this market with other businesses and companies offering the same services, including, for example, UPS Stores and various branch locations of the United States Post Office. Generally, Goin' Postal Stores do a larger volume of business during the Christmas Holiday Season than during other periods of the year.

You will sign a Franchise Agreement (**Exhibit "A"**) to operate a single Goin' Postal Store at a location of your choice, subject to any territorial rights of other franchisees. Generally Stores are located in high visibility and high traffic areas. While we may advise you against a certain location, you will have the final decision on any currently unrestricted location. Although, with our prior approval and subject to conditions applicable to all Goin' Postal Stores, you may be entitled to purchase and own more than one Goin' Postal Store (See Item 11 and Item 12 of this Disclosure Document), each Goin' Postal Store will be subject to the fees under Item 5 and Item 6 (see immediately below, however, for current franchise fee arrangements offered to franchisees who open additional Stores), require that you sign the Franchise Agreement and all other agreements then in effect, and otherwise be subject to all the terms and conditions of purchasing, owning and operating a Goin' Postal franchise as set forth in this Disclosure Document (as amended from time to time and in effect at the time of purchase). At the present time, we have implemented a program for those of our franchisees who purchase from us one or more

additional Goin' Postal Store franchises pursuant to which the franchise fee payable to us by such franchisee for each additional Store franchise purchased will not exceed the initial franchise fee such franchisee paid to us for the purchase of their initial Goin' Postal Store franchise (see Item 5 for more details).

In addition to our "traditional" Goin' Postal franchise offering (a "Standard Goin' Postal Franchise"), we offer a Turn-Key Franchise Package to assist those franchisees who are either too busy to personally set-up and establish their own Store, or who for other reasons would prefer having us set-up and establish their Store rather than personally investing the time and labor to do it themselves.  Under the Turn-Key Franchise Package, we will assist you in: (a) locating and negotiating the lease for your desired Store location (though we do not serve as legal counsel or in any other professional or advisory capacity); (b) procuring and installing required equipment, furnishings, fixtures, signs and décor as required by us; (c) completing Store build-out consistent with our Standards and preparing the Store for opening for business as required by our Disclosure Document and the Standards, Specifications, Systems and Methods we have established; and (d) training as detailed in our Disclosure Document.  If you desire to purchase one of our Turn-Key Franchise Packages, you must complete and sign a Turn-Key Store Agreement (**Exhibit "J"**) in addition to the other documents you are required to sign under this Disclosure Document.  See Item 5 and Item 11 of this Disclosure Document for a detailed description of the Turn-Key Franchise Package and see Item 7 for a description of the current initial investment required for a Turn-Key Franchise Package.

Until the later part of 2008, we also offered an Express Kiosk Franchise Package to individuals or companies who already owned and operated a high traffic business such as a convenience store, gift shop, supermarket, mall store, computer store or department store and who desired to incorporate as an adjunct to such existing business a Goin' Postal Express Kiosk.  Under the Express Kiosk Franchise Package, a franchisee was able to offer DHL and United States Postal shipping and mail services and was also able to sell a selection of inventory such as packaging supplies, stamps, ink and toner supplies, and office supplies, both by on-site retail and delivery service.   As a result of DHL ceasing its domestic shipping services, we no longer offer any type of Kiosk franchise package and we allowed all those franchisees who previously purchased an Express Kiosk Franchise Package to terminate their franchise agreements without penalty. However, these franchisees remained bound by the Non-Competition and Non-Solicitation Agreement and all other provisions of the Franchise Agreement applicable upon termination of a franchise.

## Prior Business Experience of Franchisor, Its Predecessor and Affiliates

We have been offering franchises since the beginning of September, 2004, and with the franchised Stores we took over from our predecessor, Goin' Postal, Inc, our franchise network, as of December 31, 2008 consisted of 284 franchised Store locations (including the one franchisor owned Store referenced below), but is expected to continue expanding rapidly.

Goin' Postal Franchises were previously sold starting in the beginning of 2004 by Goin' Postal, Inc.  Our predecessor, Goin' Postal, Inc. also is a Florida corporation which was incorporated in Florida on September 17, 2002 and was originally formed to own its own Goin' Postal shipping Stores.  Goin' Postal, Inc. ceased offering Goin' Postal Franchises around the beginning of September 2004, which is when we took over the Goin' Postal franchising operations (see detailed discussion of the trademark/service marks we purchased from Goin' Postal, Inc. under Item 13 of this Disclosure Document).  Goin' Postal, Inc. initially established 9 Goin' Postal franchises under a pilot program to determine the viability and market acceptance of the Goin' Postal shipping Stores.  The 9 initial pilot franchises each paid a $10,000.00 initial franchise fee, but do not pay royalties, marketing fees nor any other continuing fees.  Goin' Postal, Inc. also established 2 additional Goin' Postal franchises, each of whom pay royalty and marketing fees. Goin' Postal, Inc. transferred all 9 of these pilot franchises and the 2 additional franchises to us, and Goin' Postal, Inc. does not operate any Goin' Postal franchises or Stores.  On January 2,

2007, we purchased from Goin' Postal, Inc. all rights, title and interest in the trademarks used by us. Goin' Postal, Inc., which is privately held by the same individual owners of Goin' Postal Franchise Corporation, presently conducts no business operations.

Our predecessor, Goin' Postal, Inc. operated a shipping Store of the type being franchised pursuant to this Disclosure Document for 3 years before that Store became the franchised Store previously operated by our affiliate, Goin' Postal Zephyrhills, Inc., and now, as of January, 2007 owned and operated by us.

## Current and Possible Other Future Franchise Lines

We presently offer two (2) other franchises under separate and independent brands, in different lines of business, and pursuant to their own separate and independent Franchise Disclosure Documents. As discussed below, we have plans to expand our franchise brands in the future.

We have developed a new franchise offering pursuant to separate Uniform Franchise Disclosure Document which primarily involves the retail sales to the public of custom designed signs. Although we have developed this franchise using the "Skywatch Signs" business model (but under the trademark of "einSigns"), we are still fine tuning the development of a UFDD, form of franchise agreement and marketing program for this franchise concept. We have also developed a retail consignment franchise offering pursuant to separate Uniform Franchise Disclosure Document, under our trademark "Hut no. 8", which involves the resale at retail of slightly used brand name clothing. We are still fine tuning the development of a UFDD, form of franchise agreement and marketing program for this franchise concept. Once fully developed, we do not anticipate that either the "einSigns" franchise business or Hut no. 8 franchise business will compete with your Goin' Postal franchise.

Our Goin' Postal franchisees are able to purchase for resale in their Stores, at discounted prices, one or more of the ink/toner/office supply packages available from our online store at www.goinpostalsupplies.com (see Item 8 discussion). Goin' Postal franchisees who choose to offer the ink and toner products may be in competition with our online store (see commission opportunities available to our Goin' Postal franchisees in the Item 8 discussion).

Neither of our prior affiliates, Goin' Postal Tampa Fowler, Inc. and Goin' Postal Zephyrhills, Inc., have ever conducted business in any other line of business and have never offered franchises in the type of business the franchisee will operate, nor in any other line of business. Our predecessor, Goin' Postal, Inc., has never conducted business in any other line of business and has never offered franchises in any other line of business.

## ITEM 2:      BUSINESS EXPERIENCE

### Marcus Price: Chief Executive Officer, Director

Marcus Price served as the President of Goin' Postal Franchise Corporation since its formation in August of 2004 through December 2006, and has been the President of our predecessor, Goin' Postal, Inc. since its formation in September of 2002. In December 2006, Marcus Price was elected Chief Executive Officer of Goin' Postal Franchise Corporation.   Marcus Price is responsible for overseeing all aspects of the franchising operation.

Marcus Price and M.J. Price together formed the first Goin' Postal shipping store in Zephyrhills, Florida in late 2002.

Marcus Price served as Vice President of Life Size Greetings, Inc. located in Zephyrhills, Florida, until we purchased the assets of Life Size Greetings, Inc. in early 2007.

9          Franchisee's Initials _____

## MJ Price; President, Director

MJ Price served as the Vice President of Goin' Postal Franchise Corporation since its formation in August of 2004 through December 2006, and has been the Vice-President of our predecessor, Goin' Postal, Inc., since its formation in September of 2002.  In December 2006, MJ Price was elected President of Goin' Postal Franchise Corporation. MJ Price is responsible for franchise sales and franchisee relations, and editing and contributing to the Goin' Postal Store Owners' Manual, training materials, website materials, and advertising/promotional materials.

M.J. Price has worked at various times from September 2001 through January 2003 as a reporter, writer, photographer and editor for a number of publications, including The Pasco News, Zephyrhills Sun, East Pasco's Discover Magazine and the Carrollwood Forum News.  She has written three books, The Pet Sitter's Diary and The Jam-Packed Pet Information Manual, The Prescription for Happiness, and The Street, all of which were published between 1999 and 2004.

## James Hall: General Manager, Goin' Postal Franchise Corporation

James Hall joined Goin' Postal Franchise Corporation in January 2005 and served as one of our National Representatives until December 2006.   As a National Representative he was responsible for assisting with Franchisee Store location set-ups, training and travel.  James Hall became our General Manager in January 2006, and in such position, oversees all Goin' Postal Franchise Corporation day-to-day operations at our corporate headquarters.

From November 2003 until December 31, 2004, James Hall was employed as a computer repair technician with Getronics in Tampa, Florida.

## Larry Kottke: Vice President, Goin' Postal Division

Larry Kottke joined Goin' Postal Franchise Corporation in October 2004 and served as National Representative until June 2008.  As National Representative he was responsible for assisting with Franchisee Store location set-ups, training and travel.  In June 2008, Larry Kottke was elected Vice President of our Goin' Postal division overseeing franchisee and vendor relations, training implementation and brand management associated with our Goin' Postal franchises.

From January 1, 2004 until October 2004, Larry Kottke was self-employed as a resource/marketing consultant.

## Current Store Owners

Two franchisee Store owners currently provide us solely with additional Store set-up and operations support for current and new franchisees pursuant to separate Regional Directorship Agreements.  The 2 Regional Directors, and their respective regions, are presently as follows:

Victor Hui-Wee
Phone:  (269) 685-8015
Region: Michigan, Illinois, Indiana, Wisconsin and Ohio

Charles Kramer
Phone: (336) 659-4534
Territory: North Carolina, South Carolina, West Virginia, Kentucky and Tennessee

Under these Regional Directorship Agreements, Victor Hui-Wee and Charles Kramer receive compensation to help set-up franchised Stores (and train the franchisee owners and employees of such Stores on-site) within their assigned regions and for assisting franchisees in their respective regions with ongoing operational inquiries.   NEITHER VICTOR HUI-WEE NOR CHARLES KRAMER ARE AUTHORIZED OR PERMITTED IN ANY WAY TO SOLICIT, OFFER,

ADVERTISE OR SELL GOIN' POSTAL FRANCHISES, AND NO SOLICITATION, OFFER, ADVERTISEMENT OR SALE OF ANY GOIN' POSTAL FRANCHISE MAY BE MADE EXCEPT BY AND THROUGH MARCUS PRICE OR M.J. PRICE.

At the present time, we are not offering any new Regional Directorships. We are also in the process of effecting a buy-out and cancellation of both of these Regional Directorships.

## ITEM 3:        LITIGATION:

Neither Goin' Postal Franchise Corporation, our predecessor, Goin' Postal, Inc., nor any of our principal officers, directors or individuals having management responsibility relating to the sale or operation of Goin' Postal franchises offered by this Disclosure Document have any current or prior litigation required to be disclosed in this Disclosure Document except for the following:

### Offer of Rescission to Virginia Franchisees:

By virtue of a settlement reached on March 1, 2006 with the Virginia Division of Securities and Retail Franchising (the "Virginia Division") resulting from an investigation conducted by the Virginia Division to determine whether we had sold unregistered franchises in the State of Virginia and/or sold franchises in the State of Virginia without providing required disclosure documents, we sent Offers of Rescission to two Virginia franchisees, Keith and Michele ("Mickie") Nance and Jose Flores, both of whom rejected the Offer of Rescission and chose instead to remain a Goin' Postal franchisee.

### Other Matters:

Goin' Postal Franchise Corporation regularly engages in ordinary routine litigation and other legal action in the ordinary course of and incidental to our business, including actions against others to protect our intellectual property (such as our trademarks and copyrights).

## ITEM 4:      BANKRUPTCY

Except as reflected below, no bankruptcy information is required to be disclosed in this Disclosure Document.

GPFC's General Manager, James Hall, filed a bankruptcy petition under the liquidation provisions of Chapter 7 of the U.S. Bankruptcy Code on June 13, 2002, in the United States Bankruptcy Court, Middle District of Florida, Tampa Division, as Chapter 7 Case Number 02-08447-8W7.  On August 15, 2002, the Bankruptcy Court entered a discharge.

## ITEM 5:       INITIAL FEES

### Initial Franchise Fee -- Standard Franchise Package

To purchase a Standard Goin' Postal Franchise, you will pay an initial lump sum franchise fee of $15,000.00 which is due at the time you sign and submit the Franchise Agreement. This initial franchise fee is fully earned and non-refundable unless you are rejected by Goin' Postal Franchise Corporation as a franchisee as a result of your desired territory and/or location not being available, or for any other reason, in which case Goin' Postal Franchise Corporation will refund the entire amount. The $15,000.00 franchise fee may be paid by check, credit card (Visa, MasterCard, Amex, Discover), electronic funds transfer or cash. The initial franchise fee is in consideration of administrative and other expenses incurred by us in entering into the Franchise Agreement and for our lost or deferred opportunity to enter into a Franchise Agreement with others.  For these reasons, once you have signed your franchise documents, you are bound by

the Non-Competition and Non-Solicitation Agreement (see **Exhibit "B"** to this Disclosure Document) until the end of the non-competition term of that Agreement (subject to any applicable State limits under Item 17 or **Exhibit "H"** of this Disclosure Document).

Except for certain discounts we may offer as described below, all new purchasers of a Goin' Postal franchise and all existing franchisees who purchase a new additional Goin' Postal Store franchise from us pay this uniform initial franchise fee.

## Initial Franchise Fee – Turn-Key Franchise Package

We offer a Goin' Postal Turn-Key Franchise Package. The Turn-Key Franchise Package is structured for those franchisees who wish to purchase a Goin' Postal Franchise, but do not want to personally set-up and make ready for opening their Goin' Postal Store. A purchaser of a Turn-Key Franchise Package will pay the same $15,000.00 initial lump sum franchise fee as purchasers of a Standard Goin' Postal Franchise pay (see general discussion of the initial franchise fee earlier in this Item 5). In addition to the $15,000.00 sum consisting of the initial franchise fee, a purchaser of a Turn-Key Franchise Package must also make a separate payment to us in the sum of $102,000.00 for the purchase of a complete Store set-up service package which is separate from and in addition to your purchase of a Goin' Postal franchise. The $15,000.00 initial franchise fee required for the purchase of a Turn-Key Franchise Package is due at the time a purchaser of this package signs and submits the Franchise Agreement (**Exhibit "A"**) and other agreements required under the purchase of a Standard Goin' Postal Franchise. In addition, a purchaser of a Turn-Key Franchise Package must sign and submit the Turn-Key Store Agreement (**Exhibit "J"**) and submit a separate payment in the amount of $102,000.00 at the same time as and together with payment of the $15,000.00 sum stated previously and delivery of the signed Franchise Agreement and other required agreements (see **Exhibit "G"** Instructions).   The $15,000.00 initial franchise fee payment is payable by using the same methods of payment available for making payment of the initial franchise fee under a Standard Goin' Postal Franchise.   The separate $102,000.00 Turn-Key payment may be made only by check.  The terms of refundability for the Turn-Key Franchise Package initial franchise fee and Point of Sale System costs are the same as with a Standard Goin' Postal Franchise.   The additional $102,000.00 payment required for the purchase of a Turn-Key Franchise Package is broken down into the various categories of services and products provided under Item 11 of the Disclosure Document below and in the Turn-Key Store Agreement itself (**Exhibit "J"**).  Once any particular cost, or part thereof, is paid or incurred, it is non-refundable.

## Franchisee Fee – Additional Stores

At the present time, we have implemented a program for those of our franchisees who purchase from us one or more additional Goin' Postal Store franchises pursuant to which the franchise fee payable to us by such franchisee for each additional Store franchise purchased will not exceed the initial franchise fee such franchisee paid to us for the purchase of their initial Goin' Postal Store franchise.  To qualify for this stable franchise fee program, you must concurrently own another Goin' Postal Store franchise (the stable franchise fee is not granted based upon former ownership) and the percentage ownership structure of the additional Goin' Postal Store franchise must be identical to the percentage ownership structure of the initial Goin' Postal Store franchise.

For Goin' Postal franchisees purchasing their fourth (4th) and subsequent Goin' Postal franchise locations from us, we will waive the Initial Franchise Fee on that franchisee's purchase of such fourth (4th) and each subsequent Goin' Postal franchise. However, the franchisee will be required to pay all other fees applicable to the purchase of those Goin' Postal franchises and shall otherwise be bound by all other terms and conditions of the then current Franchise Agreement and all other agreements required to be executed by Goin' Postal franchisees at such time.

We may end or change either of these policies, impose rules or conditions, or implement other discount programs, as and whenever we choose.

## Initial Franchise Fee – Conversion

We may offer a discounted initial franchise fee for the conversion of an existing independently owned shipping and packaging (or related) business to a Goin' Postal Store, at our discretion.

## Referral Fees

If you become a Goin' Postal franchisee, and after such time you complete and send us a "referral form" which clearly identifies you as the party making the referral, and refers to us a prospective franchisee for a new Goin' Postal Store (not as part of a transfer), and your referral actually purchases a franchise for a new Goin' Postal Store, we may (and we reserve the right to or not to, at our discretion) provide you with a referral fee which may consist of cash, merchandise, or, depending upon the circumstances and provided we are legally permitted to do so, common stock in Goin' Postal Franchise Corporation. We may implement, end or change this policy, and impose rules or conditions, whenever we choose. We do not expect or want you to be involved in the offering or sales process, and you are strictly prohibited from doing so. You simply are passing along to us the name of someone you know who might be interested in acquiring a new Goin' Postal franchise.

## Point Of Sale Systems

You must purchase two (2) Point of Sale Systems from us with pre-installed software, both of which are included as part of the mandatory Required Minimum Purchases as detailed below (all Turn-Key Franchise Package purchasers also purchase two Point of Sale Systems). Each Point Of Sale System will be composed of a PC and monitor, Point Of Sale software and hardware (cash drawer, thermal receipt printer and credit card reader), our proprietary software GP Rate Pro, QuickBooks Pro, UPS shipping software, and FedEx shipping software. Costs for shipping of the Point of Sale Systems to your location will be charged to your credit card on file or must otherwise be paid for in advance, unless you are purchasing the optional Turn-Key Franchise Package, in which case the shipping costs are included in the additional Turn-Key Franchise Package fee. If you choose to purchase additional Point of Sale Systems for your Store at the Location, your total system will consist of your two primary Point of Sale Systems, each additional Point Of Sale System, and all networking equipment and configuration. The total cost for each additional Point of Sale System will currently be approximately $2,800.00 each.

These Point of Sale Systems and Software may be paid for by check, credit card, or through an electronic funds transfer arrangement, and are purchased as part of your Required Minimum Purchases detailed below. Once you pay us the cost for your Required Minimum Purchases, which includes your two Point of Sale Systems (as detailed below), those costs are non-refundable, even if you fail to ultimately open a Goin' Postal Store. Your required Point of Sale Systems, once ordered and paid for, will be shipped to your designated location, even if you do not open a Store; however, if you do not open a Store, none of the Point of Sale Systems will contain any of our GP Rate Pro software or other proprietary information, as all of our proprietary software and data will be deleted from each System. If we are shipping the equipment to a location in Florida, you will also be responsible for sales tax.

All new purchasers of either a Standard Goin' Postal Franchise or Turn-Key Franchise Package, and all existing franchisees who purchase a new additional Goin' Postal Store franchise from us, must purchase two Point of Sale Systems from us as described above for each Goin' Postal Store.

## Required Minimum Purchases

You must purchase from us for a total cost of $9,284.00 the following items we require you to have at your Store prior to the time of the final on-site training and Store opening. Your order and

payment for these items must be received by us at the time you sign and deliver the Franchise Agreement, to be paid to us together with your initial franchise fee at our Headquarters in Zephyrhills, Florida (the items are already included as part of a Turn-Key Franchise Package:

| Item | Qty | Total |
|------|-----|-------|
| Point of Sale Systems | 2 | $7,500.00 |
| Counter/ Wall Signs | 1 | $ 299.00 |
| Window Sign | 1 | $ 295.00 |
| Embroidered Shirts | 6 | $ 114.00 |
| Rubber Stamp Set | 1 | $ 50.00 |
| 1000 Shipping Forms | 1 | $ 50.00 |
| Printed Shirts | 3 | $ 30.00 |
| Wall Display | 1 | $ 99.00 |
| Thermal Label Printer | 1 | $ 349.00 |
| 150lb. Scales | 2 | $ 498.00 |
| **Total** | | **$9,284.00** |

The entire $9,284.00 is due in full at the time of payment of the required initial franchise fee, and may be paid by check, credit card or through an electronic funds transfer arrangement. All new purchasers of a Standard Goin' Postal franchise and all existing franchisees who purchase a new additional Goin' Postal Store franchise from us must purchase from us these required items. We reserve the right to increase these prices in line with inflation and/or when our costs to purchase these items increases. If you are purchasing the optional Turn-Key Franchise Package, these items are already included as part of that package, and therefore do not need to be purchased separately.

**Franchisor's Surety Bond – States of California, Minnesota and North Dakota**

We have procured a Franchisor's Surety Bond issued by Wachovia Insurance Services, Inc. as agent for Platte River Insurance Company as part of our franchise registration in the States of California, Minnesota and North Dakota. In California, the Bond is issued in favor of the Commissioner of Corporations of the State of California (1515 K Street, Sacramento, California 95814; Phone (916) 445-7205). In Minnesota, the Bond is issued in favor of the State of Minnesota (c/o Minnesota Department of Commerce, 85 7TH Place East, Suite 600, St. Paul, Minnesota 55101-3165; Phone (651) 296-4026). In North Dakota, the Bond is issued in favor of the North Dakota Securities Commissioner (600 East Boulevard Avenue, State Capitol 5th Floor, Bismarck, North Dakota 58505-0510; Phone (701) 328-2910).

Franchisee's Initials _____ 

ITEM 6:        OTHER FEES

Item 6 Table
**Other Fees**

| Column 1<br>Type of fee | Column 2<br>Amount | Column 3<br>Due Date | Column 4<br>Remarks |
|---|---|---|---|
| Royalty[1] | $315.00 per month (increasing each calendar year as proscribed in the footnote 1 table below); 10% processing fee may apply | Payable monthly on the 1st business day of the month | See Note 1 below concerning Royalty payment commencement date.  A portion of the Royalty may be used by us for advertising purposes. |
| Transfer[1] | $3,000.00 | Prior to consummation of transfer | Payable when you sell or transfer your franchise. No charge if franchise transferred to a corporation which you control. |
| Conversion[1] | $3,000.00 | Prior to consummation of conversion | Payable when you convert your independent shipping store to a Goin' Postal Store |
| On Site Training at your Location[2] | Varies per location. Additional $1,000.00 per each additional training scheduled at your Location | Payable by you as incurred by us | Includes airfare, lodging, transportation, $40.00 per day meal expense, etc. |
| Relocation[1] | $500.00 | Prior to consummation of approved relocation | Only required for an approved relocation outside of existing territory |
| Audit[1] | Cost of audit | Due upon receipt of audit invoice. | Payable only if audit is imposed under Franchise Agreement. |
| Renewal Fee[1] | None. | N/A | |
| Annual Software Update Fee[1] | $240.00 as of January 1, 2009, but may be increased from time to time | January 1 of each year | Entire fee amount is paid to us per Store (not per POS System) |

| Classroom Cancellation Penalty[1,3] | Currently $200.00 per Person | Payable at time of Cancellation | Payable, if you cancel a training week scheduled at our headquarters in Zephyrhills, Florida. |
| Location Cancellation Penalty[1,3] | Currently $1,500.00, plus costs of rebooking | Payable at time of cancellation | Payable if you cancel a training session scheduled at your Location or if your Store is not ready to open by your scheduled opening date when our rep arrives |
| Liquidated Damages | Varies according to Section 13.5c of Franchise Agreement | Payable upon exercise by us of right to receive | You may be required to pay liquidated damages on an early termination under Section 13.5 of the Franchise Agreement |

[1] All fees are uniformly imposed and collected by and are payable to Goin' Postal Franchise Corporation (the entire annual software update fee is paid to us for annual updates to the GP Rate Pro and associated software used by your Point of Sale Systems). All fees are non-refundable. Commencing January 1, 2009, all new franchisees purchasing a Goin' Postal franchise will pay a flat $315.00 per month royalty fee during the initial calendar year (or portion thereof) of the term of their Franchise Agreement, with the monthly royalty fee increasing by approximately five percent (5%) for each subsequent calendar year (or portion thereof) during the term of their Franchise Agreement per the following table:

| Calendar Year | Monthly Royalties |
|---|---|
| 2009 | $315.00 |
| 2010 | $330.00 |
| 2011 | $345.00 |
| 2012 | $360.00 |
| 2013 | $380.00 |
| 2014 | $400.00 |
| 2015 | $420.00 |
| 2016 | $440.00 |
| 2017 | $460.00 |
| 2018 | $480.00 |
| 2019 | $500.00 |
| 2020 | $525.00 |
| 2021 | $550.00 |
| 2022 | $575.00 |
| 2023 | $600.00 |
| 2024 | $630.00 |

Franchisees who purchased a Goin' Postal franchise between January 1, 2006 and December 31, 2007 pay a flat $200.00 per month royalty fee throughout the term of their Franchise Agreement. Prior to January 1, 2006, franchisees were given the option of selecting either a percentage or a $200.00 monthly flat fee payment obligation. Of our current franchisees, only 14 elected the percentage payment arrangements, and over half of those have since converted to the flat rate royalty. Your obligation to pay

16          Franchisee's Initials ___*EB*___

us the monthly Royalty will begin the first (1st) day of the month following the date your Store opens for business. As an example, if your Store opened for business on January 30, 2009, your obligation to begin paying us the initial 2009 calendar year $315.00 per month Royalty would commence on February 1, 2009. Monthly Royalties are generally required to be paid by means of an electronic funds transfer payment program whereby we electronically debit from your designated bank account the monthly Royalty obligations. You may elect to pay Royalties by means of a credit card, but to do so you will be charged an additional 10% processing fee per month on top of the monthly Royalty amount.

[2] You are responsible for travel expenses incurred by or on behalf of our representative when he or she visits your new location for opening and training. These fees are payable as incurred. Travel expenses include 2-way airfare to and from the closest or most convenient airport, and transportation, which must be either a rental car or taxi (under no circumstances may a personal car be provided by you, the owners of your Store if you are an entity, or their affiliates). A hotel room must be provided to our representative in the vicinity of the location of your Store at your expense. Our representative may not stay at your Store or at a personal residence. All of these fees will vary depending on your location. If you are purchasing the optional Turn-Key Franchise Package, these travel expenses for our representatives are included in the additional Turn-Key Franchise Package fee.

[3] Cancellation Penalties. Any Franchisee who cancels either the classroom training scheduled at our Headquarters in Zephyrhills, Florida or the on site training and Store opening scheduled at the Franchisee's Location will be subject to cancellation penalties. A Franchisee who cancels scheduled classroom training at our Headquarters less than one (1) month prior to the scheduled training commencement date will be subject to a $200.00 cancellation fee per each scheduled attendee to subsidize us for our lost classroom capacity. A Franchisee who cancels on site set up, training and Store opening any time after confirmation of scheduled dates will be subject to a $1,500.00 cancellation fee to reimburse us for expenses incurred in changing travel plans and to compensate our representative whose travel was cancelled, and will also owe the costs incurred by us to rebook travel and hotel accommodations for the subsequently scheduled on-site training and Store opening activities. If our representative arrives at your Store location for the scheduled Store opening, and you do not have your Store ready for opening as prescribed in the Store Set-Up Manual and Store opening checklist we will provide to you prior to your scheduling of a Store opening date, our representative may be instructed by us to return to our Headquarters (based upon the representative's report to us on the state of unpreparedness for Store opening), in which case you will be charged the applicable cancellation penalty, you will be required to reimburse us for all travel expenses we incurred for the initial visit to your Store location, and you will be responsible to pay all our travel expenses incurred for a return visit to your Store location. F

17        Franchisee's Initials   $\mathcal{E}\mathcal{B}$

ITEM 7:    ESTIMATED INITIAL INVESTMENT

ITEM 7 TABLE:

YOUR ESTIMATED INITIAL INVESTMENT WITH STANDARD FRANCHISE PACKAGE

(Note 1)

| Column 1 TYPE OF EXPENDITURE | Column 2 AMOUNT | Column 3 METHOD OF PAYMENT | Column 4 WHEN DUE | Column 5 TO WHOM PAYMENT IS TO BE MADE | Column 6 REFUNDABILITY |
|---|---|---|---|---|---|
| INITIAL FRANCHISE FEE | $15,000 (Note 2) | Check or Credit Card | Lump Sum Due due at signing Franchise Agreement | GPFC | See Item 5 |
| POINT OF SALE SYSTEMS AND OTHER REQUIRED MINIMUM PURCHASES | $9,284.00 (Note 2) | Check or Credit Card | Lump Sum Due at signing of Franchise Agreement | GPFC | Non-Refundable |
| YOUR TRAVEL AND LIVING EXPENSES WHILE TRAINING IN FLORIDA | $1,000 - $1,500.00 (Note 3) | Check or Credit Card | As Incurred | Other Vendors | Non-Refundable |
| TRAVEL AND LIVING EXPENSES OF OUR REPRESENTATIVE AT YOUR LOCATION | $1,000 - $1,500 (Note 4) | Check or Credit Card | Upon booking of our travel arrangements | GPFC | Non-Refundable |
| REAL ESTATE – LEASEHOLD PROCUMENT | $ 3,000 - $6,000 (See Note 5) | (Note 5) | (Note 5) | (Note 5) | Non-Refundable |
| REMODELING/ DECORATING, LEASEHOLD IMPROVEMENTS AND CONSTRUCTION EXPENSES | $4,000 - $30,000 (Note 6) | Payable as incurred to the contractor(s) of your choice. Expenses will vary dependent on amount of work done by you instead of using contractors. | | | Non-refundable |
| OTHER EQUIPMENT | $1,000 - $4,000 (Note 7) | Payable as incurred or at time of sale; GPFC and other vendors. | | | Non-Refundable |
| SIGNS (EXTERIOR) | $ 1,000 - $4,000 | As arranged with GPFC or other vendors.  The cost of your signs may vary widely depending on your location, lease requirements, landlord and local codes. | | | Non-Refundable |
| LEGAL & PERMITS | $500 - $4,000 (See Note 8) | As arranged with vendors, or governmentally imposed. | | | Non-Refundable |
| OPENING INVENTORY | $2,000 - $4,000 (Note 9) | Payable as  incurred at the time of sale; GPFC and other vendors. | | | Non-Refundable |
| ADVERTISING | $1,000 - $2,000 | Payable as arranged with vendors and your choice of advertising media. See Advertising restrictions under Item 8 and Item 11. | | | Non-Refundable |
| ADDITIONAL FUNDS – 6 Months (Note 10) (Note 11) | $10,000 - $15,000 | As incurred | As Incurred | Employees, Suppliers, Utilities | Non-Refundable |
| TOTAL | $48,784.00 to $96,284.00 (Note 11) (Note 12) | This will vary upon your location and your preferences. Does not include real estate purchase costs or ongoing operating expenses. | | | |

18          Franchisee's Initials    _EB_____

ITEM 7 TABLE:

## YOUR ESTIMATED INITIAL INVESTMENT WITH TURN-KEY FRANCHISE PACKAGE

| NAME OF FEE | AMOUNT | METHOD OF PAYMENT | WHEN DUE | TO WHOM PAYMENT IS TO BE MADE | REFUNDABILITY |
|---|---|---|---|---|---|
| INITIAL FRANCHISE FEE | $15,000 (Note 2) | Check or Credit Card | Lump Sum Due at signing of Franchise Agreement. | GPFC | See Item 5 |
| YOUR TRAVEL AND LIVING EXPENSES WHILE TRAINING IN FLORIDA | $1,000 - $1,500.00 (Note 3) | Check or Credit Card | As Incurred | Other Vendors | Non-Refundable |
| TURN-KEY FRANCHISE PACKAGE FEE (Note 5) (Note 13) | $102,000.00 | Check | Lump Sum Due at signing of Franchise Agreement | GPFC | Non-Refundable |
| ADVERTISING | $1,000.00-$2,000.00 | Payable as arranged with vendors and your choice of advertising media. See Advertising restrictions under Item 8 and Item 11. | Payable as arranged with vendors and your choice of advertising media. See Advertising restrictions under Item 8 and Item 11 | Payable as arranged with vendors and your choice of advertising media. See Advertising restrictions under Item 8 and Item 11 | Non-Refundable |
| ADDITIONAL FUNDS – 6 months (Note 10) (Note 11) | $10,000 - $15,000 | As Incurred | As Incurred | Employees, Suppliers, Utilities | Non-Refundable |
| TOTAL | $129,000 to $135,500 (Note 11) (Note 12) | This will vary upon your location and your preferences. Does not include real estate purchase costs or ongoing operating expenses | | | |

Notes:

(1) This particular Item 7 chart estimates the start-up expenses for the first three months of each newly established Standard Goin' Postal Franchise Store (see separate chart under this Item 7 for estimated start-up expenses under a Turn-Key Franchise Package).

(2) Beginning January 1, 2006, the Initial Franchise Fee is $15,000.00. See Item 5 for the conditions when this fee is refundable. Except for the limited refund conditions on the Initial Franchise Fee as described in Item 5 of this Disclosure Document, all other expense items listed in this Item 7 are non-refundable from us. Payments to third party vendors are either non-refundable by such vendor or subject to the particular third party vendor's terms and conditions of refund. Goin' Postal Franchise Corporation does not finance any fee but your fees can be paid by credit card.  You also have the option of ordering additional Point of Sale Systems at your discretion (see Item 5).  The payment to Goin' Postal Franchise Corporation for your Point of Sale Systems and other Required Minimum Purchases is non-refundable.  Should you order and pay us for your Required Minimum Purchases (which includes two (2) Point of Sales Systems) but you do not complete your purchase of a Goin' Postal franchise and do not proceed to sign the then existing Franchise Agreement, or you otherwise fail to open a Goin' Postal Store, we will still ship to you the POS Systems you ordered, but with all of our proprietary and copyrighted software deleted from each POS System, with all of our Marks and logos removed, and you will not receive any refund of the amount we received from you for the applicable cost for these items you ordered.

Franchisee's Initials _____

(3) If your Store location is outside the State of Florida or if you will otherwise be required to incur airfare and hotel expenses to attend the required training in Florida, you can expect to incur between approximately $1,000.00 to $1,500.00 to travel to and attend the required one week training program at our Headquarters in Zephyrhills, Florida. Some franchisees located within the State of Florida have paid as low as $100.00 to attend the training at our Headquarters in Zephyrhills, Florida. You will not be permitted to attend this training unless you have first signed and delivered to us the Non-Competition and Non-Solicitation Agreement attached as **Exhibit "B"** to this Disclosure Document and have ordered and paid for your Required Minimum Purchases (see Item 5 of this Disclosure Document).

(4) This line item pertains to those expenses you will pay for our representative to conduct the on-site training at your Store location. The expenses you should expect to incur for traveling to Florida for training at our headquarters in Zephyrhills, Florida are reflected in the line item of this Item 7 table which immediately precedes this line item (see also Note 3 immediately above). These costs include airfare, automobile rental, per-diem meal allowance and hotel expenses.

(5) You will require approximately 1,200 square feet for your Store location, which you can either lease or purchase. If you do not own adequate retail space, you must lease or purchase the location for your Store. This cost could vary widely from location to location. Rent could vary significantly per year depending on factors such as size, condition and location of the leased premises, and your particular credit standing. These figures do not represent costs you would incur to purchase a location (which could be significantly higher), but represent costs you might expect to incur in securing leasehold premises under a typical landlord/tenant relationship (which could also vary significantly from market to market), such as security deposit and first and last month's rent. Most landlords require an advance payment of first and last months' rent and a security deposit. The initial costs to procure leasehold premises in the nature of first and last months' rent and security deposit are factored into the $102,000.00 additional Turn-Key Franchise Fee required for the purchase of a Turn-Key Franchise Package. You will pay your landlord directly for any rent and other lease payments when due.

(6) Included in our estimate for build-out improvements is costs for minor improvements, painting, counters, interior signs, walls, lighting, flooring and for mailboxes. These prices will vary depending upon how much of the work you do yourself and how much you contract out to professionals. Our budget for your mailboxes is based on used boxes from a variety of sources including eBay. New boxes will be significantly more expensive. Counters and walls can be built very inexpensively if you do them yourself. Using contractors could add significantly to your expenses and set up time, and must only involve licensed and bonded companies. If you will require the services of a licensed contractor to complete the necessary interior improvements at your Store, you may incur between $10,000.00 and $30,000.00 for these services, depending on the extent and nature of interior improvements necessary to make your location operational as a Goin' Postal Store. Some franchisees who have been able to perform most of the interior improvements at their Store by themselves other than some basic electrical and/or plumbing work have incurred as little as $500.00 for such basic services. Purchasing materials and tools required to build-out the Store yourself could cost around $5,000.00.

(7) In addition to your Point of Sale Systems and other Required Minimum Purchases (see Item 5 of this Disclosure Document), other equipment necessary for operation of your Store such as fax machine, printers, laminators, copiers, etc. can be purchased (using our guidelines found in our Manuals) from your preferred vendor. You are required to purchase from us the basic start-up equipment, supplies and promotional items designated in this Disclosure Document as the Required Minimum Purchases to assist you with the set-up and opening of your Store (see Item 5 and Item 11 of this Disclosure Document for further details; see also Note 9 of this Item 7 below).

(8) Includes incorporation fee and DBA costs done with a low cost service provider such as BizFilings Inc. Goin' Postal Franchise Corporation receives a small referral fee (From $20 - $40) if you use BizFilings incorporation services. Includes (in the possible range of costs) legal fees to incorporate entity (if applicable) and possible permit fees.

20          Franchisee's Initials  $\mathcal{E}$ $\mathcal{B}$

(9) This payment is payable directly to vendors for boxes, stamps, tape, packing materials, etc and is generally non-refundable. Please see the Owners' Section of our website for a list of available vendors and their websites. You must purchase, as part of the Required Minimum Purchases, a minimum quantity of some basic supplies and inventory to assist you with the opening of your Store (see Item 5 and Item 11 of this Disclosure Document for further details). You may also purchase directly from us an inventory of ink and toner supplies and office supplies (see Item 8 for detailed discussion of our www.goinpostalsupplies.com online store).

(10) You should also anticipate and set up a reserve for miscellaneous ongoing expenses as part of your initial start up expenses, including rent, utilities, telephone, and start-up employment needs. Because these expenses vary considerably depending on your location and the personal features or requirements you establish for your individual Store, estimating the additional requirements is difficult. Anticipated payroll costs alone will vary depending upon the number of employees and compensation arrangements you establish for your Store. We recommend, however, that you establish a reserve of at least six (6) months worth of operating expenses after establishing and preparing your Store to open (more of a reserve may be necessary in high rent markets). It is advisable to establish an operating expense budget and reserve with a professional business advisor.

(11) Goin' Postal Franchise Corporation relied on its own experience in setting up stores on a small budget to compile these estimates. Your ability to duplicate these estimated costs depends on your business experience, personal desires concerning your Store, and the extent to which you follow the same methods and procedures we used in setting up our own and other Goin' Postal Stores. You should review these figures carefully with a professional business advisor before making any decision to purchase the franchise. These figures are estimates and Goin' Postal Franchise Corporation cannot guarantee that you will not have additional expenses starting the business. Your costs will depend on factors such as: how much you follow Goin' Postal Franchise Corporation's recommended methods and procedures; your management skill, experience and business acumen; local economic conditions; the local market for our product and services; the prevailing wage rate; competition; and the sales level reached during the initial period.

(12) Goin' Postal Franchise Corporation does not offer direct or indirect financing to franchisees for any items.

(13)      Under a Turn-Key Franchise Package, your initial direct expenses generally consist of your initial franchisee fee, the Turn-Key Franchise Package fee (startup rental expenditures of first and last months' rent and security deposit are factored into this fee; you may incur rental/lease expenditures beyond those included as part of the Turn-Key Franchise Package; see Item 11 and **Exhibit "J"**), and your personal travel expenses (and related accommodations) you incur to attend the mandatory training at our Headquarters in Zephyrhills, Florida. All of the other direct expenditures to set up and establish your Store in a condition ready for opening are paid for by us out of the $102,000.00 ʳTurn-Key Franchise Package fee (except to the extent of overages for which we are not responsible – see Item 11 and the specific terms and conditions under the Turn-Key Store Agreement attached to this Disclosure Document as **Exhibit "J"**). Due to the additional salary requirements, the purchase and installation of premium furniture and fixtures, full permitting and business licensing, additional travel related expenses, and use of licensed contractors as part of a Turn-Key Franchise Package, a purchaser of a Turn-Key Franchise Package may expect to pay more of an initial investment than a purchaser of a Standard Goin' Postal Franchise. If you purchase a Turn-Key Franchise Package, you will be required to sign the additional agreement designated as the Turn-Key Store Agreement attached to this Disclosure Document as **Exhibit "J"**, and be bound by the additional restrictions and requirements of that additional agreement.



## ITEM 8:      RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES

The internal color and paint schemes for your Store **must** be red, white and blue in accordance with our Store Set-Up Manual.  You must follow these required color and paint schemes explicitly and may not deviate from them without our prior written approval.

As part of the Required Minimum Purchases (see Item 5 of this Disclosure Document) you must purchase at least two (2) Point Of Sale Systems from Goin' Postal Franchise Corporation for the cost stated in Item 5 above, from which Goin' Postal Franchise Corporation derives approximately $1,000.00 in profit, which is in exchange for the time it takes to install the software and configure the system. Between January 1, 2008 and December 31, 2008 (the "Current Period"), we received approximately $257,014.00 of revenues from our sale of Point of Sale Systems, or approximately 8.8% of our total revenues for the Current Period.  For the balance of the Required Minimum Purchases, we received during the Current Period approximately $75,131.00 of revenues, or approximately 2% of our total revenues for the Current Period. You are also required to pay an annual software update fee to update our GP Rate Pro software which is part of your Point of Sale System (see Item 11 for a detailed discussion of this annual software update fee).  Our annual software update is generally completed in January of each year.  In January 2008, we received approximately $39,402.00 (approximately 1.4% of our total revenue for the Current Period) in update fees for our GP Rate Pro Software, which is used in the development of the software over the course of the year.

You must purchase all merchandise and other items bearing the Goin' Postal Marks, including trademarks, service marks and/or logos, whether for resale, advertising, promotional and/or personal use, from Goin' Postal Franchise Corporation or from one or more of our approved vendors which we specifically designate for these purchases. This merchandise and other items includes but is not limited to staff uniforms, shirts and miscellaneous clothing, interior signs, and promotional items including stuffed dolls, figures, mugs, drinking cups, license plates, bumper stickers, buttons, pins, pens, pencils and mouse pads, and business cards, flyers, and other promotional printed materials. No advertising or promotional items or materials may bear the Goin' Postal Marks unless you first obtain our approval for those items and materials and then we order them for you, and at your cost, directly from the manufacturer or other supplier.   You are not allowed under any circumstance to purchase from any manufacturer, supplier or other vendor, any goods, items or materials which bear, contain or display the Goin' Postal Marks, nor are you permitted to create or produce them for yourself. During the Current Period, we received approximately $463,263.00 of revenues from our sale of Goin' Postal uniforms and other merchandise, or approximately 16% of our total revenues for the Current Period.

Your purchase of two Point of Sale Systems and the other Required Minimum Purchases, Goin' Postal uniforms and other Goin' Postal merchandise will represent approximately 10% to 20% of the total cost to establish your Store.  Your purchase of the annual GP Rate Pro Software update fees, Goin' Postal uniforms and other Goin' Postal merchandise will represent approximately .25% of the total cost to operate your Store annually.

As a Goin' Postal franchisee, you obviously must feature and offer to your customers shipping services in operating your Store, which must include at a minimum FedEx and the United States Postal Services and we prefer that you additionally offer UPS and DHL; or those of the four designated carriers whose services are available to your Store and Location. You will need to set up an account with these required shipping service suppliers and sign agreements with each supplier in order to offer and sell their respective shipping services.  We receive no revenues from your use of these required shipping service suppliers.

We do not provide any material benefit to you (example: granting additional franchises) based upon your use of required, approved or recommended sources of supply.  We do, however, negotiate purchase arrangements with several suppliers (including price terms and discounts) for the benefit of our franchisees.

Franchisee's Initials 

Goin' Postal Franchise Corporation must pre-approve any sign design by an independent sign maker. You may e-mail your sign requests to us for approval. In order to be approved, the independent sign maker must possess all licenses required by such independent sign maker's State and/or local governments, must possess the necessary experience, must not have any outstanding complaints with the Better Business Bureau, and must maintain a website to allow us to verify any information you provide us concerning the sign maker. **This is the same approval criteria we will use for evaluating all vendors.** All requests for sign design approval must also be accompanied with a proof of such design for our approval. We will evaluate each sign design based upon our adopted color schemes, quality of workmanship and our other specifications we have implemented as set out in our Manuals. We generally respond to sign approval requests by e-mail within 2 to 3 business days following our receipt of the required information and design proofs. You are not required to pay any fee to us in order to secure sign maker approval. You are solely responsible for ensuring that sign designs which are approved by us comply with all lease and applicable legal requirements. We presently operate a sign manufacturing division which not only provides Goin' Postal franchisees with signs and related products, but also serves as the basis upon which we offer a new franchising concept under our protected "einSigns" trademark. If you purchase signs from our einSigns division either for use in your Store or for resale to your Goin' Postal customers, you will receive dealer pricing on those sign purchases. An independent sign manufacturer (Skywatch Signs, LLC) owned in part by one of our key employees, is one of our approved vendors from whom franchisees may purchase directly a significant portion of the signs which will be used in and at their Store. We do not receive any revenues or other payments resulting from your use of Skywatch Signs, LLC.

You must follow the same approval process outlined above for sign designs and sign makers when requesting approval of any artwork you desire to use for advertising or display purposes and which was not furnished to you by us via the Owners' Section of our website. All advertising and promotional materials must be approved by us in advance and prior to being released to the public, including items such as apparel (of any sort), print ads, balloons, banners, baseball caps, billboards, brochures, bumper stickers, business cards, buttons and pins, coloring books, flyers, "Frisbees", jackets, magnets and magnetic signs, radio spots/ads, shirts, signage of any sort, sweatshirts, T.V. ads, vinyl decals, websites, and any and all other materials and items of any sort and in any medium whatsoever which are intended to advertise, market or promote your franchised Store. You must submit a proof of all desired artwork and/or advertising (we will evaluate these items in a manner similar to our evaluation of any proposed sign designs you submit to us as described above) and you must provide proof that the advertising/artwork vendor meets our approval criteria reflected above. We generally respond to advertising/artwork approval requests by e-mail within 2 to 3 business days following our receipt of the required information and advertising/artwork proofs. You are not required to pay us a fee for securing any advertising/artwork supplier or vendor approval.

All requests for general product/service vendor approval other than those previously discussed above must be submitted in writing (e-mail requests are acceptable) and must provide information supporting such vendor's compliance with our vendor approval criteria described above. We must be able to review a Better Business Bureau report and access a website or other publicly disseminated information to assess the basic strength and credibility of each prospective vendor or supplier. We generally respond to general vendor approval requests by e-mail within 7 business days following our receipt of the required information. You are not required to pay us a fee for securing these approvals.

We will not unreasonably withhold our approval of a vendor so long as the vendor meets our vendor approval criteria described above and will provide you with a brief explanation of the reasons for any disapproval; however, we do reserve the right to limit the number of approved vendors servicing our franchise network and the types of products sold by our franchisees (see Item 16 of this Disclosure Document for restrictions pertaining to products and services you may sell at your Store). You must not order or sell any products or services of the proposed vendor until you receive our written approval of the proposed vendor. Once a vendor or supplier has been approved, we generally will not revoke such previous approval unless we receive continued complaints against such vendor which remain unresolved following notice to the vendor concerning the complaints, or unless we receive other credible information reflecting adversely on such vendor's strength or credibility.

You have the opportunity, but not the obligation, to purchase directly from us (and only from us) and sell in your Store life size custom made cut-out stand-ups and standees (made from a customer's photos) and giant greeting cards which we in turn will produce and manufacture through the business (now conducted as our production and merchandising division) we purchased at the beginning of 2007 from Life Size Greetings, Inc. If you decide to purchase these products from us for resale in your Store, a portion of the price you pay to us for your order of any of these products will be retained by us as a mark-up or profit.

You have the opportunity, but not the obligation, to purchase directly from us and sell in your Store ink & toner products and miscellaneous office supplies bearing the brand name of our choice. If you decide to purchase these products from us for resale in your Store, a portion of the price you pay to us for your order of any of these products will be retained by us as a mark-up or profit. Presently, we are operating an online store (www.goinpostalsupplies.com) for the sale of various ink and toner and office supply packages to our franchisees (for resale in their Stores) and to the general public. We currently use two suppliers of these products, Clover Technologies Group, L.L.C. and the Azerty division of United Stationers Supply Co. (which in turn is owned by United Stationers, Inc.). The different ink/toner/office supply packages we offer our franchisees are marked-up 7.5% over the cost we pay to our suppliers to cover credit card and order processing fees we incur to fill those orders. Under no circumstances are you permitted to deal directly with either of these designated suppliers for ink, toner and office supplies, and all such items for resale in your Store must be purchased either from us or from a third party not affiliated with either Clover Technologies Group, LLC or United Stationers Supply Co.

One of our recommended suppliers of services to assist you with incorporating your franchised business (should you choose to do so), BizFilings, Inc., pays us a commission of between 10% to 15% of all corporation services our franchisees purchase. For the Current Period, we received no commissions from BizFilings, Inc. Konica Minolta pays us a $200.00 referral fee for each copier purchased from Konica Minolta (or one of its authorized dealers) by a Goin' Postal franchisee. In the Current Period, we received $4,000.00 in referral fees from Konica Minolta, or 0.14% of our total revenues for the Current Period.

We currently have entered into a contract with Mark Camara of American Property Exchange, Inc., 4491 W. Whitewater Avenue, Westin, Florida 33332 (phone: 954/389-1885, Ext. 111) primarily to assist with locating sites for those persons who purchase a Turn-Key Franchise Package and to assist with lease negotiations once a location is selected. Mark Camara/American Property Exchange, Inc. will also assist franchisees who have not purchased a Turn-Key Franchise Package (but who have submitted their signed Franchise Agreement and other required contracts and have paid in full their Initial Franchise Fee) in finding a suitable Store location. Mark Camara/American Property Exchange will not assist any franchisee in finding a Store location unless and until we have received the signed Franchise Agreement (and other required contracts) from such franchisee, together with all fees required to be submitted to us at the time of delivery of the signed Franchise Agreement. Mark Camara/American Property Exchange, Inc. is compensated by the particular listing broker of the particular location chosen for the Store of a Turn-Key Franchise Package purchaser, and we not receive any portion of these commissions.

We do not currently have, nor do we participate in, a purchasing or distribution cooperative. We do on occasion negotiate purchase arrangements with suppliers, including price terms, for the benefit of franchisees.

Except for the ownership interests of Marcus Price, our CEO, and M.J. Price, our President, in the Franchisor, Goin' Postal Franchise Corporation, as previously disclosed in this Disclosure Document, and except for the ownership interest of one of our key employees in Skywatch Signs, LLC, as previously disclosed in this Disclosure Document, none of our executive officers own an interest in any supplier from whom you may or are required to purchase any goods or services.

ITEM 9:         FRANCHISEE'S OBLIGATIONS

ITEM 9 TABLE:
FRANCHISEE'S OBLIGATIONS

This table lists your principal obligations under the Franchise and other agreements.  It will help you find more detailed information about your obligations in these Agreements and in other Items of this Disclosure Document.

| Obligation | Section in Agreement | Disclosure Document Item |
|---|---|---|
| a. Site selection and acquisition/lease | Section 1 and Section 3 of Franchise Agreement; if applicable, see also Turn-Key Store Agreement | Items 6, 11 and 12; If applicable, Exhibit "J" |
| b. Pre-opening purchases/leases | Section 5 of Franchise Agreement; if applicable, see also Turn-Key Store Agreement | Items 8 and 11; If applicable, Exhibit "J" |
| c. Site development and other pre-opening requirements | Section 3 of Franchise Agreement; if applicable, see also Turn-Key Store Agreement | Items 6, 7 and 11; If applicable, Exhibit "J" |
| d. Initial and ongoing training | Section 4 of Franchise Agreement | Item 11 |
| e. Opening | Not Applicable | |
| f. Fees | Section 5 of Franchise Agreement; if applicable, see also Turn-Key Store Agreement | Items 5 and 6; If applicable, Exhibit "J" |
| g. Compliance with standards and policies / Operations Manual | Section 7 of Franchise Agreement | Item 11 |
| h. Trademarks and proprietary information | Section 6 of Franchise Agreement | Items 13 and 14 |
| i. Restrictions on products/ services offered | Section 7 of Franchise Agreement; | Item 8, Item 16 and Exhibit "F"; |
| j. Warranty and Customer service requirements | Section 7 of Franchise Agreement | Item 11 |
| k. Territorial development and sales quotas | Not Applicable | |
| l. Ongoing product/service purchases | Section 7 of Franchise Agreement | Item 8, Item 16 and Exhibit "F" |
| m. Maintenance, appearance and remodeling requirements | Sections 3 and 7 of Franchise Agreement | Item 11 |
| n. Insurance | Section 15 of Franchise Agreement | Items 6, 7 and 8 |
| o. Advertising | Section 8 of Franchise Agreement | Items 6, 7 and 11 |
| p. Indemnification | Section 17 of Franchise Agreement | Item 6 |
| q. Owner's participation/ management/staffing | Sections 7 and 10 of Franchise Agreement | Items 11 and 15 |
| r. Records and Reports | Section 5 and Section 9 of Franchise Agreement | Items 6 and 11 |
| s. Inspections and audits | Section 5 and Section 9 of Franchise Agreement | Items 6 and 11 |
| t. Transfer | Section 11 of Franchise Agreement and Exhibit "B" to Franchise Agreement | Item 17 |

25          Franchisee's Initials _____ 

| u. Renewal | Section 2 of Franchise Agreement | Item 17 |
| --- | --- | --- |
| v. Post-termination obligations | Section 12, 13, and 14 of Franchise Agreement and Non-Competition and Non-Solicitation Agreement (Exhibit "B"); Exhibit "C" to Franchise Agreement | Item 17; Exhibit "B" |
| w. Non-competition covenants | Section 14 of Franchise Agreement and Non-Competition and Non-Solicitation Agreement (Exhibit "B") | Item 17; Exhibit "B" |
| x. Dispute resolution | Section 20 of Franchise Agreement | Item 17 |
| y. Other | | |

## ITEM 10:     FINANCING

Goin' Postal Franchise Corporation does not offer direct or indirect financing for any part of the fees or other monetary obligations due or to be incurred by you under the Franchise Agreement or in connection with your purchase of a Goin' Postal franchise.  Goin' Postal Franchise Corporation does not back or guarantee any note or lease you may sign with any third party, or any of your other obligations.  We do make available to franchisees upon request, but only after they have become a franchisee, actual sales records from our company-owned Zephyrhills, Florida Store for use by said franchisees in developing a sales forecast or business plan to present to the particular lender of their choice in procuring financing arrangements.  However, any franchisee requesting a copy of such financial data must sign some disclaimers associated with the use of our Zephyrhills, Florida Store data, including an acknowledgment that such Store data was not provided to such franchisee in advance of such franchisee's decision to purchase a Goin' Postal franchise, that such data only reflects the results of operations from a Franchisor-owned Store of the type the franchisee will own and operate but it is not a representation or warranty, or even necessarily indicative, of the actual results the franchisee will experience at their particular Store, and that such data was not presented to the franchisee as an "Earnings Claim" or otherwise used by the franchisee or relied upon in making their decision to purchase a Goin' Postal franchise.

You should know, however, that the majority of the financial requirements you will incur as part of this Franchise Agreement, including the initial franchise fee, and equipment, may be financed through many 3rd party means, including credit cards, bank loans or business grants.   Goin' Postal Franchise Corporation does not recommend putting your home or any other personal assets at risk by obtaining a home equity or guaranteed loans to finance your new business.  Even the best run business can fail due to a wide variety of circumstances.

## ITEM 11:     FRANCHISOR'S   ASSISTANCE,   ADVERTISING,   COMPUTER   SYSTEMS,   AND TRAINING

**Except as listed below, Goin' Postal Franchise Corporation is not required to provide you with any assistance.**

### Pre-Opening Obligations

After you sign the Franchise Agreement and submit your initial franchise fee and before you open your new Goin' Postal business, Goin' Postal Franchise Corporation will:

1) If you have not already supplied us with a specific physical address which you desire for your Store location, we will assist you in selecting a business location. Your retail location must have approximately 1,200 square feet in area and have adequate parking spaces. We may advise you of any concerns we have about your chosen location, and/or we may recommend a location, but you will have the final decision (subject to territorial rights of other franchisees) and under no circumstances do we guarantee the success of any location you select, whether recommended or approved by us or not, nor will we be held responsible should any chosen location prove to be unsuccessful. Your location decision should take into account factors such as proximity of adequate parking, high traffic and high visibility factors, amount of rent, nature of surrounding businesses, proximity to competitive businesses, rear access, physical characteristics of location and building (including aesthetics and other appearance features), and similar factors. We do not purchase any location for and then lease it to a franchisee, nor do we lease a location for and sublease it to a franchisee. (Franchise Agreement – Section 1 and Section 3). As discussed previously under Item 8 of this Disclosure Document, we have an arrangement with Mark Camara of American Realty Exchange, Inc. to assist those franchisees who have not purchased one of our Turn-Key Franchise Packages but who have submitted a signed Franchise Agreement (and other required contracts) and have paid all fees required to be paid with delivery of the signed Franchise Agreement with finding a suitable location.

2) Evaluate your desired Store location, and upon our approval of such location (using those factors outlined in "Pre-Opening Obligation #1" immediately above), designate your exclusive territory. (Franchise Agreement - Section 1; see Item 12 for territory disclosures).

3) Within 7 days of our receipt of your signed Franchise Agreement and your payment of the initial fees required under Item 5 of this Disclosure Document, Goin' Postal Franchise Corporation will provide you with access to the Owners' Section of the Goin' Postal Franchise Corporation website which contains training materials, artwork and other resources for both setting up and operating your franchised business. This information will be sent to you via e-mail (Franchise Agreement – Section 4.2). Included in these materials will be our Store Set-Up Manual and New Franchisee Primer which contains vital information you will need to successfully set-up your Store and prepare it to open for business, including detailed and precise diagrams, photos, floor plans and instructions for the interior build-out of your Store (including our required red, white and blue color and paint schemes, from which you may not deviate in any respect without our advance written approval), and instructions on how to set up UPS, FedEx and other accounts. Our Store Set-Up Manual and New Franchisee Primer is confidential and proprietary to us, is only loaned to you while you are our franchisee, and remains our property. The current Table of Contents of Our Store Set-Up Manual as of December 31, 2008 is set out below:

Setup Manual Table of Contents

| | |
|---|---|
| WELCOME TO THE GOIN' POSTAL FAMILY.... | 1 |
| ABOUT THE FAMILY YOU'VE JOINED... | 1 |
| STAY FOCUSED AND ENTHUSIASTIC | 2 |
| CONTACTS | 7 |
| TRAINING | 9 |
| Booking Your Training Dates | 10 |
| Flights | 10 |
| Important Tips | 11 |
| SETTING UP SHOP | 18 |
| CONSUMER FINANCING OPTIONS | 18 |
| American Express Gold Charge Card | 18 |
| American Express Blue Credit Card | 18 |
| Home Depot or Lowes Charge Account | 19 |

27          Franchisee's Initials _____

| | |
|---|---|
| Sam's Club Business Charge Account | 19 |
| Staples Charge Account | 19 |
| Regular Cash Back and SkyMiles Cards | 19 |
| BUSINESS BASICS | 20 |
| Location, Location, Location! | 20 |
| How We Can Help | 20 |
| Location Finding | 21 |
| Funding | 21 |
| Incorporation | 21 |
| Naming Your Corporation | 21 |
| Sub S Election | 22 |
| Federal Employer Identification Number | 22 |
| State Sales Tax Registration | 22 |
| Local Business Licenses | 22 |
| Promotions | 22 |
| Sign Permits | 23 |
| Commercial Check and Permits | 24 |
| Bank Accounts | 24 |
| Credit Card Merchant Account | 24 |
| Business Cards | 25 |
| SHIPPING ACCOUNTS | 25 |
| UPS Shipping Account | 25 |
| FedEx Authorized Ship Center (ASC) | 26 |
| ACCOUNTS | 28 |
| Post Office Account | 28 |
| UPS Account | 32 |
| FedEx Account | 32 |
| DHL Account | 32 |
| Freightquote.com | 32 |
| eBay Trading Assistant | 32 |
| USPS Private Mailbox Agreement | 33 |
| UTILITIES | 33 |
| Electricity | 33 |
| Water | 33 |
| Phone | 33 |
| Internet Access | 34 |
| Garbage | 34 |
| EQUIPMENT LIST | 34 |
| Rental Mailboxes | 34 |
| Signage | 35 |
| Point of Sale System | 35 |
| Scales | 36 |
| Thermal Label Printer | 37 |
| Office Machines | 37 |
| Copier | 37 |
| Fax Machine | 39 |
| Networking | 39 |
| WIRED is BEST! | 40 |
| Surge Protectors and UPS | 41 |
| Laminating Machine | 41 |
| Printer | 42 |
| Shipping Supplies | 45 |
| INITIAL BOX ORDER | 45 |
| Initial Stamp Order | 46 |
| Setting Up Your Cash Drawer | 46 |

Franchisee's Initials _____

| | |
|---|---|
| DOING YOUR BUILD-OUT | 49 |
| TOOLS | 49 |
| Miter Saw | 50 |
| Skill Saw | 50 |
| Power Drill | 50 |
| Laminate Trimmer | 50 |
| Drill Bits & Screwdriver Bits | 50 |
| Hammer, Screwdrivers, and Pliers | 50 |
| Steel Ruler, Tape Measures, and Level | 50 |
| Utility Knives | 50 |
| ShopVac | 50 |
| Dry-walling Tools | 50 |
| BUILD-OUT SUPPLIES | 51 |
| Lumber | 51 |
| Laminate | 51 |
| Drywall & Drywall Mud | 51 |
| Paint | 51 |
| FLOOR PLAN | 52 |
| Customer Area | 52 |
| Customer Counter | 52 |
| Flooring | 53 |
| Employee Area | 53 |
| Construction Photos | 53 |
| OUR REPRESENTATIVE'S VISIT TO YOUR STORE | 57 |
| Goin' Postal Assisted Build-Outs | 58 |
| OUR REPRESENTATIVE'S TRAVEL ARRANGEMENTS | 59 |
| Booking the Dates for Your Store Set-Up | 59 |
| Rental Car | 60 |
| Per Diem Meal Expense | 60 |
| Parking Expenses | 61 |
| Listen to our Rep! | 61 |
| GRAND OPENINGS & RIBBON CUTTINGS | 61 |
| What To Have At A Grand Opening | 61 |
| Radio Broadcasts | 62 |
| Prize Giveaways | 62 |
| Advertise "Smart", NOT "Expensive" | 62 |
| Coupons, coupons, coupons and more coupons.... | 62 |
| Local Newspapers | 63 |
| BUILD-OUT INSTRUCTIONS | 65 |
| Drywall: | 65 |
| Partition: | 68 |
| Counter | 72 |
| Mailroom | 79 |
| Box Shelves | 82 |
| Building your Packing Table: | 84 |
| Bubble Wrap Mounts: | 86 |
| Trim and Baseboard | 89 |
| Displays and Hardware | 91 |
| Dollar Tree | 91 |
| Cheap and Free Displays (our favorite) | 91 |
| Window Displays | 93 |
| SIGNS | 94 |
| Using the Carriers' Logos | 97 |

29          Franchisee's Initials _____

*Contents of Store Set-Up Manual and page numbers are subject to change, without notice, but any revised Manuals will be available to you via the Owners' Section of our website.

4) Within 7 days of our receipt of a floor plan for your chosen business location, we will provide you with our suggestions and any required changes we advise. Your floor plan must (i) separate the customer area from the employees only area by a counter; (ii) position the packing table within the employees only area but in plain view from the customer area; (iii) strictly adhere to our red, white and blue color and paint schemes; and (iv) otherwise be in compliance with our Store Set-Up Manual (see "Pre-Opening Obligation #3" immediately above). (Franchise Agreement – Section 3). Although our Store Set-Up Manual provides vital and useful information on matters such as: (i) conforming the Store premises to local ordinances and building codes, and obtaining required permits; (ii) constructing, remodeling and decorating the Store premises; (iii) providing for necessary equipment, signs, fixtures, opening inventory, and supplies; and (iv) scheduling the necessary and required training sessions for your owners, manager(s) and primary operator(s), unless you are purchasing one of our Turn-Key Franchise Packages, these are primarily your responsibilities, and our assistance is principally provided through e-mail and limited telephone contact, and through the required training sessions.

5) After our receipt of your payment for the Required Minimum Purchases, which includes two (2) Point of Sale Systems (see Item 5 of this Disclosure Document), your ordered Point of Sale Systems will be assembled and programmed by us, and available to be shipped to the address you have designated for these items to be shipped prior to the scheduled date of your Store opening. Each Point of Sale System you order from us will consist of the following components:

   -PC and Monitor (from independent manufacturer(s) of our choice)

   -Cash Drawer (misc. independent manufacturers)

   -Credit Card Swipe (misc. independent manufacturers)

   -Receipt Printer (misc. independent manufacturers)

   -Software (some proprietary to us and some proprietary to independent third parties: see Item 5 discussion and discussion under Note 6 immediately below).

Two (2) Point of Sale Systems must be purchased from us as part of the Required Minimum Purchases  We make approximately $1,000.00 profit from the two (2) Point of Sale Systems purchased at $7,500.00 as part of the Required Minimum Purchases, which is used to offset our costs for assembly, programming, set up and the expenses incurred by us in the initial development of our proprietary software. If you desire additional Point of Sale Systems, you can buy them from us at a cost of $2,800.00 (this current price for additional Point of Sale System is subject to change without prior notice) per each additional system. All Point of Sale Systems must be programmed with our proprietary software and any third party software as necessary. Any updating or improvements to the software occurring between your initial purchase and the next ensuing annual upgrade will be at no cost to you. At the first of each year during the term of the Franchise Agreement, your credit card on file (or, at our discretion, your designated account under an electronic funds transfer payment program we have established with you) will be charged for the cost of performing an annual software update and maintenance to program current carrier rates, shipping information and related data into your System. This annual upgrade cost is currently $240.00 (but may be increased from time to time) and is paid entirely to us for your continued use of our proprietary "GP Rate Pro" software for us. For those Point of Sale Systems you purchase from us, we provide for the replacement, at no cost to you, of any parts or components which become defective within the first twelve months from the date of your purchase and which are reported to us to be defective within that time period. After that initial twelve month period, individual Point of Sale System components or entire Point of Sale Systems needing to be replaced may be purchased from us at our then advertised prices or otherwise replaced or repaired by you at your cost. We provide both phone and online support for software related issues, and provide

both phone and online support for problems associated with equipment which we supply to you. You are responsible for all costs to repair, replace, maintain and remedy all equipment which you purchase from someone other than us. Although you are not contractually obligated to upgrade the hardware components of the Point of Sale Systems, such as the cash register, computer system, etc., it may become necessary for you to do so at some time in the future if any of the annual software upgrades you are required to make (as previously discussed) cause any of your hardware components to be incompatible or otherwise ineffective.

Our proprietary software, GP Rate Pro, has been in use by us for approximately four years. The Quick Books Point of Sale and Quick Books Pro software forming a part of the Point of Sale System you will purchase from us are both made and developed by Intuit, have been on the market for between six to eleven years and have been used by us for approximately four years, and was used by our predecessor for close to two years. The UPS proprietary software and FedEx proprietary software components of your Point of Sale System have been used by those independent companies for approximately seven years and have been used by us for approximately four years and by our predecessor for close to two years. Each Point of Sale System will be used by you to "ring up" sales, price shipping rates, price products, track inventory, collect and maintain customer information, access our website, receive and send franchise related e-mails and for related functions. We will only have direct access to the information and data stored in your Point of Sale System(s) when you have granted such access to us as part of any request you make for us to provide technical support with respect to any of your Point of Sale Systems.

(For provisions covering the Point of Sale System, see Franchise Agreement – Section 4.2 and Section 5.1).

6) At the time we ship you your ordered Point of Sale Systems, we will also ship to you the mandatory start-up equipment, supplies, promotional items, and items of retail inventory you are required to purchase from us as part of the Required Minimum Purchases (see discussion under Item 5 of this Disclosure Document), to assist you with the set-up and opening of your Store. You will incur an additional charge for the actual items we supply to you, and you will be responsible for the costs to ship them to you. These items will be shipped using the same carrier used to ship you your Point of Sale Systems and will either be charged to your UPS or FedEx account established for your Store, or if no such account has been set up by you at that time, we will either bill your credit card on file or perform an electronic funds transfer for the purchase costs and shipping costs incurred to send you these mandatory Store set-up items. You will be responsible for the installation of all the Required Minimum Purchase items we deliver to you, including the Point of Sale Systems.

7) Within 1 to 2 weeks from the time you have purchased or signed a lease for your chosen business location (or sooner if you already own your approved location), you will need to schedule with us the dates for your mandatory initial training session at our Zephyrhills, Florida Headquarters (Franchise Agreement Section 4.1). Initial training dates are booked on a "first-come, first-served" basis and you must request a desired initial training date reservation by e-mail sent to either training@goinpostal.com or mecan@goinpostal.com. No initial training dates are established or otherwise available to you unless and until confirmed by us in writing by means of e-mail sent from us to you specifying the dates of your initial training. You will not be able to attend this initial training unless you have ordered and paid for your Required Minimum Purchases (see discussion under Item 5 of this Disclosure Document) and unless you first sign the Non-Competition and Non-Solicitation Agreement **(Exhibit "B"** to this Disclosure Document) and deliver it to us before your scheduled training dates or unless you sign the Non-Competition and Non-Solicitation Agreement when you arrive at our headquarters for your scheduled training and before the start of training. You will not be permitted to participate in the training at our headquarters unless all owners, managers and primary operators have signed the Non-Competition and Non-Solicitation Agreement. If you cancel your scheduled training at our headquarters less than one (1) month prior to your scheduled training commencement date, you will be subject to a $200.00 cancellation fee per

each scheduled attendee to subsidize us for our lost classroom capacity. At the one week initial training session you are required to schedule and attend at our Headquarters in Zephyrhills, Florida, you will receive approximately 40 hours of classroom training (8 hours M, Tu, W and F; & 10 hours Th) in all aspects of your new business including:

Franchisee's Initials _____

ITEM 11 TABLE

## TRAINING PROGRAM – AT OUR HEADQUARTERS

| Column 1 Subject | Column 2 Hours of Classroom Training | Column 3 Hours of On-The-Job Training | Column 4 Location |
|---|---|---|---|
| Introductory Matters | 0.5 | -0- | Our Headquarters |
| UPS, FedEx, DHL | 2.0 | -0- | Our Headquarters |
| USPS | 1.0 | -0- | Our Headquarters |
| Shipping Basics | 1.0 | -0- | Our Headquarters |
| Insurance | 1.0 | -0- | Our Headquarters |
| Shipping Forms | 1.0 | -0- | Our Headquarters |
| GP Rate Pro | 1.0 | -0- | Our Headquarters |
| POS Systems | 1.0 | -0- | Our Headquarters |
| GP Owners' Website | 3.0 | -0- | Our Headquarters |
| Fed Ex Processing | 1.0 | -0- | Our Headquarters |
| UPS Processing | 1.0 | -0- | Our Headquarters |
| DHL Processing | 1.0 | -0- | Our Headquarters |
| USPS Processing | 1.0 | -0- | Our Headquarters |
| Freight | 3.0 | -0- | Our Headquarters |
| eBay | 1.0 | -0- | Our Headquarters |
| Copiers | 2.0 | -0- | Our Headquarters |
| International Shipping | 3.0 | -0- | Our Headquarters |
| Mailboxes | 1.0 | -0- | Our Headquarters |
| Quick Books Pro | 1.0 | -0- | Our Headquarters |
| Pitney Bowes | 0.5 | -0- | Our Headquarters |
| Merchant Services | 1.0 | -0- | Our Headquarters |
| Packaging and Box Building | 2.0 | -0- | Our Headquarters |
| Shipping Accounts | 3.0 | -0- | Our Headquarters |
| Role Play/ Customer Care | 3.0 | -0- | Our Headquarters |
| Actual Customer Interaction | | 4.0 | Company Owned Store |
| TOTAL | 36.0 | 4.0 | |

33        Franchisee's Initials  $\mathcal{EB}$

NOTE: All times are subject to adjustment based on personal needs of franchisees.

Goin' Postal Franchise Corporation does not charge you for your initial training at our Headquarters, but you are responsible for the costs of your travel, lodging, meals, etc. for attending your training in Florida and for the costs outlined above in Item 6 OTHER FEES for our representative when he or she is on-site to conduct the second required training session at your Store location. While at the training at our Headquarters, you will take a series of tests which you must pass to move on to the next section of the training. If you are unable to pass these tests by the end of training at our Headquarters, you must establish competency to operate your Store during the on-site training at your Store, and our representative who conducts the training at your Store must sign off on your competency prior to you being able to open your Store without supervision (see Note 8 below).

While your main training will be at our Headquarters in Zephyrhills, Florida, our rep will also go over the training again while on-site at your Store.

8) Within 1 to 2 weeks after you inform us that your Store at your chosen location is substantially set up and ready to open for business, you will need to schedule with us a 5 to 6 day period during which a Goin' Postal Franchise Corporation representative will be at your chosen location to help you with opening your Store and training your staff. It is our standard practice to schedule the training at your location during a period which is 2 to 3 weeks subsequent to completion of your training at our Headquarters in Zephyrhills, Florida (Franchise Agreement – Section 4.1). Final on-location training and Store opening dates are booked on a "first come, first-served" basis and you must request a final on-location training and Store opening date reservation by e-mail sent to either training@goinpostal.com or megan@goinpostal.com. No final on-location training and Store opening dates are established or otherwise available to you unless and until confirmed by us in writing by means of e-mail sent from us to you specifying the dates of your final on-location training and Store opening. This on-site training consists of approximately 53 hours of on-the-job training at your Store, including approximately 30 hours of actual live customer interaction and processing actual customer transactions, and is generally conducted Monday through Friday, for approximately 8 to 10 hours per day. See the Table below which highlights the training which will be conducted on-site at your Store. If you fail to show the level of competency necessary to open and run your Store without supervision, you will not be permitted to open your Store for business at that time and you will be required to attend a second week of training at our Headquarters in Zephyrhills, Florida at your sole cost. We have not yet needed to impose upon any franchisee this second week of training at our Headquarters. Do not book final on-location training dates and Store opening dates unless and until you are absolutely certain that you can keep those specific dates. In the case of your Store opening dates, your location must be ready to receive the GPFC representative and be suitable to serve customers during the week of the GPFC representative's visit, unless arrangements have been made in advance to have GPFC do your build-out. Be advised that if you cancel final on-location training dates and/or Store opening dates after you have booked them and after those specific dates have been confirmed by GPFC in writing, a \$1,500.00 penalty may be levied at GPFC's discretion for the resultant necessary alterations in scheduling, traveling, and lodging (the various GPFC representatives' schedules and flights, car rentals, and lodging plans will have to be canceled and rearranged). You will also be responsible for all the costs necessary to rebook travel and living accommodation for our representative to make a return or alternate visit to your Store location. Should your Store not be in a ready-to-open condition and it therefore becomes necessary for our representative to make a return trip to your Store to oversee the opening of it, you will be assessed and charged the \$1,500.00 penalty, plus all travel and living expenses of our representative to make both the initial trip and this return trip.

## ITEM 11 TABLE
### TRAINING PROGRAM – AT YOUR STORE

| Column 1<br>Subject | Column 2<br>Hours of Classroom Training | Column 3<br>Hours of On-The-Job Training | Column 4<br>Location |
|---|---|---|---|
| Introductory Matters | -0- | 0.5 | Your Store |
| UPS, FedEx, DHL | -0- | 1.0 | Your Store |
| USPS | -0- | 4.0 | Your Store |
| Shipping Basics | -0- | 0.5 | Your Store |
| Insurance | -0- | 0.5 | Your Store |
| Shipping Forms | -0- | 1.0 | Your Store |
| GP Rate Pro | -0- | 2.0 | Your Store |
| POS Systems | -0- | 2.0 | Your Store |
| GP Owners' Website | -0- | 0.5 | Your Store |
| Fed Ex Processing | -0- | 0.5 | Your Store |
| UPS Processing | -0- | 0.5 | Your Store |
| DHL Processing | -0- | 0.5 | Your Store |
| USPS Processing | -0- | 1.0 | Your Store |
| Freight | -0- | 0.5 | Your Store |
| eBay | -0- | 0.5 | Your Store |
| Copiers | -0- | -0- | Your Store |
| International Shipping | -0- | 1.0 | Your Store |
| Mailboxes | -0- | 0.5 | Your Store |
| Quick Books Pro | -0- | 0.5 | Your Store |
| Pitney Bowes | -0- | 0.5 | Your Store |
| Merchant Services | -0- | -0- | Your Store |
| Packaging and Box Building | -0- | 1.0 | Your Store |
| Shipping Accounts | -0- | -0- | Your Store |
| Role Play/<br>Customer Care | -0- | 4.0 | Your Store |
| Actual Customer Interaction | -0- | 30.0 | Your Store |
| TOTAL | -0- | 53.0 | |

35        Franchisee's Initials ____EB____

9. Franchisees, on average, typically open their franchised Stores for business 6 to 10 weeks after they have signed both a Franchise Agreement and have signed a lease on their chosen location. The factors which may affect this time period are your ability to procure a location and sign a lease, scheduling conflicts or other matters which affect the scheduling of your required training, your ability to procure any necessary financing, construction related delays (including obtaining required building permits), zoning and local ordinances, weather conditions, and installation of equipment, fixtures, signs and similar items. However, your obligation to begin paying the monthly Royalty to us may actually commence sooner than the date you open your Store for business (see explanation under Note 1 of Item 6 of this Disclosure Document), so it is incumbent upon you to proceed expeditiously to both initiate and complete the required steps to establish your Store location, set-up your Store, complete your mandatory training and schedule your Store opening date. Under a Turn-Key Franchise Package, a Turn-Key Franchisee's Store is generally ready to open for business 2 to 3 months after they sign a Franchise Agreement and Turn-Key Store Agreement, subject to the Turn-Key Franchisee's full cooperation in all phases of the Turn-Key Franchise Package, and depending further on the availability of a suitable location for the Turn-Key Franchisee's Store and the time it takes to locate and secure suitable premises. A Turn-Key Franchisee's obligation to begin paying Royalties generally begins the first month during which Goin' Postal Franchise Corporation approves the Turn-Key Franchisee's Store for opening, unless the Turn-Key Franchisee has failed to approve any proposed locations forwarded by Goin' Postal Franchise Corporation, in which case Royalties will be payable to us under the same procedures applicable to a purchaser of a Standard Goin' Postal franchise.

## Post-Opening Obligations

Once your Goin' Postal Store is open for business and during the operation of your Store, Goin' Postal Franchise Corporation will:

1) Develop new products and methods and provide you with information about developments (Franchise Agreement – Section 4.2).

2) Give you online access by means of a password to our Operations Manual which contains mandatory and suggested specifications, standards and procedures (Franchise Agreement – Section 4.2). This Operations Manual is confidential and proprietary to us, is only loaned to you while you are our franchisee, and remains our property. Goin' Postal Franchise Corporation will modify this manual from time-to-time and you will be expected to follow the evolving guidelines, methods, and policies as they appear in this manual, but the modifications will not alter your status and rights under the Franchise Agreement. The current Table of Contents of our online Operations Manual as of December 31, 2008 is set out below:

Operations Manual Table of Contents

| | |
|---|---|
| SHIPPING BASICS | 10 |
| DIFFERENT TYPES OF SHIPPING SERVICES | 10 |
| Ground | 10 |
| Express | 10 |
| Freight | 11 |
| Fuel Surcharge | 11 |
| Weighing a Package | 11 |
| Measuring a Package | 11 |
| Size and Weight Limits for Packages | 11 |
| Understanding "Oversize" Classifications | 12 |
| Oversize 2 | 12 |
| Oversize 3 | 12 |
| Firearms | 14 |
| Miscellaneous Information | 14 |

| | |
|---|---|
| ZONES AND GROUND TRANSIT TIMES | 15 |
| Transit Times | 16 |
| CARRIER DISCOUNTS | 16 |
| Published Rates | 16 |
| Fuel Surcharge | 17 |
| Retail Rates | 17 |
| Carrier Tier Discounts | 18 |
| Profiting from the "spread" | 18 |
| Understanding the Software Quote | 18 |
| UPS Worldship 9.0 Quotes | 18 |
| FedEx Ship Manager Quotes | 18 |
| Wheeling and Dealing Using Your Understanding of the Software Programs | 18 |
| UNITED STATES POSTAL SERVICES | 20 |
| What Are You Mailing? | 22 |
| CHOOSING A SERVICE FOR MAILING | 24 |
| Unusual Shapes and Sizes | 29 |
| INTERNATIONAL SHIPPING | 35 |
| Keep the Mail Safe: Hazardous and Restricted Materials! | 41 |
| FEDEX SERVICES | 44 |
| Size | 44 |
| FEDEX SHIP MANAGER SOFTWARE | 46 |
| Flow Chart for Domestic (within the U.S.A.) Shipping | 46 |
| Screen/Monitor Display for FedEx Domestic Shipping | 47 |
| FEDEX International Shipping | 48 |
| Viewing the FedEx Shipping List within ShipManager | 48 |
| FedEx Shipping List Screen to View Items Processed for Shipment | 49 |
| FEDEX RETURN SERVICES | 50 |
| IMPORTANT | 50 |
| Declared Value Coverage (DVC) | 50 |
| Placing a "Declared Value Coverage" Claim | 51 |
| UPS SERVICES | 54 |
| UPS Services | 54 |
| UPS SOFTWARE | 55 |
| Main Shipping Screen | 55 |
| OPTIONS TAB | 56 |
| Quantum View Notify | 56 |
| Additional Handling | 56 |
| Delivery Confirmation | 57 |
| Declared Value | 57 |
| Detail Tab | 58 |
| Return Services/Call Tag | 60 |
| Breakdown of Steps To Create a UPS Call Tag/Return Services Label | 61 |
| Airbills | 61 |
| UPS INTERNATIONAL SHIPPING | 62 |
| Declared Value Coverage | 64 |
| Declared Value Coverage Exclusion | 64 |
| Claims | 64 |
| DHL SERVICES | 68 |
| It's Official! | 68 |
| Special Perks for Goin' Postal Franchisees | 68 |
| DHL SERVICE OPTIONS | 69 |
| Domestic: | 69 |
| International: | 70 |
| HOW TO PROCESS SHIPMENTS | 71 |
| WebShip | 71 |

| | |
|---|---|
| Logging Onto Webship | 71 |
| Preparing DHL Ground And DHL Express Shipments | 71 |
| Voiding Shipments | 72 |
| Editing Shipments | 72 |
| Day End | 72 |
| Viewing Recent Shipments | 73 |
| Reports | 73 |
| Address Book | 73 |
| Your User Profile | 73 |
| Shipping Preferences | 73 |
| SHIPMENT TRACKING | 74 |
| Other Online Tools | 74 |
| Obtaining Assistance | 74 |
| Ordering Shipping Supplies | 74 |
| DHL Express | 74 |
| International Waybill Image | 75 |
| WEIGHT LIMITS & DIMENSION LIMITS | 76 |
| For DHL Domestic Express Services (Next Day & 2nd Day within the U.S.): | 76 |
| For DHL Domestic Ground Services (Ground within the U.S.): | 76 |
| For DHL International Services (going outside the U.S.): | 76 |
| Weight Definitions | 76 |
| Understanding and Calculating "Dimensional Weight" | 76 |
| Domestic | 77 |
| International | 77 |
| Weight Corrections | 78 |
| INSURANCE | 78 |
| DHL's Liability/Insurance Limits | 78 |
| DHL explained insurance limitations to us like this: | 78 |
| Warsaw Convention: | 78 |
| Shipment Value Protection (SVP) | 78 |
| What is an SED/EEI, and why must I fill it out? | 79 |
| UNACCEPTABLE SHIPMENTS/PROHIBITED SHIPMENTS VIA DHL | 79 |
| Excellent references for researching classification of specific items: | 80 |
| Restricted Shipments | 80 |
| Special Care Shipments | 81 |
| Inspection of Packages | 81 |
| CLAIMS | 81 |
| Claims Process | 81 |
| Loss or Damage Claims | 81 |
| The DHL Service Guarantee does NOT apply to: | 82 |
| DASC DHL U.S. FEES EFFECTIVE FEBRUARY 5, 2006 | 83 |
| Delivery Area Service | 83 |
| DIM Weight Divisor | 83 |
| Document Preparation Service | 83 |
| Exception Handling Fee | 84 |
| Excess Dimensions | 84 |
| Fuel Surcharge | 84 |
| Iraq/Afghanistan Security | 85 |
| Large Package Fee | 85 |
| Late Payment | 85 |
| Oversize 1 | 85 |
| Oversize 2 | 85 |
| Oversize 3 | 85 |
| Rebills | 85 |
| Remote Area Service | 85 |

Franchisee's Initials _EB_ _____

| | |
|---|---|
| Residential Delivery | 85 |
| Saturday Pickup or Delivery | 85 |
| Shipment Value Protection (Air) | 86 |
| Shipment Value Protection (Ground) | 86 |
| Signature Required Fee | 86 |
| Spill Fees | 86 |
| Sunday, Holiday and After Hours Service | 86 |
| Undeliverable or Refused Shipments | 86 |
| U.S. Import Service Fees* | 86 |
| Weekly Service Fee | 87 |
| DHL Next Day 10:30am Service | 87 |
| Fees that DHL May Charge for Various Reasons | 87 |
| Address Correction | 87 |
| Emergency Situations | 87 |
| $50.00 Excess Limits Fee | 88 |
| Import Express Account Change | 88 |
| Pickup and Return on Demand (PROD) | 88 |
| Special Handling | 88 |
| BILLING ISSUES | 88 |
| SMARTMAIL! | 88 |
| Why SmartMail? | 89 |
| How To Prepare SmartMail Shipments | 89 |
| Special Instructions | 93 |
| FREIGHT SERVICES | 95 |
| DAY-TO-DAY BASICS | 100 |
| Morning / Opening Check List | 100 |
| Evening / Closing Check List | 101 |
| MARKETING | 103 |
| Location | 103 |
| Public / Community Events | 104 |
| Window Signage and Window Displays | 105 |
| Newspaper Advertising | 105 |
| Coupons | 106 |
| Flyers | 106 |
| Website | 107 |
| Radio Spots and T.V. Ads | 107 |
| Pens, Pins/Campaign Buttons, Frisbees, Balloons, Fridge Magnets | 108 |
| Advertising and Promotional Materials on the Owners' Section of www.coinpostal.com | 108 |
| Effective and Inexpensive Promotions | 108 |
| PITNEY BOWES | 111 |
| Rent vs Lease vs Buy | 111 |
| PROCESSING PACKAGES | 115 |
| Postage Machine | 115 |
| Stamps | 115 |
| Post Office Website | 116 |
| WHAT POSTAGE DO I USE? | 117 |
| First Class Mail | 117 |
| Priority Mail | 117 |
| Parcel Post | 117 |
| Express Mail | 117 |
| International | 117 |
| HAZARDOUS, RESTRICTED AND PROHIBITED ITEMS | 119 |
| *For Quick Reference: | 120 |
| In General: | 120 |

| | |
|---|---|
| Alcohol Restrictions: | 120 |
| Live Animals: | 120 |
| Blood, Urine, etc.: | 120 |
| Shipping Hazardous Materials with FedEx Ground® | 121 |
| SHIPPING POINTERS CHECKLIST | 121 |
| Final Questions to Ask Before Shipping | 121 |
| Prohibited Items for Import/Export | 122 |
| If You Want to Be Trained to Handle Hazmats/Firearms/Wine/etc. | 123 |
| Examples of Labels Required for Shipping Hazardous | 123 |
| Examples of Labels Required for Shipping Hazardous Materials | 124 |
| PACKAGING | 125 |
| Custom Boxes | 125 |
| Billing | 125 |
| Non-Fragile/Non-Breakable Items· | 126 |
| Single-Box Packing Method | 126 |
| Engines/Transmissions, Lawn Equipment, Motorcycles | 126 |
| Engines, Transmissions, Lawn Equipment, and Motorcycles CONTINUED... | 127 |
| Photos, Posterboard, X-rays | 127 |
| Industrial Machinery Parts, Sheet Metal Parts | 127 |
| Printed Matter | 127 |
| Printed Matter CONTINUED... | 128 |
| FRAGILE ITEMS | 128 |
| Basic Box-In-Box Packing Method | 128 |
| Box-In-Box Packing Method for Delicate or Thin Parts | 129 |
| Stringed Musical Instruments | 129 |
| Computers and Peripherals | 130 |
| Monitors | 130 |
| Printers | 130 |
| Servers/Routers | 131 |
| Magnetic Storage Devices | 131 |
| ODDLY OR IRREGULARLY SHAPED ITEMS | 131 |
| General Shipping Recommendations | 131 |
| PERISHABLES | 131 |
| Keeping Products Frozen During Transit | 131 |
| • Arrange products compactly, but leave space around the products for dry ice.* | 132 |
| Keeping Products Refrigerated During Transit | 132 |
| Requirements for Perishable Shipments with Wet Ice | 132 |
| Recommended Three-Strip Taping Method | 133 |
| Restricted Taping/Sealing Materials | 133 |
| General Labeling Recommendations | 133 |
| General Labeling Recommendations CONTINUED... | 134 |
| Items That Require Tie-On Tags | 134 |
| SIZE AND WEIGHT LIMITS | 135 |
| Maximum Dimensions for Shipping with FedEx and UPS | 135 |
| CUSTOM BOX MAKING | 137 |
| CUSTOM BOX MAKING | 137 |
| GP RATE PRO SOFTWARE | 138 |
| Installing GP Rate Pro version 3.0.0 | 140 |
| CONFIGURING GP RATE PRO 3.0.0 | 146 |
| Troubleshooting Registration Issues | 147 |
| Setting up Client Computers with GP Rate Pro | 150 |
| Setting up your printers | 151 |
| Setting Fuel Surcharges | 157 |
| Understanding How to Set Your % Mark-Ups, Step-By-Step, for Profitability. | 158 |
| Carrier Envelope Markups | 158 |

| | |
|---|---|
| Parcel Mark-Ups | 159 |
| First Class Mail Markups | 159 |
| Setting Passwords | 159 |
| SOFTWARE INTERFACE | 160 |
| Domestic Shipping | 162 |
| APO/ APO AE/ FPO | 165 |
| Canada | 165 |
| First Class Mail | 165 |
| PRINTING DHL LABELS WITH GP RATE PRO | 165 |
| Let's get started. | 165 |
| Cancel | 167 |
| Process Later | 167 |
| Process Now | 168 |
| Reprinting labels | 170 |
| Voiding Printed Labels | 171 |
| Processing Earlier Shipments | 172 |
| End of Day | 172 |
| Saving Customers | 173 |
| Retrieving Customer Information from the Process Package Screen | 174 |
| Saving detailed package information | 175 |
| 3rd Party Insurance | 175 |
| Reports | 176 |
| Searching you shipment history | 176 |
| MAILBOXES | 178 |
| 24-Hour Access to Mailboxes | 178 |
| Form 1583A | 178 |
| Form 1583 | 178 |
| Keeping Track Of Renters | 181 |
| Forwarding Mail | 181 |
| QUICKBOOKS PRO | 183 |
| Chart of Accounts | 187 |
| Protecting Your QuickBooks | 187 |
| Backing Up Your Data | 187 |
| Restoring Your Data | 188 |
| Banking, Credit Cards, and Financing | 188 |
| Accounts Receivable | 189 |
| Learning How to Receive a Payment | 190 |
| Reconciling an Account to Your Bank Statement | 191 |
| Working with Vendors | 192 |
| Add New Vendor | 192 |
| Enter Bills | 193 |
| Paying Bills | 193 |
| Paying a Bill with a Check | 193 |
| Paying Only Part of a Bill | 194 |
| Paying a Bill with a Credit Card | 194 |
| What happens after you record a bill payment? If you paid by: | 194 |
| Sales Tax | 195 |
| Paying Sales Tax | 195 |
| To Pay Sales Tax | 195 |
| Changing a Sales Tax Rate | 195 |
| Payroll and Employees | 197 |
| Employee Forms and Applications | 197 |
| Quarterly Payroll Tax forms and 941 Deposits | 197 |
| PAYROLL INFORMATION | 198 |
| Good News for The Computer Challenged! | 198 |

| | |
|---|---|
| GP SHIPPING FORMS | 202 |
| What Is the GP Shipping Form? | 202 |
| COMPUTERS ARE OUR FRIENDS! | 209 |
| Typing Tutorials | 212 |
| Communicating Through Instant Messenger | 212 |
| Communicating with Messenger | 214 |
| Fixing Large Issues | 215 |
| COMPANY POLICIES | 218 |
| Staying Informed and Trained | 218 |
| You May NOT Serve Customers At Your Store Prior to the GPFC Rep's Sign-Off | 219 |
| Do Not Misuse Customers' Personal Information | 221 |
| Refund Rule: Don't Charge Customers for Items They Don't Ship | 221 |
| Understanding Overtime Pay | 222 |
| Treatment of Potential Franchisees | 224 |
| To Have GPFC Approve a Particular Vendor, Service, or Product | 225 |
| Phone Etiquette | 226 |
| Royalty Payments | 226 |
| Credit Card on File | 227 |
| Issues or Problems | 229 |
| Questions about the Goin' Postal Name and Goin' Postal in General | 231 |
| Communication | 231 |
| Treatment of Potential Franchisees | 232 |
| Bootleg Merchandise | 232 |
| Negotiating on Behalf of The Chain | 233 |
| Circumventing the Franchise System | 234 |
| Continuing Education | 236 |
| Store Information | 236 |
| Statements and Records | 237 |
| Contacting Other Franchisees | 237 |
| Creating or Modifying Advertising Materials | 238 |
| Do Not Open Customers' Mail or Packages | 238 |
| New Policy as of September 2006: Secret Shoppers | 240 |
| Immediate Termination | 242 |
| Abandonment of Store | 242 |
| Racism, Bias, or Prejudice In ANY Form | 242 |
| Default Notice/Breach of Contract | 243 |
| Improper Operations | 243 |
| Improper Decorating and Store Design | 243 |
| Cleanliness of Your Store | 243 |
| Outstanding Payments | 250 |
| Coloring Contests, Raffles, and Many Types of Contests are NOT PERMITTED | 250 |
| Recommended Reading | 251 |
| CONTACTS | 257 |
| MANUAL RECEIPT - MAY 2007 | 261 |

*Contents of Operations Manual and page numbers are subject to change, without notice, but any revised Operations Manuals will be available to you via the Owners' Section of our website.

3) Goin' Postal Franchise Corporation will provide a reasonable level of telephone support during our normal business hours (Eastern Standard Time) to assist with resolving operating problems and for any general or technical questions you may have (Franchise Agreement – Section 4.2). However, your Operations Manual (including updates posted within the Owners' Section of our website) is your primary source of information concerning your Store operation and you are responsible for reading and becoming familiar with the Operations Manual. You may, subject to room and availability, and at your sole cost and expense schedule additional training

Franchisee's Initials _EβB_____

for one or more of your employees at our Headquarters in Zephyrhills, Florida. We have no obligation or responsibility to train your employees once those individuals you sent for the two (2) "Pre-Opening" training sessions (see discussion under "Pre-Opening Obligations #7" and "Pre-Opening Obligation #8" above) have completed such training. We do not provide assistance in the actual hiring of your employees.

4) Goin' Postal Franchise Corporation will make available via a password all its resources via the secure, password protected Owners' Section of the Goin' Postal Franchise Corporation website (Franchise Agreement – Section 4.2). This secure, password protected Owners' Section may only be accessed through use of a password which we provide you. You may not provide your password and may not provide access to, or copies of any materials within, our Owners' Section without our prior written and informed consent. Within this Owners' Section, you will find a variety of materials aimed at assisting you in improving and developing your franchised business (including concepts for community events and related activities to foster the reputation and goodwill of your franchised business within your locality), as well as various materials we have prepared to improve and develop the Goin' Postal chain as a whole. Most of the information you will need concerning administrative, bookkeeping, accounting and inventory control procedures are covered for you in the Operations Manual and were covered in your training sessions.

5) Goin' Postal Franchise Corporation will provide artwork for your advertising which may be downloaded via the Owners' Section of the Goin' Postal Franchise Corporation website or which may otherwise be ordered directly from us. Goin' Postal Franchise Corporation must approve any and all advertising materials not developed or provided by us in advance and in writing (Franchise Agreement – Section 4.2, Section 5.1 and Section 8). See Item 8 of this Disclosure Document for information on obtaining approval for use of advertising and artwork which has not been furnished to you by us. Currently, we charge all our franchisees a Royalty (excluding the 9 pilot franchisees; see further discussion later in this Note 5). This Royalty is paid to us by you through use of your designated credit card or by means of an electronic funds transfer payment program we have required you to establish with us, and a portion of the Royalty may be used by us, as set forth in Section 8 of the Franchise Agreement for public relations, advertising, testing and marketing new programs, product and services, promotional programs and related items. Currently, all advertising materials available to you on our website have been prepared by us in-house. All franchisees agree as part of becoming a Goin' Postal franchisee that they, their employees and their Stores may be photographed and used by us in our website, advertising and promotional materials. The portion of Royalties of all franchisees allocated by us for advertising, marketing and promotional purposes will be pooled and once a sufficient level of funds have been allocated for such purposes, are intended to be used to produce TV, radio and print ads on a national level, which ads will also be available to you free of charge on the Owners' Section of our website for you to download and use or run at your discretion, at your cost, in your own markets. We provide you with free access to the Owners' Section of our website, by use of a password we provide you, where you will be provided various advertising materials and resources. The use of all Royalties and the administration of the use of those funds will be determined by us, and the expenditure of funds for advertising and marketing purposes will be reflected on the annual audited financial statements prepared by our independent CPA as part of the yearly updates we make to this Disclosure Document. A copy of any particular annual audit will be made available within a reasonable amount of time following your written request. Currently, we have no money accumulated in an advertising fund out of prior Marketing Fees and Royalties received by us, as we have spent the entire $1,200.00 of Marketing Fees and Royalties received by us between January 1, 2008 and December 31, 2008 for direct franchisee advertising and promotional services. As the total amount of Marketing Fees received and the portion of Royalties which we have allocated for advertising and other marketing purposes (around $1,200.00) have been insufficient to provide for any significant media production, we have not used the advertising fund for any national marketing. We have found that the in-house advertising materials we currently make available to you at no charge have proven both adequate and successful. From January 1, 2008 through December 31, 2008, we have expended in excess of $200,000.00 to develop network-wide franchisee advertising materials such as website design, pay per click advertising,

43                     Franchisee's Initials _____

and print advertising. These expenditures have been out of general sales revenues received by us which are separate from the franchisee advertising fund and these expenditures have been in addition to the small amount expended from the advertising fund established by franchisee Marketing Fees and Royalties. Beginning January 1, 2006, we implemented a flat $200.00 per month fee which was paid by all new franchisees instead of the separate percentage Royalty and Marketing Fee payments. Commencing January 1, 2008, this flat monthly Royalty was increased to $300.00 per month during the 2008 calendar year, with an approximate 5% increase each subsequent calendar year through the term of the Franchise Agreement (see Item 6). For calendar year 2009, the flat monthly Royalty is $315.00 per month. Prior to January 1, 2006, we provided our existing and new franchisees with an election to pay a $200.00 per month Royalty, or to pay a percentage Royalty and percentage Marketing Fee. Only 14 of our current franchisees elected to pay percentage Royalties and percentage Marketing Fees, and since then, more than one-half of those franchisees have elected to pay the flat fee Royalty. All percentage Marketing Fees received by us from those few franchisees who continue to pay a percentage Marketing Fee will be allocated to the advertising fund. We will allocate as we deem necessary or appropriate a portion of such monthly flat fee Royalty payments for advertising and marketing purposes. Once allocated, no portion of the advertising or marketing fund will be paid to us or any affiliate for providing any goods or services related to the advertising fund. We will have the sole discretion in determining the form of advertising, any particular advertising media, and the location and territorial coverage of such advertising, and we are not obligated to spend any amount on advertising in the territory where your particular Goin' Postal Store is or will be located. Any monies allocated by us to the advertising fund in any year which are not spent for advertising and marketing purposes during such year will remain in such advertising fund and continue to accrue for future advertising and marketing functions. No monies in the advertising fund are used by us to promote the sale of additional Goin' Postal franchises (though a portion of the Initial Franchise Fee and/or Royalty Fees not allocated to the advertising fund may be used for such purposes). You are not required to join or participate in any local, regional or national advertising cooperative. You are not required to participate in any other advertising fund beyond any advertising fund we determine to establish from and out of a portion of the monthly Royalties you pay us. We do not maintain any advertising council, and all decisions on how best to use the advertising fund and the methods and modes of advertising are made solely by us. Upon and with our prior review and approval, you may develop and use your own local advertising material. All advertising materials you develop and desire to use must be submitted to us prior to your use for our review and approval (see Item 8 of this Disclosure Document above). All franchisees, except the 9 pilot franchisees initially started by our predecessor and our one (1) company owned Store, pay either the 0.75% of gross sales percentage Marketing Fee (only around 6 of our current franchisees pay the percentage Marketing Fee), the $200.00 per month flat fee Royalty presently being charged to those franchisees who became Goin' Postal franchisees between January 1, 2006 and December 31, 2007, or pay the $315.00 per month flat fee Royalty (with calendar year increases of approximately 5%) currently being charged to all new franchisees from and after January 1, 2009. All franchisees who submit Franchise Agreements commencing January 1, 2009 to establish a new Goin' Postal Store or to purchase an existing Goin' Postal Store will initially pay a flat $315.00 per month Royalty which in turn increases each calendar year during the term of the Franchise Agreement (see Item 6 of this Disclosure Document above).

## Turn-Key Store Obligations

If you purchase a Turn-Key Franchise Package (see Item 5 of this Disclosure Document), in addition to the other Pre-Opening and Post-Opening obligations reflected above, Goin' Postal Franchise Corporation will, within the limits of responsibility reflected in the table below and in the Turn-Key Store Agreement, provide the following additional services (the following is only intended to be a general summary of these services; for these services, you must sign a separate Turn-Key Store Agreement, **Exhibit "J"**, and you must carefully read and understand this separate Turn-Key Store Agreement in its entirety):

1) **Site Location**. A Turn-Key Franchise Package purchaser (throughout this portion of this Item 11, such a purchaser will be referred to as a "Turn-Key Franchisee") will have the exclusive

responsibility of choosing a specific city, town, or locality within which they desire to locate their Goin' Postal Store (the more specific and more confined the area chosen by the Turn-Key Franchisee, the longer it may take to locate and secure a suitable Store location within that limited area). Primarily through use of a real estate professional with whom we have entered into a contract for these purposes (see Item 8 of this Disclosure Document), as well as contacts with various real estate brokers within the vicinity of your desired location, we will use our best efforts to locate suitable premises for a Store in the area chosen by the Turn-Key Franchisee. The real estate professional with whom we presently have a contract to assist in locating suitable premises, as well as undertaking lease negotiations for the benefit of Turn-Key Franchisees, is Mark Camara, American Property Exchange, Inc., 4491 W. Whitewater Avenue, Westin, Florida 33332 (phone: 954/389-1885, Ext. 111). If a Turn-Key Franchisee has a specific desired location for the Store, this information must be provided to us at the time of completing and submitting the Turn-Key Store Agreement (**Exhibit "J"**). The Turn-Key Franchisee may also assist us by scouting the general area for potential locations and then providing this information to us. Once one or more suitable locations have been found, one of our representatives will visit the location(s) and approve a particular location from among the location possibilities. It is strongly recommended that the Turn-Key Franchisee attend these visits to the location possibilities to provide personal input on final approval of the chosen location, particularly since the Turn-Key Franchisee will be required as part of this particular franchise package to sign off on the final location as both acceptable and approved by the Turn-Key Franchisee. We do not in any way or under any circumstances warrant any location to be fit for the Turn-Key Franchisee's business or guarantee that the Turn-Key Franchisee's Store will be successful at the chosen location. Any Store may fail due to a variety of reasons totally unrelated to the specific location of such Store.

2) **Lease Negotiations**. Once the location of a Turn-Key Franchisee's Store has been chosen and the location is approved by us, presently through the services of Mark Camara, a lease will be negotiated on behalf and for the benefit of the Turn-Key Franchisee. Although, through the services of Mark Camara, lease terms will be negotiated which are as favorable to the Turn-Key Franchisee as possible, the Turn-Key Franchisee will have the ultimate responsibility to review and approve the lease terms, and it is recommended that the Turn-Key Franchisee utilizes the services of independent legal counsel or a separately retained real estate broker to advise and counsel the Turn-Key Franchisee on the meaning and effect of the various lease terms. We do not in any manner whatsoever act as legal counsel or in any other advisory capacity to any Turn-Key Franchisee and we do not provide any Turn-Key Franchisee with any opinion, advice or counsel as to whether the Turn-Key Franchisee should accept or reject any particular lease terms, or whether such lease terms are favorable or beneficial to the Turn-Key Franchisee. Each Turn-Key Franchisee may choose to personally negotiate the particular terms of the lease for the location of their Store, but if a Turn-Key Franchisee so chooses to undertake lease negotiations, neither Goin' Postal Franchise Corporation nor Mark Camara will be involved in those negotiations. Further, any lease negotiations undertaken by us or Mark Camara on behalf of a Turn-Key Franchisee will be pursuant to the Turn-Key Franchisee's particular credit standing and other relevant personal information, and we do not sign, counter-sign, or act as a guarantor on any lease(s) for or on behalf of a Turn-Key Franchisee. In accordance with the table set forth below, we will pay the costs of securing the particular premises chosen for the Turn-Key Franchisee's Store location, consisting of those standard costs such as leasehold security deposits, and any upfront advance rent payments (i.e., first and last months' rent). Any additional costs and fees to either locate suitable premises or establish a lease for the chosen location will be paid for by the Turn-Key Franchisee and will not be paid for by us.

3) **Incorporation and Business License**. If the Turn-Key Franchisee desires to incorporate the Store ownership and franchised business, we will pay the expenses incurred in providing basic incorporation services for the Turn-Key Franchisee and will obtain the Turn-Key Franchisee's federal identification number, state sales tax number, and any required local business licenses, within the responsibility limits reflected in the table set forth below. The Turn-Key Franchisee is responsible for providing any desired corporate name (which may not

include any of our protected Marks, logos, taglines or related intellectual and proprietary rights) and will provide all required officer and director names and social security numbers, addresses, and other information necessary to proceed with the incorporation. The Turn-Key Franchisee will also be responsible for signing all documents necessary to proceed with the incorporation. Turn-Key Franchisee will either personally act as the agent for service of process with respect to such corporation or designate someone else to serve in that capacity. We do not act as registered agent for any Turn-Key Franchisee's corporation.

4) **Insurance.** We will procure for a Turn-Key Franchisee basic liability and hazard insurance coverage in the Turn-Key Franchisee's name, and will pay the first month's insurance premium on such policy. The Turn-Key Franchisee will be responsible for signing any and all applications and other documents necessary to obtain such insurance coverage.

5) **Utilities.** We will establish utility accounts in the Turn-Key Franchisee's name for electricity, telephone, garbage, water and sewer, and will pay any initial upfront deposits on such accounts.

6) **Store Build-out.** We will arrange and pay for the build-out and Store set-up costs for the Turn-Key Franchisee's Store, to include materials, furniture, and equipment, and pay the cost to hire a licensed contractor. This cost allocation is based upon a standard 1,200 square foot location already in a "vanilla box" condition (see the particulars within the Turn-Key Store Agreement). If the Turn-Key Franchisee wishes to have a larger Store, or if the chosen premises are not already in a vanilla box condition, the Turn-Key Franchisee will be billed for the costs of the additional materials, furniture, equipment and labor necessary to convert the premises to a vanilla box condition and/or build-out, furnish and equip a location larger than the standard 1,200 square footage Store upon which our fees for a Turn-Key Franchise Package were based. In such circumstances, the Turn-Key Franchisee will to the extent possible be informed of an estimate of these additional charges prior to our approving and securing this particular "non-standard" location for you. The Store build-out will include the following services:

- Carpeting and tile
- Painting and decorating
- Wall units with lighting
- Three place counter and cash wrap
- Slat wall
- Rear Wall
- Box shelves and storages
- Two units of mailboxes (60 boxes total)
- Packaging table and area
- Peanut hopper
- Shelves
- Interior signage

The build-out and Store set up will be in accordance with our Standards and Specification for Store set-up as reflected in our Store Set-Up Manual, including internal color and paint schemes.

7) **Exterior Signs.** We will pay for exterior signage at the Turn-Key Franchisee's Store location. All exterior signs will be based on and in accordance with the specific lease requirements for the Turn-Key Franchisee's Store location. If a monument or pylon sign is available at the roadside entrance to the Turn-Key Franchisee's Store location, we will pay up to $500.00 toward the costs of panels for this roadside sign.

8) **Copier,** We will pay for the purchase of a Konica Minolta copier with a 25 page per minute color copier capacity with automatic document feeder and booklet finisher. The Turn-Key Franchisee will be solely responsible to pay the costs for procuring and then maintaining a maintenance agreement on this copier.

46          Franchisee's Initials _____ 

9) **Stock and Inventory.** We will provide the stock and inventory detailed in the table set forth below in order to have the Turn-Key Franchisee's Store ready for opening.

10) **Inspections.** We will have all necessary inspections carried out to obtain appropriate authority to open the Turn-Key Franchisee's Store for business.

11) **Limitations.** The table set forth below provides a detailed listing of our responsibilities with respect to a Turn-Key Franchise Package. Any deviations which the Turn-Key Franchisee wishes to make to their Store from those reflected in the table below are the Turn-Key Franchisee's sole responsibility and will be at the Turn-Key Franchisee's sole cost and expense. The Turn-Key Franchisee must provide us with either a credit card account authorization or with an electronic funds transfer arrangement, as we choose, so that any overages incurred above and beyond those to which we have agreed to be responsible as set forth below may be appropriately paid as they are incurred. The Turn-Key Franchisee must be available to sign any and all documents required as part of this Turn-Key Franchise Package, and we do not act as an agent, partner, power of attorney or other representative for or on behalf of any Turn-Key Franchisee. For the total sum of $117,000.00, a Turn-Key Franchisee receives the following as part of a Turn-Key Franchise Package:

## INCLUDED ITEMS UNDER TURN-KEY FRANCHISE PACKAGE

| Included in $117,000.00 | Description | # |
|---|---|---|
| Franchise Fee | Standard Franchise Fee | 1 |
| Point of Sale systems | Two complete Point of sale systems | 2 |
| Rent & Deposits | We will pay the rent and deposits for the first month, last month, and security deposit to the extent required to commence possession and use of premises. Turn-Key Franchisee is solely responsible for all further rent obligations and other payments due under lease | 1 |
| Utility deposits | We will pay upfront utility deposits for telephone, electricity, gas, water, sewer and garbage | 1 |
| Insurance | Liability insurance first monthly premium payment or deposit. Turn-Key Franchisee responsible for all additional premiums and other payments | 1 |
| Incorporation | Basic Incorporation and EIN number | 1 |
| Licenses | City Business Licenses etc. | 1 |
| Build out | Carpet, tile, pre-fabricated fixture walls, counters, shelves, islands, mailboxes, display lighting. This is based on a vanilla box. If your location needs structured walls, HVAC, bathrooms, ceilings etc you will be responsible for these costs. | 1 |
| Contractor | | 1 |
| Sign | | 1 |
| Permits | | 1 |
| Copier – Color | | 1 |
| Fax | | 1 |
| Laminator | | 1 |
| Phone System | | 1 |
| Printers | All necessary printers | 1 |
| Furniture (desks, filing) | Desk, Filing cabinets etc. | 1 |
| Pitney Bowes Machine | 1 months lease payment and 1 postage refill | 1 |
| Various Salaries | All GPFC salaries to establish location | 1 |
| Packaging Office | Panes, paper, tape, knives, CDs etc. | 1 |

Franchisee's Initials ___*EB*___

Supplies Stock

| | | |
|---|---|---|
| Greeting Cards/Gifts | Cards, racks and various gift wrap items. | 1 |
| | | |
| Boxes | Startup package | 1 |
| Stamps | Startup package | 1 |
| Retail Office Supplies | Start-up package of ink, toner and other office supplies inventory | 1 |
| GPFC Travel expenses | Location selection, buildout, reps visit. Turn-Key Franchisee responsible for travel expenses to Zephyrhills and all related accommodations. | 1 |

| | |
|---|---|
| 48" Steel Rule | 1 |
| 3 Tier Plastic Display | 1 |
| Utility Knives | 4 |
| Tape Measurers | 2 |
| Stamp Drawer | 1 |
| Foam Mounting Tape | 2 |
| Business Cards | 1 |
| Card Holders | 3 |
| Stapler | 1 |
| Hole Punch | 1 |
| Receipt Spikes | 2 |
| Pouches starter kit | 1 |
| Scotch Tape | 2 |
| Paper | 1 |
| Scissors | 2 |
| Markers | 1 |
| Tape Guns | 2 |
| Bubble Mailers | 1 |
| Power Strips | 3 |
| Pens | 1 |
| Paper Clips | 1 |
| Set Up Box | 100 |
| Slatwall Hooks 6" | 50 |
| Slatwall Brackets | 24 |

| | |
|---|---|
| Counter Wall Sign | 1 |
| Window Sign | 1 |
| 15' Banner | 1 |
| 1 set mugs | 1 |
| Shirts | 6 |
| Stamp Set | 1 |
| 1000 Shipping Forms | 1 |
| Printed Shirts | 3 |
| Lifesize Running Guy | 1 |

| | |
|---|---|
| Digital Camera | 1 |
| Photo Printer | 1 |
| Photo Passport Software | 1 |

| | |
|---|---|
| Thermal Label Printer | 1 |
| 150lb Scale | 2 |

Franchisee's Initials _EB_____

12) **Turn-Key Store Agreement.** In order to participate in a Turn-Key Franchise Package, a Turn-Key Franchisee must sign and return the Turn-Key Store Agreement (**Exhibit "J"**), together with the Franchise Agreement (**Exhibit "A"**), Non-Competition and Non-Solicitation Agreement (**Exhibit "B"**) and all other agreements and writings required to be completed, signed and returned under this Disclosure Document, and together with full payment of the total required $117,000.00 (paid to Goin' Postal Franchise Corporation in two separate checks, one for $15,000.00 and the other for $102,000.00) advance payment for the purchase of a Turn-Key Franchise Package.  The specific obligations and agreements of both Goin' Postal Franchise Corporation and the Turn-Key Franchisee are reflected in the Turn-Key Store Agreement, and the above is intended to be a general summary of those terms. Items included in the above Table are intended to indicate the factors upon which we arrived at the internal budget we have established for specific components of the Turn-Key Franchise Package and the basis for the $117,000.00 package price. Any overages or underages on any estimated budget item(s) will be absorbed by or accrue to the benefit of Goin' Postal Franchise Corporation.

Franchisor's obligations under this Item 11 are applicable to each new Goin' Postal Store you purchase from us in accordance with our Disclosure Document, and the ongoing obligations of Franchisor applicable to operating Goin' Postal Stores will also apply to any Goin' Postal Store we authorize you to purchase from one of our other franchisees.

## ITEM 12:    TERRITORY

Once you have furnished to us in writing a specific physical address for your desired Store location and we have notified you in writing that we approve such Store location, GPFC will provide you with a protected territory outlined by geographical features such as roads and state, city and county lines, or by means of a designated circular area defined by an established radius allocated to you by us at our discretion. Currently, franchise territorial boundaries are established by a one (1) mile radius within city/metropolitan/urban areas and a five (5) mile radius in rural areas, with a minor +/- variance (to the extent reasonably practical) so as to make use of existing streets or other well known landmarks lying at the outer perimeters of such radius to provide a more easily recognizable and supportable territorial description.

The standard territory allocation may be reduced by us if your desired Store location is in an area of extremely high population density, such as Manhattan (New York City), New York, downtown Los Angeles, California, downtown Seattle, Washington, downtown Boston, Massachusetts, downtown Chicago, Illinois or Washington, D.C.   If GPFC receives a signed Franchise Agreement from a prospective Franchisee residing (or wanting to locate their franchised Store) within one of those areas of extremely high population density, the prospective Franchisee must approve in writing the reduced territory assigned by GPFC prior to GPFC accepting the Franchise Agreement and accepting the prospective Franchisee as a Goin' Postal Franchisee.

GPFC will not allow another Franchisee to open a Goin' Postal Store under its Goin' Postal Marks or under another competing trademark owned by GPFC or one of our affiliates within your territory.

GPFC will not open any Franchisor owned Shipping Stores which sells shipping and packaging services to the general public or small businesses (and would therefore compete with your Store), either under our Mark or under another mark, within your territory.

You may open additional Stores within and up to the boundaries of your protected territory only upon the prior written approval of GPFC and, if so approved, only by executing the Franchise Agreement in effect at that time and by paying the full franchise fee and other fees (including the cost to purchase the two Point of Sale Systems and other Required Minimum Purchases) in effect at such time for each additional

Store (see Item 5 for a discussion of current discounts on franchise fees for additional Stores). Upon opening of additional Stores, we will endeavor to expand your protected territory around the new Store(s) as long as it doesn't encroach on another franchisee's protected territory or that territory associated with a Franchisor owned (or affiliate owned) Store. You may not open another shipping Store under our trademark or another competing name or mark owned by us within or outside of your territory without our prior approval and without executing the GPFC Franchise Agreement in effect at that time for that Store and paying all fees required by us at that time.

Franchisor owned and/or Franchisor affiliate owned Stores exist with their own protected territory as do other franchisee owned Stores. Franchisor owned Stores abide by the same rules and obligations as laid out in this UFDD.

We may not modify the protected territory assigned to you without your prior permission (although you forfeit and lose all such territorial rights upon the occurrence of any default or other action resulting in termination of the Franchise Agreement – see Item 17 and **Exhibit "A"** of this Disclosure Document). You may, at the request of Goin' Postal Franchise Corporation, allow another franchisee to open a Store within your territory. If you approve the request, the protected territory will be reapportioned to provide protection for both you and the new franchisee.

Your territory is granted by us based on the specific Store location address you provide us on signing the Franchise Agreement, or shortly thereafter, and which we in turn approve and assign to you with the granted territory. You do not have a protected territory or any rights to any specific territory unless and until you have submitted to us, in writing, a specific physical address for your Store, and we, in turn, submit to you, in writing, our approval of that specific physical address. Your protected territory will be established using the criteria described earlier in this Item 12 based upon and around the approved specific physical Store address. You will operate from that one approved location and must receive our permission before relocating. Should the location cease to be available, we will use our best efforts to reassign an amended territory around a new location within your territory, subject to limitations imposed by existing territories which may then be established for other Stores owned by other franchisees, by the Franchisor or by Franchisor affiliates. Once your territory has been assigned, the only conditions you must meet in order to keep these territorial rights is to be a Goin' Postal franchisee in good standing and otherwise be in compliance with your obligations under the Franchise Agreement (see Item 9, Item 17 and **Exhibit "A"** of this Disclosure Document), under the Non-Competition and Non-Solicitation Agreement (see **Exhibit "B"** of this Disclosure Document) and under each of the other agreements you are required to sign as part of becoming a Goin' Postal franchisee (see Item 22 for a list of those agreements).

We may, at our sole discretion, approve a relocation of your business within your territory without your incurring a relocation fee. Should you require relocation outside of your territory, a \$500 relocation fee will be assessed to provide you with a new one; provided a territory is reasonably available and not already protected. All relocations selected by you and approved by us are subject to the then existing territorial rights of other franchisees and Franchisor/affiliate owned Stores.

You will have no restrictions on soliciting business from outside your territory by direct or indirect contact such as telephone, or mail. A Standard or Turn-Key Goin' Postal franchisee may operate a Goin' Postal "mobile shipping store" (a vehicle outfitted with a Point of Sale System, a scale and the ability to serve customers and receive payment for shipping services at a remote location) within the protected territory assigned to such franchisee. You may not under any circumstance operate a pick up or delivery service within the protected territory of another franchisee.

We will not solicit orders for our company/affiliate owned Stores within your or another franchisee's territory. Except through conducting our online stores as more fully explained later, we will not establish other channels of distribution of the goods and services which we franchise to you under the Franchise Agreement using the Marks except through franchised Goin' Postal Stores, including affiliate-owned Stores and those Goin' Postal Stores we may establish ourselves (subject to the restrictions set forth above). However, we do intend to continue the business operations which we purchased from Life Size

Greetings, Inc. consisting primarily of the sale of giant sized greeting cards and custom stand-ups replicated from photographs submitted by a customer. These business activities will primarily be handled through the online store operated from the website we maintain at www.lifesizegreetings.com. We may in the future develop a new and separate franchise concept designed around the giant sized greeting card and custom stand-up business, which will primarily consist of the rental of these items, but may also involve the retail sale of such products as well. Both our operation of the giant sized greeting card and custom stand-up business and the possible future franchising of these activities may be competitive with a Goin' Postal franchisee's business solely to the extent such Goin' Postal franchisee has chosen to include these "Life Size Greeting" products as part of their approved Goin' Postal products and services. Further, we commenced operating around March, 2008 an office supply and ink/toner supply online store which we operate from the website we maintain at www.goinpostalsupplies.com (see Item 8 of this Disclosure Document for further details). Both new and existing Goin' Postal franchisees who have purchased the Standard Goin' Postal Store Franchise Package or the Turn-Key Goin' Postal Franchise Package have the opportunity, but will not be obligated, to offer as part of the pre-approved products and services permitted at a Goin' Postal Store office supplies and ink and toner supplies. GPFC offers its Goin' Postal franchisees, via its www.goinpostalsupplies.com website, a variety of different office supply packages (see the specifics of these offerings in Item 8 of this Disclosure Document). If you do not purchase one of our available "Office Supply Packages" as part of the permitted product and service offerings to be sold at your Goin' Postal Store, those Goin' Postal franchisee Store owners who do sell office and ink and toner supplies through purchase of one of our Office Supply Packages may conduct sales of these office supplies within your designated territory, including a mobile delivery service. Our online office supply store may be competitive with any office supply sales you may offer at your Goin' Postal Store, but if you have purchased office and ink and toner supplies through us by purchasing one of our Office Supply Packages, and a customer who purchases office supplies from our on-line office supply store resides in your protected territory, we will pay you a commission in accordance with the procedures outlined in this Item 12 of this Disclosure Document. Purchases of these supplies may only be made from GPFC through use of its online store at www.goinpostalsupplies.com. You may not purchase any of these supplies directly or indirectly from either Clover Technologies Group, L.L.C. or the Azerty division of United Stationers Supply Co. (or any of their respective affiliates). Should you purchase from GPFC for resale in your Store one of GPFC's Office Supply Packages of ink/toner/office supplies, and should a purchase of any of those supplies be made by a customer off of GPFC's online store for a delivery within your protected territory, GPFC shall pay you a commission equal to the difference between the price at which GPFC sold such supplies to such customer, less the sum of the following amounts: (i) the cost you would have paid to GPFC for the purchase of such supplies from GPFC's online store; (ii) the $2.50 drop shipping processing fee GPFC pays its supplier per each order; and (iii) a flat shipping charge currently equal to $9.00 (subject to change by GPFC's supplier) GPFC must pay its supplier on shipments of orders of $250.00 or less (the $9.00 shipping fee is waived from this total sum on order above $250.00). Any commission(s) due to you will be held in a suspense account until such total commission balance due to you exceeds $200.00, at which point you may either demand a check (only one (1) commission check, if due, will be paid per month) for the total account balance, or apply the account balance toward purchase of another ink/toner/office supply package from GPFC, toward the purchase of Goin' Postal merchandise (i.e. mugs, shirts, etc.) from GPFC, or toward the annual GP Rate Pro update costs (no commission account balance may be applied toward Royalties, which are automatically paid to GPFC through an electronic funds transfer arrangement).

You have the right to purchase other non-protected territories by signing our then current franchise agreement and paying to us the franchise fees (including the Required Minimum Purchases) in effect at the time for each new territory you intend to purchase (see Item 5 for a discussion of current discounts on franchise fees for additional Stores). By purchasing this option, you are agreeing to establish, in each new territory you have acquired per the requirements in the immediately preceding sentence, an approved Store location and then open an additional Store at such approved location within the new territory within 6 months of the signing of the then current franchise agreement. Failure on your part to establish and open such additional Store in such new territory within said 6 month period will result in a forfeiture of both the territory and the franchise fees you paid to us for that territory. No franchisee has any contractual option or right of first refusal to acquire the franchise of any other franchisee or to acquire additional franchises, whether in your territory, contiguous territories, or elsewhere, other than the ability

to purchase a non-protected territory as expressed in the preceding sentences. You may also negotiate with us the expansion and enlargement of the specific territory applicable to an existing Store owned by you (in instances where you do not desire or intend to open an additional Store), and any such territorial expansion approved by us will require as a condition to such approval that you first pay to us such additional fee as we determine reasonable based upon the scope and extent of the desired expansion and the level of existing territorial protection we have already allocated to other of our Goin' Postal franchisees in the general vicinity of your existing Store and your desired new territorial expansion.

Territories do not transfer with the sale of an existing Store. Upon the sale of an existing Goin' Postal Store, the existing territory allocated to that Store will no longer be valid or applicable, and the new owner(s) of such Store will be assigned and allocated a new territory having the defined limits and parameters prescribed in this Disclosure Document and the Franchise Agreement (as then in effect; see Exhibit "A" of this Disclosure Document).

## ITEM 13:    TRADEMARKS

Goin' Postal Franchise Corporation grants you the right to operate a Goin' Postal shipping Store under our current and future "Marks". By "Marks", GPFC means trademarks, service marks, names, slogans, taglines and logos owned (now and in the future) by us, including in particular, but not limited to, the registered Marks "Goin' Postal" (see class distinctions for this Mark set forth below), the registered Mark "Goin' Postal Your Friendly Neighborhood Shipping Center" and associated design as set forth below (and each separate element thereof), the registered Mark depicted by our Goin' Postal parcel deliveryman and associated design as set forth below (and each separate element thereof), the registered Mark "Delivering the Best of America" and associated design as set forth below (and each separate element thereof), the Marks evidenced by our filed and pending registration applications set forth below (and each separate element thereof), and the presentation of our composite Mark appearing on the Cover Page of this Disclosure Document and enlarged immediately below (and each separate element thereof). The predecessor of GPFC, Goin' Postal, Inc., registered the Mark "Goin' Postal Your Friendly Neighborhood Shipping Center" and associated design on the United States Patent and Trademark Office principal register effective April 18, 2006 (see detailed information of this registered Mark below). Other than the Mark we filed with the United States Patent and Trademark Office principal register on August 22, 2008 (see detailed information below for the Mark bearing Serial No. 77553437), our predecessor, Goin' Postal, Inc. also filed registration applications for each of the other Marks described below on the United States Patent and Trademark Office principal register. On January 2, 2007, we purchased from Goin' Postal, Inc. all of the Marks initially filed for registration by Goin' Postal, Inc., and we are now the sole owner of them. The Mark depicted by our Goin' Postal parcel deliveryman, the Mark "Delivering the Best of America", and the Mark "Goin' Postal" (as to the class designations set forth below) are now registered (see dates of registration for each set forth below) on the United States Patent and Trademark Office principal register. Our Mark, "Goin' Postal" in the class designations allocated by the United States Patent and Trademark Office to the services described in the two Mark presentations appearing below under the caption "Our Marks filed for registration and currently pending" are subject to a filed and presently pending registration application on the United States Patent and Trademark Office principal register. The application bearing Serial No. 78778230 has successfully completed final review prior to publication, and will be published for opposition. The application bearing Serial No. 77553437 is presently subject to a non-final office action pursuant to which the examining attorney has requested additional information concerning the identification of Goods portion of this application. We intend to timely respond to this non-final office action by adopting the identification of goods as suggested by the examiner and by specifying with particularity commercial or generic names for the goods where required. Other than just described, there are no currently effective material determinations of the Patent and Trademark Office, Trademark Trial and Appeal Board, The Trademark Administrator of your or any other State or any Court; no pending infringement, opposition or cancellation; and no pending material litigation involving the principal trademarks to be used by you in owning and operating a Goin' Postal franchised Store. We have filed all required affidavits for each of the Marks filed with the United States Patent and Trademark Office and none of our registered Marks have yet required renewal or are required to be renewed at this time. However, certain classes of services of

one of the principal trademarks to be used by you as depicted below are not currently registered with the United States Patent and Trademark Office. We do not yet have a federal registration for our principal trademark "Goin' Postal" for use in international class 028, 032, 039 or 041 or US class 022, 023, 038, 045, 046, 048, 050,100, 101, 105 or 107. Therefore, our trademark, "Goin' Postal", within those designated classes (see description of these classes in detailed description of this Mark below), does not have many legal benefits and rights as a federally registered trademark. If our right to use the trademark, "Goin' Postal", in the designated classes of services is challenged, you may have to change to an alternative trademark, which my increase your expenses. On January 2, 2007, our predecessor, Goin' Postal, Inc. (see Item 1 of this Disclosure Document for disclosures pertaining to Goin' Postal, Inc.) entered into an Assignment of Trademark with us pursuant to which GPFC is now the sole and exclusive owner of the Marks and has the exclusive rights to establish Goin' Postal franchises through use of the Marks depicted and/or described below.

Our composite Mark is depicted as follows:



53          Franchisee's Initials _6 B_

Our registered Marks are described and depicted as follows:



| | |
|---|---|
| Word Mark | GOIN' POSTAL YOUR FRIENDLY NEIGHBORHOOD SHIPPING CENTER |
| Mark Drawing Code | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| Serial Number | 78372054 |
| Filing Date | February 23, 2004 |
| Registration Number | 3083574 |
| Registration Date | April 18, 2006 |
| Owner | (REGISTRANT) Goin' Postal Inc CORPORATION FLORIDA 4941 4th Street, Zephyrhills FLORIDA 33542 |
| | (LAST LISTED OWNER) Goin' Postal Franchise Corporation, CORPORATION FLORIDA, 4941 4th Street, Zephyrhills, FLORIDA 33542 (Assignment Recorded) |
| Type of Mark | SERVICE MARK |
| Register | PRINCIPAL |
| Live/Dead Indicator | LIVE |

# GOIN' POSTAL

| | |
|---|---|
| Word Mark | GOIN' POSTAL |
| Mark Drawing Code | (4) STANDARD CHARACTER MARK |
| Serial Numbers | 78856562 (Class 16), |
| Filing Date | April 7, 2006 |
| Registration Number | 3274805 |
| Registration Date | August 7, 2007 |
| Owner | (REGISTRANT) Goin' Postal Franchise Corporation, CORPORATION FLORIDA 4941 4th Street Zephyrhills FLORIDA 33542 (Assignment Recorded) |

54          Franchisee's Initials _EB_

| Type of Mark | TRADEMARK. SERVICE MARK |
| --- | --- |
| Register | PRINCIPAL |
| Live/Dead Indicator | LIVE |

# GOIN' POSTAL

Word Mark        GOIN' POSTAL

Mark Drawing
Code            (4) STANDARD CHARACTER MARK

Serial Numbers  78978228 (Class 25)
Filing Date     April 7, 2006

Registration
Number          3283156

Registration
Date            August 21, 2007

Owner           (REGISTRANT) Goin' Postal Franchise Corporation, CORPORATION FLORIDA 4941 4th Street
                Zephyrhills FLORIDA 33542 (Assignment Recorded)

| Type of Mark | TRADEMARK. SERVICE MARK |
| --- | --- |
| Register | PRINCIPAL |
| Live/Dead Indicator | LIVE |

55        Franchisee's Initials _____ $\in \beta$

# GOIN' POSTAL

| | |
|---|---|
| **Word Mark** | **GOIN' POSTAL** |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Numbers** | 78978229 (Class 35) |
| **Filing Date** | April 7, 2006 |
| **Registration Number** | 3302660 |
| **Registration Date** | October 2, 2007 |
| **Owner** | (REGISTRANT) Goin' Postal Franchise Corporation, CORPORATION FLORIDA 4941 4th Street Zephyrhills FLORIDA 33542 (Assignment Recorded) |
| **Type of Mark** | TRADEMARK. SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |



**Word Mark**    GP

**Mark Drawing Code** (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS

| | |
|---|---|
| **Serial Number** | 78856614 |
| **Filing Date** | April 7, 2006 |
| **Registration Number** | 3279690 |
| **Registration Date** | August 14, 2007 |

56     Franchisee's Initials 

| | |
|---|---|
| Owner | (REGISTRANT) Goin' Postal Franchise Corporation, CORPORATION FLORIDA 4941 4th Street Zephyrhills FLORIDA 33542 (Assignment Recorded) |
| Description of Mark | The mark consists of Delivery man carrying package. |
| Type of Mark | TRADEMARK. SERVICE MARK |
| Register | PRINCIPAL |
| Live/Dead Indicator | LIVE |

# Delivering the Best of America

| | |
|---|---|
| Word Mark | DELIVERING THE BEST OF AMERICA |
| Mark Drawing Code | (4) STANDARD CHARACTER MARK |
| Serial Number | 78856660 |
| Filing Date | April 7, 2006 |
| Registration Number | 3360732 |
| Registration Date | December 25, 2007 |
| Owner | (REGISTRANT) Goin' Postal Franchise Corporation, CORPORATION FLORIDA 4941 4th Street Zephyrhills FLORIDA 33542 (Assignment Recorded) |
| Type of Mark | TRADEMARK. SERVICE MARK |
| Register | PRINCIPAL |
| Live/Dead Indicator | LIVE |

57                    Franchisee's Initials _____

Our Marks filed for registration and currently pending are described and depicted as follows:

# GOIN' POSTAL

| | |
|---|---|
| **Word Mark** | GOIN' POSTAL |
| **Goods and Services** | IC 039. US 100 105 G & S: Transportation services, namely arranging and managing shipping and delivery of goods and parcels for others by air and motor vehicle; packing of goods for others for transport by air and motor vehicle; arranging and managing postal services, namely, arranging and managing mail and parcel delivery; arranging delivery of documents, packages, and other freight for others by air or motor vehicle; transportation and delivery services, namely, arranging and managing same day shipment services; private mailbox rental. FIRST USE: 20031001. FIRST USE IN COMMERCE: 20031001 |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 78978230 |
| **Filing Date** | April 7, 2006 |
| **Owner** | (APPLICANT) **GOIN' POSTAL FRANCHISE CORPORATION**, FLORIDA 4941 4th STREET ZEPHYRHILLS FLORIDA 33542 |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

Franchisee's Initials _____

# GOIN' POSTAL

| | |
|---|---|
| **Word Mark** | **GOIN' POSTAL** |
| **Goods and Services** | IC 028. US 022 023 038 050. G & S: sporting goods and equipment, namely, winter sports equipment, water sports equipment, competitive sports equipment, field and fitness equipment, extreme sports equipment, athletic and team equipment, recreational activities equipment |
| | IC 032. US 045 046 048. G & S: Non-alcoholic beverages, namely, sports drinks, energy drinks and soft drinks |
| | IC 041. US 100 101 107. G & S: Organizing and conducting athletic competitions, sports exhibitions, entertainment events and contests; organization of fairs and exhibitions for cultural, sporting and educational purposes, entertainment services, namely, musical performances and cultural activities |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 77553437 |
| **Filing Date** | August 22, 2008 |
| **Owner** | (APPLICANT) GOIN' POSTAL FRANCHISE CORPORATION; CORPORATION FLORIDA 4941 4TH STREET ZEPHYRHILLS FLORIDA 33542 |
| **Type of Mark** | TRADEMARK. SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

We do not claim as part of our registered trademark/service mark the use or depiction of the United States flag. Our postal deliveryman drawing and our slogan, "Delivering the Best of America", both of which are part of our composite Mark, are part of our registered trademark/service mark. Our Mark, "Goin' Postal" is registered under international classes IC16, IC 25 and IC 35, but presently not IC 28, IC 32, IC 39 or IC 41 (we expect to receive registration in classes IC 28, IC 32, IC 39 and IC 41 sometime this year). However, we do claim at this time the specific use of the United States flag as part of our composite Mark depicted above, and in our slogans, "Don't Go it Alone...Go with Goin' Postal", "Sometimes, Goin' Postal is the Only Way" and "Relieve Stress by Goin' Postal". We also claim as part

Franchisee's Initials _____

of our Marks all trademark/service mark rights in and to each separate element of our Marks, including the text only elements of our Marks as they exist without any design elements, each independent design element of our composite Mark depicted above (other than the United States flag as used independent of our composite Mark), and all trademark/service mark rights resulting from any future amendments to any registered Marks filed with the United States Patent and Trademark Office or to any common law Marks.

We have also filed separate registration applications on the United States Patent and Trademark Office principal register for the trademark "ein Signs" (Serial Number 77110747), and the trademark "Hut no. 8" (Serial Number 77655003), both of which are unassociated with and inapplicable to your Goin' Postal franchise and in which you will not have or possess any rights under this Disclosure Document or as part of your purchase of a Goin' Postal franchise. You will, however, be subject to the same restrictions concerning your duplication or infringing misappropriations of such trademarks.

You must follow our rules when you use these Marks. You can not use our name or Marks as part of a corporate name or with modifying words, designs or symbols except for those which GPFC licenses to you as part of a franchise grant in accordance with this UFDD and the Franchise Agreement. You may not useGPFC's name or Marks in connection with the sale of an unauthorized product or service or in a manner not authorized in writing by us.

No agreements limitGPFC's right to use or license the use ofGPFC's Marks in a manner material to Goin' Postal franchises.

You must notify GPFC immediately when you learn about an infringement of or challenge to your use of our Marks. GPFC will take the action we think appropriate, and we have the right to control any administrative proceedings or litigation involving our Marks. While GPFC is not required to defend you against a claim against your use of our Mark, GPFC will reimburse you for your liability and reasonable costs in connection with defending, or participating in our defending, GPFC's Marks. To receive reimbursement you must have notified GPFC immediately when you learned about the infringement or challenge.

You must modify or discontinue, at your expense, the use of a Mark if GPFC modifies or discontinues it. If this happens, you must not directly or indirectly contest our right to our Marks, trade secrets or business techniques that are part of our business.

GPFC does not know of any superior prior rights or infringing uses that could materially affect your use ofGPFC's Marks in connection with the operation of your Goin' Postal Store within your State. When we refer to "our Marks/marks", "our Marks/marks filed for registration" or a similar phrase, we are also including all non-registered trademarks and service marks, all trade names, and all common law marks, and rights therein, we have by virtue of our using them in interstate commerce (together with the associated rights to exclude others from using the same or confusingly similar marks for similar products or services within the area of geographic and market influence of us, our affiliates and/or our franchisees).

## ITEM 14:      PATENTS AND COPYRIGHTS

GPFC currently holds no patents to its business or to the Goin' Postal franchises we offer, nor do we have any pending patent applications. You do not receive the right to use apart from your operating a Goin' Postal franchise under this Disclosure Document or the Franchise Agreement any copyrighted materials produced for Goin' Postal Stores, including proprietary information that is published in our confidential manuals and other materials and our proprietary computer software. We claim a copyright in numerous materials, including, without limitation, our Goin' Postal deliveryman drawing, our Manuals, our website address www.goinpostal.com and all materials maintained by us in, on and at such website (including advertising materials), and our GP Rate Pro proprietary software. You must treat the information contained in the software, website, Manuals and other manuals or supplemental material supplied by us as confidential trade secrets and must use all reasonable efforts to maintain this information as secret and confidential.  The software, website, and Manuals are our property and you may not duplicate, copy, disclose or disseminate the contents of the software, website and Manuals at any time, without our prior written consent.  We may modify or supplement the software, website and

Manuals upon notice or delivery to you. Upon the termination or non-renewal of your franchise, you must return all Manuals, website materials and software to us. All information about our Methods or Systems revealed in the Manuals or in our website (including in particular but not limited to our password protected website Owners' Section) constitutes confidential trade secrets, and you must at all times maintain, protect and safeguard the confidential nature of those materials.

You must not, during the term of the Franchise Agreement or thereafter, communicate, divulge, or use for your personal benefit or for the benefit of any other person, partnership, association or corporation, any confidential information, knowledge or know-how concerning the method of operation of your Store which may be communicated to you or of which you may be apprised by virtue of your operation under the terms of the Franchise Agreement, including information, knowledge, or know-how regarding our Systems and Methods. You may divulge this confidential information during the term of the Franchise Agreement only to those of your employees who must have access to it in order to operate your Store.

## ITEM 15: OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE FRANCHISE BUSINESS

As an individual franchisee, you have no obligation to personally participate in the everyday running of your franchised business, although it is your individual obligation to see that the franchise obligations and responsibilities under this Disclosure Document and the Franchise Agreement are performed. We do require on-site supervision of your Store by at least one primary operator, who must be a manager, Owner or employee who has successfully completed our franchise training programs, as you are responsible for any reports of service problems or violations of this Disclosure Document or the Franchise Agreement, no matter who actually commits the breach.

As your representatives, your chosen manager or other primary operator, as well as any 10% or greater percentage owner in the franchise entity (if applicable), must sign an agreement assuming and agreeing to be bound by this Disclosure Document and the Franchise Agreement, and the Non-Competition and Non-Solicitation Agreement (or other agreement to not disclose any sensitive or confidential information to any third party). You will sign the Non-Competition and Non-Solicitation Agreement irrespective of whether you are a primary operator.

## ITEM 16: RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL

You must sell and offer all services designated by GPFC to be core services of your Goin' Postal franchise Store business and required of all franchisees (see Item 8 and Item 9). These core services are UPS, FedEx (or whatever combination of UPS and/or FedEx we may specify at any time), and The United States Postal Service shipping and mailing services. You must also provide as a core service both fax and copy service on site. Since our principal business is the franchising of Goin' Postal Stores as outlined in this Disclosure Document, we will not change these core authorized goods and services absent a cessation of our conduct of this business. We may add to or suggest additional goods and services to the list of pre-approved services and products, but do not anticipate at this time adding to the list of mandatory core services.

You must receive approval for the sale of any services and products not on our pre-approved list of services and products and for those services and products on our pre-approved list which specify "with our approval". Upon our approval of any new service or product, we will make the information available to other franchisees for the expansion of the chain and product offerings.

You will see a current list of our pre-approved services and products in **Exhibit "F"** attached to this Disclosure Document.

You may under the limitations stated in this paragraph, sell ink and toner supplies and a larger scale selection of office supplies solely as an adjunct aspect of your Goin' Postal Shipping Store and solely to the extent your inventory of such items for resale to your customers are purchased from and supplied by

61          Franchisee's Initials _____ €ℬ _____

us (see Item 8 of this Disclosure Document for a discussion of our ink/toner office supply packages) or from a vendor specified by GPFC. You may not, however, deal directly with either Clover Technologies Group, L.L.C. or the Azerty division of United Stationers Supply Co. (or any of their respective affiliates) as these are the companies who presently fill and supply GPFC's purchases of ink/toner and office supplies.

You must use the approved location solely as a Goin' Postal Store in strict accordance with the Franchise Agreement, the Store Set-Up Manual, the Operation Manuals, our Standards and Specifications, our Systems and Methods, and with any other agreements you will enter into with us as part of your being granted a Goin' Postal franchise.

## ITEM 17:   RENEWAL, TERMINATION, TRANSFER, AND DISPUTE RESOLUTION

Item 17 Table:

### THE FRANCHISE RELATIONSHIP

**This table lists certain important provisions of the franchise and related agreements. You should read these provisions in the agreements attached to this Disclosure Document. See Note 1, Note 2 and Note 3 below and Exhibit "H" (if applicable) attached to this Disclosure Document for important information concerning the application of many of the provisions set out in the table below in your particular State.**

| Provision | Section in Franchise or Other Agreement | Summary |
|---|---|---|
| a. Length of the franchise term | Section 2 | 15 years (see, however, Section 2.1 and Section 12 of Franchise Agreement) |
| b. Renewal or extension of the term | Section 2 | If you are in good standing, you can renew for successive periods of 15 years each as stated in the Franchise Agreement. |
| c. Requirements for franchisee to renew or extend | Section 2 | Sign new franchise agreement. By signing the then current franchise agreement on renewal, franchisees may be asked to sign an agreement with materially different terms and conditions than their original agreement. No renewal fee required to renew. No existing uncured defaults and must be current with all financial obligations to us and to third parties. Sample "Release" you may have to sign appears in Exhibit "H" under "Maryland" heading. |
| d. Termination by franchisee | Section 12.1 | Franchisor must be in material default; you must give us notice and opportunity to cure |
| e. Termination by Goin' Postal Franchise Corporation' without cause | Not Applicable | Not Applicable |
| f. Termination by Goin' Postal Franchise Corporation with cause | Section 12.2 Section 12.3 Section 12.4 Section 12.5 | Goin' Postal Franchise Corporation can terminate only if you default |
| g. "Cause" defined-curable defaults | Section 12.3 | You have 30 days to cure: any default not listed in Sec. 12.4 ("two strike" grace limit) |

Franchisee's Initials   ᏝᏝ

| | | |
|---|---|---|
| h. "Cause" defined – non-curable defaults | Section 12.4 | Non-curable defaults: conviction of felony, abandonment, trademark misuse and unapproved transfers; exceeding "two strike" grace on repeated curable defaults (even if cured); non-payment of fees and/or failure to file reports; see other non-curable defaults under Section 12.4 of Franchise Agreement |
| i. Franchisee's obligations on termination/ non-renewal | Section 13 and Section 14 – See Exhibit "B" – Non-Competition and Non-Solicitation Agreement | Obligations include complete deidentification and dissociation and payment of amounts due (also see "r", below) and you must cease use of our Marks and proprietary items; cease further involvement in any retail shipping business; payment of liquidated damages, if applicable |
| j. Assignment of contract by Goin' Postal Franchise Corporation. | Section 11.1 | No restriction on Goin' Postal Franchise Corporation's right to assign Franchise Agreement |
| k. "Transfer" by franchisee – defined | Section 11.2 | Includes transfer of Franchisee Agreement or assets or ownership change |
| l. Goin' Postal Franchise Corporation's approval of transfer by franchisee | Section 11.2 and Section 11.3 – see also required Addendum attached as Exhibit "B" to Franchise Agreement | Goin' Postal Franchise Corporation has the right to approve all transfers, but will not unreasonably withhold approval when conditions for transfer are met |
| m. Conditions for Goin' Postal Franchise Corporation's approval of transfer | Section 11.3 - see also required Addendum attached as Exhibit "B" to Franchise Agreement | New franchisee qualifies, transfer fee paid, purchase agreement approved, existing franchisee and new franchisee sign required Addendum (Exhibit "B" to Franchise Agreement), training arranged, release signed by you and current franchisee agreement signed by new franchisee (also see "r", below). Upon approved transfer, new franchisee receives a new 15 year term. A sample "Release" you must sign appears in Exhibit "H" under "Maryland" heading. |
| n. Goin' Postal Franchise Corporation's right of first refusal to acquire franchisee's business | Section 11.5 | Goin' Postal Franchise Corporation has the right to match any offer for your business |
| o. Goin' Postal Franchise Corporation's option to purchase franchisee's business | Section 13.2 (see policy described in Note 1) Section 14.6 | Goin' Postal Franchise Corporation can acquire tangible assets of franchised Store upon termination of Franchise Agreement |
| p. Death or disability of franchisee | Section 11.4 | Franchise must be assigned by estate to approved buyer or heir who qualifies as a franchisee within 6 months and new franchise agreement must be signed |
| q. Non-competition covenants during the term of the franchise | Section 10.2 Section 12.4 – See Exhibit "B" – Non-Competition and Non-Solicitation Agreement | No involvement in competing business anywhere in U.S. |

Franchisee's Initials   _E B_

| r. Non-competition covenants after the franchise is terminated or expires | Sections 13 and 14 See Exhibit "B" – Non-Competition and Non-Solicitation Agreement | No competing business for 2 years (including after assignment or transfer) anywhere in U.S. |
|---|---|---|
| s. Modification of the agreement | Section 18 and Section 21 | No modifications generally, but Operations Manual and training are subject to change |
| t. Integration/ merger clause | Section 21 | Only the terms of the Franchise Agreement are binding (subject to state law). Any representations or promises outside of this Disclosure Document and the Franchise Agreement may not be enforceable |
| u. Dispute resolution by arbitration or mediation | Section 20 | Except for certain claims involving our intellectual property rights, all disputes must be mediated in Florida (see Note 2 and Note 3) |
| v. Choice of forum | Section 20 | Litigation must be in Florida (see Note 2 and Note 3) |
| w. Choice of law | Section 20 | Florida law applies (see Note 2 and Note 3) |

Note 1 - Franchisor is not obligated by the Agreement to do so, but, if the franchise is terminated, Franchisor has the right to buy tangible assets at fair market value. This policy is subject to change at any time.

Note 2 - These states have statutes which may supersede the Franchise Agreement in your relationship with the Franchisor including the areas of termination and renewal of your franchise: ARKANSAS [Stat. Section 70-807], CALIFORNIA [Bus. & Prof. Code Sections 20000-20043], CONNECTICUT [Gen. Stat. Section 42-133e et seq.], DELAWARE [Code, tit. 6, Section 2552], HAWAII [Rev. Stat. Chapter 482E], ILLINOIS [Rev. Stat. Chapter 815 para. 705/1-705/44], INDIANA [Stat. Section 23-2-2.7], IOWA [Code Sections 523H.1-523H.17 ], MARYLAND [Code Ann, Bus Reg Sections 14-201-14-233], MICHIGAN [Stat. Section 19.854(27); Comp. Laws Sections 445.771 et seq], MINNESOTA [Stat. Sections 80C.01-80C.22], MISSISSIPPI [Code Section 75-24-51], MISSOURI [Stat. Section 407.400], NEBRASKA [Rev. Stat. Section 87-401], NEW JERSEY [Stat. Section 56:10-1], NEW YORK [Gen. Bus. Law Sections 680-695], NORTH DAKOTA [Cent. Code Section 51-19-01], OREGON [Rev. Stat. Sections 650.005-650.085], RHODE ISLAND [Gen. Laws Sections 19-28.1-1-19-28.1-34], SOUTH DAKOTA [Codified Laws Sections 37-5A-1-37-5A-87], TEXAS [Rev. Civ. Stat. Ann. Art. 16.01], VIRGINIA [Code 13.1-557-13.1-574], WASHINGTON [Code Sections 19.100.010-19.100.940], WISCONSIN [Stat. Sections 553.01-553.78; Wis. Stat. Sections 135.01-135.07]. These and other states may also have court decisions which may supersede the Franchise Agreement in your relationship with the franchisor including the areas of termination and renewal of your franchise.

We reserve the right to challenge the enforceability of any State law listed above that declares void or unenforceable any provision in the Franchise Agreement by bringing an appropriate legal action or by raising the claim in a legal action or arbitration that you initiate.

A provision in the Franchise Agreement that terminates such agreement on your bankruptcy may not be enforceable under Title 11, United States Code Section 101.

Note 3 – If applicable, Exhibit "H" attached to this Disclosure Document may contain information regarding your particular State's laws which may limit application of one or more of the provisions listed in this Item 17.

## ITEM 18:     PUBLIC FIGURES

Goin' Postal Franchise Corporation does not use any public figure to promote its franchise.

## ITEM 19:     FINANCIAL PERFORMANCE REPRESENTATIONS

The FTC's Franchise Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and/or franchisor-owned outlets, if there is a reasonable basis for the information, and if the information is included in the disclosure document.  Financial performance information that differs from that included in Item 19 may be given only if: (1) a franchisor provides the actual records of an existing outlet you are considering buying; or (2) a franchisor supplements the information provided in this Item 19, for example, by providing information about possible performance at a particular location or under particular circumstances.

We do not make any representations about a franchisee's future financial performance or the past financial performance of company-owned or franchised outlets.  We also do not authorize our employees or representatives to make any such representations either orally or in writing.  If you are purchasing an existing outlet, however, we may provide you with the actual records of that outlet.  If you receive any other financial performance information or projections of your future income, you should report it to the franchisor's management by contacting Marcus Price, CEO or M.J. Price, President, at 4941 4th Street, Zephyrhills, Florida 33542 or (813) 782-1500, the Federal Trade Commission, and the appropriate state regulatory agencies.

Franchisee's Initials  _EB_____

ITEM 20:      OUTLETS AND FRANCHISEE INFORMATION

Table No. 1
Systemwide Outlet Summary
For years 2006 to 2008

| Column 1 Outlet Type | Column 2 Year | Column 3 Outlets at the Start of the Year | Column 4 Outlets at the End of the Year | Column 5 Net Change |
|---|---|---|---|---|
| Franchised | 2006 | 73 | 160 | +87 |
| | 2007 | 160 | 250 | +90 |
| | 2008 | 250 | 283 | +33 |
| Company-Owned | 2006 | 1 | 1 | No Change |
| | 2007 | 1 | 1 | No Change |
| | 2008 | 1 | 1 | No Change |
| Total Outlets | 2006 | 74 | 161 | +87 |
| | 2007 | 161 | 251 | +90 |
| | 2008 | 251 | 284 | +33 |

Table No. 2

Transfers of Outlets from Franchisees to New Owners (other than the Franchisor)
For years 2006 to 2008

| Column 1 State | Column 2 Year | Column 3 Number of Transfers |
|---|---|---|
| AK | 2006 | 0 |
| | 2007 | 0 |
| | 2008 | 0 |
| AL | 2006 | 1 |
| | 2007 | 0 |
| | 2008 | 0 |
| AR | 2006 | 0 |
| | 2007 | 0 |
| | 2008 | 0 |

Franchisee's Initials  _ЄЉ_____

| | | |
|---|---|---|
| | 2006 | 0 |
| AZ | 2007 | 0 |
| | 2008 | 0 |
| | 2006 | 1 |
| CA | 2007 | 5 |
| | 2008 | 3 |
| | 2006 | 0 |
| CO | 2007 | 0 |
| | 2008 | 0 |
| | 2006 | 0 |
| CT | 2007 | 0 |
| | 2008 | 0 |
| | 2006 | 0 |
| DE | 2007 | 0 |
| | 2008 | 0 |
| | 2006 | 1 |
| FL | 2007 | 4 |
| | 2008 | 5 |
| | 2006 | 2 |
| GA | 2007 | 2 |
| | 2008 | 2 |
| | 2006 | 0 |
| HI | 2007 | 0 |
| | 2008 | 0 |
| | 2006 | 0 |
| IA | 2007 | 0 |
| | 2008 | 0 |
| | 2006 | 0 |
| ID | 2007 | 0 |
| | 2008 | 0 |
| | 2006 | 1 |
| IL | 2007 | 1 |
| | 2008 | 0 |
| | 2006 | 0 |
| IN | 2007 | 0 |
| | 2008 | 0 |
| | 2006 | 0 |
| KS | 2007 | 0 |
| | 2008 | 0 |
| | 2006 | 0 |
| KY | 2007 | 0 |
| | 2008 | 0 |
| | 2006 | 0 |
| LA | 2007 | 0 |
| | 2008 | 0 |
| | 2006 | 0 |
| MA | 2007 | 0 |
| | 2008 | 0 |

Franchisee's Initials _EB_

| | | |
|---|---|---|
| MD | 2006 | 0 |
| | 2007 | 0 |
| | 2008 | 0 |
| ME | 2006 | 0 |
| | 2007 | 1 |
| | 2008 | 0 |
| MI | 2006 | 0 |
| | 2007 | 0 |
| | 2008 | 0 |
| MN | 2006 | 0 |
| | 2007 | 0 |
| | 2008 | 0 |
| MO | 2006 | 0 |
| | 2007 | 1 |
| | 2008 | 0 |
| MS | 2006 | 0 |
| | 2007 | 0 |
| | 2008 | 0 |
| MT | 2006 | 0 |
| | 2007 | 0 |
| | 2008 | 0 |
| NC | 2006 | 0 |
| | 2007 | 0 |
| | 2008 | 1 |
| ND | 2006 | 0 |
| | 2007 | 0 |
| | 2008 | 0 |
| NE | 2006 | 0 |
| | 2007 | 0 |
| | 2008 | 0 |
| NH | 2006 | 0 |
| | 2007 | 0 |
| | 2008 | 0 |
| NJ | 2006 | 0 |
| | 2007 | 1 |
| | 2008 | 0 |
| NM | 2006 | 0 |
| | 2007 | 0 |
| | 2008 | 0 |
| NV | 2006 | 0 |
| | 2007 | 0 |
| | 2008 | 0 |
| NY | 2006 | 0 |
| | 2007 | 0 |
| | 2008 | 0 |
| OH | 2006 | 0 |
| | 2007 | 0 |
| | 2008 | 0 |

Franchisee's Initials ___E.B___

| | | |
|---|---|---|
| | 2006 | 0 |
| OK | 2007 | 0 |
| | 2008 | 0 |
| | 2006 | 0 |
| OR | 2007 | 0 |
| | 2008 | 0 |
| | 2006 | 1 |
| PA | 2007 | 0 |
| | 2008 | 3 |
| | 2006 | 0 |
| RI | 2007 | 0 |
| | 2008 | 0 |
| | 2006 | 0 |
| SC | 2007 | 0 |
| | 2008 | 0 |
| | 2006 | 0 |
| SD | 2007 | 0 |
| | 2008 | 0 |
| | 2006 | 0 |
| TN | 2007 | 0 |
| | 2008 | 1 |
| | 2006 | 0 |
| TX | 2007 | 1 |
| | 2008 | 0 |
| | 2006 | 0 |
| UT | 2007 | 0 |
| | 2008 | 0 |
| | 2006 | 0 |
| VA | 2007 | 3 |
| | 2008 | 0 |
| | 2006 | 0 |
| VT | 2007 | 0 |
| | 2008 | 0 |
| | 2006 | 0 |
| WA | 2007 | 1 |
| | 2008 | 1 |
| | 2006 | 0 |
| WI | 2007 | 0 |
| | 2008 | 0 |
| | 2006 | 0 |
| WV | 2007 | 0 |
| | 2008 | 0 |
| | 2006 | 0 |
| WY | 2007 | 0 |
| | 2008 | 0 |
| | 2006 | 7 |
| Total | 2007 | 20 |
| | 2008 | 16 |

69          Franchisee's Initials _EB_

Table No. 3

## Status of Franchised Outlets
## For years 2006 to 2008

Due to change in the domestic service business model implemented by DHL in late 2008, we were no longer able to offer Express Kiosk Franchise Packages in the United States.  As a result, we allowed multiple franchisees who were under an Express Kiosk Agreement to terminate that Agreement and the corresponding Franchise Agreement with no early termination or other penalties.  Such franchisees continue, however, to be bound by the terms of our Non-Competition and Non-Solicitation Agreement (see **Exhibit "B"** to this UFDD) for the remainder of the term of that Agreement.

| Col. 1 | Col. 2 | Col. 3 | Col. 4 | Col. 5 | Col. 6 | Col. 7 | Col. 8 | Col. 9 |
|---|---|---|---|---|---|---|---|---|
| State | Year | Outlets at Start of Year | Outlets Opened | Terminations | Non-Renewals | Reacquired by Franchisor | Ceased Operations Other Reasons | Outlets at End of Year |
| AK | 2006 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2007 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2008 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| AL | 2006 | 4 | 0 | 0 | 0 | 0 | 0 | 4 |
|    | 2007 | 4 | 4 | 1 | 0 | 0 | 0 | 7 |
|    | 2008 | 7 | 1 | 3 | 0 | 0 | 0 | 5 |
| AR | 2006 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
|    | 2007 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
|    | 2008 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| AZ | 2006 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
|    | 2007 | 2 | 1 | 0 | 0 | 0 | 0 | 3 |
|    | 2008 | 3 | 1 | 2 | 0 | 0 | 0 | 2 |
| CA | 2006 | 7 | 6 | 0 | 0 | 0 | 0 | 13 |
|    | 2007 | 13 | 9 | 0 | 0 | 0 | 0 | 22 |
|    | 2008 | 22 | 4 | 6 | 0 | 0 | 0 | 20 |
| CO | 2006 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2007 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2008 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CT | 2006 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2007 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
|    | 2008 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| DE | 2006 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
|    | 2007 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
|    | 2008 | 2 | 0 | 1 | 0 | 0 | 0 | 1 |
| FL | 2006 | 10 | 16 | 0 | 0 | 1 | 0 | 25 |
|    | 2007 | 25 | 22 | 1 | 0 | 0 | 0 | 46 |
|    | 2008 | 46 | 19 | 11 | 0 | 0 | 0 | 54 |
| GA | 2006 | 6 | 8 | 0 | 0 | 0 | 0 | 14 |
|    | 2007 | 14 | 5 | 1 | 0 | 0 | 0 | 18 |
|    | 2008 | 18 | 5 | 0 | 0 | 0 | 0 | 23 |

Franchisee's Initials   _____

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2006 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HI | 2007 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2008 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2006 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| IA | 2007 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2008 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2006 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| ID | 2007 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2008 | 1 | 2 | 0 | 0 | 0 | 0 | 3 |
| | 2006 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| IL | 2007 | 1 | 2 | 0 | 0 | 0 | 0 | 3 |
| | 2008 | 3 | 1 | 1 | 0 | 0 | 0 | 3 |
| | 2006 | 2 | 2 | 0 | 0 | 0 | 0 | 4 |
| IN | 2007 | 4 | 0 | 0 | 0 | 0 | 1 | 3 |
| | 2008 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| | 2006 | 1 | 3 | 0 | 0 | 0 | 0 | 4 |
| KS | 2007 | 4 | 0 | 0 | 0 | 0 | 0 | 4 |
| | 2008 | 4 | 2 | 2 | 0 | 0 | 0 | 4 |
| | 2006 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| KY | 2007 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2008 | 1 | 2 | 1 | 0 | 0 | 0 | 2 |
| | 2006 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| LA | 2007 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| | 2008 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2006 | 0 | 3 | 0 | 0 | 0 | 0 | 3 |
| MA | 2007 | 3 | 1 | 1 | 0 | 0 | 0 | 3 |
| | 2008 | 3 | 3 | 2 | 0 | 0 | 0 | 4 |
| | 2006 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MD | 2007 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2008 | 1 | 3 | 0 | 0 | 0 | 0 | 4 |
| | 2006 | 2 | 1 | 0 | 0 | 0 | 0 | 3 |
| ME | 2007 | 3 | 1 | 0 | 0 | 0 | 0 | 4 |
| | 2008 | 4 | 0 | 0 | 0 | 0 | 0 | 4 |
| | 2006 | 2 | 1 | 0 | 0 | 0 | 0 | 3 |
| MI | 2007 | 3 | 2 | 0 | 0 | 0 | 0 | 5 |
| | 2008 | 5 | 1 | 1 | 0 | 0 | 0 | 5 |
| | 2006 | 1 | 3 | 0 | 0 | 0 | 0 | 4 |
| MN | 2007 | 4 | 1 | 0 | 0 | 0 | 0 | 5 |
| | 2008 | 5 | 2 | 1 | 0 | 0 | 0 | 6 |
| | 2006 | 3 | 5 | 0 | 0 | 0 | 1 | 7 |
| MO | 2007 | 7 | 4 | 0 | 0 | 0 | 0 | 11 |
| | 2008 | 11 | 2 | 0 | 0 | 0 | 0 | 13 |

Franchisee's Initials _____

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2006 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MS | 2007 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2008 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2006 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MT | 2007 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2008 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2006 | 4 | 7 | 0 | 0 | 0 | 0 | 11 |
| NC | 2007 | 11 | 4 | 0 | 0 | 0 | 0 | 15 |
| | 2008 | 15 | 1 | 2 | 0 | 0 | 0 | 14 |
| | 2006 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ND | 2007 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2008 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2006 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| NE | 2007 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| | 2008 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2006 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| NH | 2007 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2008 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2006 | 0 | 3 | 0 | 0 | 0 | 0 | 3 |
| NJ | 2007 | 3 | 1 | 0 | 0 | 0 | 0 | 4 |
| | 2008 | 4 | 0 | 2 | 0 | 0 | 0 | 2 |
| | 2006 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| NM | 2007 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2008 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2006 | 3 | 1 | 0 | 0 | 0 | 0 | 4 |
| NV | 2007 | 4 | 1 | 0 | 0 | 0 | 0 | 5 |
| | 2008 | 5 | 0 | 2 | 0 | 0 | 0 | 3 |
| | 2006 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| NY | 2007 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2008 | 1 | 2 | 0 | 0 | 0 | 0 | 3 |
| | 2006 | 2 | 0 | 0 | 0 | 0 | 1 | 1 |
| OH | 2007 | 1 | 2 | 0 | 0 | 0 | 0 | 3 |
| | 2008 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| | 2006 | 2 | 1 | 0 | 0 | 0 | 0 | 3 |
| OK | 2007 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| | 2008 | 3 | 1 | 0 | 0 | 0 | 0 | 4 |
| | 2006 | 0 | 4 | 0 | 0 | 0 | 0 | 4 |
| OR | 2007 | 4 | 1 | 0 | 0 | 0 | 0 | 5 |
| | 2008 | 5 | 2 | 0 | 0 | 0 | 0 | 7 |
| | 2006 | 2 | 5 | 0 | 0 | 0 | 0 | 7 |
| PA | 2007 | 7 | 3 | 0 | 0 | 0 | 0 | 10 |
| | 2008 | 10 | 4 | 1 | 0 | 0 | 0 | 13 |

Franchisee's Initials _____

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| RI | 2006 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2007 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2008 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SC | 2006 | 1 | 2 | 0 | 0 | 0 | 0 | 3 |
| | 2007 | 3 | 2 | 0 | 0 | 0 | 0 | 5 |
| | 2008 | 5 | 1 | 1 | 0 | 0 | 0 | 5 |
| SD | 2006 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2007 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2008 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TN | 2006 | 1 | 4 | 0 | 0 | 0 | 0 | 5 |
| | 2007 | 5 | 5 | 0 | 0 | 0 | 0 | 10 |
| | 2008 | 10 | 5 | 1 | 0 | 0 | 0 | 14 |
| TX | 2006 | 8 | 3 | 0 | 0 | 0 | 0 | 11 |
| | 2007 | 11 | 9 | 0 | 0 | 0 | 0 | 20 |
| | 2008 | 20 | 2 | 2 | 0 | 0 | 0 | 20 |
| UT | 2006 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2007 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2008 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| VA | 2006 | 3 | 2 | 0 | 0 | 0 | 0 | 5 |
| | 2007 | 5 | 5 | 0 | 0 | 0 | 0 | 10 |
| | 2008 | 10 | 4 | 0 | 0 | 0 | 0 | 14 |
| VT | 2006 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2007 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2008 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| WA | 2006 | 4 | 1 | 0 | 0 | 0 | 0 | 5 |
| | 2007 | 5 | 2 | 0 | 0 | 0 | 0 | 7 |
| | 2008 | 7 | 3 | 1 | 0 | 0 | 0 | 9 |
| WI | 2006 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| | 2007 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2008 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| WV | 2006 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2007 | 1 | 2 | 0 | 0 | 0 | 0 | 3 |
| | 2008 | 3 | 1 | 0 | 0 | 0 | 0 | 4 |
| WY | 2006 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2007 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2008 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 2006 | 74 | 90 | 0 | 0 | 1 | 2 | 161 |
| | 2007 | 161 | 95 | 4 | 0 | 0 | 1 | 251 |
| | 2008 | 251 | 76 | 43 | 0 | 0 | 0 | 284 |

Franchisee's Initials _____

Table No. 4

### Status Of Company-Owned Outlets
### For Years 2006 to 2008

| Col. 1 State | Col. 2 Year | Col. 3 Outlets at Start of Year | Col. 4 Outlets Opened | Col. 5 Outlets Reacquired From Franchisee | Col. 6 Outlets Closed | Col. 7 Outlets Sold to Franchisee | Col. 8 Outlets at End of the Year |
|---|---|---|---|---|---|---|---|
| FL | 2006 | 1 | 0 | 0 | 0 | 0 | 1 |
|  | 2007 | 1 | 0 | 0 | 0 | 0 | 1 |
|  | 2008 | 1 | 0 | 0 | 0 | 0 | 1 |
| Totals | 2006 | 1 | 0 | 0 | 0 | 0 | 1 |
|  | 2007 | 1 | 0 | 0 | 0 | 0 | 1 |
|  | 2008 | 1 | 0 | 0 | 0 | 0 | 1 |

Table No. 5

## Projected Openings As Of December 31, 2008

| Colum 1 State | Column 2 Franchise Agreement Signed But Outlet Not Opened | Column 3 Projected New Franchised Outlet In The Next Fiscal Year | Column 4 Projected New Company-Owned Outlet In The Next Fiscal Year |
|---|---|---|---|
| Alabama | 0 | 1 | 0 |
| Arizona | 0 | 1 | 0 |
| Arkansas | 1 | 1 | 0 |
| California | 5 | 3 | 0 |
| Colorado | 0 | 1 | 0 |
| Connecticut | 0 | 1 | 0 |
| Delaware | 0 | 1 | 0 |
| Florida | 9 | 5 | 0 |
| Georgia | 3 | 3 | 0 |
| Hawaii | 0 | 0 | 0 |
| Idaho | 1 | 0 | 0 |
| Illinois | 1 | 1 | 0 |
| Indiana | 0 | 0 | 0 |
| Iowa | 0 | 1 | 0 |
| Kansas | 1 | 1 | 0 |
| Kentucky | 3 | 1 | 0 |
| Louisiana | 0 | 1 | 0 |
| Maine | 1 | 1 | 0 |
| Maryland | 0 | 1 | 0 |
| Massachusetts | 0 | 1 | 0 |
| Michigan | 0 | 1 | 0 |
| Minnesota | 0 | 1 | 0 |
| Mississippi | 0 | 1 | 0 |

Franchisee's Initials _____

| | | | |
|---|---|---|---|
| Missouri | 0 | 1 | 0 |
| Montana | 0 | 1 | 0 |
| Nebraska | 0 | 0 | 0 |
| New Hampshire | 0 | 1 | 0 |
| New Jersey | 0 | 1 | 0 |
| New Mexico | 0 | 0 | 0 |
| New York | 3 | 1 | 0 |
| Nevada | 0 | 1 | 0 |
| North Dakota | 0 | 0 | 0 |
| North Carolina | 0 | 2 | 0 |
| Ohio | 0 | 1 | 0 |
| Oklahoma | 0 | 0 | 0 |
| Oregon | 0 | 1 | 0 |
| Pennsylvania | 2 | 1 | 0 |
| Rhode Island | 0 | 0 | 0 |
| South Carolina | 0 | 2 | 0 |
| South Dakota | 0 | 0 | 0 |
| Tennessee | 1 | 1 | 0 |
| Texas | 0 | 3 | 0 |
| Utah | 0 | 1 | 0 |
| Vermont | 0 | 0 | 0 |
| Virginia | 0 | 1 | 0 |
| Washington | 2 | 1 | 0 |
| Wisconsin | 0 | 1 | 0 |
| West Virginia | 0 | 1 | 0 |
| Wyoming | 0 | 0 | 0 |
| | | | |
| **TOTALS** | **33** | **50** | **0** |

Franchisee's Initials _____

## LIST OF CURRENT GOIN' POSTAL FRANCHISEES AS OF DECEMBER 31, 2008

AL

Tom Comer,oneonla@goinpostal.com, 1828 Five Points Road, Cleaveland, AL, 35049,

Lorenzo & Debora Hamilton,lorenzo.hamilton@us.army.mil, 1325 Rolling Ridge Circle, Pleasant Grove, AL, 35127,

Sue Turrentine,jturrentine@diamondpro.net, 388 Summerford Orr Rd, Falkville, AL, 35622,

Susan, David, Rosie & Jerry Woodard,fourwoodsinc@yahoo.com, 144 Leathertree Lane, Madison, AL, 35758,

Laurence E. Towns Jr.,l.towns@yahoo.com, 307 Cedar Dr., Selma, AL, 36701,

AR

Mike Montgomery,mike.montgomery@yahoo.com, 5200 Johnwood, Jonesboro, AR, 72404,

Mike Montgomery,mike.montgomery@yahoo.com 1305 W. Kings Highway Suite 3, Paragould, AR, 72450,

AZ

Amy & Tim Pettigrew,amytimntiffy@earthlink.net, 8211 E. Apache Plumb Dr., Gold Canyon, AZ, 85218,

Dan & Bernadette Wylie, Darin & Angie Stordahl,danw@azbcs.com; bernaw@cox.net; djstord@cox.net, 2640 E Michelle Way, Gilbert, AZ, 85234,

CA

Fadi Bedoush,clovis@goinpostal.com, 6549 N. Whitney Ave, Fresno, CA, 93710,

Tyrone Lofton & Paulette Lofton,perris@goinpostal.com, 3801 auburn ridge dr, Perris, CA, 92571-9428,

Elizabeth & Alba  Lew,elewz28@hotmail.com; albitalew@sbcglobal.net, 5080 Pyramid Way, Fairfield, CA, 94534,

Roderick Wada,wadason50@sbcglobal.net, 3671 Satinwood Drive, San Jose, CA, 95148,

Rommy Chipumol,rkchippy@aol.com, 81350 Paludosa Dr, Indio, CA, 92201,

Tasha Wilson,sabastianbaby@sbc.global.net, 586 Lewis Ave, Yuba City, CA, 95991,

Joseph Sanchez,allensanchez1@hotmail.com, , , CA, ,

Harold & Patricia Kern,hck7082@gmail.com, PO Box 159, Pine Grove, CA, 95665,

Jun and Mayet Reina,junreina@gmail.com, 4 Windcatcher Ct, Sacramento, CA, 95834,

Monica & Abraham Rego,atwater@goinpostal.com, 2840 Greff Road, Denair, CA, 95316,

Paul Aliman,pc060296@sbcglobal.net, 27 Calle Boueva, San Clemente, CA, 92673,

Frank Madrigal,frank22h20@aol.com, 3517 Desert Drive, Stockton, CA, 95209,

Rommy Chipumol,rkchippy@aol.com, 81350 Paludosa Dr, Indio, CA, 92201,

Daniel Wencel,daniel@caboodle.com, , , CA, ,

Clint Henry,clint43@verizon.net, 1440 Beaumont Ave, Bldg A2336, Beaumont, CA, 92223,

Amelia Cutler,amycutler1@aol.com, 1598 Oakdale Ct., Upland, CA, 91786,

Rommy Chipurnoi,rkchippy@aol.com, 81350 Paludosa Dr, Indio, CA, 92201,

Donald & Elizabeth Thompson and Yvonne Rohr,dthompson@desertofficesolutions.com, 6577 Quail Springs Avenue, Twenty-nine Palms, CA, 92277,

Charles K. "Kevin" & Elizabeth J. Gregory,tomerdrugs@earthlink.net, PO Box 131 / 42050 S Merced Ave., Coalinga, CA, 93210,

Margarita Esparza,silentsolliloquy@msn.com, 12211 Grand Teton Drive, Bakersfield, CA, 93312,

CT

Dan Hardrick,dhardrick@cox.net, 291 Foster Street, Bloomfield, CT, 06074,

DE

Bob Bryan,robertbryan@mchsi.com, 213 Dodd St,  po box 547, Millsboro, DE, 19966,

FL

GPFC,info@goinpostal.com, 38439 5th Ave, Zephyrhills, FL, 33542,

Craig Lindberg & Bryan Lindberg,gpbrooksville@gmail.com, 41 Douglas St, Homosassa, FL, 34446,

Alan & Gale Decker,walandecker@yahoo.com, 4913 Whiting Drive, Sebring, FL, 33870,

James & Marla Ajac,jkajac38@msn.com, 830 Carlton Ct, Winter Haven, FL, 33884,

John Phillipp,jwp7373@hotmail.com, 5124 White Ibis Drive, North Port, FL, 34287,

Edward C. Jones,jonestinker@msn.com, 9344 River Road, Spring Hill, FL, 34608,

Joanne & James Richie,muffy00@prodigy.net, 917 Fountainview Lake Dr., Lakeland, FL, 33809,

James & R.J. Hall,james.hall@goinpostal.com, 19416 Via Del Mar #102, Tampa, Fl, 33647,

Melissa & Roberto Coris,mell3155@bellsouth.net; rcinvestor@bellsouth.net, 574 Green Spring Circle, Winter Springs, FL, 32708,

Sylvia Isem & Adrian Burleigh,sylvia.isem@gmail.com, 9435 SW 44 Street, Miami, FL, 33165,

Georgia Nelson & Donald Nelson,geninvestments@comcast.net, 10947 Hamilton Downs Court, Jacksonville, FL, 32257,

David & Jun P. Tankersley,tank5922@gmail.com, 413 E Street, St. Augustine, FL, 32080-6869,

Simone Turpin,simone_turpin@hotmail.com, 10691 Grayson St., Jacksonville, FL, 32220,

Urjit Patel,urjitp@hotmail.com, 2044 Autumnview Drive, Orlando, FL, 32825,

Charles & Robin Allen,alienescapes@yahoo.com, 950 N. Lyle Ave., Crystal River, FL, 34429,

Joe Broadus, Jim Hensel & Shannon Ivey,jbroadus3@yahoo.com; captsink@aol.com, 8010 Pepperidge Road, Port Richey, FL, 34668,

Alan & Gale Decker,sebring@goinpostal.com, 4913 Whiting Drive, Sebring, FL, 33870,

H Pierce Rumph,hprumph@cs.com, 146 Long Point Drive, Fernandina Beach, FL, 32034,

Steve & Luz Hage,ksdhage@aol.com, 21115 CR 455, Clermont, FL, 34715,

Christopher Ward / Linda Green,geroe@se.rr.com, 2246 SW Main Blvd, Lake City, FL, 32025,

Joseph Wilson,josephrwilson@comcast.net, 3104 Bent Pine Drive, Fort Pierce, FL, 34951,

The George Family,jacobmgeorge@gmail.com, 1826 Black Lake Blvd., Winter Gardens, FL, 34787,

Paul McArthur,stroke4@aol.com, 4061 Marianna Rd, Jacksonville, FL, 32217,

Steven & Luz Hage,ksdhage@aol.com, 21115 CR 455, Clermont, FL, 34715,

Steve & Luz Hage,ksdhage@aol.com, 1730 E. Hwy 50, Clermont, FL, 34715,

James M. Griffin; Jenevy Beth Griffin  aka  Jim & Jenny,jmpg51@verizon.net, 2909 Mossy Timber Trail, Valrico, FL, 33594,

John & Liz Long,longjohnny6@aol.com, 1357 Portmoor Way, Winter Garden, FL, 34787,

Kathy List,klist4@aol.com, 20662 NW 12 PL, Miami Gardens, FL, 33169,

Paul Grannan & Dale Long,long4ever@embarqmail.com, 60 Almond Drive, Ocala, FL, 34472,

Franchisee's Initials _EB_

Robert J Kyle, Robert J Kyle III & Tracy V Harelson,bobkylejr@yahoo.com, 11511 Oyster Bay Circle, New Port Richey, FL, 34654,

Wayne & JoAnn Colello,joneli222@aol.com, 9443 Woodbreeze Blvd, Windermere, FL, 34786,

Shannon Ivey, Joe Broadus & Jim Hensel,shangivey@yahoo.com, 8010 Pepperidge Ln, Port Richey, FL, 34668,

Bret and Cindy Bush,bbushdad@aol.com, 4255 NE 64 Ave Road, Silver Springs, FL, 34488,

Stephen Licata Jr.,slicatajr@yahoo.com, 8208 Canary Canyon Way, Tampa, FL, 33647,

Lynn & Tom Geng,ldgpepper@yahoo.com, 4536 Tampa Downs Blvd., Lutz, FL, 33548,

Yamila Bennett,yamiquittner@aol.com, 20120 NE 3rd Ct #4, Miami, FL, 33179,

Pareshbhai & Manisha Patel, ppurpak@aol.com, 556 Highbrooke Blvd, Ocoee, FL, 34761,

Dale Long & Paul Grannan,long4ever@embarqmail.com, 60 Almond Drive, Ocala, FL, 34472,

Shane Husbands & Dale Husbands,shanehus@gmail.com, 9121 Lake Fischer Blvd, Gotha, FL, 34734,

Judith Silvasi-Patchin,judy@silverpatch.com, 4955 Dixie Hwy NE Unit 603, Palm Bay, FL, 32905-6055,

Shane Robb, Shane Wallace & Annette R Tomlinson,shanesales17@aol.com; shanegr2007@hotmail.com, 496 Crossfield Circle, Naples, FL, 34104,

Nancy & Richard Thornton,nancy6279@verizon.net, 10074 61 Cir N, Pinellas Park, FL, 33782,

Lee Murray,leamurray@bellsouth.net, 5953 SW 112th Lane, Cooper City, FL, 33330,

Robert J Kyle, Robert J Kyle III & Tracy Harrelson,boginlittle@gmail.com; newportrichey@goinpostal.com, 11511 Oyster Bay Circle, New Port Richey, FL, 34654,

James E. & Joanne J. Lemueil,mustang1@tampabay.rr.com, 6122 Elkins Avenue, Tampa, FL, 33611,

Herbert Weiss,herbstarllc@gmail.com, 521 Virginia Drive, Winter Park, FL, 32789,

Khalid, Nadir, Tahir & Asadullah Zaman,zamankhalid@aol.com; pigmini1@bellsouth.net; zaman153@aol.co, 9900 S Thomas Drive, Panama City, FL, 32408,

Alejandro & Lisa Claudio,ac72572@aol.com, 17547 Sandgate Court, Land O' Lakes, FL, 34638,

David Singh,davewcs@aol.com, 185 SE Osprey Ridge, Port St. Lucie, FL, 34984,

Richard Morales & Angel Martinez,bym9377@nyu.edu, 10127 Shadow Creek Drive; 5148 Jetsail Drive, Orlando, FL, 32832; 32812,

Shane Robb, Shane Wallace & Annette R Tomlinson,shanesales17@aol.com; shanegr2007@hotmail.com, 15031 Punta Rassa Rd, Ft. Myers, FL, 33908,

Stephen Licata Jr.,slicatajr@yahoo.com, 8208 Canary Canyon Way, Tampa, FL, 33647,

Ronak A. Limbachia,apopka@goinpostal.com, 2110 Retreatview Circle, Sanford, FL, 32771,

Ana C Londero,, 4675 Ponce De Leon Blvd Suite #305B, Coral Gables, FL., 33146,

GA

John & Elliott Ware,augusta@goinpostal.com, 3170 Skinner Mill Road N5, Augusta, GA, 30909,

John & Elliott Ware,augusta@goinpostal.com,.5108 Wrightsboro Road STE A, Grovetown, GA 30813,

Dilip & Jyotsna Patel,gpwoodstock@yahoo.com, 5101 Old Chestnut Ct, Woodstock, GA, 30188,

Darren & Wendy Helms,helmsgroup@bellsouth.net, 295 Balmy Court, Powder Springs, GA, 30127,

James R. Murray,jamesmurray2@alltel.net, 3615 Fodder Creek Road, Hiawassee, GA, 30546,

James P. Seals Jr. & Patricia S. Seals,scblueagle@hotmail.com; scpattyseals@hotmail.com, 948 Fairlong Dr NW, Acworth, GA, 30101-7891,

Julie S. Jones,robj_03@alltel.net, 317 Longhorn Trail, Perry, GA, 31069,

Ben & Kim Richard,bhrcpi@hotmail.com, 2180 Pondtown Road, Bainbridge, GA, 39817,

Robart Aderholt, Carolyn Aderholt, Tom Aderholt,RobertAderholt@netscape.net, 3399 Spinnaker Way, Acworth, GA, 30102,

Tina Ford,postdeville@yahoo.com, 4654 Pedenville Road, Concord, GA, 30206,

Derrik Allen & Calvin Addison,dallen@addison-allen.com; caddison@addison-allen.com, 1608 Greenview Court, Woodstock, GA, 30189,

Joy Tyler & Marcie Craig,mjcraig1955@charter.net, 222 James Allen Place, Temple, GA, 30179,

Cynthia Carroll,danandcindy@hotmail.com, 6970 Recreation Lane, Acworth, GA, 30102,

Michelle & Allison,Mich.Mclean@gmail.com; theseons@aol.com, 145 Chennings Lake Drive, Lawrenceville, GA, 30043,

Jason & Ingrid Varn,varnjc@hotmail.com, ingridvam@yahoo.com, 3835 Ga Hwy 297, Vidalia, GA, 30474,

James & Debbie Reynolds,jreynolds@georglabeltone.com, 203 Mallard Loop, Savannah, GA, 31405,

John A. Chitoh,achimjo2002@yahoo.com, 2750 Owens Ave SW, Marietta, GA, 30064,

Gary & Beatrice Campbell,garygjc@bellsouth.net, 2265 Democracy Drive, Burford, GA, 30519,

Anthony Bailey,aballey7@bellsouth.net, 313 Tomochichi Road, Griffin, GA, 30223,

John E. Ware, Michael B. Ware, Rudy Card,augusta@goinpostal.com, 3170 Skinner Mill Road, Augusta, GA, 30909,

Adrian S Bryson,asbryson@aol.com, 5689 Legends Club Circle, Braselton, GA, 30517,

Dale & Ronda McCarty,boxerland2@plantersqnet, 199 Ziltrouer Rd., Guyton, GA, 31312,

Bruce and Grace Flantzer,flantzer1@aol.com, 1585 Femstone Circle, Acworth, GA, 30101,

HI

Paul C S Kim,rokttiger@gmail.com, 583 Kamoku Street #405, Honolulu, HI, 96826,

ID

Christy Fieldstad,christyf90@aol.com, 9027 Woodside Ct, Boise, ID, 83704,

Christy Fieldstad,christyf90@aol.com, 9027 5212 W Franklin Road, Boise, ID 83704,

Christy Fieldstad,christyf90@aol.com, 513 N Milwaukee Street, Boise ID, 83704

IL

Tim & Laurie Burns,burnstl@juno.com, 11169 Prairie Wind Place, Roscoe, IL, 61073,

Mike , Misty & Jaxin Reed,limitdz@yahoo.com, 291 Cloverdale Drive, O Fallon, IL, 62269,

Lisa Holste,effinghamgp@yahoo.com, 14703 N Court One, Effingham, IL, 62401,

IN

Larry & Sharon Gilbert,columbiacity@goinpostal.com, 334 N Walnut, Columbia City, IN, 46725,

John & Kim Ragusa,kimragusa@gmail.com, 330 N Francke Road, Henryville, IN, 47126,

Eric Linton & Mark Levenda,linton.eric@gmail.com, 6401 E Urmeyville Rd, Franklin, IN, 46131,

KS

Ross & Rita Anello,eldorado@goinpostal.com, 349 200th St, Eureka, KS, 67045,

Kenneth and Christina Elkins,teamoutstanding@aol.com, 107 Karen Lane, Lansing, KS, 66043,

Frank & Barbara Blake,fblake@ameritech.net, 2122 Newberry, Derby, KS., 67037,

Franchisee's Initials _____ _____

Frank & Barbara Blake,fblake@ameritech.net, 1076 36th Street, Wichita, KS., 67206,
KY
Robyn Thomas, Karen Thomas, Janet Thomas, Brenda Thomas, and H. Wayne Smith,robynt@comcast.net, 220 Goodman Lane, Elizabethtown, KY, 42701,
Jennifer McClain,jennifermcclain42@yahoo.com, 4030 Tates Creek Road, Apt. 5607, Lexington, KY, 40517,
LA
Paul & Elizabeth Fisher,liznpaul@myway.com, 1813 Palmer Court, Mandeville, LA, 70448,
Harold Archield,sticking202@yahoo.com, 321 11th Street, Lake Charles, LA, 70601,
MA
Frank & Fumie Brooks,chicopee@goinpostal.com, 282 Narragansett Blvd, Chicopee, MA, 01013,
Frank & Fumie Brooks,frank.fumie@verizon.net, 282 Narragansett Blvd, Chicopee, MA, 01013,
Frank & Fumie Brooks,frank.fumie@verizon.net, 282 Narragansett Blvd, Chicopee, MA, 01013,
Matthew Guerra,mag92479@yahoo.com, 503 Winthrop St STE 4, Rehoboth, MA 02769,
MD
Jigesh Patel,jigesh0181@yahoo.com, 1800 Belmont Ave, Windsor Mill, MD, 21244,
The Quadri Family,haquad@haquad.com, 2045 Astilbe Way, Odenton, MD, 21113,
Angela & Quansah,quansaha@comcast.net; quansahc@comcash.net, 11047 San Andrew Or., New Market, MD, 21774,
Joe Manley,leyman@comcast.net, 6239 Woodcrest Drive, Ellicott City., MD., 21043.,
ME
Scott Peacock / Cindy Moulston,auburn@goinpostal.com, 13b Woodcart Street, Gray, ME, 04039,
Bill Holmquist / Scott Peacock,norway@goinpostal.com, 21 Wildwood Ln, Gray, ME, 04039,
Tamia Glidden,dglidde3@maine.rr.com, 239 State Street, Presque Isle, ME, 04769,
Dale Crafts,dalecrafts@aol.com, 2 Passing Lane, Lisbon Falls, ME, 04252,
MI
Victor & Mary Hui-Wee,plainwell@goinpostal.net, 6011 brook creek, Kalamazoo, MI, 49007,
Samson Kebede & Samuel Nigussie,samson1073@yahoo.com, 1259 elmwood dr #8, ypsilanti, MI, 48197,
Victor & Mary Hui-Wee,milwood@goinpostal.net, 6011 brook creek, Kalamazoo, MI, 49007,
Cassandra Hines & Stacey M. Todd,cassa2@sbcglobal.net, 28710 Ravenwood, Farmington Hills, MI, 48334,
Epson Johnson,epsonjohnson@comcast.net, 556 Cherry Street, Westland, MI, 48186,
MN
Marshall & Kristi Lefferts,staxman@aol.com, 6387 Craig Dr, Eden Prairie, MN, 55346,
Gary Bohannon,bohannongary@yahoo.com, 215 Tianna Drive, Walker, MN, 56484,
Guy & Maureen Ramsey,sertec@rea-alp.com, 675 Brophy Shores Road NW, Alexandria, MN, 56308,
Melissa & Brad Lorentz,kroshusm@hotmail.com, 24044 Cherry Hill Road, Detroit Lakes, MN, 56501,
Linda & Leon VanDenBroeke,lee.lynn@charter.net, 617 Lincoln Dr NE, St. Michael, MN, 55376,
Abdullahi A. Musse,musse141@hotmail.com, 1516 Elliot Ave, Minneapolis, MN, 55404,
MO
Lisa Stiern,dandistiern@socket.net, 31718 Cedar Trail, Warrenton, MO, 63383,
Renwick & Felecia Ware,fware@sbcglobal.net, 221 Day Drive, Ferguson, MO, 63135,
Jack and Julie Giacomelli,halglac@hotmail.com, 1122 Bluebird Lane, Liberty, MO, 64068,
Danial J. & Beverly G. Dirck,gpkansascity@hotmail.com, 1306 Rose, Kearney, MO, 64060,
Jeanne Desmond ,jeanne.desmond@gmail.com, 345 Camellia Dr, Webster Groves, MO, 63119,
Patricia Hackmann,phackmenn@hotmail.com, 18430 Hackmann Road, Marthasville, MO, 63357,
Pride & Catherine Fox,pridefox@aol.com, 8201 NW High Point Drive, Weatherby Lake, MO, 64152,
Alice and Ken Brokhausen,gram_alice2006@yahoo.com, 20004 Cole Road, Kearney, MO, 64060,
Noble & Tamarya Milam,nobull@boycomonline.com, 305 Co. Rd. 4761, Poplar Bluff, MO, 63901,
Mark & Tina Wiegard,mar_kw@hotmail.com, 14 Eliot Ct, OFallon, MO, 63366-7432,
Mark & Sheila Kovac,makshekov@hotmail.com, 5119 Faraon, Apt A, St Joseph, MO, 64506,
Josh L Paschall & Renee L Paschall,joshpschll@yahoo.com, 600 Buckeye Lane, Pleasant Hill, MO, 64080,
Sharon Lee,diannelee1950@yahoo.com, 26200 Hwy W, Waynesville, MO, 65583,
MS
Terry Slater, slayterman@yahoo.com, 17240 Hwy 26 West Lucedale MS 39452
NC
Bob Black,goinpostal@nc.rr.com, 476 Arlington Drive, Lumberton, NC, 28358,
P.J. Morgan,mountairy@goinpostal.com, 118 Jacob Street, Dobson, NC, 27017,
Charlie Kramer,winstonsalem@goinpostal.com, 3639 Clinard Avenue, Winston-Salem, NC, 27106,
Robert & Louise Brothers,elizabethcity@goinpostal.com, 1166 Perkins Lane, Elizabeth City, NC, 27909,
Nathan Wooten, Jill Cooper & Justin Hooker,nathanww@adelphia.net, 441 B South Main Street, King, NC, 27021,
Phoebe Mayberry / Leon Mayberry,leonm@carolina.rr.com, 3325 Unionville-Indian Trail Road, Indian Trail, NC, 28079,
Rob Muskelley,wilkesboro@goinpostal.com, 425 Sedgefield Cir, Wilkesboro, NC, 28697,
Kristen Stich,kastich@gmail.com, 1417 Kenbrook Dr, Garner, NC, 27529,
Leslie & Bob Servicky,leslie.servicky@wllm.ppdi.com, 113 Coots Trail, Hampstead, NC, 28443,
Marianne Alef,malef@triad.rr.com, 216 Mayflower Dr., Greensboro, NC, 27403,
Vic and Shirley Bragman,vbragman@bellsouth.net, 3411 Donegal Dr., Clemmons, NC, 27012,
Tasha P. Brown,tbrown1037@yahoo.com, 1037 Timberland Trail, East Bend, NC, 27028,
Steve and Marty Weir,mweir@mchsi.com, 101 Egret Cove, Moyock, NC, 27958,
Levi Samuels,l3@l3stylz.com, 7983 Villanow Dr., Sanford, NC, 27332,
ND
Andrea Hoffner, Dawn & Nick Michels,andreahoffner@meritcare.com; dmichels@yahoo.com;, 116 Woodland Dr., Fargo, ND, 58102,

78                    Franchisee's Initials _____

**NE**

Dan L. & Wanda Martin,omaha@goinpostal.com, 12665 Anne Street, Omaha, NE, 68137.

Chuck Lewis,chucklewls@earthlink.net, 3837 Sumner Street, Lincoln, NE, 68506,

**NJ**

Mark & Nicole Burnham,markburnham@comcast.net, 167 Lake Drive, Atco, NJ, 08004,

Young Jun Kim,yjkim514@yahoo.co.kr, 14 Dean Street, Harrington Park, NJ, 07640,

**NV**

Amy & Bryan Lawe,ablawe@cox.net, 297 Horizon Pointe Circle, Henderson, NV, 89012,

Adan V. Ayala,ventura53@yahoo.com, 5907 Soft Mist Court, Las Vegas, NV, 89110,

Bruce & Susan Weber,blwlou@cox.net, 3704 Treasure Bluff Ct., Las Vegas, NV, 89129,

**NY**

Katie & Rick Kegresse,goinpostalpennyan@verizon.net, 208 Court Street, Penn Yan, NY, 14527,

Audrey Morgan,amorganmc@gmail.com, 1 Forbes Rd, New City, NY, 10956,

Ho Tak Lok,jasonlok@gmail.com, 34 Garden Street, Valley Stream, NY, 11581,

**OH**

Jan, Roy & Trey MacDonald, Bud & Dorothy Jackson,macjani@hotmail.com, 15293 Harris Rd., Defiance, OH, 43512,

Donald and Linda Merryman,linmerry@windstream.net, 29 Edgewood Drive, Grafton, OH, 44044,

Emad A. Shenouda,eashenouda@aol.com, 876 Kiowa Trail, Lima, OH', 45805,

**OK**

Gene Matthews,vintontx@aol.com, 17 Seneca Drive, Guymon, OK, 73942,

Charles & Kristi Olzawski,ckolzawski@netzero.net, 1603 Tiger Road, Fort Gibson, OK, 74434,

Kristy Sheets,michaelsheets@alltel.net, PO Box 1467, Stilwell, OK, 74960,

Desiree McGarity,desrae@sbcglobal.net, 800 C SE, Ardmore, OK, 73401,

**OR**

Carlos & Sandra Aviles,avilesgenesis@comcast.net, 13474 SE 119th Court, Clackamas, OR, 97015,

Joan L. Ruthruff,nanasattic@comcast.net, 4839 Spring Hill Dr. NW, Albany, OR, 97321,

Dave Smith,inapodinc@gmail.com, 1922 Larson Road, Roseburg, OR, 97470,

Waldemar,tholowet@aol.com, 14708 SW Jenshire Lane, Tigard, OR, 97223,

Matthew and Paula Boyd,trkon@hotmail.com, 865 South Main Street #1, Myrtle Creek, OR, 97470,

Mary Gardner,mzgardner74@yahoo.com, 473 53rd PL NE, Salem, OR, 97317,

David Smtih,inapodinc@gmail.com, 1922 Larson Road, Roseburg, OR, 97470,

**PA**

Nancy Cusack,ncusack@ptd.net, 309 Big Ridge, East Stroudsburg, PA, 18301,

Oleg Gapon,olegg04@yahoo.com, 9302 Jamison Ave.#A, Philadelphia, PA, 19115,

Terry Halfhill,trh12@psu.edu, 1139 Rivers Edge Rd, Connellsville, PA, 15425,

Dave Westwood & John Perrott,jperrott@ptd.net, 13 Lenape Drive, Morgantown, PA, 19543,

Philip Weitz & Denise Weitz,phil.weitz@midlandtechsales.com, 45 Woodshire Dr., Easton, PA, 18042,

Rebecca Brittain,becca92@earthlink.net, 124 Chruch Ln, Reedsville, PA, 17084,

Shane D Kilmore & V Eugene Kilmore,skilmore@gmail.com, 79 N. Main St., Marysville, PA, 17053,

Michelle V Pugliese,chellep@alltel.net, 260 Arrowhead Dr., Leechburg, PA, 15656,

Gayle Gavin,gavin1@atlanticbb.net, 959 Banning Rd., Dawson, PA, 15428,

Shane & Gene Kilmore,goinpostalcarlisle@gmail.com, 79 N. Main St., Marysville, PA, 17053,

Karen Ann Adams,gettysburg@goinpostal.com, 279 Kindig Rd., Littlestown, PA, 17340,

Paul R Rusnak,paul.rusnak@gmail.com, 90 Morvale Road, Easton, PA, 18042,

John Perrott & Dave Westwood,jperrott@ptd.net; qwest1@comcast.net, 13 Lenape Drive, Morgantown, PA., 19543,

**SC**

Marcus Johnson,mdjthe1st@yahoo.com, 229 Windsor Point Road 3C, Columbia, SC, 29223,

Jim & Dee Struchen,jlsnsc@comcast.net, 507 Greenbriar Drive, North Augusta, SC, Boyuluyo,

Phil & Leigh Hemingway / Nat & Chris Jones,phil@phileigh.com, 3318 Cottonfield Dr, Mount Pleasant, SC, 29466,

Antonio Santiague, Sasim Patel, and Rashard Grier,antonio@smokingpipes.com, 211 1st Ave S. Apt #5, North Mytle Beach, SC, 29582,

Phil & Leigh Hemingway / Nat & Chris Jones,phil@phileigh.com, 3318 Cottonfield Dr, Mount Pleasant, SC, 29466,

**TN**

Dick Graham,ocoee@goinpostal.com, 192 Old Chestuee Rd. N.E., Cleveland Tn., TN, 37323,

George Climer,gclimer@bellsouth.net, 2758 Rock Wall Rd., Nashville, TN, 37221,

Jennifer Shrum, Mike Marshall,shrum4@nctc.com, 1114 Lutton Drive, Lafayette, TN, 37028,

Cathy Sorter & Gayle Anderson,sixgunner@charter.net, 1426 Scarlett Ohara Ct, Clarksville, TN, 37042,

Donald Sundquist, Jr.,tnatsea@aol.com, 1130 East 10th Street, Apt. J-4, Cookeville, TN, 38501,

Randy & Lisa Johnston,lcrepezzi@msn.com, 8323 Alamo Road, Brentwood, TN, 37027,

Michael & Terry Bogen,mebtlb@comcast.net, 2208 Sassafras Drive, Murfreesboro, TN, 37128,

Michael and Darlene Porter,michael_porter32@excite.com, 315 Willow Creek CV NE, Cleveland, TN, 37323,

Richard & Denise Sherriff,r_sherriff06@comcast.net, 5205 Hunter Village Dr., Ooltewah, TN, 37363,

Kerry Tang & Scott Brewer,yeletang@yahoo.com, 3137 Jenkins Dr., Murfreesboro, TN, 37128,

Audrey McKinney,audmckn@aol.com, 3891 Twinmont St, Memphis, TN, 38128,

Kevin & Susie Broyles,skunkgolf@comcast.net, 104 Mercedes Drive, Smyrna, TN, 37167,

Robert & Inessa Sloan,rksloan@wwamail.com, 214 Oohleeno Trace, Loudon, TN, 37774,

Robert K Sloan,maryville@goinpostal.com, 214 Oohleeno Trace, Loudon, TN, 37774,

**TX**

Dennis Giroux,degiroux@aol.com, 406 W. SHORE DRIVE, Wills Point, TX, 75169,

Emigdio Lugo Jr.,laredo@goinpostal.com, 4207 Jalapa, Laredo, TX, 78046,

79                    Franchisee's Initials _____

Viresh Patel,viresh05@gmail.com, 3708 Sawmill Drive, Austin, TX, 78749,
Georgia M. Mens & Betty Jo Tankersley,Mens010203@yahoo.com, Route 4 Box 44-B, Kirbyville, TX, 75956,
Mark & Renee Gray,markgray@austin.rr.com, 110 Falcon Court, Bastrop, TX, 78602,
Wall Family,vwall@ellsysltd.com, 7600 Capella Ct., Plano, TX, 75025,
Tawn & Khamphay Daravong,tdara31@yahoo.com, 302 Salsbury Dr, Euless, TX, 76040,
K. Frank Lin,franklin121203@yahoo.com, 519 Heather Ridge, San Antonio, TX, 78260-2605,
Brian & Tamara Scherry,tscherry@gt.rr.com, 235 Teal Drive, Vidor, TX, 77662,
Christiane and Arno Pitzen,cpitzen@austin.rr.com, 3208 Bay Hill Lane, Round Rock, TX, 78664,
Manuel & Karen Treviño,mxtrevino@charter.net, 800 Ridge Crest Dr, Burleson, TX, 76028,
Narciso & Esmeralda Solis,n.v.solis@netzero.com, 8000 Doffing Rd., Mission, TX, 78574,
Patty Pena,p_pena25@yahoo.com, 1205 Melrose, Victoria, TX, 77901,
Lee & Jere Redd,lee-jere@suddenlink.net, 7400 Baughman Dr., Amarillo, TX, 79121,
Donald 'Don' Haygood,haygooddon@earthlink.net, 10716 Sierra Oaks, Austin, TX, 78759,
Heath Edwards,aaastorage@grandecom.net, 4123 US Hwy 290, Fredericksburg, TX, 78620,
Heath Edwards,matt@yourstorageplace.net, 4123 US Hwy 290, Fredericksburg, TX, 78624,
Deborah Jane Triesch,dtriesch@moment.net, PO Box 514 , Blanco, TX, 78606,
Angelina Francis,sanantonio@goinpostal.com, 406 Territory Oak, San Antonio, TX., 78253,
Jesus M. Martinez, David J. Russell & Marla C. Sanchez,sprinkdoc@yahoo.com, 835 Point Sunset; 927 Magnolia Crest, San Antonio, TX., 38253; 38251,
UT
Marsha A. Pensis,mapensis@hotmail.com, PO Box 1646 (597 West 100 South), Parowan, UT, 84761,
VA
Mickie Nance,suffolk@goinpostal.com, 342 Saunders Dr, Portsmouth, VA, 23701,
Dotty & Moises Medel,quidot@yahoo.com, 1529 Stewards Way, Virginia Beach, VA, 23453,
Michael & Wendy Dobrasz,mdobrasz@yahoo.com, 20-8519171, 3000 Beaden Dr, VA, 23456,
Mickie Nance,koolmickie@msn.com, 342 SAUNDERS DRIVE, PORTSMOUTH, VA, 23701,
Nancy White,plgleishs@aol.com, 15425 Lawson Creek Lane, Smithfield, VA, 23430,
Michael & Wendy Dobrasz,virginiabeach@goinpostal.com, 3000 Beaden Dr, Virginia Beach, VA, 23456,
Bruce & Janna MacConnell,bcmacconnell@comcast.net, 3809 Rupert Lane, Richmond, VA, 23233,
Susan Goodnight,smg304@verizon.net, 304 Burgh Westra Drive, Hampton, VA, 23669,
Michael & Wendy Dobrasz,mdobrasz@yahoo.com, 3000 Beadan Dr, Viginia Beach, VA, 23456,
Roosevelt H. T. Phillips,rophillips1@yahoo.com, 118A Kathann Dr., Hampton, VA, 23605,
Nicholas Astarb,nicka95290@aol.com, 140 Marietta Lane, Swoope, VA, 24479,
Dennis & Virginia Bowerman,beachden@earthlink.net, 2256 Wild Oak Crescent, Virginia Beach, VA, 23456,
Brenda, Rhonda & Carrie ,brwilson@aol.com, 704 Burgess Ave, Hampton, VA, 23664,
Yvette & Travis Williams,yvettewilliams@cox.net; travis.williams@langley.af.mil, 1 Steelers Circle, Hampton, VA, 23666,
WA
Thomas & Kris Taylor,BlackDogEnterprise@aol.com, 6208 Winnwood Loop SE, Chehalis, WA, 98513,
Russ Curran,eagleruss@yahoo.com, 7420 204th St NE Ste 102, Arlington, WA, 98223,
Michelle Arousa,ykwangha@hotmail.com, 126 177th ST E, Spanaway, WA, 98387,
Tom & Kris Taylor,KTaylor37@aol.com, 6208 Winnwood Loop SE, Chehalis, WA, 98513,
Edward & Kristine Aaron,dublinpkea@comcast.net., 418 212th Street SW, Bothell, WA, 98021,
Thomas & Jan Haughton,haughton5@pocketinet.com, 58602 N Demoss rd., Benton City, WA, 99320,
Jan & Tom Haugton,richland@goinpostal.com, 58602 N. Demoss Rd., Benton City, WA, 99320,
Trisha Nelson,tm_e@hotmail.com, 126 E Street SW, Ephrata, WA, 98823,
Sara J Fahy,rosscarbury@gmail.com, PO Box 1004, Lakebay, WA, 98349,
WI
Mark & Jan Pankratz,mpankratz66@hotmail.com, W254S6480 McGregor Ct, Waukesha, WI, 53189-9260,
John Verlooy / Manager - Andy Perfetti,jverlooy@yahoo.com, 3690 E. Wick road, Superior, WI, 54880,
WV
Brian & Janette Woofter,brian.woofter@gmail.com, 727 Divide Hill, Kenna, WV, 25248,
Cliff & Karen Sumner,csum2006@hotmail.com, 735 Showers Lane, Martinsburg, WV, 25403,
Kevin & Lynda Robinson,krobinson213@comcast.net, 213 Ash Ave, Moundsville, WV, 26041-1535,
Howard ,csum2006@hotmail.com; martinsburg@goinpostal.com, 735 Showers Lane, Martinsburg, WV, 25403,

Franchisee's Initials _____

## FRANCHISE TERMINATIONS INCLUDING NONRENEWALS AND TRANSFERS

The name, city and state, and current business telephone number, or if known, the last known home telephone number of every Franchisee who has had a Store franchise terminated, canceled, not renewed, transferred, or otherwise voluntarily or involuntarily ceased to do business under the Franchise Agreement during the period from January 1, 2008 through December 31, 2008, or who has not communicated with us within ten (10) weeks of December 31, 2008, are as follows:

If you buy this franchise, your contact information may be disclosed in the future to other buyers when you leave the franchise system.

Terminations:

| | | | | | |
|---|---|---|---|---|---|
| John Lee Broadenax | 205-527-3211 | 1250 Indiana Street | Birmingham. | AL | 35524 |
| Laurence E. Towns Jr. | 205-246-4346 | 307 Cedar Dr. | Selma | AL | 36701 |
| Wendy Michelle Grzybowski | 251-583-3139 | 9005 Dovetail Ln | Wilmer | AL | 36587 |
| Jeff & Rona Miller | 480-204-3543 | 19403 E Oriole Way | Queen Creek | AZ | 85242 |
| Shelby & Bruce Kerr | 520-256-3968 | 7313 N Heathcliff Ave | Tucson | AZ | 85741 |
| Daniel Wencel | | | | CA | |
| Rommy Chipurnoi | 760-413-3233 | 81350 Paludosa Dr | Indio | CA | 92201 |
| Tabatha Davis | 714-476-4300 | 409 Roosevelt St. | Corona | CA | 92879 |
| David Kruss | 925-215-5610 | 10777 Inspiration Circle | Dublin | CA | 94568 |
| Jun & Mayet Reina | 916-524-4723 | 4 Windcatcher Ct | Sacramento. | CA | 95834 |
| Patrick Beaver | 916-233-8187 | 3906 Wildrose Way | Sacramento | CA | 95826. |
| Jim & Michelle Martin | 302-228-7138 | 30193 Whitehall Drive | Milton | DE | 19968 |
| Michael Steifield & Phil Margot | 407-234-7227 | 474 Long Meadow Lane | Longwood | FL | 32779 |
| Carl Munn | 352-267-1072 | 9531 Midsummer Lane | Leesburg | FL | 34788 |
| Jennifer & Chuck Thompson | 386-365-3282 | 25036 67th Rd | OBrien. | FL | 32071 |
| Carl Munn | 352-267-1072 | 9531 Midsummer Lane | Leesburg | FL. | 34788. |
| Carl Munn | 352-267-1072 | 9531 Midsummer Lane | Leesburg | FL. | 34788 |
| The George Family | 718-986-5253 | 1826 Black Lake Blvd. | Winter Gardens | FL | 34787 |
| Ron & Michelle LaNeve | 954-829-6901 | 19241 SW 62nd street | Pembroke Pines | FL | 33332 |
| Stephen Licata Jr. | 813-334-5190 | 8208 Canary Canyon Way | Tampa | FL | 33647 |
| Grace & Arnold Kraemer | 813-601-4077 | 5845 Meadow Park Place | Lithia | FL. | 33547 |
| Carl Munn | 352-267-1072 | 9531 Midsummer Lane | Leesburg | FL | 34788 |
| Armineh Gharakani. | 561-753-2198 | 11483 Beacon Pointe Lane | Wellington. | FL. | 33414. |
| The Robinson Family | 847-506-1520 | 4000 Bayside Dr, Apt 107 | Palatine | IL | 60074 |
| Shelley & Rod Ochsner | 316-706-6111 | 1619 W. Parkdale | Wichita | KS | 67212 |
| Frank & Barbara Blake | 316-259-0790 | 2122 Newberry | Derby | KS | 67037 |
| Beverly Detrich, Angela R. Stark | 502-442-4913 | 760 Lakeside Drive | Taylorsville | KY | 40071 |
| Chor Leung "Kenny" Lam | 617-816-6816 | 330 Tremont St. | Boston | MA | 02116 |
| Robert Costa | 508-294-7903 | 308 Elm Street | Seekonk | MA | 02771 |
| Epson Johnson | 734-772-2802 | 556 Cherry Street | Westland | MI | 48186 |
| Marshall & Kristi Lefferts | 612-817-5023 | 6387 Craig Dr | Eden Prarie | MN | 55346 |
| Brandon Michael Eborst | 919-394-5129 | 582 Sheridan Forest Road | Goldsboro | NC | 27534 |
| April Epps and Samuel Harris | 336-314-9668 | 3101 Esteswood Court. | Greensboro. | NC | 27406. |
| Craig Robbins & Isabel Robbins | 732-861-1468 | 85 Tices Lane Apt #12 | East Brunswick | NJ | 08816 |
| Bibi Z. Stewart | 973-768-3994 | 77 Fairmount Terr | East Orange | NJ | 07018 |
| Jeff & Suzanne Herring | 702-210-0054 | 7470 W Eldora Street | Las Vegas | NV | 89117 |
| Jeff Herring | 702-210-0054 | 7470 W Eldora Street | Las Vegas | NV | 89117 |
| Nancy Cusack | 917 715 8087 | 309 Big Ridge | East Stroudsburg | PA | 18301 |
| Richard & Wanda Query | 843-743-1619 | 100 Niblick Rd. | Summerville | SC | 29483 |
| Richard & Denise Sherriff | 423-240-7073 | 5205 Hunter Village Dr. | Ooltewah | TN | 37363 |
| Donald 'Don' Haygood | 512-623-0614 | 10716 Sierra Oaks | Austin | TX | 78759 |
| Daniel Acosta Jr. | 915-525-3464 | 12401 Tierra Limon Dr. | El Paso | TX | 79938 |
| Jerome Gunarso | | | Bellevue | WA | 98007 |

Franchisee's Initials _____

Transfers

| | | | | | |
|---|---|---|---|---|---|
| Benjamin Carranza | 213-999-1838 | 1271 Bellevue Ave. | Los Angeles | CA. | 90026 |
| Kevin Tonn & Roy Macy | 916-759-5694 | 3258 Outlook Drive | Rocklin | CA | 95765 |
| Israel, Jhonathan | 951 757 5465 | 25331 ORBIT CT. | Moreno Valley | CA | 92551 |
| Megan Andersen | 813-469-3427 | 38137 5th Ave | Zephyrhills | FL | 33542 |
| Wayne & Karen Stumpf | 407-733-3403 | 510 Sunrise Avenue | Winter Springs | FL | 32708 |
| Chris & Dianna McCall | 352-206-0687 | 15940 barry rd | dade city | FL. | 33523 |
| Howard James | 941-587-8914 | 6713 Beedla St. | North Port | FL | 34286 |
| Ronald & Eleonor James | 978-985-8115 | 15475 Gulf Blvd | Madeira Beach | FL | 33708 |
| Roja Settles | 404-409-8814 | 3305 Acworth Oaks Drive NW | Acworth | GA | 30101 |
| Joshua Lee & Donna Lee | 404-226-6222 | 170 Mirramont Lake Drive | Woodstock | GA | 30189 |
| Manisha & S.K. Patel | 336-880-7549 | 3558 Running Cedar Trail | High Point | NC | 27265 |
| Terry Halfhill | 412-576-1183 | 101 Rilla Drive | Connellsville | PA | 15425 |
| Terry Halfhill | 412-576-1183 | 101 Rilla Drive | Connellsville | PA | 15425 |
| Brian J Marra | 412-818-9023 | 406 Painter Ave | Natrona Heights | PA | 15065 |
| Dick Graham | 423-595-7913 | 315 Willow Creek CV NE | Cleveland Tn. | TN | 37323 |
| Michelle Arousa | 253-576-5124 | 126 177th ST E | Spanaway | WA | 98387 |

Some of the former franchisees in the list above owned more than one Goin' Postal franchise, in which case, the number of total "terminations", if more than one, for each franchisee is reflected.

Due to changes in the domestic service business model by DHL in late 2008, we were no longer able to offer Express Kiosk Franchise Packages in the United States. As a result, we allowed multiple franchisees who were under an Express Kiosk Agreement to terminate that Agreement and the corresponding Franchise Agreement with no early termination or other penalties. Such franchisees continue, however, to be bound by the terms of our Non-Competition and Non-Solicitation Agreement (see **Exhibit "B"** to this UFDD) for the remainder of the term of that Agreement.

Except for confidentiality obligations pertaining to our trade secrets and other confidential and proprietary properties, and except for covenants within the Franchise Agreement and Non-Competition and Non-Solicitation Agreement prohibiting franchisees from engaging in any business practice or conduct or doing anything else injurious or prejudicial to the goodwill or reputation associated with our Marks, Method or Goin' Postal Franchise Chain, no franchisee has signed or is requested to sign a confidentiality agreement restricting their ability to speak openly about their experience with the Goin' Postal Franchise System. There exists no trademark-specific franchisee organization associated with the Goin' Postal Franchise System.

Franchisee's Initials _____

Item 21

FINANCIAL STATEMENTS
GOIN' POSTAL FRANCHISE CORPORATION

Goin' Postal Franchise Corporation's audited financial statements for its most recent three fiscal years of operations appear within Exhibit "I" attached to this Disclosure Document, including the balance sheets at December 31, 2008 and December 31, 2007, and the related statements of operations, shareholders' [deficit] equity and cash flows for the fiscal years ended December 31, 2008, December 31, 2007 and December 31, 2006. Also appearing within Exhibit "I" attached to this Disclosure Document immediately following the presentation of the referenced audited financial statements is an unaudited reviewed report for the period ending March 31, 2009. The March 31, 2009 reviewed report, though unaudited, was prepared in accordance with generally accepted accounting practices. Prospective franchisees should be advised that no independent certified public accountant has audited the March 31, 2009 reviewed report or expressed an opinion with regard to its content or form (the December 31, 2008, December 31, 2007 and December 31, 2006 year end reports which appear at the beginning of the attached Exhibit "I", however, were prepared pursuant to an audit).

83          Franchisee's Initials _____

## Item 22
## CONTRACTS

Attached to this Disclosure Document are copies of the following agreements you will be required to execute and deliver to Goin' Postal Franchise Corporation at 4941 4th Street, Zephyrhills, Florida 33542 as part of your purchase of a Goin' Postal franchise:

A.    Franchise Agreement
B.    Non-Competition and Non-Solicitation Agreement
C.    Personal Data Disclosure and Franchisee Ownership Information Form
D.    Credit Card and Designated Account Authorization Form
E.    Listing of  State Administrators, and Agents for Service of Process
F.    Pre-Approved Products and Services
G.    **Instructions**
H.    State Specific Addendum (as applicable)
I.    Financial Statements
J.    Turn-Key Store Agreement (as applicable)
K.    Continuing Personal Guaranty (as applicable)

(This space intentionally left blank; Item 23 appears on the next page)

Franchisee's Initials _____

### Item 23
### RECEIPTS
### Receipt

This Disclosure Document summarizes certain provisions of The Franchise Agreement and other information in plain language. Read this Disclosure Document and all agreements carefully.

If Goin' Postal Franchise Corporation offers you a franchise, it must provide this Disclosure Document to you 14 calendar-days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale. See the bracketed provisions in bold print which follow immediately after this paragraph to determine whether your State requires delivery of these materials sooner than the referenced 14 calendar-day period.

**[Maryland, New York and Rhode Island require Goin' Postal Franchise Corporation to provide this Disclosure Document to you at the earlier of the first personal meeting or 10 business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship.]**

**[Michigan, Oregon and Washington require Goin' Postal Franchise Corporation to provide this Disclosure Document to you at least 10 business days before the execution of any binding franchise or other agreement of the payment of any consideration, whichever occurs first.]**

If Goin' Postal Franchise Corporation does not deliver this Disclosure Document on time or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and, if applicable, to your State agency on **Exhibit "E"** to this Disclosure Document.

The name, principal business address, and telephone number of each "franchise seller" offering the franchise are as follows: Marcus Price, CEO and M.J. Price, President; 4941 4th Street, Zephyrhills, Florida 33542, (813) 782-1500

The Issuance Date of this Disclosure Document in your particular State is reflected in the **State Effective Date Exhibit** which follows immediately after the State Cover Page. The Effective Date of this Disclosure Document in your State may be different than the March 20, 2009 Issuance Date applicable in States which do not require registration.

Goin' Postal Franchise Corporation, authorizes Robert W. Bible, Jr., Esq., Lopez, Kelly & Bible, P.A., 4100 W. Kennedy Blvd., Suite 114, Tampa, Florida 33609 to receive service of process (i.e. service of summons or litigation pleadings) for Goin' Postal Franchise Corporation in the State of Florida. **Your State may require that we designate an agent in your State who is authorized to receive service of process in connection with actions arising under your State's laws. See Exhibit "E" attached to this Disclosure Document (if applicable) to determine if we have appointed an agent authorized to receive process in your State. Goin' Postal Franchise Corporation authorizes the respective designated agents identified on Exhibit "E" to receive service of process for it in the particular identified State.**

I received on the date appearing adjacent to my signature below a Franchise Disclosure Document of Goin' Postal Franchise Corporation dated as of the applicable Issuance Date/Effective Date set forth in the State Effective Date Exhibit which follows immediately after the State Cover Page, which included the Exhibits (Exhibits "A" through "K") listed below:

| | | |
|---|---|---|
| A. | Franchise Agreement | Exhibit "A" |
| B. | Non-Competition and Non-Solicitation Agreement | Exhibit "B" |
| C. | Personal Data Disclosure/Franchisee Ownership Information Form | Exhibit "C" |
| D. | Credit Card and Designated Account Authorization Form | Exhibit "D" |
| E. | Listing of State Administrators, and Agents for Service of Process | Exhibit "E" |

Franchisee's Initials _____

F.    Pre-Approved Products and Services                                Exhibit "F"
G.    **Instructions**                                                  Exhibit "G"
H.    State Specific Addendum (as applicable)                           Exhibit "H"
I.    Financial Statements                                              Exhibit "I"
J.    Turn-Key Store Agreement (as applicable)                          Exhibit "J"
K.    Continuing Personal Guaranty (as applicable)                      Exhibit "K"


_____                    _____
Franchisee Signature                               Date You Received UFDD
                                                   [Do Not Leave Blank]
Print Name of Franchisee: _____
              [if a corporation, etc., print name of entity]
Print Name of Person signing as or for Franchisee: _____
Print Title, if any: _____
**NOTE:    Two Receipts appear at the end of this Disclosure Document which, if interested in
purchasing a Goin' Postal franchise, you are to complete, sign and return per the Instructions
appearing as Exhibit "G" to this Disclosure Document.**

86            Franchisee's Initials _____

EXHIBIT "A" TO UNIFORM FRANCHISE DISCLOSURE DOCUMENT

GOIN' POSTAL

FRANCHISE AGREEMENT

THIS AGREEMENT IS ENTERED INTO EFFECTIVE ON THE DATE OF FRANCHISOR'S SIGNATURE APPEARING AT THE END OF THIS AGREEMENT (THE **"EFFECTIVE DATE"**), BY AND BETWEEN GOIN' POSTAL FRANCHISE CORPORATION, A FLORIDA CORPORATION, WHOSE PRINCIPAL ADDRESS IS 4941 4TH STREET, ZEPHYRHILLS, FLORIDA 33542 (HEREINAFTER REFERRED TO AS "GPFC" OR SOMETIMES REFERRED TO AS "FRANCHISOR") AND THE PERSON OR PERSONS OR LEGAL ENTITY LISTED BELOW DESCRIBED AS "FRANCHISEE" (HEREINAFTER REFERRED TO AS "FRANCHISEE", WHICH, FOR PURPOSES OF THE OBLIGATIONS OF FRANCHISEE SET FORTH IN THIS AGREEMENT, SHALL INCLUDE EACH AND EVERY INDIVIDUAL SIGNING ON BEHALF OF FRANCHISEE HEREINBELOW). **THIS AGREEMENT IS MADE SUBJECT TO ANY PROVISIONS OF ANY EXHIBIT "H" ATTACHED TO THE DISCLOSURE DOCUMENT PURSUANT TO WHICH THIS FRANCHISE AGREEMENT WAS PRESENTED TO AND SIGNED BY FRANCHISEE AND WHICH SPECIFICALLY AND EXPRESSLY RELATE TO THE STATE OF FRANCHISEE'S RESIDENCY (SEE SECTION 20.6 OF THIS AGREEMENT).**

FRANCHISOR (**"GPFC"**):    GOIN' POSTAL FRANCHISE CORPORATION,
A FLORIDA CORPORATION

FRANCHISEE:          FULL LEGAL NAME
*Should be the same entity/individuals listed in Exhibit "C" to the Disclosure Document, Part II, Franchise Ownership Information Form.

_AllHealth Complete CARE Inc_

_DBA goin Postal Lawrenceville_

LOCATION OF FRANCHISEE'S GOIN' POSTAL STORE (THE **"LOCATION"**):

_3780 Lawrenceville Hwy Suite C 124_
(street address)

_Lawrenceville    GA    30044_
(city)             (state)         (zip code)

GOIN' POSTAL STORE #: _____ (THE **"FRANCHISEE'S STORE"**)

87       Franchisee's Initials _____

RECITALS

**WHEREAS**, GPFC is the owner of all rights, title and interest in and to those certain trademarks, service marks, logos, indicia of origin and trade names, and all related registrations and applications for registrations as more particularly described in the registration files designated by Registration Number 3083574, Registration Number 3274805, Registration Number 3283156, Registration Number 3302660, Registration Number 3279690,   Registration Number 3360732,   Serial Number 78978230 and Serial Number 77553437, together with any and all amendments thereto, including, in particular, but not limited to, "Goin' Postal", "Goin' Postal Your Friendly Neighborhood Shipping Center", "Delivering the Best of America", and all similar, related, comparable and derivative names, marks and logos, and all registered and common law trademark, service mark and trade name rights and interests reflected in the depiction of the composite mark appearing on **Exhibit "A"** attached hereto and incorporated herein by this reference, and GPFC owns, and will own, as applicable, any and all other current and future trade names, trademarks, service marks and logos associated with Goin' Postal franchises, including our website address (www.goinpostal.com) and all website materials, and our current advertising slogans, "Don't Go it Alone...Go with Goin' Postal", "Sometimes Goin' Postal is the Only Way", and "Relieve Stress by Goin' Postal" (collectively, all of the foregoing, including each separate text only element and each separate design element, being referred to herein as the "Marks");

**WHEREAS**, GPFC owns and has the rights to license and franchise the Marks, including "Goin' Postal", the distinctiveness and value of which are acknowledged by the Franchisee;

**WHEREAS**, GPFC has developed and continues to develop know-how and a comprehensive method for establishing, equipping, designing, marketing, managing and operating franchised stores under the Marks which provide authorized postal, packaging, shipping, business services, and other authorized goods and services through retail locations (hereinafter, the "Method");

**WHEREAS**, Franchisee acknowledges substantial goodwill and business value in the Marks and Method and Franchisee understands and accepts the importance of GPFC's standards and specifications for quality, appearance, and service to the value of the Marks and the Method, and the necessity of operation of Franchisee's business activities in conformity with the Method and with the services, sales development programs and other related business practices GPFC has developed as part of the Method for use by all franchisees in the Goin' Postal franchise chain ("GPFC's Goin' Postal Franchise Chain") as it exists from time to time during the "Term" hereof; and

**WHEREAS**, Franchisee desires to acquire from GPFC, and GPFC is willing to grant Franchisee, a Goin' Postal franchise upon the terms and subject to the conditions set forth in this Agreement.

NOW THEREFORE, IN CONSIDERATION OF THE FOREGOING, THE FEES AND OTHER SUMS PAYABLE BY FRANCHISEE AND THE MUTUAL COVENANTS CONTAINED IN THIS AGREEMENT, THE PARTIES AGREE AS FOLLOWS:

## 1.    GRANT OF FRANCHISE

### 1.1    Store Location

a.    GPFC hereby grants Franchisee, and Franchisee hereby accepts, the right and license during the Term (i) to use and display the Marks; (ii) to operate solely one (1) Goin' Postal franchised store designated as Goin' Postal Store No._____ (hereinafter such Store No. being referred to as the "Franchisee's Store", and the individual Goin Postal franchised stores within GPFC's Goin' Postal Franchise Chain, in general (including any owned or operated by GPFC or one of its affiliates), being referred to as a "Store"); and (iii) to exercise such rights as specified in (i) and (ii) immediately preceding at, and only at the Location, all upon

the terms and subject to provisions of this Agreement and all ancillary documents hereto, and all in accordance with and through authorized use of the Method.

b.  Franchisee may relocate the Store (even within the Franchisee's own protected territory) only with the prior written consent from GPFC. Should any approved relocation be outside of Franchisee's Territory, Franchisee will be assessed a $500.00 relocation fee.  All relocation requests are subject to GPFC's sole discretion and subject to reasonable availability of non-protected territories.

## 1.2   Territory

During the Term:

a.  Once Franchisee has submitted to GPFC in writing a specific physical address for the Location of Franchisee's Store and such Location has been approved in writing by GPFC and Franchisee's Store has been allocated a Store No., Franchisee shall be allocated a protected territory consisting of an area approximately one (1) mile in radius (5-mile radius if the Location is in a rural area) with the Location being at the center (such protected territory specifically allocated to Franchisee by GPFC being referred to throughout this Agreement as the "Territory").  The perimeter of the outer boundaries of the Territory assigned to Franchisee by GPFC based upon the applicable radius may be slightly more or less at any given point than the established mile radius in order to make use of existing streets and other well known landmarks to provide a more easily recognizable and supportable Territory. Unless and until Franchisee has submitted to GPFC in writing a specific physical address for the Location of Franchisee's Store and that Location has been approved by GPFC in writing, neither a Territory for Franchisee's Store nor any rights of Franchisee to claim or possess any territory (protected or otherwise) shall exist. The standard Territory allocation may be reduced by GPFC if the Location Franchisee has chosen for Franchisee's Store is in an area of extreme high population density, such as Manhattan (New York City), New York, downtown Los Angeles, California, downtown Seattle, Washington, downtown Boston, Massachusetts, downtown Chicago, Illinois or Washington, D.C.  This reduced Territory must be mutually agreed upon by GPFC and Franchisee before GPFC will proceed with counter-signing this Agreement (as reflected in this Agreement, this Agreement is not effective until GPFC countersigns it).  If Franchisee refuses to accept such a reduced Territory under the circumstances permitting GPFC to assign a reduced Territory, GPFC will refund Franchisee any and all monies paid and Franchisee shall not become a Goin' Postal franchisee or have any rights or entitlements under this Agreement.

b.  Except as set forth in this Section 1.2, GPFC will neither own or operate a Store, as that term is specifically defined herein, nor license or franchise others to do so, at any site located within the Territory.

c.  GPFC expressly reserves for itself or its designee, the unrestricted right to produce, franchise, license, sell, distribute and market any products or services (under any brands, including but not limited to the Marks) from any Stores the physical premises of which are located outside of the Territory, regardless of (i) the proximity of the Franchisee's Store, or (ii) whether or not such products or services are purchased by customers whose residences or places of business are located within the Territory.

d.  GPFC may engage in any activities, without any restrictions whatsoever, outside of the Territory that are not specifically prohibited by this Section of the Agreement.

Franchisee's Initials 

e.   So long as Franchisee is not in default of this Agreement, and provided GPFC has given its prior written approval to do so, Franchisee shall have the right during the Term to open additional Stores within the Territory by execution of another franchise agreement, as in existence at such time, and payment of all fees required under the franchise agreement in existence at such time, for each approved additional Store. Franchisee's Territory will be expanded to include and protect the new location(s), provided that it does not interfere with another franchisee's protected territory.

f.   Franchisee may operate an unrestricted mobile shipping store van (a "mobile shipping store" is a vehicle outfitted with a Point of Sale System, a scale and the ability to serve customers and receive payment for shipping services at a remote location) within the Territory. Franchisee may operate a mobile shipping store van outside of the Territory but not within the protected territory of another franchise. Franchisee may not under any circumstances operate either a pick-up or delivery service within the protected territory of another franchisee's Store; provided, however, if Franchisee has purchased from GPFC for resale in its Store one of the ink/toner/office supply packages offered by GPFC, then Franchisee may provide for deliveries of those products within the protected territory of another franchisee's Store if such other franchisee has not purchased for resale in their Store one of GPFC's ink/toner/office supply packages.

g.   Franchisee acknowledges that customers, including customers located in Franchisee's Territory, are free to patronize any Store within GPFC's Goin' Postal Franchise Chain of their choosing, and no Store (including those owned or operated by GPFC or one of its affiliates) shall be precluded from serving or transacting business with any customer who chooses to patronize that particular Store.

h.   With GPFC's prior written consent, and provided Franchisee first executes the then current Franchise Agreement and pays both the then current franchise fee and the then current cost for the Required Minimum Purchases (see Section 5.1(d) below) for each new territory intended to be so purchased, Franchisee may expand Franchisee's Territory through the purchase of one or more (as approved by GPFC) non-protected territories equal in area to Franchisee's initial Territory assigned hereunder (subject to any reduction in the new territory resulting from its potential encroachment into another franchisee's protected territory).   Should Franchisee purchase another non-protected territory in accordance with these provisions, Franchisee must, within this new territory, and within six (6) months of the date Franchisee signed the Franchise Agreement and paid the franchise fee and the then existing cost for the two (2) Point of Sale Systems and other Required Minimum Purchases with respect to such new territory, (i) submit a specific physical address for the location of the new Store to GPFC in writing, and receive written approval from GPFC for such location; (ii) complete all necessary Store build-outs and improvements; (iii) complete all required training; and (iv) open a Store within this new territory.   Failure on the part of Franchisee to so open a Store within the new territory within the allotted six (6) month time period shall cause the option to acquire such new territory to lapse and terminate, in which case Franchisee shall forfeit the franchise fee and other fees paid to acquire such new territory and Franchisee shall have no further rights, claims or interests in or to such new territory.   Should Franchisee only desire to expand the Territory allocated to Franchisees' Store without opening another Store within that region, GPFC will have the sole discretion to grant any such expansion, and if granted, Franchisee will be required to pay such additional fee as GPFC deems appropriate in light of the scope and extent of expansion requested and the level of

competition from other Stores within the general vicinity of Franchisee's desired expanded Territory.

## 2.   TERM AND RENEWAL

2.1     The term of this Agreement shall begin on the Effective Date of this Agreement and shall continue for a period of fifteen (15) years, unless terminated as provided herein (the "Term"). As indicated in the introductory provisions of this Agreement, the "Effective Date" of this Agreement is the date it has been signed by GPFC as such date appears adjacent to the signature of GPFC set forth at the end of this Agreement. In the event Franchisee fails to renew or GPFC elects not to renew this Agreement (in accordance with Sections 2.2, 2.3 and 2.4 below) , this Agreement will expire at the end of the Term.  Expiration shall constitute a termination of this Agreement for all purposes and effects.

2.2     Provided that Franchisee shall have complied with all the terms of this Agreement, and subject to prior fulfillment of the terms and conditions of renewal set forth in Section 2.3 below, Franchisee shall have the right and option to renew the Goin' Postal franchise granted to Franchisee pursuant to this Agreement for successive period(s) of 15 years each.  Each 15 year renewal period shall be an independent Term, and the conditions of renewal must be met and satisfied with respect to each independent 15 year renewal opportunity.

2.3     As conditions to renewal, Franchisee must first meet and satisfy each of the following:

a.      Provide GPFC with written notice of Franchisee's intent to renew this Agreement not less than 2 months and not more than 12 months before the end of the Term then in effect.

b.      Execute the then-current franchise agreement being utilized by GPFC for new Stores, and all other documents required by GPFC, and comply with GPFC's then current Standards and Specifications and GPFC's then current Manuals.

c.      Be in compliance with this Agreement, including payment of all fees due, and with the requirements set forth in Manuals and other agreements between GPFC and/or its affiliates and Franchisee.

d.      Be in compliance with all financial obligations to third parties, including Franchisee's landlord and other vendors of products or services of Franchisee's Store at the Location.

e.      Provide GPFC with an executed lease and other written confirmation satisfactory to GPFC that Franchisee maintains the right to possess, occupy and use the Franchisee's Store at the Location for the applicable fifteen (15) year term of the renewal.

f.      Execute a general release in favor or GPFC from any claims, known or unknown, arising during the Term of this Agreement.

2.4     If and when GPFC receives Franchisee's timely renewal notice, and all other terms of this Agreement and renewal conditions are met, GPFC agrees to give Franchisee notice, not later than 30 days after the receipt of the renewal notice, of the renewal of the Franchise Term for an additional 15 year period.  Alternatively, should, upon receipt of Franchisee's timely renewal notice, the terms of this Agreement and renewal conditions not be met, GPFC shall, within said 30 day period, give Franchisee its written notice electing not to renew this Agreement.

Franchisee's Initials _____

2.5  Upon any such grant by GPFC of a renewal of the Term of this Agreement, Franchisee shall be required, as a condition to the continued effectiveness of such renewal authorization, upgrade, remodel, refurbish and redesign, prior to the conclusion of the Term intended to be renewed, or within twenty (20) days of receiving GPFC's notice that renewal has been granted, whichever date is later, Franchisee's Store, both exterior and interior, as well as Point of Sale Systems and associated hardware and software, as mandated by GPFC to comply with GPFC's then current Standards and Specifications as described in the Manuals.

## 3.   SITE LOCATION AND CONSTRUCTION OF STORE

3.1  **Store Location.**  The Location of Franchisee's Store set forth on the first page of this Agreement (or to be set forth on the first page of this Agreement upon Franchisee's decision of Location), has been accepted by GPFC upon GPFC's counter-execution of this Agreement (provided, acceptance shall not be deemed given by GPFC if the first page of this Agreement is not completed in its entirety upon Franchisee's execution and delivery of this Agreement; in such event, acceptance will occur when GPFC counter-signs and delivers a counterpart original with the Location information appearing on the first page of this Agreement completed or when GPFC subsequently initials and delivers to Franchisee a completed first page of this Agreement).   Nevertheless, GPFC's acceptance of the Location shall in no way constitute a guarantee, representation nor an express or implied warranty as to the viability or success of a Store at such Location. Upon GPFC's acceptance, the Location inserted on the first page of this Agreement shall be deemed to be the "Location", as defined herein. For purposes of applying this Section 3.1, the "first page of this Agreement" is the page at the beginning of this Franchise Agreement designated by **Exhibit "A" to Uniform Franchise Disclosure Document.**

3.2  **Store Design.**  GPFC or its representative will act in a consultant capacity to advise Franchisee upon a suggested layout of the Franchisee's Store.  Franchisee may accept or disregard this advice upon the suggested layout, except to the extent Franchisee's desired design would violate GPFC's principles of accepted business practices, would violate any OSHA regulations or any other applicable laws (including the Americans with Disabilities Act); would deviate from the uniformity of GPFC's Method and Standards for the general appearance of all Stores within GPFC's Goin' Postal Franchise Chain, or would create any safety or health risks. Further, any Store layout or alterations which deviate from GPFC's suggested layout may not be implemented by Franchisee without GPFC's prior written approval. Any suggested layout from GPFC does not guarantee the viability or success of said layout or compliance with any applicable laws, and Franchisee shall, at Franchisee's sole cost and expense, ensure that the Store design complies with all applicable laws, including the Americans with Disabilities Act and any OSHA regulations.   If Franchisee chooses to disregard GPFC's suggested layout without receiving GPFC's prior written approval, Franchisee will be responsible for making any necessary changes when the GPFC representative arrives for Store set up and training so as to bring Franchisee's Store into uniformity with the Method and general appearance of all Stores within GPFC's Goin' Postal Franchise Chain.

3.3  **Store Construction.**  The Franchisee, at Franchisee's sole cost, shall be solely responsible for obtaining local permits, contractors, and constructing the Franchisee's Store in a timely manner.  Construction shall be completed within six (6) months of the Effective Date of this Agreement.  All internal and external signs shall be uniform with the Marks and the Method and shall be subject to GPFC's prior approval.

3.4  **Store Appearance.**  Franchisee shall maintain the appearance and condition of the Franchisee's Store in a "Like New" level of cosmetic appearance to maintain the cosmetic appearance of the Store as attractive, clean and efficiently operated, offering high quality products and services. The Internal color and paint schemes of Franchisee's Store must

be red, white and blue and shall be uniform with the Method as detailed in GPFC's Store Set-Up Manual.  Any deviations from these required color and paint schemes are subject to, and prohibited without, GPFC's prior written approval.

3.5   **Turn-Key Store Agreement**.  If Franchisee has executed and paid the additional costs associated with a Turn-Key Store Agreement (**Exhibit "J"** to GPFC's current UFDD to which this Agreement was a part), it is acknowledged that GPFC will perform the majority of the above Store construction responsibilities on behalf of Franchisee.

4.   **TRAINING AND FRANCHISOR'S CONTINUING OBLIGATIONS**

4.1   **Initial Training**

a.   GPFC provides its franchisees with two phases of initial training.  The first week (and first phase) of Franchisee's training will be conducted at GPFC's headquarters located at 4941 4th Street, Zephyrhills, Florida 33542 ("GPFC's Headquarters"), where the Franchisee or its designee(s) will undergo one week (generally Monday through Friday) of classroom training.  The second phase of Franchisee's training will be completed by a GPFC representative on-site at the Franchisee's Store at the Location.  The GPFC staff at the first phase of training conducted at GPFC's Headquarters, and the GPFC representative while conducting the second phase of training on-site at the Franchisee's Store, will train the Franchisee or its designee(s) in all aspects of the shipping business developed and utilized by GPFC under its Method, including but not limited to:  UPS, FedEx, DHL, USPS, Freight, Rate Shopping, Point Of Sale, QuickBooks Pro and packaging.

b.   GPFC shall determine the content and manner of conducting the Franchisee's training program at its sole discretion; however, the program shall be structured to provide practical training in the day to day operation of the Franchisee's Store in accordance with the Method.  Franchisee shall pay all travel and accommodation expenses incurred (if any) by GPFC's representative.  Expenses shall include airfare, car rental, hotel accommodation, per diem meal expenses (currently $40.00 per day), transport to and from the originating airport (or, if applicable, parking expenses at the originating airport), and transport to and from the Franchisee's Store daily.  While conducting the on-site training at Franchisee's Store, Franchisee will be responsible to pay the costs for the GPFC representative to stay at a commercial accommodation such as a hotel, motel or motor lodge, and the GPFC representative will not be permitted to stay at the Store or at the residence of Franchisee or its owners, representatives or employees.  The Franchisee will also be responsible to pay the costs to provide the GPFC representative with a rental vehicle, and the GPFC representative will not be permitted to use or borrow the personal vehicle of Franchisee or its owners, representatives or employees.

c.   Franchisee may, with GPFC's prior permission, send additional manager(s) for a one week on-site course at GPFC's Headquarters.  Franchisee will be responsible for all expenses of Franchisee's manager(s) while at training.

d.   The initial training at GPFC's Headquarters and the subsequent training at Franchisee's Store at the Location are both mandatory training sessions for both original franchise Store purchases and for Store transfers.  Franchisee must attend and successfully complete both phases of training to the satisfaction of GPFC before opening Franchisee's Store. If Franchisee will not be the primary operator (the person managing the day-to-day Store operation) of the Store, then

Franchisee's primary operator(s) must attend and successfully complete the two phases of the Franchisee training before assuming the responsibility as the primary operator of the Store. If the primary operator of the Store is ever replaced, then the new primary operator must attend and successfully complete the two phases of the Franchisee training program (i) before assuming the responsibility of Store manager, or, at a minimum (ii) by no later than 90 days after such replacement. Franchisee, and all of Franchisee's Owners, managers and primary operators, as the case may be, must each sign that certain Non-Competition and Non-Solicitation Agreement attached as **Exhibit "B"** to GPFC's "UFDD" (as defined in Section 12.1 of this Agreement) prior to, and as a condition for any of them to attend and participate in, the first phase of training at GPFC's Headquarters.

e.   In the event Franchisee cancels the first phase of training scheduled at GPFC's Headquarters less than one (1) month prior to the scheduled training commencement date, Franchisee will be subject to a $200.00 cancellation fee per each scheduled attendee to subsidize GPFC for lost classroom capacity. In the event Franchisee cancels the second phase of training which has been scheduled on-site at Franchisee's Store, Franchisee will be assessed a cancellation penalty in the amount of $1,500.00 to cover ticket cancellation charges and associated administration expenses to cancel and re-schedule this training at Franchisee's Store.   Franchisee will, upon any cancellation of the second phase of training, additionally be responsible for all travel, living, and other costs and expenses incurred by GPFC and its representative to reschedule, attend and conduct their second phase of training at Franchisee's Store.   The $1,500.00 cancellation fee will also apply if at the time of arrival of GPFC's representative, Franchisee's Store is not setup and ready to become operational in accordance with the mandatory procedures outlined in the Store Setup Manual and any checklist provided by GPFC to Franchisee prior to GPFC's visit to conduct the second phase of training and Store opening.

f.   In the event GPFC requires or otherwise deems it necessary, in its sole discretion, Franchisee or, if Franchisee is an entity, its Owners, of, if Owners do not manage the Store's day-to-day operations, then Franchisee's primary operator, shall attend supplemental or additional training programs to be conducted on-site at Franchisee's Store.  Franchisee shall pay all travel, living, per diem meal allocation (currently $40.00 per day), compensation (currently $1,000.00, but subject to modification as set forth in the Operations Manual), and other expenses incurred by GPFC's representative in connection with attending and conducting such additional training at Franchisee's Store.

g.   In the event Franchisee is a purchaser of an existing Store, or Franchisee converted an independently owned shipping business to a Goin' Postal Store, Franchisee must attend and successfully complete both a one week first phase of mandatory training at GPFC's Headquarters (the cost of this training, exclusive of Franchisee's travel/airfare, hotel/living accommodations, meals and related personal expenses to attend such training, are included within the mandatory $3,000.00 transfer/conversion fee) as well as a second phase of training at Franchisee's Store conducted during the Franchisee's initial week of operation of Franchisee's Store (travel expenses for GPFC's representative are included in the $3,000.00 transfer/conversion fee).

## 4.2   Franchisor's Continuing Obligations

From time to time during the Term of this Agreement, GPFC, or its designee, may provide the following assistance to Franchisee:

Franchisee's Initials _EB_____

a.  GPFC may provide, at its discretion, proprietary and non-proprietary software licenses and updates. Should GPFC insist that Franchisee update existing purchased software systems, GPFC will provide this initial software at no charge to Franchisee. Franchisee will still be responsible for yearly update costs. This update cost shall initially be $240.00 per year (but may be increased from time to time by GPFC) for Goin' Postal proprietary software and at the rate set by the vendor for non-Goin' Postal software.

b.  Provide, upon Franchisee's request, reasonable continuing consultation and training in the operation of the Franchisee's Store via telephone, e-mail, fax, the GPFC website and other means of GPFC's choosing.

c.  Make available, via password access to the Owners' Section of the GPFC website, GPFC's Store Set-Up Manual, GPFC's Operations Manuals, training materials and, in the near future, video clips that can be downloaded at Franchisee's discretion.

d.  Make available, via password access to the Owners' Section of GPFC website, various advertising materials and resources.

## 5.   FEES AND OTHER PAYMENTS

5.1   Franchisee shall, in accordance with the following, pay to GPFC the following fees:

a.  An initial franchisee fee of $15,000 shall be due and payable by Franchisee to GPFC on the date of Franchisee's execution of this Agreement   The initial franchise fee is fully earned and non-refundable upon receipt unless Franchisee is not accepted by GPFC as a Franchisee, in which case it will be fully refunded. The initial $15,000 is due with submission of this Franchise Agreement and shall be paid by check or credit card.

b.  The initial franchise fee shall not apply if the Franchisee is:

i.   signing this Agreement as a renewal of a previous franchise agreement at the end of a completed Term. In such case the initial franchise fee for the renewal shall be waived.

ii.  signing this Agreement in connection with the purchase of an existing Goin' Postal franchise and Store from another franchisee. In such case the transfer fee due to GPFC shall be $3,000.00.

iii. signing this Agreement in connection with an approved relocation of Franchisee's Store; provided if such approved relocation is outside of the Territory, a relocation fee of $500.00 shall be due to GPFC.

iv.  Subject to the conditions of this subsection iv pertaining to time duration of Franchisee's existing business operations, and subject to satisfactory completion by Franchisee of the same mandatory training requirements imposed upon a purchaser of an existing Store, GPFC may discount, at its discretion, the initial franchise fee due from any Franchisee signing this Agreement as part of converting an existing shipping/packaging store from either a recognized competing chain (no such conversion will in any way or under any circumstances be permitted if Franchisee is subject to any agreement which would restrict, prohibit or otherwise limit the conversion of Franchisee's existing store to a Goin' Postal Store) or from an independent store owned and operated by Franchisee. In such a case, in addition to the

initial franchise fee (discounted or otherwise), Franchisee will pay GPFC a conversion fee of $3,000.00 (which will cover the first phase of training in like manner as the $3,000.00 transfer fee as described above) and will also be responsible for the costs of conducting the second phase of training at Franchisee's Store in like manner as a purchaser of an existing Store. The foregoing notwithstanding, in order to be considered for any discount of the full initial franchise fee then in effect on converting an existing shipping/packaging store, the Franchisee must have operated their existing store for a period of no less than two (2) years, if an independently owned and operated store, or for a period of no less than one (1) year if converting from a recognized chain of franchised shipping stores (subject to the prohibition on this type of conversion if Franchisee and/or Franchisee's existing store is subject to any form or manner of restriction or prohibition which would preclude the lawful conversion to a Goin' Postal Store). Franchisee shall disclose to GPFC upon any desired conversion of an existing shipping/packaging store to a Goin' Postal shipping Store whether Franchisee and/or Franchisee's existing store is/are subject to any form or manner of restriction or prohibition which would preclude the lawful conversion to a Goin' Postal Store, and Franchisee shall be solely liable for any breach of any such restrictions or prohibitions and shall indemnify, defend and hold harmless GPFC, its officers, directors and shareholders therefrom.

c.   At the time of signing this Agreement and concurrent with payment of the initial franchise fee required under Section 5.1(a) immediately above, Franchisee must also pay and remit to Franchisor, using the same mode of payment as with the initial franchise fee, the sum of $9,284.00 for the purchase of the following required items (the "Required Minimum Purchases") which GPFC mandates as part of Franchisee's set up and establishment of Franchisee's Store (this separate payment is not required under a Turn-Key Franchise):

| Item | Qty | Total |
|------|-----|-------|
| Point of Sale Systems | 2 | $7,500.00 |
| Counter Wall Sign | 1 | $ 299.00 |
| Window Sign | 1 | $ 295.00 |
| Embroidered Shirts | 6 | $ 114.00 |
| Rubber Stamp Set | 1 | $ 50.00 |
| 1000 Shipping Forms | 1 | $ 50.00 |
| Printed Shirts | 3 | $ 30.00 |
| Wall Display | 1 | $ 99.00 |
| Thermal Label Printer | 1 | $ 349.00 |
| 150lb. Scales | 2 | $ 498.00 |
| Total | | $9,284.00 |

d.   Should Franchisee desire to purchase additional Point of Sale Systems for Franchisee's Store at the Location, the cost for each shall be $2,800.00 and shall also be due with payment of the initial franchise fee. Once paid, the cost(s) for each Point of Sale System you order from us is (are) non-refundable.

e.   A continuing royalty in the initial amount of $315.00 per month during the initial calendar year of the Term, and then increasing each calendar year during the Term thereafter at an approximate rate of five percent (5%) per calendar year as set forth in the table below (hereunder, the "Royalty" or "Royalties"), shall be paid by Franchisee in accordance with the provisions of this Agreement each month

commencing with the date specified herein and continuing during the initial Term of the Goin' Postal franchise granted hereby (this period of time being referred to herein as the "Royalty Payment Period"). Franchisee's obligation to pay monthly Royalties shall commence the first business day of the calendar month following the month in which Franchisee opens Franchisee's Store for business. For instance, if Franchisee has opened Franchisee's Store on January 30th, the obligation to pay Royalties would commence February 1st of that same year.

The Royalties are payable as prescribed in the following table:

| Calendar Year | Monthly Royalties |
|---|---|
| 2009 | $ 315.00 |
| 2010 | $ 330.00 |
| 2011 | $ 345.00 |
| 2012 | $ 360.00 |
| 2013 | $ 380.00 |
| 2014 | $ 400.00 |
| 2015 | $ 420.00 |
| 2016 | $ 440.00 |
| 2017 | $ 460.00 |
| 2018 | $ 480.00 |
| 2019 | $ 500.00 |
| 2020 | $ 525.00 |
| 2021 | $ 550.00 |
| 2022 | $ 575.00 |
| 2023 | $ 600.00 |
| 2024 | $ 630.00 |

Royalties commence at the monthly rate applicable to the calendar year in which the Franchisee's Store opens for business, and then increase by approximately five percent (5%) each calendar year thereafter. These Royalty rates apply to all new Goin' Postal franchisees until changed. For example, if left unchanged, a franchisee whose store opens in 2009 would pay an initial monthly Royalty of $315.00 per month, whereas a franchisee whose Store opens in 2011 would pay an initial monthly Royalty of $345.00 per month.

      f.      A portion of the Royalty as determined by GPFC in is sole discretion will be used for the production of advertising materials for use by all franchisees within GPFC's Goin' Postal Franchise Chain in their own respective markets and territories.

      g.      Any and all other applicable fees and sums due to GPFC as set forth in GPFC's then current Franchise Disclosure Document, the current version of which is accessible via password in the Owners' Section of GPFC's website.

## 5.2 Method of Payment

      a.      Franchisee shall pay the Royalty on a monthly basis as instructed using the supplied online forms in the Owners' Section of the GPFC website. Payment of a particular month's Royalty is due on the 1st business day of such month.

      b.      As imposed and designated by GPFC, in its sole discretion, Franchisee will be required to make Royalty payments by electronic funds transfer payment program whereby GPFC will be able to electronically debit from Franchisee's bank account(s) the Royalties and other amounts due from or owed by Franchisee to GPFC hereunder. If Franchisee elects to make Royalty payments by credit card or other approved method other than GPFC's automated electronic funds transfer

program, there will be an additional monthly processing fee due with each Royalty payment in the amount of 10% of the applicable monthly Royalty amount.

### 5.3   Auditing

In order to maintain the strength and integrity of GPFC's Goin' Postal Franchise Chain and Method, GPFC may, at its discretion, order an audit of Franchisee and Franchisee's Store by GPFC's designated auditor, at GPFC's expense.   Franchisee will provide GPFC's designated auditor with Franchisee's complete cooperation.

### 5.4   Other payments

In addition to all other payments provided herein, it shall be a material requirement for Franchisee to pay to GPFC, its affiliates, designees, and others promptly when due:

    a.    All obligations, including Royalties, trade accounts, promissory notes, financing agreements and equipment purchase and lease payments, arising out of the operation of Franchisee's Store.   Royalties and all other monetary obligations owed by Franchisee to GPFC shall be paid electronically or by credit card as previously provided hereinabove.

    b.    All lease and rental payments for Franchisee's Location.

    c.    All amounts advanced by GPFC or which GPFC has paid on behalf of or became obligated to pay for the Franchisee.

    d.    The amount of all sales taxes, use taxes, personal property taxes and similar taxes which shall be imposed on Franchisee or in connection with Franchisee's Store at the Location.

    e.    Any amounts due on account of the purchase of goods, supplies, or services relating to the operation of the Franchisee's Store.

### 5.5   Finance Charges and Late Fees on Delinquencies Owed to GPFC.

    a.    If Franchisee fails to pay to GPFC the entire amount of any payment due to GPFC hereunder promptly when due, Franchisee shall pay to GPFC, in addition to all other amounts that are due but unpaid (including the late fee described below), finance charges on the unpaid amounts, for the period beginning on the day after the original due date and continuing until the date of actual payment, at a rate equal to the highest annual rate allowed by applicable law.

    b.    The parties stipulate that the finance charges and late fees set forth within this Section represent reasonable estimates of the additional administrative costs that will be incurred by GPFC and shall be in addition to and not in lieu of any other remedies available to GPFC at law or at equity.

    c.    In addition to the interest amounts previously set forth, GPFC shall be entitled to charge a late fee of $35.00 for each and every month of delinquent fees.

    d.    GPFC will invoice Franchisee for these late fees and interest and such invoice is payable upon receipt.   GPFC will either charge these amounts to Franchisee's credit card or conduct an electronic funds transfer payment from Franchisee's designated account if not paid in full within 15 days of invoice date.

Franchisee's Initials _____

5.6     Personal Guaranty

If Franchisee, as designated in **Exhibit "C"** attached to GPFC's Franchise Disclosure Document to which this Agreement is attached as **Exhibit "A"** and as first depicted in the "Franchisee" designation appearing on the initial page of this Agreement, is an entity as opposed to one or more individuals, each of the equity Owners of Franchisee (as required to be set forth in Part II, Paragraph 3 of said **Exhibit "C"**) must sign and deliver to GPFC concurrent with Franchisee's execution of this Agreement the Continuing Personal Guaranty attached as **Exhibit "K"** to GPFC's Franchise Disclosure Document to which this Agreement is attached as **Exhibit "A"**.

6.      OWNERSHIP OF INTELLECTUAL PROPERTY

6.1     Franchisee hereby acknowledges and agrees that all right, title and interest (including goodwill) in and to GPFC's Goin' Postal Franchise Chain, the Marks, the Method, the Manuals, GPFC's website (including the Owners' Section and all confidential materials located therein), the GP Rate Pro Software and the Goin' Postal name, are and shall remain vested solely in GPFC. Franchisee hereby disclaims any right, title, claim or interest in GPFC's Goin' Postal Franchise Chain, the Marks, the Method, the Manuals, GPFC's website (including the Owners' Section and all confidential materials located therein), the GP Rate Pro Software, the Goin' Postal name, or the goodwill derived therefrom.  Upon termination or expiration of this Agreement, no monetary amount shall be assigned as attributable to any goodwill associated with the Franchisee's use, and discontinuation thereof, of GPFC's Goin' Postal Franchise Chain, Marks, Method, Manuals, GPFC's website (including the Owners' Section and all confidential materials located therein), the GP Rate Pro Software  or Goin' Postal name.

6.2     Franchisee agrees not to contest at any time, either directly or indirectly, the validity of the Marks or GPFC's ownership, right, title or interest in the Marks and/or GPFC's sole right to register, use, franchise or license others to use the same.

6.3     Franchisee understands that any use of the Marks other than as expressly authorized by this Agreement, without GPFC's prior written consent, constitutes infringement and/or counterfeit of GPFC's rights in the Marks, and that Franchisee's right to use the Marks does not extend beyond the termination and/or expiration of this Agreement and does not extend beyond the rights granted by this Agreement during the Term in relation to Franchisee's Store at the Location in accordance with the Method and as part of GPFC's Goin' Postal Franchise Chain.

6.4     If Franchisee is an entity, Franchisee shall not use any of the Marks or any abbreviations or variations thereof, or any words deemed by GPFC to be confusingly similar to the Marks as part of the name of any entity or Franchisee's name, including any of the words "Goin' Postal" or "Goin'" or "Postal".

6.5     Franchisee shall immediately notify GPFC of any infringements or imitations of the Marks, and of any challenges to Franchisee's use of any of the Marks, of which Franchisee becomes aware.  GPFC shall have sole discretion to take any action, administrative proceeding or litigation affecting the Marks.  Franchisee shall cooperate in the prosecution or defense of any such action as requested by GPFC. GPFC will (provided Franchisee has notified GPFC immediately upon becoming aware of an infringement of or challenge to Franchisee's use of the Marks) reimburse Franchisee any reasonable costs Franchisee incurs in its defense or participation in the defense of GPFC's Marks.

6.6     GPFC reserves the right, in its sole discretion to designate one or more new, modified or replacement Marks for use by Franchisee and, upon written notice from GPFC, Franchisee shall implement such new, modified or replacement Marks, as prescribed by

Franchisee's Initials _____ *EB*

GPFC.  Any expense or costs associated with the use by Franchisee of any such new Marks shall be the sole responsibility of the Franchisee.

## 7.   STANDARDS AND SPECIFICATIONS;  CONFIDENTIAL OPERATIONS MANUAL

7.1    Operating Standards and Specifications

a.  Throughout the Term, the Franchisee shall adhere to the methods and practices developed by GPFC for the operation of the Franchisee's Store, including the Method established by GPFC for postal, packaging, shipping, business and communication services as provided herein and in the GPFC Operations Manuals.

b.  Throughout the Term, Franchisee shall operate the Franchisee's Store at the Location as specified herein and in compliance with GPFC's Store Set-Up Manual and current Standards and Specifications for internal and external Store image specifications, Store design, advertising, computer hardware and software, and products and services.

c.  Franchisee shall do business under Franchisee's legal name followed by the initials "d/b/a" and the business  name "Goin' Postal".  If Franchisee is required by applicable law, Franchisee shall promptly upon execution of this Agreement, file a notice of intent to conduct business under the name "Goin' Postal" and file any associated state or local registration.   Promptly upon an expiration or termination of this Agreement, Franchisee shall file such documents as are necessary by local law to terminate such assumed name, and if Franchisee shall fail to do so, Franchisee hereby appoints GPFC as its attorney-in-fact to do so for and on behalf for Franchisee.

d.  GPFC may revise its Standards and Specifications for all franchisees from time to time.  Consequently, Franchisee may be required to upgrade or update its computer hardware and software system, or its Store image and trade dress consistent with the then existing Standards and Specifications adopted by GPFC as part of the Method. There are no limitations on the frequency of these upgrades, though GPFC's industry reflects an update or upgrade every 3 to 4 years.  If Franchisee is required to upgrade, Franchisee must purchase and utilize these upgrades as specified in the GPFC Manuals.   If at any time GPFC shall mandate a software change to replace (as opposed to updating) currently approved Point of Sale System and/or accounting software, GPFC shall provide this software at no charge to existing franchisees. GPFC's proprietary GP Rate Pro software, as well as various third party software program, require annual updating, and Franchisee is solely responsible for the costs to do so (presently, $240.00 annually for GPFC's GP Rate Pro software).

e.  Franchisee shall timely submit reports and Royalty payments as required in Section 5 of this Agreement.

7.2    Confidential Manuals

a.  Upon execution of this Agreement, GPFC shall furnish the Franchisee, via password access to the Owners' Section of the GPFC website, with one copy of the GPFC Store Set-Up Manual and New Franchisee Primer (referred to throughout this Agreement as the "Store Set-Up Manual") and with one copy of the GPFC Operations Manual (referred to throughout this Agreement as the "Operations Manual"), both of which may be printed by Franchisee and used in the operation of Franchisee's Store (sometimes in this Agreement the Store Set-Up Manual and the Operations Manual may be referred to collectively as the "Manuals").  GPFC will periodically update the Store Set-Up Manual and/or Operations Manual and make these updates available on

the GPFC website. Once Franchisee's Store is open and operational, Franchisee shall be required on a bi-monthly, monthly or annual schedule, as prescribed by GPFC, to download and print any new updated Operations Manual, and either destroy all prior versions of the Operations Manual by shredding, or alternatively they must be returned to GPFC.

b. Franchisee shall strictly adhere to the Standards and Specifications (referred to throughout this Agreement as the "Standards and Specifications") laid out in the GPFC Store Set-Up Manual and GPFC Operations Manual, or as set forth in the secure password protected Owners' Section of the GPFC website. If Franchisee cannot lawfully or practically adhere to any of such Standards and Specifications, Franchisee must immediately notify GPFC in writing advising of such inability and the reasons therefore, and asking for a waiver of the specific Standards and Specifications at issue. GPFC shall have the sole discretion to determine whether any such waiver request is justifiable and whether or not to issue any such waiver.

c. As GPFC continues to develop additional confidential information and other trade secrets associated with the Method and GPFC's Goin' Postal Franchise Chain, GPFC will make this information available to Franchisee as and to the extent it is needed for the operation of Franchisee's Store. Franchisee will use GPFC's Store Set-Up Manual, Operations Manual, online website materials (including, specifically, but not to limited to, all materials and information contained within the secure password protected Owners' Section, and other confidential information and trade secrets created by GPFC and provided or made available to Franchisee only in connection with the operation of Franchisee's Store at the Location as part of GPFC's Goin' Postal Franchise Chain and Franchisee will keep this information confidential and will not disclose, disseminate or distribute it to any third party for any reason.

d. Franchisee's duty not to disclose to any unauthorized third party, and not to use for any unauthorized purpose, the confidential information outlined in this Section 7 shall survive the expiration or termination of this Agreement.

7.3   Purchase and Sale Of Goods and Services

a. At all times throughout the Term, Franchisee shall offer, sell and provide in connection with the Franchisee's Store, only those goods and services that are authorized by Goin' Postal Franchise Corporation. Franchisee shall only purchase authorized goods and services from GPFC approved suppliers.

b. If Franchisee should desire to purchase a product or service from a supplier other than one already pre-approved by GPFC, Franchisee must first obtain approval from GPFC. The request must be made in writing via e-mail to GPFC and, if approved, GPFC will e-mail approval to Franchisee authorizing Franchisee to proceed with the purchase.

c. If Franchisee chooses to sell ink and toner supplies and/or a broader scale inventory selection of office supplies, Franchisee may do so only by purchasing such supplies from GPFC or from a vendor designated by GPFC. Purchases of these supplies may be made from GPFC through use of its online store at www.goinpostalsupplies.com. Franchisee may not purchase any of these supplies directly or indirectly from either Clover Technologies Group, L.L.C. or the Azerty division of United Stationers Supply Co. (or any of their respective affiliates). Should Franchisee purchase from GPFC for resale in Franchisee's Store one of GPFC's packages of ink/toner/office supplies, and should a purchase of any of those supplies be made off of GPFC's online store for a delivery within Franchisee's Territory, GPFC shall pay Franchisee a commission equal to the difference between the price at which GPFC sold such supplies to such

customer, less the sum of the following amounts: (i) the cost Franchisee would have paid to GPFC for the purchase of such supplies from GPFC's online store; (ii) the $2.50 drop shipping processing fee GPFC pays its supplier per each order; and (iii) a flat shipping charge currently equal to $9.00 (subject to change by GPFC's supplier) GPFC must pay its supplier on shipments of orders of $250.00 or less (the $9.00 shipping fee is waived from this total sum on orders above $250.00). Any commission(s) due to Franchisee will be held in a suspense account until such total commission balance due to Franchisee exceeds $200.00, at which point Franchisee may either demand a check (only one (1) commission check, if due, will be paid per calendar month) for the total account balance, or apply the account balance toward purchase of another ink/toner/office supply package from GPFC, toward the purchase of Goin' Postal merchandise (i.e. mugs, shirts, etc.) from GPFC, or toward the annual GP Rate Pro update costs (no commission account balance may be applied toward Royalties, which are automatically paid to GPFC through an electronic funds transfer arrangement).

7.4    Trained Staff

Franchisee shall at all times during the Term designate and retain as a primary operator to direct the operation and manage Franchisee's Store at the Location a Manager, an Owner, the Franchisee (if an individual) or another employee of Franchisee who has successfully completed to the satisfaction of GPFC all training conducted at GPFC's Headquarters and at the Franchisee's Store at the Location. Franchisee shall immediately notify GPFC of any change in this designated person and Franchisee shall be responsible to pay for the training of any replacement designee within 60 days of any such change; provided, however, should there be space available in a particular training session at GPFC's Headquarters scheduled by Franchisee for any additional designee(s) of Franchisee which is not otherwise filled with new franchisees, there will be no additional charge imposed by GPFC upon Franchisee for its new designee(s) to attend this training (but Franchisee shall be solely responsible for all travel expenses, meals, lodging and living expenses for the designee(s) to attend such training in Zephyrhills, Florida), with the understanding that the new designee's(s') scheduled dates may be cancelled upon reasonable notice to make space for any new franchisee(s) wanting to schedule their initial training during such period.

## 8.    ADVERTISING AND MARKETING

The parties acknowledge the value of standardized advertising and marketing programs to the growth and public awareness of GPFC's Goin' Postal Franchise Chain and the goodwill and public image toward it, and, as such, the following terms and conditions shall govern the scope of, and conditions and limitations on, all advertising and marketing of Stores, the Method, and GPFC's Goin' Postal Franchise Chain:

8.1    A portion of the Royalty received by GPFC from all Goin' Postal franchisees may be expended by GPFC, in its sole discretion, for public relations, advertising, testing and marketing new programs, products and services, promotional programs and other related undertakings pertaining to the entire Method and GPFC's Goin' Postal Franchise Chain. GPFC shall have complete discretion as to the use and allocation of these funds.

8.2    GPFC has the final decision as to all advertising, marketing and promotional decisions and activities, as well as the use of the funds in the marketing fund generated by Royalties paid by all franchisees.

8.3    GPFC shall make available to Franchisee all advertising, marketing and promotional materials produced by or at the direction of GPFC through use of the marketing fund, at no cost to the Franchisee. Franchisee agrees that GPFC shall have the right and ability during all training sessions and during reasonable business hours of Franchisee's Store

operation to photograph Franchisee, Franchisee's owners and employees, and Franchisee's Store and use those photographs in GPFC's website, advertising and promotional materials.

8.4    Any independent advertising by Franchisee on the Internet must comply with GPFC's strict Internet quality standards and must be approved by GPFC in advance of any use or dissemination of such advertising materials. All independent website designs must be approved by GPFC before being made available to the public.

8.5    Franchisee shall use the Marks, trade styles, color combinations, designs, and slogans of GPFC in a manner only as expressly permitted by this Agreement or by GPFC in writing.

8.6    Franchisee shall not use the Marks or slogans of GPFC in any Internet domain name, Internet home page or other website or Internet accessible materials without prior written consent of GPFC.

## 9.    RECORDS, STATEMENTS, INSPECTIONS AND AUDITS.

9.1    Statements and Records

   a.    Franchisee shall at all times keep, maintain, and retain for a period of at least 3 calendar years, true and accurate accounts and records concerning the yearly operation of the Franchisee's Store in accordance with the recordkeeping procedures specified in the GPFC Operations Manual.

   b.    Franchisee hereby authorizes GPFC to publish and/or include Franchisee's reports for use in promoting GPFC's Goin' Postal Franchise Chain. If GPFC chooses to publish any information provided by Franchisee, it will be in an anonymous form not linked in any way to the Franchisee.

9.2    Inspections

   GPFC or its representative(s) shall have the right to enter and inspect the Location and Franchisee's Store at any time with or without notice. GPFC shall also be permitted to photograph the Franchisee's Store, and make copies of any books or records relating to the operation of the Franchisee's Store. GPFC shall use its rights under this Section of the Agreement to minimize interference with the operation of the Franchisee's Store.

## 10.    REPRESENTATIVES, WARRANTIES, AND COVENANTS

During the Term of this Agreement, Franchisee, and its Owners and/or Managers signing below, covenant and represent that they and each of them shall:

   a.    use their best and continuing efforts to promote and develop the Goin' Postal shipping business at the Franchisee's Store;

   b.    devote their full time and attention to the running of the Franchisee's Store, or have the Franchisee's Store operated by a well trained and competent manager who has successfully completed all training requirements under Section 4.1 of this Agreement above, has signed this Agreement below, and has signed the Non-Competition and Non-Solicitation Agreement (Exhibit "B" to GPFC's Franchise Disclosure Document);

   c.    maintain a sufficient number of well trained and competent staff to operate the Franchisee's Store efficiently;

103          Franchisee's Initials _____

d.    comply with all applicable laws;

e.    not disclose or disseminate to anyone other than the Franchisee's Store staff, on a need to know basis, any confidential information or trade secrets of GPFC (as more fully described in Section 7 hereinabove) provided by GPFC for the operation of the Franchisee's Store, including, without limitation, any materials contained within the secure password protected Owners' Section of GPFC's website;

f.    not use any of GPFC's confidential information or trade secrets (as described herein) provided for the operation of the Franchisee's Store in any other business venture or endeavor;

g.    operate and keep open to the public for business the Franchisee's Store at least 50 hours per week; and

h.    operate Franchisee's Store in such a way that will promote a first class and professional appearance and reputation of GPFC and of the Marks, the Method and GPFC's Goin' Postal Franchise Chain, and refrain from any business practice or conduct which would defame, damage or otherwise injure the reputation, goodwill or desirability of the Franchisee's Store, GPFC, the Method, the Marks, or GPFC's Goin' Postal Franchise Chain.

If, and only if, GPFC provides prior written consent to Franchisee's proposal to engage in a business other than the operation of the Franchisee's Store, and provided such business does not violate Franchisee's covenants within the Non-Competition and Non-Solicitation Agreement executed by Franchisee in connection herewith, then GPFC's consent as just described shall be subject to the additional following conditions:

a.    Such other business authorized to be conducted shall not be operated at the Location without GPFC's prior written consent (which may be withheld at GPFC's sole and absolute discretion) and shall not interfere with the operation of the Franchisee's Store at the Location;

b.    Franchisee shall maintain separate books, records and a distinct different image for the other business, and shall not commingle income, expenses or funds with those pertaining to the operations of the Franchisee's Store;

c.    Such other business does not damage or interfere with the value or reputation of GPFC's Marks, Method or GPFC's Goin' Postal Franchise Chain, or goodwill associated therewith;

d.    Such other business does not directly or indirectly interfere or compete with the Franchisee's Store or any other Store; and

e.    If approval has been given by GPFC to operate such other business at the Location, such other business does not violate any of the UPS, FedEx, DHL or other carrier's regulations on types of businesses that may be operated out of the Location.

As of the date of signing of this Agreement by Franchisee, the information provided in the Personal Data Disclosure and Franchisee Ownership Information Form (**Exhibit "C"** to GPFC's Franchise Disclosure Document) by the Franchisee is true, accurate and complete. Should any data not be available at the time of signing this Agreement, such as Store telephone numbers etc., Franchisee will forward this information immediately to GPFC when it is available, but no later than the date Franchisee's Store opens for business.

    Franchisee's Initials _____

Franchisee affirms that all information provided to GPFC is, and all future submissions of information shall be, true, factual and complete. Franchisee acknowledges that GPFC relies on the truthfulness, accuracy and completeness of all information provided by the Franchisee.

Franchisee shall display in Franchisee's Store any promotional materials as supplied by preferred vendors and/or GPFC in the manner instructed when supplied with said materials. GPFC shall not require Franchisee to promote any service or product that would not generate to Franchisee's Store additional income if sold.

Franchisee and its Owners and Managers signing below, if any, represent, warrant and covenant that they received a copy of GPFC's current Franchise Disclosure Document at least fourteen (14) calendar days before any of them signed this Agreement or paid any money to GPFC, that they read and reviewed a copy of GPFC's current Franchise Disclosure Document in its entirety, and that this Agreement which has been signed by each of them is in all material respects identical to that Franchise Agreement which was attached as Exhibit "A" to the specific copy of GPFC's current Franchise Disclosure Document which was so received, read and reviewed; and to the extent any material alterations were unilaterally made by GPFC to this Agreement as compared to the Franchise Agreement which was attached as **Exhibit "A"** to the specific GPFC Franchise Disclosure Document each of them received, read and reviewed, they received and reviewed a copy of this Agreement at least seven (7) calendar days before any of them signed this Agreement.

## 11.    TRANSFER AND ASSIGNMENT

By GPFC

GPFC may assign all of its rights, title and interests in this Agreement, and the rights hereunder shall inure to the benefit of its successors and assigns, provided that any such successors and assigns shall agree in writing to assume all of GPFC's obligations hereunder. Such assignment shall discharge GPFC from any further obligation hereunder. In addition, upon such terms as GPFC may determine, GPFC may assign all or part of its responsibilities and rights under this Agreement to an agent, a Regional Director whose territory includes all or part of Franchisee's Territory, or such other Regional Director as selected by GPFC.

11.2    By Franchisee

a.    The Franchisee is not permitted to pledge, encumber, or otherwise give any third party a security interest in this Agreement (or the Franchisee's rights associated with this Agreement), unless, and only if, such third party agrees in writing issued to and in favor of GPFC that if and when it seeks to pursue its rights related to the security interest in this Agreement via a repossession or similar remedy, it shall not be permitted, without the prior written consent of GPFC, to operate the Franchisee's Store associated with this Agreement, nor resell to a third party the franchise rights associated with the Franchisee's Store under this Agreement. GPFC shall apply its standard selection criteria when determining whether to grant its consent just as if the third party were a candidate to open a new Store or purchase an existing Store.

b.    The rights and duties created by this Agreement are personal to Franchisee, and GPFC has entered into this Agreement in reliance on certain factors, including the character, skill, aptitude and financial capacity of Franchisee and its Owners, if it is an entity. Accordingly, neither Franchisee's (or any Owner's) interest in this Agreement, nor any of his/her/its rights or privileges hereunder, shall be sold, conveyed, assigned, transferred, disposed of or divided, voluntarily or involuntarily, by operation of law or otherwise (including division of community property in a divorce proceeding), in any manner (all such described means of transfer or

disposition being referred to simply as an "Assignment"), without GPFC's prior written consent as provided in Section 11.3 below.   Any such Assignment occurring by operation of law or otherwise, including any Assignment by a trustee in a bankruptcy, without GPFC's prior written consent, shall be null and void and be a material default of this Agreement and grounds for an immediate termination requiring no notice or opportunity to cure.

    c.    Any sale, assignment, transfer, conveyance, gift, pledge, mortgage, encumbrance or other disposition, of a substantial portion of the assets of Franchisee's Store, or of more than 50% of the outstanding and issued stock, membership interests, partnership rights or other ownership interest of Franchisee, by one or more transfers, by operation of law, or any other event or transaction which, directly or indirectly, effectively changes the ownership of the business operations (or assets essential to continue such business operations) of Franchisee's Store or the management or voting control of Franchisee shall constitute an "Assignment" hereunder.   It shall be assumed for all purposes in applying this provision that Franchisee's management and voting control is determined under its governing documents by simple majority decision.

    d.    It shall also constitute an "Assignment" hereunder if less than 50% of the ownership interest in Franchisee effectively changes the management or voting control of Franchisee.   Example: If A owns 40%, B owns 30%, and C owns 30%, and C sells his or her shares to B, then B would be able to assume voting and management control, and as such, C's transfer would constitute an "Assignment".

11.3    Franchisee acknowledges the vital importance of Franchisee and Franchisee's Store to the market position and overall image of GPFC, the Marks, the Method and GPFC's Goin' Postal Franchise Chain.   Franchisee also recognizes that there are many objective and subjective factors that comprise the process by which GPFC selects a suitable Franchisee; therefore, GPFC may impose any reasonable condition to its consent to an Assignment, which shall include without limitation, the satisfaction of all of the following conditions:

    a.    Proposed transferee must complete, execute and comply with all requirements of the then current Franchise Agreement and GPFC's then current Franchise Disclosure Document, including satisfactory completion of all mandatory training then required by GPFC for new franchisees (currently as set forth in Section 4.1 of this Agreement above).

    b.    Proposed transferee must be a person or entity that meets GPFC's then current standards and qualifications for new franchisees.

    c.    The proposed Assignment shall be on commercially reasonable terms, and shall include as part of the documentation otherwise entered into between Franchisee and the transferee an Addendum identical in form and substance as that attached to this Agreement as **Exhibit "B"** and incorporated herein by this reference (such Addendum being hereinafter referred to as the "Required Transfer Addendum").   The Required Transfer Addendum, fully completed and signed by both Franchisee and the transferee, must be forwarded to GPFC with the required notice of intended Assignment required under Section 11.5 of this Agreement immediately below. GPFC's consent to the Assignment does not constitute a guarantee of, and does not ensure, the transferee's success as a franchisee, nor should any approved transferee rely upon GPFC's consent to the Assignment in determining whether to acquire the Franchisee's Store or not, or in determining the soundness of such transferee's investment in purchasing the Franchisee's Store.   Under no circumstances shall GPFC's consent to any Assignment be deemed or considered

to be an acknowledgment or representation on the part of GPFC in favor of either the Franchisee or Franchisee's intended transferee that the Location of Franchisee's Store is marketable, profitable, promising, or otherwise has the characteristics or potential for generating a customer and income stream to support the financial needs or requirements of the Store, the transferee, or the obligations due to GPFC under the new Franchise Agreement or to Franchisee under the sale arrangements.

d. As of the effective date of the proposed Assignment, all obligations of Franchisee hereunder and under all agreements between GPFC or any of its affiliates and Franchisee shall be fully satisfied and not be in default.

e. The transferee must execute a new Franchise Agreement in form and substance of GPFC's then current Agreement, for a new Term, and all associated documents, including, but not limited to, the then current Non-Competition and Non-Solicitation Agreement, and, if applicable, the then current Continuing Personal Guaranty.

f. At or prior to the Assignment, GPFC must receive payment from Franchisee (also known, for these purposes as the "transferor" or "seller") and/or from the Franchisee's "buyer" or "transferee" of a "Transfer Fee" in the amount of $3,000.00.

g. Franchisee shall enter into a general release (in a form prescribed by GPFC) that will release GPFC and its affiliates from any and all suits, claims or causes of action arising from or in any way connected with this Agreement, the operation by Franchisee of Franchisee's Store, and/or the sale of Franchisee's ownership of both the Franchisee's Store and the Goin' Postal franchise granted to Franchisee under this Agreement.

h. GPFC may withhold its consent to any proposed Assignment even upon compliance with the above conditions, and GPFC shall not incur any liability on account of withholding any consent of any proposed Assignment.

11.4   Death or Incapacity of Franchisee or Controlling Owner(s)

a. In the event of the death or incapacity of Franchisee or any of its Controlling Owner(s), GPFC may, upon the written request of the heirs or representatives of Franchisee or its Controlling Owner(s), subject to this Section 11.4, allow such heirs or representatives a period of six (6) months from the date of death or incapacity to:

i. Demonstrate that such heirs or representatives meet GPFC's Standards and Specifications for new Store franchisees and execute and agree to the terms of the then current Franchise Agreement (except that the term shall be the remaining Term of this Agreement and that no initial franchise fee or Transfer Fee shall be payable); or

ii. Assign this Agreement to a third party acceptable to GPFC who meets GPFC's Standards and Specifications for new Store Franchisees.

b. GPFC may impose reasonable conditions as to the rights granted under this Section 11.4, including the following which shall be deemed reasonable: (i) the Franchisee's Store at the Location must continue to be operated in conformity with this Agreement, the Method and GPFC's Manuals; and (ii) if GPFC determines that the Franchisee's Store is not being operated properly, GPFC may assign a

manager to the Franchisee's Store (at Franchisee's expense) until such time as the new owners are in a position to properly manage and operate the Franchisee's Store.

11.5    GPFC's Right of First Refusal.

    a.    If Franchisee desires to make any Assignment for value, including any Assignment consisting of a sale of the assets of Franchisee's Store or the equity ownership interests of Franchisee, as applicable, at least forty-five (45) days prior to the scheduled date to close and consummate such proposed Assignment for value, Franchisee shall notify GPFC in writing of such intended Assignment. Such notice shall set forth the name of the proposed purchaser or other transferee, all terms and conditions of the proposed Assignment for value, and must be accompanied by a fully executed purchase and sale agreement or other executed agreement which sets forth the terms and conditions of the proposed Assignment for value, and by a complete set of all the documents required under Section 11.3 hereinabove (including the Required Transfer Addendum). The effectiveness of the purchase and sale agreement or other agreement providing for the proposed Assignment must be expressly contingent upon GPFC's waiver in writing of its rights of first refusal as set forth herein and upon GPFC's written consent to the proposed Assignment.  GPFC shall have a period of thirty (30) days within which to exercise its rights of first refusal granted herein, with such 30 day period commencing upon receipt by GPFC of all required notices, documents and information stated herein.

    b.    Within the thirty (30) day period provided for GPFC to act upon its rights of first refusal, GPFC may elect to purchase or otherwise acquire Franchisee's rights under this Agreement and the assets of Franchisee's Store (or, as applicable, the ownership interests of Franchisee) on the same terms and conditions set forth in the notice required under Section 11.5(a) immediately above.  In the event that GPFC exercises its rights of first refusal provided herein, the closing on GPFC's purchase or other acquisition of Franchisee's rights under this Agreement and the assets of Franchisee's Store (or, as applicable, the ownership interests in Franchisee) shall take place on the later of the closing date stated in the notice of the proposed Assignment or ninety (90) days following GPFC's receipt of all required documents as described in Section 11.3 and Section 11.5(a) hereinabove.

    c.    If GPFC does not exercise its right of first refusal provided for herein, GPFC shall, within the 30 day period provided for hereinabove, notify Franchisee whether it consents to the proposed Assignment, which approval shall not be unreasonably withheld upon Franchisee's strict compliance with GPFC's Assignment requirements set forth in Sections 11.2 and 11.3 hereinabove.

## 12.   DEFAULT AND TERMINATION

12.1    Termination by Franchisee.

Franchisee may terminate this Agreement due to a material default by GPFC of its obligations hereunder, which is not cured by GPFC within 60 days of prompt written notice by Franchisee to GPFC outlining the alleged default with specificity; provided, that if the default is such that cannot be reasonably cured within such 60 day period, GPFC shall not be deemed to be in default for so long as it commences to cure such default within 60 days and diligently continues to prosecute such cure to completion.  Such notice of material default must be given by Franchisee to GPFC within 60 days of the date upon which the alleged default occurs.  Failure to give such notice shall constitute a waiver of

any such alleged default. If Franchisee terminates this Agreement pursuant to this section 12.1, Franchisee shall comply with all of the terms and conditions of Section 14 and Section 7.2 of this Agreement, and Franchisee (and if applicable, Owners and Managers) shall fully comply with the Non-Competition and Non-Solicitation Agreement executed by Franchisee, its Owners, and Managers, as the case may be, in connection with the execution and delivery of this Agreement and as evidenced by **Exhibit "B"** to GPFC's Franchise Disclosure Document (such Disclosure Document being sometimes referred to in this Agreement as the "UFDD"), and Franchisee's Owners, as applicable, shall continue to be bound by the provisions of the Continuing Personal Guaranty evidenced by **Exhibit "K"** to GPFC's UFDD.

12.2   Termination by GPFC

GPFC has the right to terminate this Agreement only for "cause". "Cause" is hereby defined as a material breach of this Agreement.

12.3   Termination With Notice and Opportunity to Cure

Except for any default under Section 12.4, and as otherwise expressly provided elsewhere in this Agreement or by applicable laws, Franchisee shall have 30 days after GPFC's written notice of default in which to remedy any default under this Agreement and to provide evidence of such remedy to GPFC. If any such default is not cured within that time period, or such longer time period as applicable law may require or as GPFC may specify in the notice of default, such failure shall constitute a material breach hereunder and this Agreement and all rights granted by it shall thereupon automatically terminate without further notice or opportunity to cure.

12.4   Termination by GPFC Without Notice or Opportunity to Cure.

Subject to any controlling applicable laws to the contrary, Franchisee shall be deemed to be in material breach and default and GPFC may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon delivery or attempted delivery to Franchisee of notice by GPFC of the occurrence of any of the following events:

a.   Failure on the part of Franchisee   (or, as applicable, on the part of any of Franchisee's Owners pursuant to the Continuing Personal Guaranty executed by such Owner's as evidenced by **Exhibit "K"** to GPFC's UFDD) to pay any Royalty or any other sum or monetary amount due from Franchisee to GPFC under the terms of this Agreement or any other agreement between Franchisee and GPFC (or any of its affiliates) on the designated date due, or any failure, refusal or rejection of payment or payment authorization in connection with any established credit card, electronic funds transfer or other automatic payment arrangement established by and between Franchisee and GPFC for purposes of transacting and effecting Franchisee's payments of Royalties and/or other obligations due and owing from Franchisee to GPFC under this Agreement or any such other agreements;

b.   Franchisee or any Controlling Owner(s) (throughout this Agreement, "Controlling Owner(s)" shall mean any person(s) or entity(ies) owning alone or in combination 50% or more of the ownership interests of Franchisee) of Franchisee is adjudicated bankrupt or judicially determined to be insolvent (subject to any contrary applicable state or federal laws), or fails to meet his/her/its financial obligations as they become due, or makes a disposition for the benefit of his/her/its creditors;

c.    Franchisee or any of its Owners allows a judgment against it or them in the amount of $10,000 to remain unsatisfied for a period of more than 30 days (unless a supersedeas or appeal bond has been filed);

d.    The Franchisee's Store, the Location (including the real property or building thereon), or the Franchisee's assets are seized, taken over, or foreclosed by a government official in exercise of its duties, or seized, taken over, or foreclosed by a creditor or lienholder, provided that the final judgment remains unsatisfied for a period of 30 days or more (unless a supersedeas or appeal bond has been filed);

e.    A levy of execution or attachment has been made or attempted to be made upon the Franchisee's Store and/or the franchise granted by this Agreement or upon any of the assets used in the Franchisee's Store, and it is not discharged within 5 days of such levy or attachment;

f.    Franchisee allows or permits any judgment to be entered against GPFC or its subsidiaries or affiliated corporations, arising out of or relating to the operation of the Franchisee's Store;

g.    A condemnation or Assignment in lieu of condemnation of, affecting or involving the Franchisee's Store and/or the Location;

h.    If Franchisee abandons the Franchisee's Store at the Location.  For purposes of this Agreement, "abandon" shall mean (i)  Franchisee's failure, at any time during the Term of this Agreement, to keep the Franchisee's Store open and operating for a period of three (3) consecutive business days, except as provided for in any written permission by GPFC, (ii) Franchisee's failure to keep the Franchisee's Store open and operating for any period, or any act or statement by Franchisee, after or from which it is not unreasonable under the facts and circumstances for GPFC to conclude that the Franchisee does not intend to operate the Franchisee's Store, unless such failure is due to fire, flood, earthquake or similar events beyond the control of Franchisee; or (iii) the withdrawal of permission or termination of lease by the applicable landlord that results in Franchisee's inability to operate the Franchisee's Store at the Location or any other forced or mandated closure of Franchisee's Store;

i.    If Franchisee receives at least 3 written notices of default from GPFC in any 12 consecutive month period (i.e. a "two strike" grace limit), concerning any breach of this Agreement by Franchisee, whether or not such breaches are curable or have or have not been cured after receipt of notice, such repeated course of conduct itself shall be considered an incurable material breach and grounds for termination of this Agreement at the same time or any time after GPFC notifies Franchisee of the third material default (nothing in this subsection shall be deemed to impose upon GPFC a duty or obligation to provide Franchisee with notice where no such notice is otherwise mandated or required under the provisions of this Agreement, nor does it restrict or prohibit GPFC from terminating this Agreement on the occurrence of a single breach under this Section 12.4);

j.    If Franchisee or any of its Owners, officers, directors, members, managers, partners or key employees is convicted of a felony or pleads guilty or nolo contendere to a felony or any other crime or offense which GPFC considers likely to adversely affect GPFC's reputation, the Method, the Marks, GPFC's Goin' Postal Franchise Chain, the goodwill associated with any of the foregoing or GPFC's interest therein;

k.   If Franchisee purports to make any Assignment without GPFC's prior written consent or otherwise violates section 11 of this Agreement;

l.   If Franchisee materially misuses or makes any unauthorized use of the Marks or otherwise materially impairs the goodwill associated therewith or GPFC's rights therein, or takes any action that reflects materially and unfavorably upon the operation or reputation of the Franchisee's Store, GPFC's network of Stores, the Method, the Marks, or GPFC's Goin' Postal Franchise Chain, or initiates, engages or participates in, or make otherwise any unauthorized use, disclosure, dissemination, distribution, or duplication of any of GPFC's Manuals or other confidential information or trade secrets (as described herein; and including, without limitation, any materials contained within the password protected Owners' Section of GPFC's website);

m.   If Franchisee makes any material misrepresentations in connection with the execution of this Agreement or the acquisition of the Franchisee's Store at the Location and/or the franchise granted hereunder in connection therewith;

n.   If Franchisee's lease is terminated and the Franchisee's Store at the Location is lost, whether for or as a result of default on or expiration of any term of the lease agreement; or

o.   If Franchisee (or, if applicable any Owner), or any of Franchisee's officers, directors, stockholders, members, managers, partners or employees, shall violate the in in-term non-competition or non-solicitation covenants of that certain Non-Competition and Non-Solicitation Agreement executed by Franchisee in connection herewith, as attached as **Exhibit "B"** to GPFC's UFDD.

12.5   Any material default by Franchisee under the terms of this Agreement, or any other agreement between GPFC (or its affiliates) and Franchisee, or under Franchisee's lease, shall be a material default of each and every said agreement. Furthermore, in the event of termination, for any cause, of this Agreement or any other agreement between the parties, GPFC may, at its option, terminate any or all of said agreements.

12.6   Notwithstanding anything to the contrary contained in this Section 12, in the event any valid applicable law of a competent governmental authority having jurisdiction over this Agreement and the parties hereto shall limit GPFC's rights of termination hereunder or shall require longer notice or cure periods than those set forth above, this Agreement shall be deemed amended to conform to the minimum notice or cure periods or restrictions upon termination required by such laws and regulations. GPFC shall not, however, be precluded from contesting the validity, enforceability or applicability of any such laws or regulations.

12.7   GPFC's rights as stated in this Section shall be without prejudice to any other rights or remedies provided by law or under this Agreement, which include, but are not limited to, injunctive relief, damages or specific performance.  GPFC's failure to enforce or terminate this Agreement or any other agreement upon the occurrence of one or more of the above events shall not constitute a waiver of or otherwise affect GPFC's rights to terminate or enforce this Agreement or any other agreement because of any other occurrence of one or more of the events set forth above.

## 13.   GPFC'S RIGHTS UPON FRANCHISEE'S TERMINATION

Upon the termination of this Agreement as set forth above, in addition to all other rights and remedies of GPFC (including as set forth in Section 14), GPFC may, at its option:

13.1    Commence proceedings for damages, injunctive relief and/or specific performance.

13.2    Purchase from Franchisee, or assign such right to a third party, the tangible assets (equipment, décor, etc.) of Franchisee's Store at a purchase price equal to such assets' appraised fair market value, from which shall be deducted the following, in the following order:

     a.    All outstanding and unpaid obligations of Franchisee to GPFC, including all unpaid fees, late payment fees and interest, and any promissory notes and equipment leases;

     b.    All of GPFC's costs of collection (including attorneys' fees) of unpaid obligations, if any;

     c.    The cost of upgrading Franchisee's Store to GPFC's then current Standards and Specifications for Stores; and

     d.    All outstanding claims of Franchisee's creditors and all accrued but unpaid amounts owed to Franchisee's lessor for the Franchisee's Store as of the date of the termination.

If GPFC exercises its right to receive liquidated damages in accordance with Section 13.5, GPFC shall then be prohibited from exercising its rights under this Section 13.2 to purchase the tangible assets of Franchisee's Store.

13.3    Because the termination of Franchisee's Agreement extinguishes all intangible franchise rights which were formally held by Franchisee, Franchisee acknowledges that the purchase described in Section 13.2 would not be in exchange for any such intangible assets or intangible rights which were formerly held by Franchisee.

13.4    If this Agreement is terminated due to Franchisee's abandonment of Franchisee's Store as described in Section 12.4(h) above, Franchisee has thereby abandoned any rights to the former business, including but not limited to, any potential proceeds from a potential purchase or sale as described above, or any payment or remuneration of any kind. Franchisee shall not upon any abandonment of Franchisee's Store remove any fixtures, equipment, furnishings, inventory, Point of Sale Systems or any other assets of Franchisee's Store not belonging to or otherwise required under this Agreement to be returned to GPFC unless and until all amounts owed to GPFC under this Agreement (including any "Liquidated Damages" due to GPFC) have been satisfied in full and until Franchisee has complied with all of Franchisee's obligations under Section 14 immediately below.

13.5    Payment of Liquidated Damages

     a.    If this Agreement terminates prior to its expiration (i) by GPFC in accordance with the terms of this Agreement, or (ii) by Franchisee not in accordance with Section 12.1 of this Agreement, GPFC has the right, but not the obligation, to require that Franchisee pay GPFC liquidated damages ("Liquidated Damages") as set forth in Section 13.5(c) below.   Franchisee's payment of Liquidated Damages to GPFC shall not be considered a penalty for Franchisee's breaching this Agreement, but rather a reasonable estimate of GPFC's damages and lost future fees GPFC would have received from Franchisee under this Agreement had Franchisee not prematurely terminated.

Franchisee's Initials 

      b.      Franchisee acknowledges that its obligation to pay to GPFC Liquidated Damages is in addition to, not in lieu of (i) Franchisee's obligations to pay any amounts then due to GPFC, (ii) Franchisee's obligation to fully comply with all of its post-termination duties set forth in this Agreement, including those set forth in the Non-Competition and Non-Solicitation Agreement executed by Franchisee in connection herewith, and (iii) any other post-termination remedies that may be available to GPFC under the law. However, if GPFC exercises its right to receive Liquidated Damages in accordance with this provision, GPFC shall then be prohibited from exercising its rights, under Section 13.2 of this Agreement, to purchase the tangible assets of the Franchisee's Store.

      c.      "Liquidated Damages" shall mean the amount of Royalty revenue that GPFC would have earned during the period of time from the date of termination until the Agreement's expiration date, but in no event greater than three (3) years ("Liquidated Damages Period"). Liquidated Damages shall be calculated by adding together the total amount of the monthly Royalty payments which would have been required to be paid by Franchisee under the terms of this Agreement (per the table in Section 5.1(e) above) during the Liquidated Damages Period. Any Liquidated Damages Period days in addition to full months shall be pro-rated appropriately. Franchisee acknowledges that the preceding formula for calculating such damage amounts is applicable and reasonable.

13.6    Enforce any violation by Franchisee of Franchisee's obligations under the Non-Competition and Non-Solicitation Agreement executed by Franchisee in connection with this Agreement.

13.7    Enforce the obligations of Franchisee's Owners, as applicable, under the Continuing Personal Guaranty evidenced by **Exhibit "K"** to GPFC's UFDD.

## 14.    FRANCHISEE'S OBLIGATIONS UPON EXPIRATION AND/OR TERMINATION

Upon expiration and/or termination (subject to Section 13) of this Agreement, Franchisee shall immediately:

      a.      Cease to operate the former Store at Franchisee's Location, cease to use the Method and Marks in any form, cease to hold itself out as a Franchisee of GPFC or of GPFC's Goin' Postal Franchise Chain, and Franchisee shall not use or identify in any business name any of the words "Goin' Postal", "Goin'", "Postal", "Going Postal", "Going", "Go Postal", "Your Friendly Neighborhood Shipping Center", "Neighborhood Shipping Center", "Shipping Center", or "Delivering the Best of America" in any combination, form or fashion, or any words or letters confusingly similar to any of the words listed above. Franchisee shall take such action(s) as GPFC may require to accomplish the foregoing;

      b.      Pay all sums due to GPFC. Franchisee must immediately upon expiration and/or termination provide GPFC with a detailed written itemized list of all fixtures, furnishings (including all those bearing or portraying any of the Marks), equipment, signs, computer systems (including Point of Sale Systems and all hardware and software), inventory and other assets which are a part of Franchisee's Store. Except for returning to GPFC all items required to be returned per this Agreement, including the attached **Exhibit "C"** Checklist, Franchisee shall be prohibited from removing any of these assets from the Location of Franchisee's Store until all amounts due to GPFC at the time of termination and/or expiration (including any and all Liquidated Damages) have been satisfied in full. GPFC shall hold, possess and retain a security interest in all assets of Franchisee's Store, including the bank account(s) Franchisee has designated for all electronic funds transfer

arrangements, effective on and as of the Effective Date of this Agreement and continuing until Franchisee pays in full all sums due to GPFC.

c. Return to GPFC or its designee the GPFC Store Set-Up Manual, the GPFC Operations Manual, proprietary hardware and software, computer disks, and all other trade secrets and other confidential information delivered to Franchisee, and all copies thereof, and certify the deletion of all electronic copies of the above;

d. Surrender to GPFC any stationery, printed matter, signs, promotional items and advertising materials containing the Marks, as may be requested by GPFC.

e. Take such action as may be required by GPFC, including:

   i. Transfer and assign the business telephone number, fax number, and business Internet e-mail address for Franchisee's Store to GPFC or its designee;

   ii. Disconnect and transfer all such telephone numbers and Internet services to GPFC or its designee;

   iii. Transfer to GPFC or its designee "white" and "yellow" page telephone listings, references and advertisements and all trade and similar name registrations and business licenses and cancel any interest which Franchisee may have in the same; and

   iv. Implement all additional actions listed on GPFC's "Franchisee De-Identification Checklist" attached to this Agreement as **Exhibit "C"** and incorporated herein by this reference; provided, if GPFC elects its option to purchase the tangible assets of Franchisee's Store, some of these actions may not be necessary;

f. Provided that GPFC, or its designee, does not take possession of the Franchisee's Store, make such changes to signs, décor, furniture, and equipment at Franchisee's Store at the Location as GPFC may require to distinguish and make readily clear that the premises (and business conducted at the premises) is not only no longer a Store under GPFC's Goin' Postal Franchise Chain, but is also no longer a retail shipping store under any chain or brand or under independent operation; and

g. Strictly comply with Franchisee's obligations under the Non-Competition and Non-Solicitation Agreement executed by Franchisee in connection herewith.

In the event of termination and/or expiration of this Agreement, Franchisee hereby authorizes and appoints GPFC to act as attorney-in-fact for Franchisee to transfer any "white" and "yellow" pages listings, e-mail addresses, and Internet presence relating to Franchisee's Store.

In the event of the termination and/or expiration of this Agreement, Franchisee hereby authorizes GPFC to notify Franchisee's customers, vendors, suppliers, and any other appropriate party or parties that this Agreement and all Franchisee's rights and entitlements as a franchisee in GPFC's Goin' Postal Franchise Chain expired and /or have been terminated.

Termination and/or expiration of this Agreement shall be without prejudice to any other rights or remedies that GPFC or Franchisee, as the case may be, shall have in law or in equity, including, without limitation, the right to recover benefit of the bargain damages. In no event shall a termination and/or expiration of this Agreement affect Franchisee's obligations to take or abstain from taking any actions in accordance with this Agreement, or, if applicable, affect GPFC's rights to enforce the Continuing

Personal Guaranty (**Exhibit "K"** to GPFC's UFDD). The provisions of this Agreement which constitute post-term covenants, including those set forth in the Non-Competition and Non-Solicitation Agreement and the obligation of GPFC and Franchisee to resolve any and all disputes, shall survive the termination and/or expiration of this Agreement.

Franchisee acknowledges and agrees that the goodwill and other rights, interests and title in and to the Marks, the Method, the Store Set-Up Manual, the Operations Manual, the Owners' Section of GPFC's website, GPFC's other confidential information and trade secrets, and GPFC's Goin' Postal Franchise Chain, and the use thereof, shall be and remain the sole and exclusive property of GPFC.

Upon expiration and/or termination of the Term, if Franchisee does not renew pursuant to Section 2.2 and 2.3, GPFC shall have the right and the option, but not the obligation, to purchase the tangible assets (equipment, furnishings, inventory, décor, etc.) of Franchisee's Store at the Location at a purchase price equal to such assets' appraised·fair market value, from which the following shall be deducted:

        a.      All outstanding and unpaid obligations of Franchisee to GPFC, including all unpaid fees, late payment fees and interest, promissory notes and equipment leases, if any;

        b.      All of GPFC's costs of collection (including attorneys' fees) of unpaid obligations, if any;

        c.      The cost of upgrading Franchisee's Store to GPFC's then current standards and specifications for Stores; and

        d.      All outstanding claims of Franchisee's creditors and all accrued but unpaid amounts owed to Franchisee's lessor for the Franchisee's Store as of the date of the termination.

Because the expiration and/or termination of Franchisee's Agreement extinguishes all intangible franchise rights that were formerly held by Franchisee, Franchisee acknowledges that the purchase described in Section 14.6 would not be in exchange for any such intangible assets or intangible rights which were formerly held by Franchisee as a result of this Agreement.

## 15.    INSURANCE

Franchisee shall obtain and maintain throughout the Term of this Agreement, a minimum of one million dollars in general liability insurance coverage, including premises liability and property and casualty, and shall furnish a copy of such policy or policies initially upon the opening of the Franchisee's Store, and subsequently within 10 days of request in writing by GPFC.

In the event that damage to Franchisee's Store at the Location is covered by insurance, Franchisee shall use the proceeds from said insurance to return Franchisee's Store to operational status unless said repair is prohibited by Franchisee's lease.

If required by specific vendors and agencies, Franchisee shall purchase necessary bonds to offer certain services at the Franchisee's Store.

If Franchisee fails to comply with this Section, GPFC may, but is not obligated to, obtain and maintain insurance for Franchisee, for which Franchisee will be responsible for all costs and fees involved and will pay GPFC these costs and fees upon demand. GPFC is hereby authorized by Franchisee to charge on Franchisee's credit card any such fees and costs paid by GPFC and not reimbursed by Franchisee upon demand.

## 16.    COMPLIANCE WITH LAWS AND OBLIGATIONS

Franchisee shall comply with all applicable laws and timely obtain and maintain any and all permits, certificates and licenses for the full and proper conduct of business at Franchisee's Store at the Location, including all laws which impact the design and interior layout and improvements of Franchisee's Store.

Franchisee shall operate the Franchisee's Store in conformity with all U.S. Postal Service regulations and shall implement any and all changes in U.S. Postal Service regulations as instructed or notified by The United States Postal Service and shall follow all guidelines of the local post office in the general locality of Franchisee's Store at the Location.

## 17.   INDEMNIFICATION AND INDEPENDENT CONTRACTOR

17.1    Franchisee shall, at Franchisee's sole cost, defend and indemnify GPFC, its affiliates and their respective owners, directors, officers, agents, representatives, employees, successors and. assigns, and hold each of them harmless from and against, and reimburse them for, all losses, claims, liabilities, obligations, damages, attorneys' fees, costs, settlement amounts, judgments, lost profits, charges, expenses, and taxes based upon, arising out of, or in any way related to the operation of the Franchisee's Store at the Location, Franchisee's acts or omissions, or the breach by Franchisee of any provision of this Agreement or any agreement executed by Franchisee in connection herewith. GPFC and its affiliates shall have the right to defend and/or settle any such matter in such a manner as they deem appropriate, in their sole discretion, and without the consent of Franchisee. Franchisee shall also reimburse each of the foregoing indemnified parties for any and all costs reasonably incurred in investigating and defending any such matter, including without limitation, attorneys' fees and court costs. This Section shall continue in full force and effect notwithstanding the termination and/or the expiration of this Agreement.

17.2    In all dealings with third parties, including but not limited to, employees, suppliers and customers, Franchisee shall disclose that it is in an independently owned and operated entity licensed by GPFC to operate a Store under a Goin' Postal franchise granted by this Agreement. Nothing In this Agreement is intended by the parties to create a fiduciary relationship between them, nor to constitute Franchisee an agent, legal representative, subsidiary, joint venturer, partner or employee of GPFC for any purpose whatsoever. It is understood and accepted that Franchisee is an independent contractor, and is in no way authorized to make any contract, warranty, or representation, or to create any obligation on behalf of GPFC. Neither GPFC nor Franchisee shall guarantee the obligations of the other or in any way become obligated for the debts or expenses of the other.

## 18.   WAIVERS, FORMS OF AGREEMENT AND AMENDMENT

No failure of GPFC to exercise any power reserved to it by this Agreement and no custom or practice of the parties at variance with the terms hereof shall constitute a waiver of GPFC's right to demand exact compliance with any of the terms herein. No waiver or acceptance by GPFC of any particular breach or default by Franchisee, nor any delay, forbearance, or omission by GPFC to act or give notice of default or to exercise any power or right arising by reason of default hereunder, nor acceptance by GPFC of payments due hereunder, shall be considered a waiver or acceptance by GPFC of any preceding or subsequent breach or default by Franchisee of any term, covenant or condition of this Agreement.

No warranty or representation is made by GPFC that all franchise agreements heretofore or hereafter issued by GPFC for Stores do or will contain terms substantially similar to those contained in this Agreement. Further, Franchisee recognizes and agrees that GPFC may, in its reasonable business judgment, due to local business conditions, or otherwise, waive or modify comparable provisions of other franchise agreements heretofore or hereafter granted to other franchisees of GPFC in a non-uniform manner.

Franchisee's Initials _____

No amendment, change or variance from the terms and conditions in this Agreement shall be binding on either GPFC or Franchisee except by mutual written agreement signed by both parties hereto.

## 19.   NOTICES

All notices and other communications (including notices of default or termination) permitted or required to be given pursuant to this Agreement shall be deemed to be delivered:  (a) at the time personally delivered to GPFC's Headquarters (if delivered to GPFC) or Franchisee's address for the Franchisee's Store at the Location as described in this Agreement (if to Franchisee); (b) on the next day after placing in the hands of a commercial courier service or the United States Postal Service for Express Next Day Delivery; or (c) five days after placement in the United States Mail by Certified Mail, Return Receipt Requested, postage prepaid and addressed to the GPFC's Headquarters (if to GPFC) or Franchisee's address for the Franchisee's Store at the Location (if to Franchisee), or on the date of actual receipt, whichever is earlier.

## 20.   GOVERNING LAW AND DISPUTE RESOLUTION

Validity, Choice of Law, Venue and Jurisdiction

a.   This Agreement shall become valid and effective when counter-executed and accepted by GPFC. The Effective Date of this Agreement shall be the date when signed and accepted by GPFC. This Agreement shall be deemed made and entered into in the State of Florida and shall be governed and construed under and in accordance with the laws of the State of Florida without giving effect to any conflict of laws, except: (i) that the Non-Competition and Non-Solicitation Agreement (**Exhibit "B"** to GPFC's UFDD) shall be deemed made and entered into, and governed and construed under and in accordance with, the laws of the State that is determined by the "Choice of Law" provision (Section 10) of such Non-Competition and Non-Solicitation Agreement; and (ii) to the extent governed by such federal laws protective of GPFC's or GPFC's affiliates' intellectual property rights in the Marks, in the Method, in the Store Set-Up Manual, in the Operations Manual, in the GP Rate Pro Software, and/or in any of GPFC's other intellectual properties, including but not limited to, the Federal Trademark Act, the Federal Copyright Act, the Federal Lanham Act and the Federal Uniform Trade Secrets Act.

b.   Exclusive venue and jurisdiction of any suit arising hereunder shall lie within the courts of the State of Florida, located in Tampa, Florida or within the courts of the United States of America located within the Middle District of Florida.

Mediation

a.   Subject to the limitation provided in the last sentence of this Section 20.2(a), and subject to Section 20.2(b), before either party may initiate suit or action against the other, the parties pledge to first attempt to resolve the controversy or claim arising out of or relating to this Agreement (a "Dispute") pursuant to mediation conducted in accordance with the Commercial Mediation Rules of The American Arbitration Association, unless the parties agree on alternative rules and a mediator within 15 days after either party first gives notice of such Dispute (the "Mediation Notice"). Mediation shall be conducted at GPFC's Headquarters or at the office of GPFC's attorney, at the option of GPFC.  The fees and expenses charged by the mediator shall be shared equally by the parties. The mediator shall be disqualified as a witness, expert or counsel for any party with respect to the Dispute and any related matter.   Mediation is a compromise negotiation and shall constitute privileged

communications under Florida and other applicable laws. The entire mediation process shall be confidential and the conduct, statements, promises, offers, views, and opinions of the mediator and the parties shall not be discoverable or admissible in any legal proceeding for any purpose; provided, however, that evidence that is otherwise discoverable or admissible shall not be excluded from discovery as a result of its use in the mediation. Mediation shall be deemed completed 30 days after the date of the Mediation Notice unless extended by mutual consent of the parties.

b.    GPFC shall not be required to attempt to first mediate a controversy or claim against Franchisee through mediation as set forth in Section 20.2(a) if such claim or controversy concerns an allegation or allegations by GPFC that Franchisee has violated (or threatens to violate or poses an imminent risk of violating) any of GPFC's federally protected intellectual property rights in the Marks, in the Method, in the Store Set-Up Manual, in the Operations Manual, in the GP Rate Pro Software, or in any of GPFC's other intellectual properties, in which case GPFC shall reserve (and hereby reserves) the right to immediately seek injunctive relief, civil damages, ex parte seizure and other available remedies within the courts of the State of Florida or United States of America located within Tampa, Florida or the Middle District of Florida, as the case may be.

GPFC may be granted injunctive relief without the necessity of a bond, but upon notice; provided no prior notice shall be required in the event Franchisee counterfeits the Marks or the Method and GPFC pursues available ex-parte remedies.

IN ALL CASES EXCEPT WHERE EXPRESSLY PROHIBITED BY APPLICABLE STATUTORY LAW, FRANCHISEE AND GPFC EACH WAIVES ANY RIGHT TO A TRIAL BY JURY.

If GPFC institutes any action at law or in equity against Franchisee to secure or protect GPFC's rights under or to enforce this Agreement, in addition to any judgment entered in its favor, GPFC shall be entitled to recover such reasonable attorneys' fees and costs as may be allowed by the court, together with court costs and expenses of litigation.

20.6    **To the extent the UFDD of GPFC pursuant to which this Agreement has been executed included a state-specific Addendum as Exhibit "H" which contained additions, modifications or other changes to this Agreement mandated by the laws of the State of residency of Franchisee (hereinafter any such state-specific Addendum being referred to as the "Applicable State-Specific Addendum"), such Applicable State-Specific Addendum is incorporated herein and shall, to the extent required by the laws of the State of Franchisee's residency, supersede and take precedence over any contrary, conflicting or inconsistent provisions herein.**

## 21.    SEVERABILITY AND CONSTRUCTION

Every part of this Agreement will be considered severable as set forth below.

a.    If, after application of any Applicable State-Specific Addendum, a court of competent jurisdiction declares any provision of this Agreement (or any exhibit or other document referred to herein) pertaining to the subject matters referenced in Section 21.1(b) to be invalid or unenforceable, but such provision could be rendered valid and enforceable if modified, then Franchisee and GPFC hereby agree that such provision shall be deemed modified to the extent required to make it valid and enforceable to the fullest extent under applicable state law and public policy.

b.    The subject matters that are made subject to Section 21.1(a) are any provisions of this Agreement (or any exhibit or other document referred to herein) pertaining to

(i) termination of this Agreement, (ii) non-renewal of this Agreement, (iii) designation of jurisdiction and venue for dispute resolution proceedings, (iv) waivers of right to a jury trial, (v) "choice of law" provisions that specify which state's law would apply in a dispute resolution proceeding, (vi) certain types of mandatory franchisee "releases" or "waivers", and (vii) any other provision that is governed by any Applicable State-Specific Addendum or is otherwise inconsistent with a valid and applicable state law that was specifically intended to protect the rights of franchisees.

c.     If a mediator, arbitrator or court of competent jurisdiction declares any provision of this Agreement (or any exhibit or other document referred to herein), other than the provisions corresponding to the subject matters referenced in Section 21.1(b), to be invalid or unenforceable, but such provision could be rendered valid if modified, then Franchisee and GPFC hereby agree that GPFC shall have the right, in its sole discretion, to modify such invalid or unenforceable provision(s) to the extent necessary to render such provision(s) valid and enforceable, including, without limitation, the right to delete the provision in its entirety.

d.     Should any provision of this Agreement be found invalid or unenforceable as presented in the above provisions of this Section 21.1, the remainder of this Agreement shall in no way be affected and shall remain valid and enforceable for all purposes, both parties hereto declaring that they would have executed this Agreement without inclusion of such provision. In the event that such total or partial invalidity or unenforceability of any provision of this Agreement exists only with respect to the laws of a particular jurisdiction, this Section 21.1 shall operate only upon such provision to the extent that the laws of such jurisdiction are applicable to such provision. Each party shall execute and deliver to the other any further documents that may be reasonably required to effectuate fully the provisions hereof.

This Agreement and all other agreements and writings referred to herein, including but not limited to the Exhibits, the Non-Competition and Non-Solicitation Agreement, to the extent applicable, the Turn-Key Store Agreement, to the extent applicable, the Continuing Personal Guaranty, the UFDD, the Store Set-Up Manual, the GPFC Operations Manual, and the Standards and Specifications referred to herein, contain the entire agreement of the parties pertaining to the subject matter hereof and no prior or contemporaneous representations, inducements, promises, or agreements, oral or otherwise, between the parties not set forth herein shall be of any force and effect. The terms of all Exhibits hereto and, to the extent not inconsistent with or contrary to the provisions hereof, all agreements and writings referred to herein, including in particular, but not limited to, GPFC's UFDD (and all supplements and amendments thereto made by GPFC throughout the Term), are hereby incorporated into and made a part of this Agreement as if the same had been set forth in full herein.

The table of contents, headings and captions contained herein are for the purpose of convenience and reference only and are not to be construed as part of this Agreement. All terms used herein shall be construed to include the number and gender as the context of this Agreement may require. As used in this Agreement the words "include", "includes" or "including" are used in a non-exclusive sense. Unless otherwise expressly provided herein to the contrary, any consent, acceptance, approval or authorization by GPFC which Franchisee may be required to obtain hereunder may be given or withheld by GPFC in its sole discretion, and on any occasion where GPFC is required or permitted hereunder to make any judgment or determination, including any decision as to whether any condition or circumstance meets GPFC's Standards and Specifications or GPFC's satisfaction, GPFC may do so in its sole subjective judgment. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against the drafter hereof, whether under any rule of construction or otherwise. To the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto. GPFC and Franchisee intend that if any provision of this Agreement is susceptible to two or

more constructions, one of which would render the provision enforceable and the other or others of which would render the provisions unenforceable, then the provision shall be given the meaning that renders it enforceable. The parties agree that each Section of this Agreement shall be construed independently of any other section or provision of this Agreement.

## 22.  MISCELLANEOUS

In addition to all other remedies herein granted, if Franchisee shall default in the performance of any of its obligations or breach any term or condition of this Agreement or any related agreement, GPFC may at its sole discretion, immediately or at any time thereafter, without waiving any claim for breach hereunder and without notice to Franchisee, cure such default for the account and on behalf of Franchisee, and the cost to GPFC thereof shall be due and payable on demand and shall be deemed to be additional compensation due to GPFC hereunder and shall be added to the amount of compensation next accruing hereunder, at the election of GPFC, and may be charged against any credit card Franchisee has allocated toward payment of Royalties or paid out of any bank account Franchisee has designated under any electronic funds transfer arrangement between the parties established hereunder for payment of Royalties.

This Agreement may be executed in any number of counterparts and copies, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

The submission of this Agreement does not constitute an offer or acceptance by GPFC and this Agreement shall not be deemed valid, effective or binding upon GPFC until such time as GPFC accepts it and it is signed by an authorized officer on behalf of GPFC.

22.4  Franchisee and its Owners jointly and severally acknowledge that they have carefully read and understand this Agreement and all other related documents to be executed concurrently or in conjunction herewith (including in particular the UFDD, the Non-Competition and Non-Solicitation Agreement attached as **Exhibit "B"** to the UFDD, and, if applicable, the Continuing Personal Guaranty attached as **Exhibit "K"** to the UFDD), that they have had the opportunity to consult with legal counsel, accountants and financial advisors in connection with entering into this Agreement, that they understand the nature of this Agreement, and that they intend to comply herewith and to be bound hereby. Franchisee and its Owners and Managers signing below, if any, represent, warrant and covenant that they received a copy of GPFC's current Franchise Disclosure Document at least fourteen (14) calendar days before any of them signed this Agreement or paid any money to GPFC, that they read and reviewed a copy of GPFC's current Franchise Disclosure Document in its entirety, and that this Agreement which has been signed by each of them is in all material respects identical to that Franchise Agreement which was attached as Exhibit "A" to the specific copy of GPFC's current Franchise Disclosure Document which was so received, read and reviewed; and to the extent any material alterations were unilaterally made by GPFC to this Agreement as compared to the Franchise Agreement which was attached as **Exhibit "A"** to the specific GPFC Franchise Disclosure Document each of them received, read and reviewed, they received and reviewed a copy of this Agreement at least seven (7) calendar days before any of them signed this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed effective as of the date of counter execution by GPFC's authorized signing officer shown as follows:

### "FRANCHISEE"

If the "Franchisee" is a legal entity (corporation, limited liability company, partnership, etc.) then (i) enter the name of the entity Franchisee in the following space:  *AllHealth Complete Care* , (ii) each equity owner of the Franchisee must sign below (attach additional sheet if necessary) and must sign the Continuing Personal

120                                    Franchisee's Initials _*CB*_

Guaranty (attached as **Exhibit "K"** to GPFC's UFDD), and (iii) in the lines appearing below each signature line, print the name(s) of the person(s) that are signing this Agreement, and print their title within such entity (president, partner, manager, member, etc.). If the Franchisee is not a legal entity at the time of signing, but rather one or more individual persons, then do not fill in the title lines below.

1:
_____
Signature of Franchisee or equity owner if Franchisee is a legal entity

11/1/09  , 200 9
Date        Year

ERIC BROCONE
Printed name of person that signed above

CEO
Title of person that signed above

2:
_____        , 200
Signature of Franchisee or equity owner if Franchisee is a legal entity   Date   Year

_____
Printed name of person that signed above

_____
Title of person that signed above

3:
_____        , 200
Signature of Franchisee or equity owner if Franchisee is a legal entity   Date   Year

_____
Printed name of person that signed above

_____
Title of person that signed above

"GPFC"
FOR GOIN' POSTAL FRANCHISE CORPORATION

GOIN' POSTAL FRANCHISE CORPORATION
A Florida Corporation

BY:
_____        , 200 9
Authorized Signing Officer          *Date        *Year
*Date of Goin' Postal Franchise Corporation's Counter Signature is "Effective Date" of this Franchise Agreement

Print Name of Officer: MARCUS PRICE
Title of Officer: CEO

121        Franchisee's Initials  EB

EXHIBIT "A"

TO

GOIN' POSTAL FRANCHISE CORPORATION

FRANCHISE AGREEMENT



Franchisee's Initials

EXHIBIT "B" TO GOIN' POSTAL FRANCHISE CORPORATION
FRANCHISE AGREEMENT

ADDENDUM TO CONTRACT/AGREEMENT
FOR SALE AND PURCHASE

THIS ADDENDUM is made and entered into by and between _J&P Serals LLC_ [insert name of individual or entity who is selling the business] with a principal address of _5624 Bells Ferry Rd._ (hereinafter for purposes of this Addendum such party being referred to as the "Seller"), and _All Health Complete Care Inc_ [insert name of individual or entity who is buying the business] with a principal address of _3870 Lawrenceville Hwy Suite 124C_ (hereinafter for purposes of this Addendum such party being referred to as the "Buyer").

WITNESSETH:

WHEREAS, Seller is the owner and operator of a packaging and shipping business located at _5624 Bells Ferry Rd., Woodstock_ [insert the business address for the location of the business being sold by Seller to Buyer]; _, GA 30189_

WHEREAS, such business is being operated by Seller as a Goin' Postal franchise (hereinafter for purposes of this Addendum such franchised business being referred to as the "Goin' Postal Store");

WHEREAS, this Addendum is being entered into for purposes of both Seller and Buyer recognizing and acknowledging that Seller does not have the rights, without the approval and consent of Goin' Postal Franchise Corporation (hereinafter referred to as the "Franchisor"), and without Buyer satisfactorily completing all conditions precedent imposed by the Franchisor on such transfer, to transfer to Buyer the Goin' Postal franchise or any of the rights or entitlements thereunder.

NOW, THEREFORE, for and in consideration of the mutual covenants, representations, warranties and promises contained herein, the parties hereto agree as follows:

1.  Both Seller and Buyer recognize, agree, acknowledge and understand that, without the prior written consent of Franchisor and without Buyer satisfactorily complying with all conditions imposed by the Franchisor to both issue such consent and to accept and approve Buyer as a Goin' Postal franchisee, Seller does not have any rights to transfer, and Buyer does not have any rights or entitlements to receive, use or operate any of the following: (i) to continue operating the Goin' Postal Store; (ii) to any of the rights and benefits under the Goin' Postal Franchise Agreement under which Seller is a party, or to be or become a Goin' Postal franchisee; (iii) to continue using the Goin' Postal name or any of the other trademarks, service marks, logos, slogans, color schemes or other property rights of the Franchisor and/or of Goin' Postal, Inc.; (iv) to any territorial rights Seller possesses under the Goin' Postal Franchise Agreement to which Seller is a party; (v) to continue using the proprietary copyrighted software of the Franchisor or any of the copyrighted manuals of Franchisor; (vi) to use any of the Goin' Postal advertising or promotional materials; and (vii) to implement, use or otherwise benefit from any of the other entitlements of a Goin' Postal franchisee.

2.  It is further recognized, agreed, acknowledged and understood by both Seller and Buyer that, in addition to those other requirements imposed upon Seller under the Goin' Postal Franchise Agreement to which Seller is a party, including payment of all transfer fees and other monetary obligations due thereunder, the following requirements and conditions must be met to the full satisfaction of Franchisor as a condition to any transfer of Seller's Goin' Postal franchise and to any acceptance and approval of Buyer as a Goin' Postal franchisee:

(a)  The Buyer and its owners and principals shall receive, duly receipt for, and return a fully initialed and executed current Goin' Postal Franchise Disclosure Document, in strict compliance with all requirements thereof;

Franchisee's Initials _EB_

(b)     The Buyer and its owners and principals shall demonstrate to Franchisor's satisfaction that the Buyer and its owners and principals meet Franchisor's educational, managerial, and business standards; possess a good moral character, business reputation, and credit rating; have the aptitude and ability to conduct the Goin' Postal franchise and the business conducted at the Goin' Postal Store (as may evidenced by prior related business experience or otherwise); have adequate financial resources and capital net worth to operate the Goin' Postal franchise and associated Goin' Postal Store business; and otherwise meet the Franchisor's then current criteria for new Goin' Postal franchisees;

(c)     The Buyer (and, if the Buyer is other than an individual, such principals and/or owners of a beneficial interest in the Buyer as Franchisor may request) shall execute, for a new fifteen (15) year term, the standard, current form of Franchise Agreement currently being offered to new Goin' Postal franchisees and all such other ancillary and associated documents and agreements as Franchisor may require, including, but not limited to, the current Non-Competition and Non-Solicitation Agreement and the current Continuing Personal Guaranty (as applicable), which agreements shall supersede Seller's Goin' Postal Franchise Agreement in all respects and may differ from the terms of Seller's Goin' Postal Franchise Agreement; nevertheless, Buyer will continue to be bound to the terms, and be bound by the other obligations of Seller, under Seller's Goin' Postal Franchise Agreement;

(d)     The Buyer, at Buyer's expense, shall perform any upgrades and renovations of and to the Goin' Postal Store to conform to the current standards and specifications of Franchisor for new Goin' Postal franchisees;

(e)     At the Buyer's expense, the Buyer, and, if applicable, the Buyer's principals, owners, managers and designated primary operator(s), must attend and satisfactorily complete all training programs currently in effect for Goin' Postal franchisees and upon such terms and conditions as Franchisor may reasonable require;

(f)     The Buyer shall agree to sublease or to an assignment and assumption of the Lease of Seller's Goin' Postal Store site and shall obtain the landlord's approval, if required, prior to any such transfer or sublease, if applicable, and shall continue to operate Seller's Goin' Postal Store at the business premises under said Lease and as reflected hereinabove; provided, however, both Buyer and Seller recognize and acknowledge that the Franchise Agreement to be signed by Buyer, if approved as a Goin' Postal franchisee, provides for the possibility of relocating a franchisee's Goin' Postal Store, and any relocation by Buyer of Seller's Goin' Postal Store, and any approval or assistance by Franchisor in connection with any relocation by Buyer of Seller's Goin' Postal Store, shall not result in any liability or culpability, of any nature whatsoever, on the part of Franchisor (either to Buyer or Seller) in connection with any such relocation (it being acknowledged by both Buyer and Seller that Franchisor's rights under the Franchise Agreement signed by Buyer are superior to and take precedence over any of the rights of Buyer and Seller under the particular contract/agreement between them providing for the sale of the Goin' Postal Store from Seller to Buyer);

(g)     Franchisor shall have received timely notice of the intended sale of the Goin' Postal franchise business and Franchisor shall have effectively waived its rights of first refusal to purchase Seller's Goin' Postal business;

(h)     The Seller shall have otherwise complied with all conditions precedent set forth in Seller's Goin' Postal Franchise Agreement for the consent and approval of Franchisor for the transfer of the Goin' Postal franchise; and

(i)     Buyer and Seller shall have each have completed, initialed (where applicable), signed and delivered to Franchisor, together with a signed copy of this Addendum, the Franchise Transfer Acknowledgment attached to this Addendum as **Exhibit "A"** and incorporated herein by this reference.

3.     This Addendum and the Franchise Agreement and other agreements signed by Buyer in order to become a Goin' Postal Franchisee, and all rights and entitlements thereunder, shall control and supersede any contrary or conflicting provisions within the particular contract/agreement between Seller and Buyer pertaining to

Seller's sale of the Goin' Postal Store and associated packaging and shipping business to Buyer to which this Addendum is made a part.

"Buyer"

Name: _All Health Complete Inc_
Title: _CEO_
Date: _11/1/09_

"Seller"

_F & P Seals LLC_
Name: _Patricia J Seals_
Title: _Manine, Member_
Date: _Mar. 9, 2009_

## EXHIBIT "A" TO ADDENDUM
Franchise Transfer Acknowledgment

This Acknowledgment is made between _J & P Seals LLC_ (hereinafter known as the "Seller") and _All Health Complete One,_ (hereinafter known as the "Buyer").

The Seller has agreed to sell, and the Buyer has agreed to purchase, the Goin' Postal Shipping Store Franchise located at _Bells Ferry Road_ (address), _Woodstock_ (city), _Ga_ (state), _30189_ (zip) (hereinafter known as the "Goin' Postal Store").

Buyer acknowledges that he, she or it must sign the currently effective Franchise Agreement and Non-Competition and Non-Solicitation Agreement applicable to all new Goin' Postal franchisees, but will nevertheless be bound by the terms and conditions set forth in the original Franchise Agreement executed by the Seller. The expiration date of the new Franchise Agreement shall be 15 years from the "Effective Date" of the new Franchise Agreement to be executed by the Buyer. _9/5_ [Buyer's Initials]

**Buyer** will pay a non-refundable transfer fee of US$3,000.00 (three thousand dollars) with the submission of this Acknowledgment and the Addendum to which it is attached to Goin' Postal Franchise Corporation (the "Franchisor"). This payment must be made either by check or credit card. _9/5_ [Buyer's Initials]

**Buyer** accepts sole responsibility for the continuing customer service at the Goin' Postal Store. Buyer understands that he, she or it must attend a one (1) week training class at the Franchisor's headquarters in Zephyrhills, Florida. While there is no charge for this training apart from the $3,000.00 transfer fee, the Buyer is solely responsible for all Buyer's personal travel and related expenses. _9/5_ [Buyer's Initials]

**Buyer** agrees to continue to pay on a monthly basis all royalties as specified in the new Franchise Agreement at the established monthly rate under Franchisor's currently effective Franchise Agreement actually executed by Buyer in connection with the transfer (commencing January 1, 2009, $315.00 per month, with an approximate 5% increase for each calendar year thereafter). Buyer acknowledges and understands that this monthly royalty obligation continues uninterrupted even during any transitional period occurring in connection with any approved relocation of the Goin' Postal Store. _9/5_ [Buyer's Initials]

Buyer understands the $3,000.00 transfer fee covers the costs for a Goin' Postal representative to visit the Goin' Postal Store for its initial week of operation after Buyer's initial training in Zephyrhills, Florida. This fee is all inclusive and includes the salary of the representative who visits the Goin' Postal Store plus such representative's travel and accommodation expenses. This transfer fee is non-refundable and must be paid to Franchisor by check or credit card contemporaneously with delivery of the "Addendum" (as defined below) and this Franchise Transfer Acknowledgment. _9/5_ [Buyer's Initials]

**Buyer** understands that he, she or it is not purchasing any rights to any Goin' Postal Marks, copyrights or proprietary materials, and that they are only licensed through and in accordance with the terms and limitations of the Franchise Agreement. _9/5_ [Buyer's Initials]

Buyer understands that he, she or it is not purchasing any rights to any existing territory which may have been assigned or allocated to the Goin' Postal Store under Seller's original Franchise Agreement, and that Franchisor will provide a newly assigned and allocated territory for the Goin' Postal Store upon Buyer's purchase of it, the size, dimensions and limits of which will be as prescribed in Franchisor's then current UFDD and the Franchise Agreement Buyer will be required to sign in order to become a Goin' Postal franchisee. _9/5_ [Buyer's Initials]

Buyer, if an entity, shall as a condition to any transfer to Buyer of the Goin' Postal Store, have each of its equity Owners sign the then current Continuing Personal Guaranty applicable to all new entity Goin' Postal franchisees. _9/5_ [Buyer's Initials]

**Buyer & Seller** both acknowledge and agree that this Franchise Transfer Acknowledgment, the Addendum to which this Franchise Transfer Acknowledgment was attached as **Exhibit "A"** (the "Addendum"), the Franchise Agreement and other agreements Buyer will sign upon becoming a Goin' Postal franchisee (such Franchise

Franchisee's Initials _9/5_

Agreement and other agreements being referred to as the "Franchise Documents"), and all of the rights, entitlements, benefits and protections of Franchisor under and/or protected by the foregoing, are superior to and take precedence over any rights, benefits, duties and obligations of Buyer and Seller under the particular contract/agreement between them which provided for the sale by Seller to Buyer of the Goin' Postal Sore and the shipping and packaging business conducted at such Store (such contact/agreement being referred to as the "Buyer/Seller Sale Agreements"). In enforcing, exercising or protecting any of its rights, entitlements, benefits, or protections under the Franchise Documents, Franchisor shall have no duty or responsibility to determine, ascertain, comply with or abide by, nor shall Franchisor be liable or accountable to either Buyer or Seller for any resulting interference with or resulting breach of, any of the specific terms, provisions, duties or prohibitions under the Buyer/Seller Sale Agreements. In particular, but without limitation of the foregoing, Franchisor shall have no liability or accountability to Buyer or Seller for any interference with, or resulting breach of, the Buyer/Seller Sale Agreements associated with any communications between Franchisor and Buyer concerning a relocation of the Goin' Postal Store, as is permitted by the Franchise Documents, or by virtue of any approval of or assistance with such a relocation by Franchisor.   ·_____[Buyer's Initials] _PC_[Seller's Initials]

**Seller** accepts and continues to be bound by the Non-Competition and Non-Solicitation Agreement signed by Seller in conjunction with the original Franchise Agreement. The time period stated in the Non-Competition and Non-Solicitation Agreement begins upon the date of Closing of the sale of the Goin' Postal Store to Buyer. _____
[Seller's Initials] _PC_

**Seller & Buyer** both release Goin' Postal Franchise Corporation and Goin' Postal, Inc., and their respective officers, directors, agents, representatives, owners and employees from any and all claims and liabilities that may have arisen during the Term of the Seller's original Franchise Agreement.
_PC_ [Seller's Initials]   _____ [Buyer's Initials]

**Buyer Personal Information**

```
Name: [if an entity,
provide        all
requested
information for the
entity and for all
owners, officers and   .
directors/
Managers
Home Address

City
State
Zip

Home Phone
Work Phone
Cell Phone

SSN
Date of Birth
```
**Execution**

We the undersigned agree to and accept to be bound by this Acknowledgment, the Addendum to which it is attached and the original Franchise Agreement and Non-Competition and Non-Solicitation Agreements. Buyer agrees in addition to be bound by the newly signed Franchise Agreement and Non-Competition and Non-Solicitation Agreement.

Buyer _P Seals LLC by_                    Date _11/1/2009_
Seller _Patricia J Seals_  127            Date
                                          Franchisee's Initials _CB_

Please send this Acknowledgment, the Addendum to which it is attached, transfer fee payment of $3,000.00, fully completed (including all initials and signatures) UFDD/Franchise Agreement/Non-Competition and Non-Solicitation Agreement/Continuing Personal Guaranty (as applicable), and a copy of the signed Buyer/Seller Sale Agreements to:

Attn: Transfers
Goin' Postal Franchise Corporation
4941 4th Street
Zephyrhills, FL 33542
(813) 782-1500

Received and accepted Date: __ 11  2  09

Officer for Goin' Postal Franchise Corporation

**EXHIBIT "C"**
**TO**
**GOIN' POSTAL FRANCHISE CORPORATION**
**FRANCHISE AGREEMENT**

**GOIN' POSTAL**
**FRANCHISEE DE-IDENTIFICATION CHECKLIST**

1.  Return all confidential manuals and materials, including Store Set-Up Manual and New Franchisee Primer and Operations Manual;

2.  Remove, replace, cover, or alter so as to delete GPFC's Marks, all items from your Store which bear GPFC's Marks and design logo and which are not required to be returned to GPFC, including signs, brochures, flip charts, business cards, name tags, stationery, invoices, and any other forms or documents, and cease using the Marks and design logo for any purpose;

3.  Cease using any of GPFC's computer software, including GPFC's GP Rate Pro Software, and return without making or retaining any copy all associated disks, CD's and manuals to GPFC;

4.  Take reasonable steps to inform all clients, customers, vendors and others with whom you do business that the Store is no longer affiliated with GPFC or GPFC's Goin' Postal Franchise Chain, and that you no longer offer any retail shipping or postal services at your Location, including:

    a.  change name of the Store and cease using the Goin' Postal name or any of GPFC's Marks;

    b.  distribute notices to the customers, vendors, etc., including those customers maintaining post office boxes, informing them that as of a certain date, the business will be operated independently from the Goin' Postal Franchise Chain and there will no longer be any affiliation with GPFC or GPFC's Goin' Postal Franchise Chain and the business will no longer offer retail shipping or postal services;

    c.  inform them that the new business will cancel all existing contracts and will provide refunds to those who are terminated (customers who rent post office boxes should be notified to pick up mail, close out the post office box and submit a change of address notice to the applicable local United States Post Office); and

    d.  post a conspicuous notice in the reception area which states that this in an independently operated business and not affiliated with GPFC or GPFC's Goin Postal Franchise Chain, and no longer offers retail shipping or postal services.

5.  Notify the local telephone company(ies) of the change in name of Franchisee's business operations, advise telephone company(ies) to change the directory assistance listing, cancel white and yellow page listings and advertisements and replace them with a listing under a new name if there is a permitted continuation of the business and inform the telephone company(ies) that future yellow page advertisements should no longer bear the name Goin' Postal or contain any other of GPFC's Marks. In addition to the above steps, take other steps imposed by GPFC to ensure that no "likelihood of confusion" exists;

6.  Since GPFC uses a particular set of colors which is unique to it, change the color scheme of the Store. Redecoration, at Franchisee's expense, may also be required;

129          Franchisee's Initials _EB_

7.   If GPFC does not assume the lease obligation of the Store, notify the landlord that the new business is no longer affiliated with GPFC or GPFC's Goin' Postal Franchise Chain. At GPFC's request, an amended lease must be executed which will remove the right to conduct a retail shipping and postal business at the leased premises;

8.   Cease, desist and refrain from using, and discontinue any further use of, any of GPFC's Marks, including the name Goin' Postal, the Goin' Postal trademarks, or any related, similar, comparable, or derivative name or mark and immediately proceed to change the business name of your Store by removing any and all signs, posters, displays, advertisements and every other form or manner of name reference or usage of any of GPFC's Marks, including the name Goin' Postal and the Goin' Postal trademark and registered logo "your friendly neighborhood shipping center", the slogan and tag line "Delivering the Best of America", and any and all related, similar, comparable or derivative names, logos, slogans, tag lines or marks, including the cartoon depiction of a Goin' Postal parcel carrier or any other aspect or reproduction of any of GPFC's Marks;

9.   Cease, desist and refrain from using, and discontinue any further use of, any and all materials bearing or containing any of the GPFC's Marks, as well as GPFC's Store Set-Up and Operations Manuals and Materials, including all webpage materials, e-mail addresses, fictitious name (i.e. d/b/a) registrations, stationery, business cards, checks and banking records, advertisements, computer data systems and electronic forms and any and all other similar or related items or materials which bear or contain any of GPFC's Marks or which are part of GPFC's Store Set-Up Manual, Operations Manuals, website materials (including those within the secure password protected Owners' Section) or Materials. All such proprietary items must be returned to GPFC within 15 days of the Termination;

10.  Return to GPFC within 15 days of the Termination all GPFC Store Set-Up Manuals, Operations Manuals and other Materials, including any computer programs, computer hardware and software, or computer disks developed by or belonging to GPFC, training materials, all materials pertaining to the establishment and set up of a Goin' Postal franchise and Store, and other of GPFC's Methods and Systems, and all other written materials, computer oriented materials and similar materials and documentation developed by or related to or otherwise pertaining to the Goin' Postal franchising system and Goin' Postal franchises, and immediately discontinue all further use thereof;

11.  The Franchisee must immediately cease, desist and refrain from holding itself out as a franchisee of GPFC or of the Goin' Postal Franchise Chain, cease using all advertising materials, displays, forms and other materials bearing the name Goin' Postal or any of the other GPFC's Marks, discontinue any and all indicia of any nature whatsoever of any association with GPFC or the operation of a Goin' Postal franchise, including changing the internal and external color schemes at the Store, and cease conducting any retail shipping and/or postal business at Franchisee's Store or at the Location;

12.  Notify all other vendors, suppliers, lenders, creditors, utility companies and other third parties with whom Franchisee does business of the name change of the business operation at the Store and that Franchisee is no longer part of the Goin' Postal Franchise Chain and no longer doing business under the Goin' Postal name or doing business as a retail shipping and postal business; and

13.  Strictly abide by and refrain from violating in any way all covenants and agreements contained within the Non-Competition and Non-Solicitation Agreement executed by Franchisee in conjunction with this Agreement.

Franchisee's Initials 

### EXHIBIT "B" TO UNIFORM FRANCHISE DISCLOSURE DOCUMENT

### NON-COMPETITION AND NON-SOLICITATION AGREEMENT

This Non-Competition and Non-Solicitation Agreement ("Agreement") is entered into by and between Goin' Postal Franchise Corporation ("GPFC") and _____ ("Covenantor"), and becomes effective on the Effective Date of the Franchise Agreement once counter-signed by GPFC. **THIS AGREEMENT IS MADE SUBJECT TO ANY PROVISIONS OF ANY EXHIBIT "H" ATTACHED TO THE DISCLOSURE DOCUMENT PURSUANT TO WHICH THIS NON-COMPETITION AND NON-SOLICITATION AGREEMENT WAS PRESENTED TO AND SIGNED BY COVENANTOR AND WHICH SPECIFICALLY AND EXPRESSLY RELATE TO THE STATE OF FRANCHISEE'S RESIDENCY.**

### RECITALS

**WHEREAS,** Covenantor is either (1) the "Franchisee" named in the Franchise Agreement ("Franchise Agreement") that is being executed in conjunction with this Agreement and from and as a result of which this Agreement is being signed, and/or (2) an equity owner of the legal entity that is named as the Franchisee in the Franchise Agreement ("Covenantor" shall for all purposes under this Agreement mean and refer to the entity (if Franchisee is an entity), all equity owners of such entity, and all managers and/or primary operators of Franchisee's "Store");

**WHEREAS,** Covenantor acknowledges that GPFC has a legitimate business interest in protecting its franchise and franchisees from unfair competition by an existing or former franchisee that has had special, intimate knowledge of GPFC's methods and trade secrets and confidential information for the operation of a Goin' Postal shipping store;

**WHEREAS,** Covenantor acknowledges that GPFC has a legitimate business interest in protecting its franchises and franchisees from unfair competition by an existing or former franchisee that transfers (without GPFC's permission) the goodwill associated with GPFC's proprietary and protected marks and business practices to a business that competes with GPFC's franchisees;

**WHEREAS,** Covenantor acknowledges that GPFC has a legitimate business interest in protecting its franchises and franchisees from unfair competition by an existing or former franchisee that is able to take advantage of the knowledge and experience gained in running a Goin' Postal shipping store, and use such knowledge and experience in operating a new competing business without having to continue to pay royalties and other fees for such information, thereby placing other franchisees at a competitive disadvantage;

**WHEREAS,** Covenantor acknowledges that GPFC has a legitimate business interest in re-franchising the  formerly protected territory of a former franchisee, and GPFC would suffer irreparable damage absent this Agreement because it would be unable to attract new franchisees to the area served by its former franchisee;

**WHEREAS,** Covenantor acknowledges that GPFC has a legitimate business interest in protecting its franchises and franchisees from unfair competition by an existing or former franchisee who (1) diverts business and customers from a current or former Goin' Postal store to a competitor of GPFC, or (2) induces or attempts to induce an employee of any Goin' Postal store to discontinue their employment with the store;

**WHEREAS,** Covenantor acknowledges that GPFC requires the execution of this Agreement as an ancillary requirement to GPFC's simultaneous grant of a franchise to Covenantor or a legal entity of which Covenantor is an equity owner.

**NOW, THEREFORE,** in express acknowledgement and recognition of the importance of the foregoing recitals, the parties agrees as follows:

Franchisee's Initials _____ *EB* _____

## 1. Consideration In Exchange for Covenantor's Covenants in This Agreement

Covenantor hereby expressly acknowledges and confirms that all of the valuable benefits, advantages and opportunities enjoyed by Covenantor immediately upon (and solely as a result of) Covenantor's (or as applicable, Covenantor's legal entity) becoming a franchisee under the Franchise Agreement (which occurs simultaneously and corresponding with, the execution of this ancillary Agreement), and the additional protection provided by this Agreement being signed by all other new franchisees, serve as valuable and adequate consideration received in simultaneous exchange for all of Covenantor's promises and covenants made in this Agreement below.

## 2. Covenantor's In-Term Non-Competition and Non-Solicitation Covenants

During the term of the Franchise Agreement corresponding to this Agreement, and without geographic limits, Covenantor shall not, directly or indirectly (such as through corporations or other entities controlled by the Covenantor or by or through or in conjunction with any other individual person or persons including, but not limited to, Covenantor's spouse (if any) and employees):

a.    divert or attempt to divert any business or customer of any Store to any competitor or do anything injurious or prejudicial to the goodwill associated with GPFC's Marks, Method, GPFC's Goin' Postal Franchise Chain, or GPFC's business practices; and

b.    persuade, entice, or attempt to persuade or entice, any employee of any Goin' Postal Store to discontinue their employment with such Store; and

c.    own, maintain, engage in, be associated with, be employed by, advise, assist, invest in, be landlord to, franchise, or have any interest in any business which is the same or substantially similar to or competitive with any Goin' Postal shipping Store; and

d.    use, communicate, disseminate, provide access, or divulge to anyone at any time any confidential information or trade secrets of GPFC, or at any time copy, duplicate, record or otherwise reproduce any confidential information or trade secrets of GPFC, including without limitation those materials contained within the secure password protected Owners' Section of GPFC's website, except as expressly permitted in the Franchise Agreement.

## 3. Covenantor's Post-Term Non-Competition and Non-Solicitation Covenants

a.    For purposes of this Section 3, the word "Conclusion" means the termination/expiration of the Franchise Agreement corresponding to this Agreement, regardless of whether such termination/expiration occurs prior to, or at the end of, such Franchise Agreement's 15 year term.

b.    Upon the Conclusion of the Franchise Agreement corresponding to this Agreement, and for the stated time period thereafter and geographic restriction    set forth below, Covenantor shall not, directly or indirectly (i.e. see explanation of indirectly in Section 2 above):

(i)    for a two (2) year period following the Conclusion of the Franchise Agreement corresponding to this Agreement and without geographic limitation, divert or attempt to divert any business or customer of any Store to any competitor, or do anything injurious or prejudicial to the goodwill associated with GPFC's Marks, Method or GPFC's Goin' Postal Franchise Chain; and

(ii)    for a two (2) year period following the Conclusion of the Franchise Agreement corresponding to this Agreement and without geographic limitation, own, maintain, engage in, be associated with, be employed by , advise, assist, invest in or have

        any interest in any business which is the same as, or substantially similar to or competitive with any Goin' Postal shipping Store; and

    (iii)    for a two (2) year period following the Conclusion of the Franchise Agreement corresponding to this Agreement and without geographic limitation, persuade, entice or attempt to persuade or entice any employee of any Goin' Postal Store to discontinue their employment with such Store.

c.    Upon the Conclusion of the Franchise Agreement corresponding to this Agreement, Covenantor shall not, at any time, directly or indirectly (see Section 2 above for explanation of indirectly):

    (i)    communicate, disseminate, provide access, reveal or divulge to anyone, in whole or in part, any of the confidential information or trade secrets of GPFC; and

    (ii)    use, copy, duplicate, record or otherwise reproduce at any time any of the confidential information or trade secrets of GPFC; and

    (iii)    use in any manner whatsoever any of the Marks, the Method, GPFC's Operations Manuals, GPFC's Store Set-Up Manuals, GPFC's GP Rate Pro Software, any of the materials contained within the secure password protected Owners' Section of GPFC's website, or any other proprietary or intellectual property rights of GPFC and GPFC's Goin' Postal Franchise Chain.

d.    Upon the Conclusion of the Franchise Agreement corresponding to this Agreement, Covenantor shall immediately return to GPFC all Operations Manuals, all Store Set-Up Manuals, all training materials, all GPFC proprietary software (including GP Rate Pro software) and printed matters, all website materials, all other confidential information and trade secrets, and all of GPFC's advertising and promotional signs and similar items.

## 4. Definitions

The following terms (and any other capitalized terms herein which are not defined by this Agreement) shall have the meanings and definitions assigned to them in the Franchise Agreement unless otherwise expressly provided herein: "Store", "Marks", "Method", "GPFC's Goin' Postal Franchise Chain", "GPFC's Operations Manual", "GPFC's Store Set-Up Manual", "GPFC's GP Rate Pro Software", "Owners' Section of GPFC's website", "confidential information" and "trade secrets".

## 5. Severability

It is the parties desire and intention that the covenants contained in this Agreement shall be construed as agreements severable and independent from each other, except that any violation of Section 2 of this Agreement shall constitute a material breach and default of the Franchise Agreement associated with this Agreement and "cause" for immediate termination of the Franchise Agreement without opportunity to cure. It is also the intention of the parties that if any Section of this Agreement is deemed by a court of competent jurisdiction to be invalid or unenforceable, then the maximum legally allowable restriction permitted by applicable law shall control and bind Covenantor.

## 6. Enforcement Costs

Covenantor agrees to pay to GPFC all of the costs and expenses (including reasonable attorneys' fees) incurred by GPFC in connection with its enforcement of this Agreement.

## 7. Counter-Parts, Entire Agreement, Amendments

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together shall be one and the same instrument. The parties may execute such counterparts via fax. This Agreement, together with the Franchise Agreement associated with this Agreement, contains the entire agreement of the parties pertaining to the subject matter hereof and no prior or contemporaneous representations, inducements, promises, or agreements, oral or otherwise, between the parties not set forth herein shall be of any force and effect. Any modifications to this Agreement must be accomplished by a written agreement signed by both parties.

## 8. Suspension of Non-Compete Time Periods During Dispute Resolution Proceedings.

In the event that this Agreement or this Agreement's corresponding Franchise Agreement become the subject of any mediation, arbitration or litigation, then the applicable post-term time periods referenced above in Section 3 (or as may be determined by any mediator, arbitrator or judge) shall (a) be suspended during the entirety of any such dispute resolution proceedings; and to the maximum extent found enforceable in such proceedings, (b) begin to run from the date following such proceedings upon which Covenantor first complies with this Agreement.

## 9. Injunction.

Covenantor recognizes and agrees that the injury that GPFC and certain of its franchisees will suffer in the event of Covenantor's breach of any covenant contained in this Agreement cannot be compensated by monetary damages alone, and Covenantor therefore agrees that in the event of a breach or threatened breach by Covenantor of this Agreement, GPFC (and its affiliates, successors and assigns), in addition to and not in limitation of, any other rights, remedies, or damages available to GPFC (and/or its affiliates, successors, and assigns) at law, in equity, under this Agreement or otherwise, shall be entitled to seek an injunction from any court of competent jurisdiction in order to prevent or restrain any such breach by Covenantor or by Covenantor's agents, representatives, employees, partners, co-owners, or any and all other persons directly or indirectly acting for or with him/her/it.

## 10. Choice of Law, Venue and Jurisdiction.

This Agreement shall be (a) deemed made and entered into, and (b) construed and governed under and in accordance with the laws of the State of Florida, except to the extent that the laws of the State where the Store associated with the Franchise Agreement (that is owned and operated by Covenantor or, as applicable, Covenantor's legal entity) is located requires in order for the Franchise Agreement and this Agreement to be enforceable against the Covenantor or Covenantor's legal entity that such State's laws apply. Exclusive venue and jurisdiction of any suit arising under this Agreement shall lie within the federal or state courts within the State of Florida, except to the extent that the laws of the State where the Store (as previously described) is located requires in order for the Franchise Agreement and this Agreement to be enforceable against the Covenantor or Covenantor's legal entity that venue and jurisdiction lie in such State.

**AGREED TO AND ACCEPTED BY
COVENANTOR:**

Print your name: _____ENIC BROWNE_____

Signature: _____Eri Brown_____

Print Title (if applicable): _____

Date of Signature: _____11\11\09_____

*If the "Franchisee" named in the Franchise Agreement is an entity, or if there is more than one equity owner of "Franchisee", or if "Franchisee" consists of more than one person, or if

134                    Franchisee's Initials _____

someone other than "Franchisee" or an equity owner of an entity "Franchisee" will serve said "Franchisee" as a manager or primary operator, complete and sign the additional COVENANTOR SIGNATURES below for the entity, for each equity owner of the entity, for each person included as part of "Franchisee", or for each manager or primary operator, or alternatively submit separate signed originals of this Agreement for the entity and for each of said persons.

ADDITIONAL COVENANTOR SIGNATURES:

Print Name of Entity of Franchisee (if applicable): _____ N/A

Signature: _____

Print Name: _____
Print Title: _____
Date of Signature: _____

Print your name: _____

Signature: _____

Print Title (if applicable): _____
Date of Signature: _____

Print your name: _____

Signature: _____

Print Title (if applicable): _____
Date of Signature: _____

GOIN' POSTAL FRANCHISE CORPORATION:

Signature of Signing Officer: _____

Printed Name of Signing Officer: MARCUS PRICE

*Date of Counter Signature: 11 2 09
(*Effective Date of Agreement)



## EXHIBIT "C" TO UNIFORM FRANCHISE DISCLOSURE DOCUMENT
### I. PERSONAL DATA DISCLOSURE

This information will be kept strictly confidential and will only be used for setting up accounts for your new business, including but not limited to, UPS, FedEx, USPS, DHL and Pitney Bowes. These accounts must be activated prior to the scheduled time of our arrival at your Location due to limited time available to train you and your staff in the use of these services. Certain information may be updated by you once your Store is operational. You will be given all account names and passwords necessary and as part of your training, and you will be shown how to accomplish each task. Please provide all available information. Should certain information not be available at this time such as your new Store telephone number, please provide it immediately upon its availability, but no later than your scheduled Store opening date.

Your Name — ERIC BROWNE

Home Address — 535 ST JAMES Court

City/State/Zip Code — Lawrenceville GA 30044

SSN — 627 24 0098

Phone — 770 827 7582

Home

Work — 770 685 1630

Cell

E-mail Address — ESBROWNE @ MSN.COM

Goin' Postal Store Phone

Goin' Postal Store Fax

Tax ID Number — 27-0473324

Store Address — 3870 Lawrenceville HWY Suite 124 C Lawrenceville Ga 30044

City/State/Zip Code

Credit Card Info

Number — Visa/MC: X   Discover:   AmEx:   4816 3671 5317 6901

Ex Date — 01/11

CCV Number — 386 (This is the number on the back of your card (or front for Amex)

Billing Address — 535 St JAMES Court

City — Lawrenceville 000 Ga 30044

Billing Zip — 30044

Designated Bank Account
for ETF arrangements

Bank Name

Bank Address

Check Routing Number

Desired Account Password — MENTEE7D Please make password eight characters including at least 1 number.

I authorize my Goin' Postal Franchise Corporation representative to set up necessary accounts for my Goin' Postal Store using the above information, including setting up an electronic funds transfer ("ETF") arrangement through my designated account. I also authorize GPFC to investigate and verify any of the above information and to perform a credit check (you may wish to provide GPFC with a printout of your current credit report [within the last 60 days] from Equifax.com).

Signed: Eric Browne          Date: 10-18-09

Print Name: ERIC BROWNE

136          Franchisee's Initials EB

## II. FRANCHISEE OWNERSHIP INFORMATION FORM

1.  FULL NAME(S) OF FRANCHISEE [If this franchise is owned by a legal entity, <u>only</u> insert the name of the legal entity; if this franchise is owned by one or more individuals, <u>only</u> insert the name(s) of such individual(s):

    Entity Name: _AllHealth Complete Care Inc_

    Individual Owner(s):_____

    _____

    _____

2.  THE FRANCHISE WILL BE OWNED BY (Check which one applies):

    | | | |
    |---|---|---|
    | SOLE PROPRIETOR | _____ | Fed. Tax I.D. #_____ |
    | PARTNERSHIP | _____ | Fed. Tax I.D. #_____ |
    | CORPORATION | ___✓___ | Fed. Tax I.D. # 27-0473324 |
    | LIMITED LIABILITY COMPANY | _____ | Fed. Tax I.D. #_____ |
    | OTHER BUSINESS ENTITY | _____ | Fed. Tax I.D. #_____ |
    | (Please explain on a separate piece of paper) | | |

3.  FULL NAMES OF ALL OWNERS, PARTNERS, SHAREHOLDERS OR MEMBERS AND PERCENTAGE OF OWNERSHIP INTEREST: (Please print names, use separate sheet if necessary)

    | NAME | % OF OWNERSHIP (*) | SOCIAL SECURITY NUMBER |
    |---|---|---|
    | ERIC BROWNE | % 100 | 627·24·0078 |
    | | | |

*All Partners, Shareholders, Members or other Equity Owners of an Entity Franchisee must also sign a Continuing Personal Guaranty (see **Exhibit "K"** to the Franchise Disclosure Document to which this particular **Exhibit "C"** is attached).

Franchisee's Initials ___EB___

4.  LIST OF DIRECTORS, MANAGERS OR GENERAL PARTNERS

(Please print names, use separate sheet if necessary)

SOCIAL SECURITY
NUMBER

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

5.  LIST OF OFFICERS (Please print names, use separate sheet if necessary)

ERIC  BROWNE          CEO             62724058
(Name)              (Title)          (S.S.#)

Veronica  Browne    Treasurer        NON
(Name)              (Title)          (S.S.#)

Derek  Browne       Secretary
(Name)              (Title)          (S.S.#)

Johnnetle Browne   Counsel
(Name)              (Title)          (S.S.#)

6.  DESIGNATED CONTACT PERSON (Please print name)

Eric  Browne
(Name)

CEO / President
(Title)

535 ST. JAMES Court
Lawrenceville  Ga  30044
(Address)

770827 7582
(Telephone Number)

138          Franchisee's Initials _____ EB

4.     LIST OF DIRECTORS, MANAGERS OR GENERAL PARTNERS           SOCIAL SECURITY
                                                                 NUMBER

       (Please print names, use separate sheet if necessary)

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

5.     LIST OF OFFICERS (Please print names, use separate sheet if necessary)

_____     _____     _____
(Name)                              (Title)                (S.S.#)

_____     _____     _____
(Name)                              (Title)                (S.S.#)

_____     _____     _____
(Name)                              (Title)                (S.S.#)

_____     _____     _____
(Name)                              (Title)                (S.S.#)

6.     DESIGNATED CONTACT PERSON (Please print name)

_____
(Name)

_____
(Title)

_____
(Address)

_____
(Telephone Number)

138          Franchisee's Initials  _E B_____

## EXHIBIT "D" TO UNIFORM FRANCHISE DISCLOSURE DOCUMENT
### Credit Card and Designated Account Authorization Form
**Credit Card Information:**

Card Type (check one): Amex:_____ Discover:_____ Visa:_____ MasterCard:_____
Card Number:_____ _____ _____ Exp Date:_____/_____
CCV Number (on back of card or front if Amex):_____

Name on card:_____ _____
             (Must be exactly as Name appears on Card)
Billing Address:_____
Billing City and State:_____ Billing Zip:_____

## ETF Designated Account Information

Bank Name: _____
Bank Address:_____
Bank Telephone:_____
Bank Account No.:_____
Account/Check Routing No.:_____

You are hereby authorized to bill these charges (I understand only those charges applicable to the particular Franchise Package I choose to purchase will in fact be charged or withdrawn) either to my credit card or through an electronic fund transfer arrangement using any designated account, at your discretion with prior notification of which payment method you impose:

1.     Initial Franchise Fee                   $15,000.00

2.     Minimum Required Purchases       $9,284.00
       (together with applicable shipping expenses and any applicable sales taxes)

3.     Future Royalties currently in the amount of $315.00 per month, together with all increases in those monthly Royalties as prescribed by the Franchise Agreement. Your monthly Royalty obligations will either be billed to this credit card or withdrawn from your designated account, at our election, per the Franchise Agreement, provided should you request and we agree to a payment of monthly Royalties by means of your credit card, you authorize us to make an additional monthly charge in the amount of 10% of the applicable monthly Royalty amount as a processing fee. You may only change this credit card or your designated account by entering replacement credit card and/or bank account information on the Owners' Section of the GPFC website no later than 20 days prior to the next required monthly payment.

I further authorize Goin' Postal Franchise Corporation to charge my credit card or designated account, at its election, designated above for the above charges and for all additional equipment and services necessary to facilitate my Store set up, including charges due to Goin' Postal Franchise Corporation for training, for all Point of Sale Systems ordered by me, and for all other amounts which become due to Goin' Postal Franchise Corporation under the Franchise Agreement. If I purchased a Turn-Key Franchise Package, I also authorize GPFC to charge my credit card or withdraw from my designated account, at its election, the additional costs due for any overages GPFC incurs due to my particular specifications or circumstances per the terms of the Turn-Key Store Agreement.

Signed (Cardholder and Account Owner): _Eric Brown_ Date: _10/18/09_

Print Name: _ERIC BROWN_ Print Title (if any): _CEO/President_

Franchisee's Initials _EB_

**EXHIBIT "D" TO UNIFORM FRANCHISE DISCLOSURE DOCUMENT**
**Credit Card and Designated Account Authorization Form**

**Credit Card Information:**

Card Type (check one): Amex:____ Discover:____ Visa:____ MasterCard:____
Card Number:_____ Exp Date:____/____
CCV Number (on back of card or front if Amex):_____

Name on card:_____
(Must be exactly as Name appears on Card)
Billing Address:_____
Billing City and State:_____ Billing Zip:_____

**ETF Designated Account Information**

Bank Name: _____
Bank Address:_____
Bank Telephone:_____
Bank Account No.:_____
Account/Check Routing No.:_____

You are hereby authorized to bill these charges (I understand only those charges applicable to the particular Franchise Package I choose to purchase will in fact be charged or withdrawn) either to my credit card or through an electronic fund transfer arrangement using any designated account, at your discretion with prior notification of which payment method you impose:

1.   Initial Franchise Fee                          $15,000.00

2.   Minimum Required Purchases            $9,284.00
     (together with applicable shipping expenses and any applicable sales taxes)

3.   Future Royalties currently in the amount of $315.00 per month, together with all increases in those monthly Royalties as prescribed by the Franchise Agreement. Your monthly Royalty obligations will either be billed to this credit card or withdrawn from your designated account, at our election, per the Franchise Agreement, provided should you request and we agree to a payment of monthly Royalties by means of your credit card, you authorize us to make an additional monthly charge in the amount of 10% of the applicable monthly Royalty amount as a processing fee. You may only change this credit card or your designated account by entering replacement credit card and/or bank account information on the Owners' Section of the GPFC website no later than 20 days prior to the next required monthly payment.

I further authorize Goin' Postal Franchise Corporation to charge my credit card or designated account, at its election, designated above for the above charges and for all additional equipment and services necessary to facilitate my Store set up, including charges due to Goin' Postal Franchise Corporation for training, for all Point of Sale Systems ordered by me, and for all other amounts which become due to Goin' Postal Franchise Corporation under the Franchise Agreement. If I purchased a Turn-Key Franchise Package, I also authorize GPFC to charge my credit card or withdraw from my designated account, at its election, the additional costs due for any overages GPFC incurs due to my particular specifications or circumstances per the terms of the Turn-Key Store Agreement.

Signed (Cardholder and Account Owner):_____ Date:_____

Print Name: _____Print Title (if any): _____

139                     Franchisee's Initials ____

EXHIBIT "E" TO UNIFORM FRANCHISE DISCLOSURE DOCUMENT
LISTING OF STATE ADMINISTRATORS
AND
AGENTS FOR SERVICE OF PROCESS

STATE ADMINISTRATORS AND AGENTS FOR SERVICE OF PROCESS:

**CALIFORNIA**

Administrator:

Commissioner of Corporations
Department of Corporations
1515 K Street
Sacramento, CA 95814
1-866-ASK-CORP
(1-866-275-2677)

Agent for Service of Process:

Commissioner of Corporations
1515 K Street
Suite 200
Sacramento, CA 95814-4052
Copy to:
Robert W. Bible, Jr., Esq.
Lopez, Kelly & Bible, P.A.
4100 W. Kennedy Blvd., Suite 114
Tampa, FL 33609

**FLORIDA**

Administrator:

Florida Department of Agriculture &
Consumer Services
Room 110 – Mayo Building
Tallahassee, FL 32301
(850) 488-2221

Agent for Service of Process:

Robert W. Bible, Jr., Esq.
Lopez, Kelly & Bible, P.A.
4100 W. Kennedy Blvd., Suite 114
Tampa, Florida 33609

**HAWAII**

Administrator:

Commissioner of Securities
Department of Commerce and
  Consumer Affairs
Business Registration Division
335 Merchant Street, Room 203
Honolulu, Hawaii 96813
(808) 586-2722

Agent for Service of Process:

Commissioner of Securities
Department of Commerce and
  Consumer Affairs
Business Registration Division
335 Merchant Street, Room 203
Honolulu, Hawaii 96813
Copy to:
Robert W. Bible, Jr., Esq.
Lopez, Kelly & Bible, P.A.
4100 W. Kennedy Blvd., Suite 114
Tampa, FL 33609

**ILLINOIS**

Administrator:

Franchise Division
Office of Attorney General
500 South Second Street
Springfield, IL 62706
(217) 782-4465

Agent for Service of Process:

Illinois Attorney General
500 South Second Street
Springfield, Illinois 62706
Copy to:
Robert W. Bible, Jr., Esq.
Lopez, Kelly & Bible, P.A.
4100 W. Kennedy Blvd., Suite 114
Tampa, FL 33609

140                 Franchisee's Initials _____

## INDIANA

Administrator:

Franchise Division
Office of Secretary of State
302 W. Washington St., Rm E111
Indianapolis, IN  46204
(317) 232-6681

Agent for Service of Process:

Indiana Secretary of State
201 State House
Indianapolis, Indiana 46204
Copy to:
Robert W. Bible, Jr., Esq.
Lopez, Kelly & Bible, P.A.
4100 W. Kennedy Blvd., Suite 114
Tampa, FL  33609

## MARYLAND

Administrator:

Office of the Attorney General
Division of Securities
200 St. Paul Place
Baltimore, MD 21202-2020
(410) 576-6360

Agent for Service of Process:

Maryland Securities Commissioner
200 St. Paul Place
Baltimore, Maryland 21202-2020
Copy to:
Robert W. Bible, Jr., Esq.
Lopez, Kelly & Bible, P.A.
4100 W. Kennedy Blvd., Suite 114
Tampa, FL  33609

## MICHIGAN

Administrator:

Consumer Protection Division
Franchise Section
P.O. Box 30213
Lansing, MI 48909
(517)373-7117

Agent for Service of Process:

Department of Labor & Economic Growth
Bureau of Commercial Service
Corporate Division
P.O. Box 30054
Lansing, MI  48909
Copy to:
Robert W. Bible, Jr., Esq.
Lopez, Kelly & Bible, P.A.
4100 W. Kennedy Blvd., Suite 114
Tampa, FL  33609

## MINNESOTA

Administrator:

Franchise Division
Department of Commerce
133 East Seventh Street
St Paul, MN 55101
(651) 296-6328

Agent for Service of Process:

Commissioner of Commerce
Department of Commerce
85 7th Place East
Suite 500
St. Paul, Minnesota 55101-2198
Copy to:
Robert W. Bible, Jr., Esq.
Lopez, Kelly & Bible, P.A.
4100 W. Kennedy Blvd., Suite 114
Tampa, FL  33609

Franchisee's Initials _6 B_

## NEBRASKA

### Administrator:

Dept. of Banking and Finance
P.O. Box 95006
Lincoln, NE 68509
(402) 471-2171

### Agent for Service of Process:

Nebraska Dept. of Banking & Finance
Commerce Court
1230 "O" Street, Suite 400
P.O. Box 95006
Lincoln, Nebraska 68509-5006
Copy to:
Robert W. Bible, Jr., Esq.
Lopez, Kelly & Bible, P.A.
4100 W. Kennedy Blvd., Suite 114
Tampa, FL 33609

## NEW YORK

### Administrator:

Franchise & Securities Division
State Department of Law
120 Broadway – 23rd Floor
New York, NY 10271
(212) 416-8211

### Agent for Service of Process:

Secretary of State
41 State Street
Albany, New York 12231
Copy to:
Robert W. Bible, Jr., Esq.
Lopez, Kelly & Bible, P.A.
4100 W. Kennedy Blvd., Suite 114
Tampa, FL 33609

## NORTH DAKOTA

### Administrator:

North Dakota Securities Department
600 East Boulevard Avenue, 5th Floor
Bismarck, ND 58505-0510
(701) 328-2910

### Agent for Service of Process:

Securities Commissioner
North Dakota Securities Department
600 East Boulevard Avenue, 5th Floor
Bismarck, ND 58505-0510
Copy to:
Robert W. Bible, Jr., Esq.
Lopez, Kelly & Bible, P.A.
4100 W. Kennedy Blvd., Suite 114
Tampa, Florida 33609

## OREGON

### Administrator:

Corporate Securities Section
Department of Insurance & Finance
Labor & Industries Building
Salem, OR 97310
(503) 378-4387

### Agent for Service of Process:

Director of Department of Consumer and
Business Services
350 Winter Street NE
P.O. Box 14480
Salem, OR 07309-0405
Copy to:
Robert W. Bible, Jr., Esq.
Lopez, Kelly & Bible, P.A.
4100 W. Kennedy Blvd., Suite 114
Tampa, FL 33609

Franchisee's Initials  $\mathcal{EB}$

## RHODE ISLAND

Administrator:

Franchise Office
Division of Securities
233 Richmond St. – Suite 232
Providence, RI 02903
(401) 222-3048

Agent for Service of Process:

Director of Rhode Island
Department of Business Regulation
233 Richmond St., Suite 237
Providence, RI 02903
Copy to:
Robert W. Bible, Jr., Esq.
Lopez, Kelly & Bible, P.A.
4100 W. Kennedy Blvd., Suite 114
Tampa, FL 33609

## SOUTH DAKOTA

Administrator:

Division of Securities
Department of Revenue and Regulation
445 East Capitol Avenue
Pierre, SD 57501-3185
(605) 773-4823

Agent for Service of Process:

Director of Division of Securities
Department of Revenue and Regulation
445 East Capitol Avenue
Pierre, SD 57501-3185
Copy to:
Robert W. Bible, Jr., Esq.
Lopez, Kelly & Bible, P.A.
4100 W. Kennedy Blvd., Suite 114
Tampa, Florida 33609

## TEXAS

Administrator:

Secretary of State's Office
Statutory Documents Section
P.O. Box 13563
Austin, TX 78711
(512) 475-1769

Agent for Service of Process:

Secretary of State
P.O. Box 12887
Austin, Texas 78711-2887
Copy to:
Robert W. Bible, Jr., Esq.
Lopez, Kelly & Bible, P.A.
4100 W. Kennedy Blvd., Suite 114
Tampa, FL 33609

## UTAH

Administrator:

Department of Commerce
Division of Consumer Protection
160 East 300 South
SM Box 146704
Salt Lake City, Utah 84114-6704

Agent for Service of Process:

Department of Commerce
Division of Consumer Protection
160 East 300 South
SM Box 146704
Salt Lake City, Utah 84114-6704
Copy to:
Robert W. Bible, Jr., Esq.
Lopez, Kelly & Bible, P.A.
4100 W. Kennedy Blvd., Suite 114
Tampa, FL 33609

143          Franchisee's Initials _____

## VIRGINIA

### Administrator:

State Corporation Commission
Division of Securities and Retail Franchising
1300 East Main Street/9th Floor
Richmond, Virginia 23219
(804) 371-9051

### Agent for Service of Process:

Clerk of the State Corporation Commission
1300 East Main Street
Richmond, Virginia 23219
Copy to:
Robert W. Bible, Jr., Esq.
Lopez, Kelly & Bible, P.A.
4100 W. Kennedy Blvd., Suite 114
Tampa, FL  33609


## WASHINGTON

### Administrator:

The Department of Financial Institutions
Securities Division
P. O. Box 9033
Olympia, WA 98507-9033
Voice: (360) 902-8760
Fax:   (360) 586-5068

### Agent for Service of Process:

Administrator of Securities
P.O. Box 9033
Olympia, Washington 98507-9033
Copy to:
Robert W. Bible, Jr., Esq.
Lopez, Kelly & Bible, P.A.
4100 W. Kennedy Blvd., Suite 114
Tampa, FL  33609


## WISCONSIN

### Administrator:

Franchise Office
Wisconsin Securities Commission
P. O. Box 1768
Madison, WI 53701
(608) 266-3364

### Agent for Service of Process:

Administrator
Wisconsin Division of Securities
345 W. Washington Avenue
4th Floor
Madison, Wisconsin 53703
Copy to:
Robert W. Bible, Jr., Esq.
Lopez, Kelly & Bible, P.A.
4100 W. Kennedy Blvd., Suite 114
Tampa, FL  33609


A copy of any service of process served on any of the above-referenced Agents for Service of Process should also be served with our attorney, Robert W. Bible, Jr., Esquire, Lopez, Kelly & Bible, P.A., 4100 W. Kennedy Blvd., Suite 114, Tampa, Florida  33609.  Our Agent for Service of Process in all States other than those listed above is our attorney, Robert W. Bible, Jr., Esq., Lopez, Kelly & Bible, P.A., 4100 W. Kennedy Blvd., Suite 114, Tampa, Florida 33609.

Franchisee's Initials _____

## EXHIBIT "F" TO UNIFORM FRANCHISE OFFERING
## PRE-APPROVED SERVICES AND PRODUCTS

This a list of pre-approved services and products. Other products may be added to your line up with pre-approval by GPFC. Once a new product or service is pre-approved for a Franchisee it will be added to this list of pre-approved products and services.

### Shipping and Mailing Services

- UPS (United Parcel Service)
- FedEx (Federal Express)
- Airborne
- DHL
- USPS (United States Postal Service)
- Forex Cargo (shipping company; not currency exchange)
- California Overnight
- Lone Star Overnight
- Freight Shipping

### Services

- Web Design
- Web Hosting
- Internet Access
- Fax
- Document Services (including copy)
- Lamination
- Western Union
- Money Gram
- Business Cards
- Flyers
- Brochures
- Stationery

- Satellite TV
- Cell Phone Service
- Phone Cards
- Internet Access
- Online Auction (eBay)
- Tax Preparation Services (only with our prior approval)

### Products

- Shipping Supplies (Boxes, Tape, Knives, Paper, Bubble Wrap)
- Office Supplies (Pens, Paper, Staplers, Scissors, etc.)
- Ink & Toner (see conditions and limitations – Item 8)
- Goin' Postal Merchandise
- Local Seasonal Gift Items
- Gift Cards

Franchisee's Initials _EB_

**EXHIBIT "G" TO UNIFORM FRANCHISE DISCLOSURE DOCUMENT**
**INSTRUCTIONS**

If you are interested in opening a Goin' Postal shipping Store and becoming a Goin' Postal Franchisee, you must follow each of these steps exactly:

1.  Read the Information Packet on the Goin' Postal website at www.goinpostal.com.

2.  Download and print (if you requested that disclosure documents be provided to you electronically), and Read the Uniform Franchise Disclosure Document and all Exhibits.

3.  Read The Franchise Agreement and all Exhibits. IF you are purchasing a Turn-Key Franchise Package, you also need to give additional attention to reading the Turn-Key Store Agreement. If the Franchisee is an entity (for example, a corporation or a partnership) you also need to give additional attention to reading the Continuing Personal Guaranty (**Exhibit "K"** to the UFDD).

4.  Consult an attorney with any legal issues or questions you may have. Consult an accountant or other financial advisor with any financial issues or questions you may have.

5.  Call us with any specific questions you may have. We'll be happy to answer them on the phone.

6.  Print two copies of the UFDD and all Exhibits.

7.  Complete all blank information on, and then sign and date <u>both</u> copies of the "Receipt" attached at the very end of this Disclosure Document (identical to the Receipt appearing in sequential order which is under Item 23 in the Uniform Franchise Disclosure Document) and then mail 1 original signed and dated "Receipt" to Goin' Postal Franchise Corporation at the address set forth in Instruction #14 below. The **"Date Received"** line <u>must</u> <u>be</u> <u>dated</u> at least **14 calendar** days <u>before</u> both your payment of the initial franchise fee and your signed Franchise Agreement are sent to Goin' Postal Franchise Corporation for processing per instructions #14 and #15 below. The **"Name of Franchisee"** should be your individual name unless Franchisee is a corporation, partnership or other entity, in which case you will print the name of the entity. Keep an extra copy of your signed Receipt as you will need it in instruction #12 below. **Make sure to insert the date of the Disclosure Document (from the State Effective Dates Exhibit to the UFDD which follows immediately after the State Cover Page appearing at the beginning of this Disclosure Document) in the blank space provided in the text appearing above the listing of Exhibits.**

8.  Sign and date the Franchise Agreement which is **Exhibit "A"** to the UFDD, and initial all pages. **This Agreement must be signed by an authorized agent of Franchisee (if an entity; i.e. president, general partner, LLC manager) <u>and</u> by each Owner listed in Item #3 of Part II of Exhibit "C" (see instruction #10 below). You must have your desired Store Location approved by us and once approved, insert on the first page of the Franchise Agreement both the address of the approved Location and the Store # allocated by us for the approved Location.**

9.  Sign and date the Non-Competition and Non-Solicitation Agreement which is **Exhibit "B"** to the UFDD, and initial all pages. **This Agreement must be signed by an authorized agent of Franchisee (if an entity; i.e. president, general partner, LLC manager) <u>and</u> by each Owner listed in Item #3 of Part II of Exhibit "C" (see instruction #10 below). You will therefore need to make as many copies of this Agreement as necessary for one separate original signed Agreement to be submitted with your packet for the entity Franchisee (as applicable) and for <u>each</u> Owner.**

Franchisee's Initials _____

10.   Fill out, as completely as possible, and sign and date the Personal Data Disclosure (Part I) and Franchisee Ownership Information Form (Part II) which is **Exhibit "C"** to the UFDD. If any of the information is not currently available, you may send us the missing information as soon as it is available.

11.   Fill out and sign and date the Credit Card and Designated Account Authorization Form which is **Exhibit "D"** to the UFDD.

12.   Initial all pages of the UFDD and all Exhibits. Franchisees residing in any of the States listed in **Exhibit "H"** must enter the name of their State of residency in the space provided at the end of **Exhibit "H"** and must sign **Exhibit "H"** in the same manner as you are required to sign the Franchise Agreement (Exhibit "A") under instruction #8 above. Franchisees purchasing a Turn-Key Franchise Package must also sign, date and complete all required information on the Turn-Key Store Agreement (**Exhibit "J"** to the UFDD), and initial all pages (if applicable, the Turn-Key Store Agreement must be signed in the same manner as you are required to sign the Franchise Agreement under instruction #8 above). Franchisees who are an entity must also have each Owner listed in Item #3 of Part II of **Exhibit "C"** to the UFDD sign, date and complete all required information on the Continuing Personal Guaranty (**Exhibit "K"** to the UFDD), and initial all pages. For the page of the UFDD containing the Receipt (Item 23), use a copy of your signed and dated Receipt (from instruction #7 above), but place your initials where provided.  Make sure all appropriate areas are completed, all pages requiring your signature are signed, and each page is initialed where appropriate.

13.   Enclose with your returned packet under instruction #14 below the appropriate deposit check for the $15,000.00 initial franchise fee _and_ the $9,284.00 for the Required Minimum Purchases if you do not intend to charge these fees and costs to your designated credit card or have them automatically withdrawn by and electronic funds transfer from your designated account. Check (if applicable) should be payable to Goin' Postal Franchise Corporation. Purchasers of a Turn-Key Franchise Package are required to remit an **additional** sum of $102,000.00 by separate check made payable to Goin' Postal Franchise Corporation.

14.   Upon expiration of **fourteen (14) calendar** days from the date you entered on the "Date Received" line on your signed Receipt (Item 23 of UFDD; see instruction #7 above), **BUT NO EARLIER THAN SUCH DATE**, send the entire packet (see instruction #15 below) to:

New Franchises
Goin' Postal Franchise Corporation
4941 4th Street
Zephyrhills, FL 33542
(813) 782-1500

15.   The entire packet must consist of:

-   UFDD, signed and initialed where applicable (Receipt, Item 23, should be an initialed copy of original Receipt sent per Instruction #7 above);

-   Franchise Agreement (Exhibit "A" to UFDD), signed and initialed where applicable, and all blank areas completed and filled in, including Store information on cover page if available (see instruction #8 above for required signatures);

-   Non-Competition and Non-Solicitation Agreement (Exhibit "B" to UFDD), signed and initialed where applicable and all blank areas completed and filled in (see instruction #9 above for required signatures and number of separate Agreements required);

147        Franchisee's Initials 

- Personal Data Disclosure and Franchisee Ownership Information Form (Exhibit "C" to UFDD), fully completed, signed and dated, and initialed where applicable – all blank areas must be completed with all available information;

- Credit Card and Designated Account Authorization Form (Exhibit "D" to UFDD), fully completed, signed and dated, and initialed where applicable – all blank areas must be completed in their entirety;

- Exhibits "E", "F", "G", "H" (if applicable) and "I" to the UFDD with your initials on the bottom of each page where indicated (residents of any of the States listed in **Exhibit "H"** must also complete and sign Exhibit "H" per instruction #12 above);

- If purchasing a Turn-Key Franchise Package, Turn-Key Store Agreement (**Exhibit "J"** to UFDD), signed and initialed where applicable, and all blank areas completed and filled in (see instruction #12 and instruction #8 above for required signatures). If you are not purchasing a Turn-Key Franchise Package, do not sign the Turn-Key Store Agreement, but simply initial the bottom of each page of the Turn-Key Store Agreement and return it with the other parts of the UFDD you are required to return;

- If Franchisee is an entity, Continuing Personal Guaranty (**Exhibit "K"** to UFDD), signed by each equity Owner of Franchisee and initialed where applicable, and all blank areas completed and filled in (see instruction #12 above for required signatures). If Franchisee is not an entity, do not sign the Continuing Personal Guaranty, but simply initial the bottom of each page of the Continuing Personal Guaranty and return it with the other parts of the UFDD you are required to return; and

- Check (as applicable, if not charging to your designated credit card or paying through electronic funds transfer from your designated account)) for $15,000.00 initial franchise fee, plus $9,284.00 for the Required Minimum Purchases, plus (for Turn-Key Franchise Package purchasers only) a separate check for $102,000.00 made payable to Goin' Postal Franchise Corporation. Upon acceptance as a franchisee, GPFC will deposit and cash the check(s), or, if applicable, charge your designated credit card for or automatically withdraw from your designated account the $15,000.00 initial franchise fee, the $9,284.00 for Required Minimum Purchases, and, if applicable, $102,000.00 Turn-Key Franchise Package cost. Shipping costs and any applicable sales taxes associated with delivering your Point of Sale Systems and other Required Minimum Purchases must be paid in advance with your initial franchise fee or they will be charged to your designated credit card or automatically withdrawn from your designated account.

16.   We will call or e-mail you when we receive your complete packet to inform you of its review and our decision of acceptance. If you are not accepted, we will return any check(s) you may have sent for the initial franchise fee and Required Minimum Purchases ordered (provided, see Franchise Agreement on terms of refund on Point of Sale Systems), and, if applicable, for the purchase of a Turn-Key Franchise Package. If any part of your packet is incomplete or not properly signed or not submitted, we will reject you as franchisee unless the incomplete items or omissions are corrected within five (5) days of our notice to you of the incomplete status of your packet.

17.   Once you have been notified that you have been accepted as a franchisee, check your e-mail regularly as this will be our main form of communication during the set up process for transmitting many details and instructions to you. We will also then assign to you a new e-mail address through our Goin' Postal Internet domain which will become our primary mode of contact with you, and we will also then provide you with a confidential password, which is the only means of access to the Owners' Section of our website.

Franchisee's Initials 

EXHIBIT "H"
TO UNIFORM FRANCHISE DISCLOSURE DOCUMENT
STATE SPECIFIC ADDENDUM

ADDITIONAL STATE DISCLOSURES

If the Franchisee is a resident of any of the following States, then the designated provisions in the Disclosure Document and all Exhibits attached thereto, including the Franchise Agreement, will be amended in accordance with the provisions applicable to Franchisee's State of residency as set forth below:

CALIFORNIA

ADDENDUM TO THE DISCLOSURE DOCUMENT PURSUANT TO
THE CALIFORNIA FRANCHISE INVESTMENT LAW

THE CALIFORNIA FRANCHISE INVESTMENT LAW REQUIRES THAT A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE SALE OF THE FRANCHISE BE DELIVERED TOGETHER WITH THE DISCLOSURE DOCUMENT.

California Business and Professions Code Sections 20000 through 20043 provide rights to the franchisee concerning termination or non-renewal of a franchise.  If the Franchise Agreement contains a provision that is inconsistent with the law, the law will control.

The Franchise Agreement provides for termination upon bankruptcy, insolvency or reorganization.  This provision may not be enforceable under Federal bankruptcy law (11 U.S.C.A. Sec. 101 et. seq.), but will be enforced to the extent enforceable.

The Franchise Agreement contains a covenant not to compete which extends beyond the termination of the franchise.  This provision may not be enforceable under California law.

The Franchise Agreement contains a liquidated damages clause.  Under California Civil Code Section 1671, certain liquidated damages clauses are unenforceable.

The Franchise Agreement requires mediation.  The mediation will occur at Zephyrhills, Florida or Tampa, Florida with the costs being borne equally by Franchisor and Franchisee.  Prospective franchisees are encouraged to consult with private legal counsel to determine the applicability of California and federal laws (such as Business and Professional Code Section 20040.5, Code of Civil Procedure Section 1281, and the Federal Arbitration Act) to any provisions of the Franchise Agreement restricting venue to a forum outside the State of California.

The Franchise Agreement requires application of the laws of the State of Florida.  This provision may not be enforceable under California law.

Section 31125 of the California Franchise Investment Law requires us to give you a disclosure document approved by the Commissioner of Corporations before we ask you to consider a material modification of your Franchise Agreement.

You must sign a release of claim if you renew or transfer your franchise.  California Corporations Code Section 31512 voids a waiver of your rights under the California Franchise Investment Law (California Corporations Code Section 31000 through 31516).  Business and Professions Code Section 20010 voids a waiver of your rights under the Franchise Relations Act (Business and Professions Code Section 20000 through 20043).

Neither the Franchisor nor any person listed in Item 2 of this Disclosure Document is subject to any currently effective order of any national securities association or national securities exchange, as defined in the Securities Exchange Act of 1934, 15 U.S.C.A. 78a *et seq.,* suspending or expelling such persons from membership in that association or exchange.

OUR WEBSITE www.goinpostal.com HAS NOT BEEN REVIEWED OR APPROVED BY THE CALIFORNIA DEPARTMENT OF CORPORATIONS. ANY COMPLAINTS CONCERNING THE CONTENT OF THIS WEBSITE MAY BE DIRECTED TO THE CALIFORNIA DEPARTMENT OF CORPORATIONS AT www.corp.ca.gov

## HAWAII

**ADDENDUM TO THE DISCLOSURE DOCUMENT PURSUANT TO THE HAWAII FRANCHISE INVESTMENT LAW**

1.     **THESE FRANCHISES HAVE BEEN FILED UNDER THE FRANCHISE INVESTMENT LAW OF THE STATE OF HAWAII. FILING DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION OR ENDORSEMENT BY THE DIRECTOR OF THE DEPARTMENT OF COMMERCE AND CONSUMER AFFAIRS OR A FINDING BY THE DIRECTOR OF THE DEPARTMENT OF COMMERCE AND CONSUMER AFFAIRS THAT THE INFORMATION PROVIDED HEREIN IS TRUE, COMPLETE AND NOT MISLEADING.**

2.     **THE HAWAII FRANCHISE INVESTMENT LAW MAKES IT UNLAWFUL TO OFFER OR SELL ANY FRANCHISE IN THIS STATE WITHOUT FIRST PROVIDING TO THE PROSPECTIVE FRANCHISEE, OR SUBFRANCHISOR, AT LEAST SEVEN (7) DAYS PRIOR TO THE EXECUTION BY THE PROSPECTIVE FRANCHISEE, OF ANY BINDING FRANCHISE OR OTHER AGREEMENT, OR AT LEAST SEVEN (7) DAYS PRIOR TO THE PAYMENT OF ANY CONSIDERATION BY THE FRANCHISEE, OR SUBFRANCHISOR, WHICHEVER OCCURS FIRST, A COPY OF THE DISCLOSURE DOCUMENT, TOGETHER WITH A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE SALE OF THE FRANCHISE.**

3.     **THIS DISCLOSURE DOCUMENT CONTAINS A SUMMARY ONLY OF CERTAIN MATERIAL PROVISIONS OF THE FRANCHISE AGREEMENT. THE CONTRACT OR AGREEMENT SHOULD BE REFERRED TO FOR A STATEMENT OF ALL RIGHTS, CONDITIONS, RESTRICTIONS AND OBLIGATIONS OF BOTH THE FRANCHISOR AND FRANCHISEE.**

4.     No release, assignment, notation or waiver contained in the Franchise Agreement or entered into or assented to by Franchisee in connection therewith shall relieve Franchisor or any other person, directly or indirectly, from liability imposed by the Hawaii Franchise Investment Law, and any condition, stipulation or provision of the Franchise Agreement or any other agreement entered into by Franchisee in connection therewith which binds Franchisee to waive any provision of the Hawaii Franchise Investment Law or any rule promulgated thereunder shall be void. This paragraph shall not bar or affect the settlement by and between Franchisor and Franchisee of disputes, claims or civil suits arising or brought under the Hawaii Franchise Investment Law.

5.

A.     The States in which a registration is effective and where an Offering Circular has been filed are as follows: California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Rhode Island, South Dakota, Virginia, Washington and Wisconsin.

B.     The States in which a proposed registration or filing is or will be shortly on file are as follows: Registration renewal applications will be filed in States listed in 5A above as they come due, and post-effective amendment applications will be filed in those States listed in 5A when and as required by applicable law.

Franchisee's Initials ___ ＥＡ ___

C.     The States which have refused, by order or otherwise, to register these franchises are as follows:  None.

D.     The States that have revoked or suspended the right to offer these franchises are as follows: None.

E.     The States in which a proposed registration of these franchises has been withdrawn are as follows: None.

## ILLINOIS

## ADDENDUM TO THE DISCLOSURE DOCUMENT PURSUANT TO THE ILLINOIS FRANCHSE DISCLOSURE ACT

Notwithstanding anything to the contrary set forth in the Disclosure Document, or in any of the agreements to be executed by you as evidenced by Exhibits "A" and "B" hereto, the following provisions shall supersede and apply to all franchises offered and sold in the State of Illinois:

1.     Item 17 of the Disclosure Document is amended by the addition of the following language at the beginning thereof:

### "Notice Required by Law

THE TERMS AND CONDITIONS UNDER WHICH YOUR FRANCHISE CAN BE TERMINATED AND YOUR RIGHTS UPON NON-RENEWAL MAY BE AFFECTED BY ILLINOIS LAW, 815 ILCS 705/19-705/20."

2.     The provisions of the Illinois Franchise Disclosure Act of 1987 (the "Act") shall supersede any provisions of the Franchise Agreement or Florida law which are in conflict with the Act.

3.     The provisions of Section 20 of the Franchise Agreement which designate jurisdiction or venue in a forum outside of the State of Illinois and which direct that the Franchise Agreement shall be governed by Florida law shall not be effective for Franchise Agreements entered into in Illinois to the extent required by the Act. When and as required by the Act, Illinois law shall govern the Franchise Agreement and jurisdiction and venue shall be in the State of Illinois. Our registered agent authorized to receive service of process in Illinois for actions arising under the Act is: **Illinois Attorney General, 500 South Second Street, Springfield, Illinois 62706.**

4.     Any condition, stipulation or provision of the Franchise Agreement or any other agreement entered into by you in connection with your purchase of a Goin' Postal franchise purporting to bind you to waive compliance with any provision of the Act or any other law of the State of Illinois shall not be effective or applicable for Franchise Agreements entered into in Illinois to the extent required by Section 41 of the Act.

5.     The provisions of the Act provide that it is unlawful to offer or sell any franchise which is required to be registered under the Act without first providing to you at least 14 calendar days prior to your execution of any binding franchise or other agreement, or at least 14 calendar days prior to our receipt from you of any consideration, whichever occurs first, a copy of a disclosure statement meeting the requirements of this Act and registered by the Illinois Attorney General, together with a copy of all proposed agreements relating to the sale of the franchise.  All provisions of this Disclosure Document, including the Item 23 Receipt, and all provisions of the Franchise Agreement (including, without limitation, Section 22.4 of the Franchise Agreement) and other agreements evidenced by Exhibits to this Disclosure Document, including the Instructions set forth as Exhibit "G", are appropriately amended to

the extent necessary to comply with the above time requirements and to substitute the phrase "14 calendar days" where and as required by the Act.

6.     **THE FACT THAT THIS DISCLOSURE DOCUMENT AND THE GOIN' POSTAL FRANCHISE DISCLOSED HEREIN HAS BEEN REGISTERED BY THE ILLINOIS ATTORNEY GENERAL IS NOT A FINDING BY THE ILLINOIS ATTORNEY GENERAL THAT THIS DISCLOSURE DOCUMENT AND OTHER DISCLOSURES FILED WITH THE ILLINOIS ATTORNEY GENERAL IN CONNECTION WITH SUCH REGISTRATION IS IN ANY WAY TRUE, ACCURATE OR COMPLETE IN SUBSTANCE OR ON ITS FACE, OR TO BE HELD TO MEAN THAT THE ILLINOIS ATTORNEY GENERAL HAS IN ANY WAY PASSED UPON THE MERITS OR GIVEN APPROVAL TO SUCH FRANCHISE.  IT IS UNLAWFUL FOR US TO MAKE, OR CAUSE TO BE MADE, TO YOU ANY EXPRESS OR IMPLIED REPRESENTATION CONTRARY TO THE FOREGOING OR TO ADVERTISE OR REPRESENT THAT THE ILLINOIS ATTORNEY GENERAL APPROVES OF OR RECOMMENDS ANY FRANCHISE.**

## INDIANA

### ADDENDUM TO THE FRANCHISE DISCLOSURE DOCUMENT PURSUANT TO THE INDIANA FRANCHISE
### DISCLOSURE LAW AND THE INDIANA DECEPTIVE FRANCHISE PRACTICES ACT

Notwithstanding anything to the contrary set forth in the Disclosure Document, The Franchise Agreement, or any agreement executed by you in connection with your purchase of a franchise from us, the following provisions shall supersede and apply to all franchises offered and sold in the State of Indiana:

1.     The laws of the State of Indiana supersede any provisions of the Franchise Agreement, the other agreements you sign, or Florida law, if such provision(s) are in conflict with Indiana law.

2.     The prohibition by Indiana Code §23-2-2.7-1(7) against unilateral termination of the franchise without good cause or in bad faith, good cause being defined therein as material breach of the Franchise Agreement, shall supersede the provisions of Section 12 of the Franchise Agreement in the State of Indiana to the extent they may be inconsistent with such prohibition.

3.     No release language set forth in the Disclosure Document or Franchise Agreement, including, but not limited to, Item 17, or Sections 2.3 and 11.3, thereof, respectively, shall relieve Franchisor or any other person, directly or indirectly, from liability imposed by the laws concerning franchising of the State of Indiana.

4.     Section 20 of the Franchise Agreement is amended to provide that such agreement will be construed in accordance with the laws of the State of Indiana when such construction pertains to any action under the laws concerning franchising of the State of Indiana.

5.     Any provision in the Franchise Agreement which designates jurisdiction or venue, or requires the Franchisee to agree to jurisdiction or venue, in a forum outside of Indiana, is inapplicable in any Franchise Agreement issued in the State of Indiana when involving any action under the laws concerning franchising of the State of Indiana.

6.     The State of Indiana has a statute which may supersede the Franchise Agreement in your relation with us including the areas of termination and renewal of your franchise: [Rev. Stat. Section 23-2-2.7].

7.     The State of Indiana has a statute which may limit our ability to restrict your activity after your Franchise Agreement has ended: [Indiana Code Section 23-2-2.7-1(9)].



MARYLAND

## ADDENDUM TO THE DISCLOSURE DOCUMENT PURSUANT TO THE
## MARYLAND FRANCHSE REGISTRATION AND DISCLOSURE LAW

The general release language contained in the Franchise Agreement shall not relieve the Franchisor or any other person, directly or indirectly, from liability imposed by the laws concerning franchising of the State of Maryland.  Any general release to which you (as franchisee) are required, by the Franchise Agreement, to sign will not apply to any claims that arise under the Maryland Franchise Registration and Disclosure Law or to the extent otherwise prohibited by the Maryland Franchise Registration and Disclosure Law.

The Franchise Agreement provides that it may be terminated immediately upon, among other things, the franchisee commencing any cause, proceeding or other action seeking reorganization, etc. under any law relating to bankruptcy, etc.  This provision may not be enforceable under current U.S. Bankruptcy laws or other applicable federal law relating to bankruptcy.

Litigation must be in Florida, except that this does not apply to claims arising under the Maryland Franchise Registration and Disclosure Law.  A Franchisee may bring a lawsuit in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law.

Our registered agent authorized to receive service of process in Maryland for actions arising under the Maryland Franchise Registration and Disclosure Law is: **Maryland Securities Commissioner, 200 St. Paul Place, Baltimore, Maryland  21202-2020.**

Notwithstanding anything to the contrary in Item 17 of the Disclosure Document or in the Franchise Agreement, claims arising under the Maryland Franchise Registration and Disclosure Law must be brought within 3 years after the grant of the franchise.

Item 22 of the Disclosure Document is amended to include, as a document you may be required to execute and deliver as part of your purchase of a Goin' Postal franchise, a sample copy of the "General Release Upon Renewal, Transfer or Termination of Franchise."  The General Release which appears below and is made a part of the Maryland Section of this Exhibit "H" may be required to be signed by you as one of the conditions to you being able to renew or transfer your Goin' Postal franchise, or as part of the termination of the Franchise Agreement.

**REGISTRATION OF THIS DISCLOSURE DOCUMENT WITH THE MARYLAND DIVISION OF SECURITIES DOES NOT CONSTITUTE AND SHOULD NOT BE INTERPRETED AS APPROVAL, RECOMMENDATION, OR ENDORSEMENT BY THE MARYLAND SECURITIES COMMISSIONER.**

## AUTHORIZATION OF DISCLOSURE OF FINANCIAL RECORDS

Pursuant to Section 14-216(c)(24) of the Maryland Franchise Registration and Disclosure Law (Business Regulation Article, Title 14, Subtitle 2, Annotated Code of Maryland), any financial institution, wherever situated, possessing financial records of the sale of "Goin' Postal" franchises by Goin' Postal Franchise Corporation is hereby authorized to disclose to the Maryland Securities Commissioner financial records of the sale of said franchises, and authorization is hereby given for the Maryland Securities Commissioner to examine Goin' Postal Franchise Corporation's financial records that relate to the sale of franchises.

Sample General Release in the State of Maryland:

153          Franchisee's Initials _____

## General Release Upon Renewal, Transfer or Termination of Franchise

This General Release (the "General Release") is made and entered into this _____ day of _____, 20___ (the "Execution Date"), by _____, with a principal place of business at _____ (hereinafter referred to as the "Franchisee"), and is delivered to and in favor of **Goin' Postal Franchise Corporation,** a Florida corporation with its principal place of business at 4941 4th Avenue, Zephyrhills, Florida 33542 (hereinafter referred to as the "Franchisor").

### Recitals

**Whereas,** Franchisor and Franchisee entered into that certain Franchise Agreement dated _____, 20___ (as to Franchisee) and dated _____, 20___ (as to Franchisor) (hereinafter referred to as the "**Goin' Postal Franchise Agreement,**" which term shall refer not only to the referenced agreement, but also to any and all other agreements entered into by and between the Franchisor and Franchisee for purposes of enabling Franchisee to open and operate a Goin' Postal franchise);

**Whereas,** pursuant to the Goin' Postal Franchise Agreement, Franchisee opened and operated a Goin' Postal Franchise located at _____ _____ (the "Franchisee's Goin' Postal Store");

**Whereas,** as a condition under the Goin' Postal Franchise Agreement to the renewal, transfer and/or termination of the Goin' Postal Franchise Agreement and the Goin' Postal franchise established by the Goin' Postal Franchise Agreement, Franchisee is required to execute and deliver to Franchisor a general release in a form acceptable to Franchisor; and

**Whereas,** this General Release has been approved by Franchisor and is being delivered in connection with either the renewal, transfer or termination of the Goin' Postal Franchise Agreement and the Goin' Postal franchise established by the Goin' Postal Franchise Agreement, as applicable.

**Now, therefore,** in consideration of the premises set forth herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Franchisee hereby agrees as follows:

1.      **Acknowledgment of Effect of General Release:**  This General Release is executed and delivered by Franchisee in accordance with conditions and requirements established under the Goin' Postal Franchise Agreement, and is pursuant to either the renewal, transfer or termination of the Goin' Postal Franchise Agreement and the Goin' Postal franchise established by the Goin' Postal Franchise Agreement, as applicable. This General Release neither serves to amend, alter or modify the Goin' Postal Franchise Agreement, and Franchisee shall continue to be subject to all terms, conditions, covenants and obligations in, to and under the Goin' Postal Franchise Agreement, as applicable, including those pertaining to a renewal, transfer and termination thereof.

2.      **Waiver and Release of Claims:**

(a)      Franchisee hereby represents, covenants and agrees that as of the Execution Date, Franchisee is unaware of any claims, actions or causes of action which Franchisee has or might have against Franchisor under, as a result of or in connection with the Goin' Postal Franchise Agreement and/or the operation by Franchisee of Franchisee's Goin' Postal Store. Further, Franchisee is not aware, as of the Execution Date, of any violations by Franchisor under the Maryland Franchise Registration and Disclosure Law or any regulations issued under the Maryland Franchise Registration and Disclosure Law (collectively, the "Maryland Franchise Law"), and Franchisee is unaware, as of the Execution Date, of any claim or any basis for any claim which Franchisee has or might have against Franchisor under the Maryland Franchise Law.

154          Franchisee's Initials _____

(b)     By executing this General Release, Franchisee does hereby forever release, relinquish, discharge, abandon and waive any and all claims, causes of action, demands, liabilities, obligations, complaints, penalties, remedies, damages, costs and any and all other entitlements, rights or benefits, in law or in equity, of any kind whatsoever, whether presently known or unknown, whether now existing or previously existing (collectively referred to as the "Claims") that the Franchisee has or might have as of the Execution Date against Franchisor, its parent companies, subsidiaries and affiliates, and each of its and their respective agents, employees, officers, directors, stockholders, attorneys and other representatives (collectively, the "Franchisor Parties), relating to, in connection with, arising under or as a result of or with respect to the Goin' Postal Franchise Agreement and Franchisee's operation of the Franchisee's Goin' Postal Store, except that this waiver and release does not apply to any Claims against Franchisor which may arise under the Maryland Franchise Law, and nothing in this General Release serves to waive or release the Franchisor from liability for Claims that may arise under the Maryland Franchise Law.

3.     **Binding Effect:**  This General Release shall be binding upon the Franchisee and, as applicable to the classification of Franchisee as individual or entity, all of Franchisee's parents, subsidiaries and affiliates, each of its and their respective agents, directors, officers, employees, stockholders, attorneys and other representatives, and Franchisee's heirs, administrators, executors, partners, members, successors and assigns.  This General Release shall be for and inure to the benefit of and may be enforced by Franchisor and all of the Franchisor Parties.

**IN WITNESS WHEREOF,** the Franchisee has duly executed this General Release effective on and as of the Execution Date:

<strong>"FRANCHISEE"</strong>

If the "Franchisee" is a legal entity (corporation, limited liability company, partnership, etc.) then (i) enter the name of the entity Franchisee in the following space: _____, (ii) each equity owner of the Franchisee must sign below (attach additional sheet if necessary), and (iii) next to the name of the persons that are signing this General Release, insert their title within such entity (president, partner, manager, member, etc.).  If the Franchisee is not a legal entity at the time of signing, but rather one or more individual persons, then do not fill in the title lines below.

1: _____     _____, 200__
Signature of Franchisee or equity owner if Franchisee is a legal entity     Date          Year

_____     _____
Printed name of person that signed above          Title of person that signed above

2: _____     _____, 200__
Signature of Franchisee or equity owner if Franchisee is a legal entity     Date          Year

_____     _____
Printed name of person that signed above          Title of person that signed above

3: _____     _____, 200__
Signature of Franchisee or equity owner if Franchisee is a legal entity     Date          Year

_____     _____
Printed name of person that signed above          Title of person that signed above

Franchisee's Initials ___ E.B. ___

**MICHIGAN**

**ADDENDUM TO THE DISCLOSURE DOCUMENT PURSUANT TO THE MICHIGAN FRANCHISE INVESTMENT LAW**

The Michigan Franchise Investment Law (the "Act") requires, among other things, that every UFDD contain a notice to each franchisee that certain provisions contained in a UFDD may be void and enforceable. Therefore, every UFDD delivered in the state of Michigan should contain a notice or statement similar in format to that set forth below:

THE STATE OF MICHIGAN PROHIBITS CERTAIN UNFAIR PROVISIONS THAT ARE SOMETIMES IN FRANCHISE DOCUMENTS. IF ANY OF THE FOLLOWING PROVISIONS ARE IN THESE FRANCHISEDOCUMENTS, THE PROVISIONS ARE VOID AND CANNOT BE ENFORCED AGAINST YOU:

(A)   A PROHIBITION ON THE RIGHT OF A FRANCHISEE TO JOIN AN ASSOCIATION OF FRANCHISEES.

(B)   A REQUIREMENT THAT A FRANCHISEE ASSENT TO A RELEASE, ASSIGNMENT, NOVATION, WAIVER, OR ESTOPPEL WHICH DEPRIVES A FRANCHISEE OF RIGHTS AND PROTECTIONS PROVIDED IN THIS ACT. THIS SHALL NOT PRECLUDE A FRANCHISEE, AFTER ENTERING INTO A FRANCHISE AGREEMENT, FROM SETTLING ANY AND ALL CLAIMS.

(C)   A PROVISION THAT PERMITS A FRANCHISOR TO TERMINATE A FRANCHISE PRIOR TO THE EXPIRATION OF ITS TERM EXCEPT FOR GOOD CAUSE. GOOD CAUSE SHALL INCLUDE THE FAILURE OF THE FRANCHISEE TO COMPLY WITH ANY LAWFUL PROVISIONS OF THE FRANCHISE AGREEMENT AND TO CURE SUCH FAILURE AFTER BEING GIVEN WRITTEN NOTICE THEREOF AND A REASONABLE OPPORTUNITY, WHICH IN NO EVENT NEED BE MORE THAN 30 DAYS, TO CURE SUCH FAILURE.

(D)   A PROVISION THAT PERMITS A FRANCHISOR TO REFUSE TO RENEW A FRANCHISE WITHOUT FAIRLY COMPENSATING THE FRANCHISEE BY REPURCHASE OR OTHER MEANS FOR THE FAIR MARKET VALUE, AT THE TIME OF EXPIRATION, OF THE FRANCHISEE'S INVENTORY, SUPPLIES, EQUIPMENT, FIXTURES, AND FURNISHINGS. PERSONALIZED MATERIALS WHICH HAVE NO VALUE TO THE FRANCHISOR AND INVENTORY, SUPPLIES, EQUIPMENT, FIXTURES, AND FURNISHINGS NOT REASONABLY REQUIRED IN THE CONDUCT OF THE FRANCHISED BUSINESS ARE NOT SUBJECT TO COMPENSATION. THIS SUBSECTION APPLIES ONLY IF: THE TERM OF THE FRANCHISE IS LESS THAN 5 YEARS; AND (ii) THE FRANCHISEE IS PROHIBITED BY THE FRANCHISE OR OTHER AGREEMENT FROM CONTINUING TO CONDUCT SUBSTANTIALLY THE SAME BUSINESS UNDER ANOTHER TRADEMARK, SERVICE MARK, TRADE NAME, LOGOTYPE, ADVERTISING, OR OTHER COMMERCIAL SYMBOL IN THE SAME AREA SUBSEQUENT TO THE EXPIRATION OF THE FRANCHISE OR THE FRANCHISEE DOES NOT RECEIVE AT LEAST 6 MONTHS ADVANCE NOTICE OF FRANCHISOR'S INTENT NOT TO RENEW THE FRANCHISE.

(E)   A PROVISION THAT PERMITS THE FRANCHISOR TO REFUSE TO RENEW A FRANCHISE ON TERMS GENERALLY AVAILABLE TO OTHER FRANCHISEES OF THE SAME CLASS OR TYPE UNDER SIMILAR CIRCUMSTANCES. THIS SECTION DOES NOT REQUIRE A RENEWAL PROVISION.

156          Franchisee's Initials _____

(F)    A PROVISION REQUIRING THAT ARBITRATION OR LITIGATION BE CONDUCTED OUTSIDE THIS STATE. THIS SHALL NOT PRECLUDE THE FRANCHISEE FROM ENTERING INTO AN AGREEMENT, AT THE TIME OF ARBITRATION, TO CONDUCT ARBITRATION AT A LOCATION OUTSIDE THIS STATE.

(G)    A PROVISION WHICH PERMITS A FRANCHISOR TO REFUSE TO PERMIT A TRANSFER OF OWNERSHIP OF A FRANCHISE, EXCEPT FOR GOOD CAUSE. THIS SUBDIVISION DOES NOT PREVENT A FRANCHISOR FROM EXERCISING A RIGHT OF FIRST REFUSAL TO PURCHASE THE FRANCHISE. GOOD CAUSE SHALL INCLUDE, BUT IS NOT LIMITED TO:

(i)    THE FAILURE OF THE PROPOSED FRANCHISEE TO MEET THE FRANCHISOR'S THEN CURRENT REASONABLE QUALIFICATIONS OR STANDARDS.

(ii) THE FACT THAT THE PROPOSED TRANSFEREE IS A COMPETITOR OF THE FRANCHISOR OR SUBFRANCHISOR.

(iii) THE UNWILLINGNESS OF THE PROPOSED TRANSFEREE TO AGREE IN WRITING TO COMPLY WITH ALL LAWFUL OBLIGATIONS.

(iv) THE FAILURE OF THE FRANCHISEE OR PROPOSED TRANSFEREE TO PAY ANY SUMS OWING TO THE FRANCHISOR OR TO CURE ANY DEFAULT IN THE FRANCHISE AGREEMENT EXISTING AT THE TIME OF THE PROPOSED TRANSFER.

(H)    A PROVISION THAT REQUIRES THE FRANCHISEE TO RESELL TO THE FRANCHISOR ITEMS THAT ARE NOT UNIQUELY IDENTIFIED WITH THE FRANCHISOR. THIS SUBDIVISION DOES NOT PROHIBIT A PROVISION THAT GRANTS TO A FRANCHISOR A RIGHT OF FIRST REFUSAL TO PURCHASE THE ASSETS OF A FRANCHISE ON THE SAME TERMS AND CONDITIONS AS A BONA FIDE THIRD PARTY WILLING AND ABLE TO PURCHASE THOSE ASSETS, NOR DOES THIS SUBDIVISION PROHIBIT A PROVISION THAT GRANTS THE FRANCHISOR THE RIGHT TO ACQUIRE THE ASSETS OF A FRANCHISE FOR THE MARKET OR APPRAISED VALUE OF SUCH ASSETS IF THE FRANCHISEE HAS BREACHED THE LAWFUL PROVISIONS OF THE FRANCHISE AGREEMENT AND HAS FAILED TO CURE THE BREACH IN THE MANNER PROVIDED IN SUBDIVISION (C).

(I)    A PROVISION WHICH PERMITS THE FRANCHISOR TO DIRECTLY OR INDIRECTLY CONVEY, ASSIGN, OR OTHERWISE TRANSFER ITS OBLIGATIONS TO FULFILL CONTRACTUAL OBLIGATIONS TO THE FRANCHISEE UNLESS PROVISION HAS BEEN MADE FOR PROVIDING THE REQUIRED CONTRACTUAL SERVICES.

\*    \*    \*    \*

THE FACT THAT THERE IS A NOTICE OF THIS OFFERING ON FILE WITH THE ATTORNEY GENERAL DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION, OR ENDORSEMENT BY THE ATTORNEY GENERAL.

\*    \*    \*    \*

IF THE FRANCHISOR'S MOST RECENT FINANCIAL STATEMENTS ARE UNAUDITED AND SHOW A NET WORTH OF LESS THAN $100,000.00, THE FRANCHISOR SHALL, AT THE REQUEST OF THE FRANCHISEE, ARRANGE FOR THE ESCROW OF INITIAL INVESTMENT AND OTHER FUNDS PAID BY THE

157          Franchisee's Initials _____

FRANCHISEE UNTIL THE FRANCHISOR'S OBLIGATIONS TO PROVIDE REAL ESTATE, IMPROVEMENTS, EQUIPMENT, INVENTORY, TRAINING, OR OTHER TERMS INCLUDED IN THE FRANCHISE OFFERING ARE FULFILLED. AT THE OPTION OF THE FRANCHISOR, A SURETY BOND MAY BE PROVIDED IN PLACE OF ESCROW.

\*     \*     \*     \*

ANY QUESTIONS REGARDING THIS NOTICE SHOULD BE DIRECTED TO THE OFFICE OF THE ATTORNEY GENERAL, CONSUMER PROTECTION DIVISION, ATTN: FRANCHISE SECTION, P.O. BOX 30213, LANSING, MICHIGAN 48909; (517) 373-7117; www.michigan.gov/ag

## MINNESOTA

ADDENDUM TO THE DISCLOSURE DOCUMENT PURSUANT TO THE MINNESOTA FRANCHISE INVESTMENT LAW

Notwithstanding anything to the contrary set forth in the Disclosure Document and/or Franchise Agreement, as applicable, the following provisions shall supersede and apply to all franchises offered and sold in the State of Minnesota:

1.     The Cover Page is amended to include the following statement:

THESE FRANCHISES HAVE BEEN REGISTERED UNDER THE MINNESOTA FRANCHISE ACT. REGISTRATION DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION OR ENDORSEMENT BY THE COMMISSIONER OF COMMERCE OF MINNESOTA OR A FINDING BY THE COMMISSIONER THAT THE INFORMATION PROVIDED HEREIN IS TRUE, COMPLETE AND NOT MISLEADING.

THE MINNESOTA FRANCHISE ACT MAKES IT UNLAWFUL TO OFFER OR SELL ANY FRANCHISE IN THIS STATE WHICH IS SUBJECT TO REGISTRATION WITHOUT FIRST PROVIDING TO THE PROSPECTIVE FRANCHISEE, AT LEAST 7 DAYS PRIOR TO THE EXECUTION BY THE PROSPECTIVE FRANCHISEE OF ANY BINDING FRANCHISE OR OTHER AGREEMENT, OR AT LEAST 7 DAYS PRIOR TO THE PAYMENT OF ANY CONSIDERATION, BY THE FRANCHISEE, WHICHEVER OCCURS FIRST, A COPY OF THIS PUBLIC OFFERING STATEMENT, TOGETHER WITH A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE FRANCHISE. THIS PUBLIC OFFERING STATEMENT CONTAINS A SUMMARY ONLY OF CERTAIN MATERIAL PROVISIONS OF THE FRANCHISE AGREEMENT. THE CONTRACT OR AGREEMENT SHOULD BE REFERRED TO FOR AN UNDERSTANDING OF ALL RIGHTS AND OBLIGATIONS OF BOTH THE FRANCHISOR AND THE FRANCHISEE.

2.     The following language is added to Item 13 of the Disclosure Document and Section 6 of the Franchise Agreement:

"The Franchisor will protect the Franchisee's right to use the Franchisor's "Marks", including our trademarks, service marks, trade names, logotypes and our other commercial symbols and/or indemnify the Franchisee from any loss, costs or expenses arising out of any claim, suit or demand regarding the use of the name "Goin' Postal". Franchisee must provide notice to Franchisor of any such claim within ten (10) days and tender the defense of the claim to Franchisor. If Franchisor accepts the tender of defense, Franchisor has the right to manage the defense of the claim including the right to compromise, settle or otherwise resolve the claim, and to determine whether to appeal a final determination of the claim."

3.     Item 17 of the Disclosure Document and the corresponding Sections of the Franchise Agreement are amended as follows:

158          Franchisee's Initials _____ $\mathcal{EB}$ _____

"With respect to franchises governed by Minnesota law, Franchisor will comply with Minn. Stat. Sec. 80C.14, Subds. 3, 4, and 5 which require, except in certain specified cases, that a Franchisee be given 90 days notice of termination (with 60 days to cure) and 180 days notice for non-renewal of the Franchise Agreement."

4.    In accordance with Minn. Stat. Sec. 80C.21 and Minn. Rule 2860.4400 D, no waiver or release language set forth in the Franchise Agreement shall relieve Franchisor or any other person, directly or indirectly, from liability imposed by the laws concerning franchising of the State of Minnesota, including the Minnesota Franchise Investment Law. To the extent that any such provisions exist under the Disclosure Document or Franchise Agreement, they are hereby rendered void with respect to all Franchisees governed under the laws of Minnesota.

5.    Item 17 of the Disclosure Document is amended to add the following and the following language will apply in any Franchise Agreement issued in the State of Minnesota:

"Minn. Stat. Section 80C.21 and Minn. Rule 2860.4400J prohibits us from requiring litigation to be conducted outside Minnesota. In addition, nothing in the Disclosure Document or Franchise Agreement can abrogate or reduce any of your rights as provided for in Minnesota Statutes, Chapter 80C, or your rights to any procedure, forum or remedies provided for by the laws or the jurisdiction. Nothing contained herein shall limit Franchisee's right to submit matters to the jurisdiction of the courts of Minnesota to the full extent required by Min. Rule 2860.4400J."

6.    Minn. Rule Part 2860.4400J prohibits a Franchisee from waiving his rights to a jury trial or consenting to liquidated damages, termination penalties or judgment notes. Further, although we may seek injunctive relief, Minn. Rule Part 2860.4400D and Part 2860.4400J prohibit a Franchisee from consenting to the Franchisor obtaining injunctive relief or from waiving any bond requirement in any injunctive proceedings or waiving any other rights provided to Franchisees under the laws of Minnesota. To the extent that any such provisions as described above exist under the Disclosure Document or Franchise Agreement, they are hereby rendered void with respect to all Franchisees governed under the laws of Minnesota.

7.    To the extent that any Limitations of Claims sections exist under our Disclosure Document or Franchise Agreement, such sections are hereby revised to comply with Minn. Stat. Section 80C.17, Subdivision 5.

## NEW YORK

**ADDENDUM TO THE DISCLOSURE DOCUMENT PURSUANT TO THE NEW YORK FRANCHISE ACT**

The Cover page of the Disclosure Document is amended to add the following statements:

**REGISTRATION OF THIS FRANCHISE BY NEW YORK STATE DOES NOT MEAN THAT NEW YORK STATE RECOMMENDS IT OR HAS VERIFIED THE INFORMATION IN THIS DISCLOSURE DOCUMENT. IF YOU LEARN THAT ANYTHING IN THIS DISCLOSURE DOCUMENT IS UNTRUE, CONTACT THE FEDERAL TRADE COMMISSION AND NEW YORK STATE DEPARTMENT OF LAW, BUREAU OF INVESTOR PROTECTION AND SECURITIES, 120 BROADWAY, 23RD FLOOR, NEW YORK, N.Y. 10271.**

**THE FRANCHISOR MAY, IF IT CHOOSES, NEGOTIATE WITH YOU ABOUT ITEMS COVERED IN THE PROSPECTUS. HOWEVER, THE FRANCHISOR CANNOT USE THE NEGOTIATING PROCESS TO PREVAIL UPON A PROSPECTIVE FRANCHISEE TO ACCEPT TERMS WHICH ARE LESS FAVORABLE THAN THOSE SET FORTH IN THIS PROSPECTUS.**

**THE FRANCHISOR HAS BEEN IN EXISTENCE FOR A SHORT PERIOD OF TIME (SINCE AUGUST 2004).   THEREFORE, THERE IS ONLY A BRIEF OPERATING HISTORY TO ASSIST YOU IN JUDGING WHETHER OR NOT TO MAKE THIS INVESTMENT.**

Item 3 of the Disclosure Document is amended by adding the following:

"Neither we, our predecessor, nor a person identified in Item 2, or an affiliate offering franchises under our principal trademark:

A.    Has an administrative, criminal or civil action pending against that person alleging: a felony; a violation of a franchise, antitrust or securities law; fraud, embezzlement, or fraudulent conversion; misappropriation of property; unfair or deceptive practices; or comparable civil or misdemeanor allegations.  Moreover, there are no pending actions, other than routine litigation incidental to the business, which are significant in the context of the number of franchisees and the size, nature or financial condition of the franchise system or its business operations.

B.    Has been convicted of a felony or pleaded nolo contendere to a felony charge, or, within the ten year period immediately preceding the application for registration, has been convicted of or pleaded nolo contendere to a misdemeanor charge or has been the subject of a civil action alleging: violation of a franchise, antitrust or securities law; fraud, embezzlement, fraudulent conversion or misappropriation of property, or unfair or deceptive practices or comparable allegations.

C.    Is subject to a currently effective injunction or restrictive order or decree relating to the franchise, or under a federal, State or Canadian franchise, securities, antitrust, trade regulation or trade practice law, resulting from a concluded or pending action or proceeding brought by a public agency; or is subject to any currently effective order of any national securities association or national securities exchange, as defined in the Securities and Exchange Act of 1934, suspending or expelling such person from membership in such association or exchange; or is subject to a currently effective injunction or restrictive order relating to any other business activity as a result of an action brought by a public agency or department, including, without limitation, actions affecting a license as a real estate broker or sales agent."

Item 4 of the Disclosure Document is amended by adding the following:

"Neither we, our affiliate, our predecessor nor our officers during the 10 year period immediately before the date of the Disclosure Document: (a) filed as debtor (or had filed against it) a petition to start an action under the U.S. Bankruptcy Code; (b) obtained a discharge of its debts under the bankruptcy code; or (c) was a principal officer of a company or a general partner in a partnership that either filed as a debtor (or had filed against it) a petition to start an action under the U.S. Bankruptcy Code or that obtained a discharge of its debt under the U.S. Bankruptcy Code during or within one year after the officer or general partner of the franchisor held this position in the company or partnership."

Item 5 of the Disclosure Document is amended by adding the following to the subsection entitled "Initial Franchise Fee":

"We will use the Initial Franchise Fee to cover our costs and expenses associated with fulfilling our obligations under the Franchise Agreement to provide training to you at our Zephyrhills, Florida headquarters and to provide you with all written training materials and related items."

Item 17 of the Disclosure Document is amended by deleting the first sentence and second sentence of the first paragraph and substituting the following:

"THIS TABLE LISTS CERTAIN IMPORTANT PROVISIONS OF THE FRANCHISE AGREEMENT AND RELATED AGREEMENTS PERTAINING TO RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION.  YOU SHOULD READ THESE PROVISIONS IN THESE AGREEMENTS ATTACHED TO THIS DISCLOSURE DOCUMENT."

Franchisee's Initials _____

Item 17 of the Disclosure Document is further amended by adding the following statements to the summary columns:

(i)     The "Summary" section of Item 17(d) of the Disclosure Document is amended by adding the following:

You also may terminate the Agreement on any grounds available by law.

(ii)    The "Summary" section of Item 17(j) of the Disclosure Document is amended by adding the following:

However, no assignment will be made except to an assignee who, in our good faith judgment, is willing and able to assume our obligations under the Agreement.

(iii)   The "Summary" section of Item 17(m) of the Disclosure Document is amended by adding the following:

; provided, however, that all rights you enjoy and any causes of action arising in your favor from the provisions of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force; it being the intent of this proviso that the non-waiver provisions of GBL 687.4 and 687.5 be satisfied.

(iv)    The "Summary" section of Item 17(s) of the Disclosure Document is amended by adding the following:

Modifications to the Manual will not unreasonably affect your obligations, including economic requirements, under the Agreement.

(v)     The "Summary" sections of Items 17(v) and (w) of the Disclosure Document are amended by adding the following:

This section should not be considered a waiver of any right conferred upon you by the GBL of the State of New York, Article 33.

(vi)    The "Summary" section of Item 17(w) of the Disclosure Document is amended by adding the following:

"The foregoing choice of law should not be considered a waiver of any right conferred upon either the Franchisor or upon the Franchisee by the General Business Law of the State of New York."

**MISCELLANEOUS DISCLAIMERS CONCERNING REGISTRATION OF THIS DISCLOSURE DOCUMENT ("PROSPECTUS"):**

1.     This registered Disclosure Document does not knowingly omit any material fact or contain any untrue statement of a material fact.

2.     **REGISTRATION DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION, OR ENDORSEMENT BY THE NEW YORK STATE DEPARTMENT OF LAW.**

3.     Neither the fact that an application for registration of this Disclosure Document has been filed with the New York State Department of Law, nor the fact that such registration has become effective, constitutes a finding by the Department of Law that any document filed with the Department, including the registered Disclosure Document, is true, complete or not misleading. Neither any such fact nor the fact an exemption is available for a transaction means that the Department has passed in any way upon



the merits or qualifications of, or recommended or given approval to, any person, franchise, or transaction.

4.     The filing of an application for registration of this Disclosure Document or the acceptance and filing thereof by the Department of Law as required by the New York Franchise Act does not constitute approval of the offering or the sale of such franchise by the Department of Law or the Attorney General of the State of New York.

Item 23, the Receipt, is hereby amended by adding the particular State of New York agency you should contact if you determine a possible violation of State law may have occurred: **The New York State Department of Law, 120 Broadway, 23rd Floor, New York, NY 10271.**

## AGENT FOR SERVICE OF PROCESS IN NEW YORK:

Our registered agent authorized to receive service of process in New York for actions arising under the New York Franchise Act is:  **New York Secretary of State, 41 State Street, Albany, NY 12231.**


## NORTH DAKOTA

**ADDENDUM TO THE DISCLOSURE DOCUMENT PURSUANT TO THE NORTH DAKOTA FRANCHISE INVESTMENT LAW**

**THE NORTH DAKOTA SECURITIES COMMISSIONER HAS HELD THE FOLLOWING TO BE UNFAIR, UNJUST OR INEQUITABLE TO NORTH DAKOTA FRANCHISEES (SECTION 51-19-09, N.D.C.C.):**

A.     **Restrictive Covenants**:  Franchise Disclosure Documents which disclose the existence of covenants restricting competition contrary to Section 9-08-06, N.D.C.C., without further disclosing that such covenants will be subject to the statute.  Application of the Non-Competition and Non-Solicitation Agreement and similar covenants set forth in the Disclosure Document and Franchise Agreement will be subject to Section 9-08-06, N.D.C.C., to the extent applicable with respect to any North Dakota franchisee.

B.     **Situs of Arbitration Proceedings**:  Franchise agreements providing that the parties must agree to the arbitration of disputes at a location that is remote from the site of the franchisee's business.  Application of any arbitration provisions under the Franchise Agreement shall require such arbitration to be conducted at such place within North Dakota or as otherwise mutually agreed by the parties as will not constitute a violation of Section 51-19-09, N.D.C.C.

C.     **Restrictions on Forum**: Requiring North Dakota franchisees to consent to the jurisdiction of courts outside of North Dakota.  To the extent any cause of action under the Franchise Agreement, Disclosure Document, or any exhibits thereto involves application of the laws of North Dakota, such action will be arbitrated, tried, heard and decided within the jurisdiction of courts in the State of North Dakota.

D.     **Liquidated Damages and Termination Penalties**:  Requiring North Dakota franchisees to consent to liquidated damages or termination penalties.  To the extent any provision of the Franchise Agreement would, under the provisions of the laws of North Dakota, be determined as liquidated damages or a termination penalty, such provision(s) is amended or deleted to the extent necessary to make such provision no longer in violation of the laws of North Dakota.

E.     **Applicable Laws**: Franchise agreements which specify that they are to be governed by the laws of a state other than North Dakota.  Laws of North Dakota shall prevail and apply as and with

Franchisee's Initials 

respect to any cause of action under the Franchise Agreement, the Disclosure Document, or any exhibits thereto, otherwise enforceable under the laws of North Dakota.

F.    **Waiver of Trial by Jury**: Requiring North Dakota Franchisees to consent to the waiver of a trial by jury. Any provision under the Franchise Agreement requiring North Dakota franchisees to waive a trial by jury are inapplicable to causes of action involving application of the laws of North Dakota.

G.    **Waiver of Exemplary & Punitive Damages**: Requiring North Dakota Franchisees to consent to a waiver of exemplary and punitive damages. Any provision under the Franchise Agreement requiring North Dakota franchisees to consent to a waiver of exemplary and punitive damages are inapplicable to causes of action involving application of the laws of North Dakota.

H.    **General Release**: Franchise Agreements that require the franchisee to sign a general release upon renewal of the franchise agreement. Any provision under the Franchise Agreement requiring North Dakota franchisees to sign a general release upon renewal of the Franchise Agreement are inapplicable to renewals of franchise agreements entered into by residents of the State of North Dakota to the extent so mandated by the laws of North Dakota.

I.     **Limitation of Claims**: Franchise Agreements that require the franchisee to consent to a limitation of Claims. The statute of limitations under North Dakota law applies to causes of action which arise under and which are to be enforced in accordance with the laws of North Dakota.

J.    **Enforcement of Agreement**: Franchise Agreements that require the franchisee to pay all costs and expenses incurred by the franchisor in enforcing the agreement. The prevailing party in any enforcement action is entitled to recover all costs and expenses including attorney's fees.

To the extent this North Dakota Addendum is inconsistent with any terms or conditions of the Franchise Agreement or exhibits or attachments thereto, or the Disclosure Document or exhibits or attachments thereto, the terms of this North Dakota Addendum shall govern.

## RHODE ISLAND

**ADDENDUM TO THE DISCLOSURE DOCUMENT PURSUANT TO THE RHODE ISLAND FRANCHISE INVESTMENT ACT.**

The following provisions apply to any Franchise Agreement issued in the State of Rhode Island:

1.     Section 19-28.1-14 of the Rhode Island Franchise Investment Act (the "Act") dictates that "a provision in a franchise agreement restricting jurisdiction or venue to a forum outside this State or requiring the application of the laws of another State is void with respect to a claim otherwise enforceable under this Act".

2.     Section 19-28.1-15 of the Act dictates that "a condition, stipulation or provision requiring a franchisee to waive compliance with or relieving a person of a duty of liability imposed by or a right provided by this Act or a rule or order under this Act is void. An acknowledgment provision, disclaimer or integration clause or a provision having a similar effect in a franchise agreement does not negate or act to remove from judicial review any statement, misrepresentations or action that would violate this Act or a rule or order under this Act. This section shall not affect the settlement of disputes, claims or civil lawsuits arising or brought under this Act".

Franchisee's Initials _____

## SOUTH DAKOTA

**ADDENDUM TO THE DISCLOSURE DOCUMENT PURSUANT TO SOUTH DAKOTA CODIFIED LAWS (Franchises for Brand-Name Goods and Service)**

Notwithstanding anything to the contrary set forth in the Disclosure Document, the following provisions shall supersede and apply to all franchises offered and sold in the State of South Dakota.

1.      Although Section 13.5 of the Franchise Agreement is intended to establish an amount presumed to be the damages for breach by the Franchisee where it would otherwise be impractical or extremely difficult to fix actual damages, such Section shall be amended by the deletion of the requirement to pay liquidated damages should it be determined by a court of competent jurisdiction that it violates Section 53-9-5 of the South Dakota Codified Laws, in which event the Franchisee shall be, continue and remain liable to Franchisor for any and all damages which Franchisor has sustained or may sustain by reason of such default or defaults and the breach of the Franchise Agreement on the part of the Franchisee for the unexpired Term of the Franchise Agreement, and the Franchisee covenants to pay to Franchisor within 10 days after demand as compensation all damages, losses, costs and expenses (including reasonable attorney's fees) incurred by Franchisor, and/or amounts which would otherwise be payable thereunder but for such termination for and during the remainder of the unexpired Term of the Franchise Agreement.

2.      Franchise registration, employment, covenants not to compete and other matters of local concern will be governed by the laws of the State of South Dakota. As to contractual and all other matters, the Franchise Agreement will be and remains subject to the construction, enforcement and interpretation of the laws of the State of Florida. If said laws are determined by a court of competent jurisdiction to be applicable thereto, the Franchise Agreement and the Non-Competition and Non-Solicitation Agreement are both subject to application of Section 53-9-8 of the South Dakota Codified Laws and the designated exceptions set forth therein. Any provision in the Franchise Agreement which designates jurisdiction or venue, or requires the Franchisee to agree to jurisdiction or venue, in a forum outside of South Dakota, is inapplicable under any Franchise Agreement issued in the State of South Dakota with respect to any cause of action otherwise enforceable under Chapter 37-5A of the South Dakota Codified Laws.

3.      To the extent applicable, and then only to the extent mandated by the applicable provisions of the South Dakota Uniform Arbitration Act, any arbitration resulting from application or enforcement of the Franchise Agreement shall be conducted in accordance with the provisions of Chapter 21-25A of the South Dakota Codified Laws.

4.      Pursuant to Section 37-5A-86 of the South Dakota Codified Laws, any condition, stipulation or provision purporting to waive compliance with any provision of Chapter 37-5A of the South Dakota Codified Laws or any rule or order thereunder is void. Any acknowledgment provision, disclaimer or integration clause or provision having a similar effect in the Franchise Agreement does not negate or act to remove from judicial review any statement, misrepresentation or action that would violate Chapter 37-5A of the South Dakota Codified Laws or a rule or other thereunder. No release language set forth in the Franchise Agreement shall relieve Franchisor or any other person, directly or indirectly, from any liability which would otherwise be enforceable under the laws of South Dakota concerning franchising.

5.      REGISTRATION OF THIS FRANCHISE DOES NOT CONSTITUTE APPROVAL OR RECOMMENDATION OF THE FRANCHISE BY THE DIRECTOR OF THE SOUTH DAKOTA DIVISION OF SECURITIES.

To the extent this South Dakota Addendum is inconsistent with any terms or conditions of the Franchise Agreement or exhibits or attachments thereto, or the Disclosure Document or exhibits or attachments thereto, the terms of this South Dakota Addendum shall govern.

## VIRGINIA

### ADDENDUM TO THE DISCLOSURE DOCUMENT PURSUANT TO THE VIRGINIA   RETAIL FRANCHISING ACT

The Commonwealth of Virginia has adopted the Retail Franchising Act and has implemented Retail Franchising Act Rules which may supersede the Franchise Agreement in your franchise relationship with us, including the areas of termination and renewal of your franchise.   The Retail Franchising Act is found in Chapter 8 (Sections 13.1-557 et. seq.) of Title 13.1 of the Code of Virginia; the Retail Franchising Act Rules are found in Chapter 110, under Agency 5 of Title 21 of the Virginia Administration Code.

Pursuant to Section 13.1-564 of the Virginia Retail Franchising Act, it is unlawful for a franchisor to cancel a franchise without reasonable cause.  If any grounds for default or termination stated in the Franchise Agreement does not constitute "reasonable cause", as that term may be defined in the Virginia Retail Franchising Act or the laws of Virginia, that provision may not be enforceable.

Any condition, stipulation or provision binding you to waive compliance with any of the above laws shall be void; provided, however, nothing contained in those laws shall bar you and us from agreeing to binding arbitration of disputes consistent with the provisions of the above laws.

## WASHINGTON

### ADDENDUM TO THE DISCLOSURE DOCUMENT PURSUANT TO THE WASHINGTON FRANCHISE INVESTMENT PROTECTION ACT

Notwithstanding anything to the contrary set forth in the Disclosure Document, the following provisions shall supersede and apply to all franchises offered and sold in the State of Washington:

The State of Washington has a statute, RCW 19.100.180 which may supersede the Franchise Agreement in your relationship with the Franchisor including the areas of termination and renewal of your franchise.  There may also be court decisions which may supersede the Franchise Agreement in your relationship with the Franchisor including the areas of termination and renewal of your franchise.

In any arbitration involving a franchise purchased in Washington, the arbitration site shall be either in the State of Washington, or in a place mutually agreed upon at the time of the arbitration, or as determined by the arbitrator.

In the event of a conflict of laws, the provisions of the Washington Franchise Investment Protection Act, Chapter 19.100 RCW shall prevail.

A release or waiver of rights executed by you as franchisee shall not include rights under the Washington Franchise Investment Protection Act except when executed pursuant to a negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel.  Provisions such as those which unreasonably restrict or limit the statute of limitations period for claims under the Act, or rights or remedies under the Act such as a right to a jury trial may not be unreasonable.

Transfer fees are collectable to the extent that they reflect the Franchisor's reasonable estimated or actual costs in effecting a transfer.

If any of the provisions in this Disclosure Document or in the Franchise Agreement you will sign in connection herewith are inconsistent with the relationship provisions of RCW 19.100.180 or other requirements of the Washington Franchise Investment Protection Act, the provisions of the Act will prevail over the inconsistent provisions of this Disclosure Document and the Franchise Agreement with respect to any franchise sold in Washington.

Franchisee's Initials _____ $\mathcal{EB}$ _____

**WISCONSIN**

**ADDENDUM TO THE DISCLOSURE DOCUMENT PURSUANT TO THE WISCONSIN FRANCHISE INVESTMENT LAW**

Notwithstanding anything to the contrary set forth in the Disclosure Document, the following provisions shall supersede and apply to all franchises offered and sold in the State of Wisconsin:

1.　　REGISTRATION DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION OR ENDORSEMENT BY THE DIVISION OF SECURITIES OF THE STATE OF WISCONSIN.

2.　　The Registered Agent for the Franchisor authorized to receive service of any lawful process in the State of Wisconsin in any civil action against the Franchisor that arises under the Wisconsin Franchise Investment Law or any rule or order therein is the Administrator, Wisconsin Division of Securities, P.O. Box 1768, Madison, WI 53701-1768 (Telephone: (608) 266-8557).

3.　　The following shall apply to Franchise Agreements in the State of Wisconsin:

(a)　　The Wisconsin Fair Dealership Law, Wisconsin Statutes, Chapter 135 (the "Law"), shall apply to and govern the provisions of Franchise Agreements issued in the State of Wisconsin.

(b)　　The Law's requirements, including that in certain circumstances a Franchisee receive ninety (90) days notice of termination, cancellation, non-renewal or substantial change in competitive circumstances, and sixty (60) days to remedy claimed deficiencies, shall supersede the provisions of the Franchise Agreement to the extent they may be inconsistent with the Law's requirements.

(c)　　Item 17 of the Disclosure Document and the corresponding Sections of the Franchise Agreement are superseded by the Law to the extent any provisions in the Franchise Agreement are inconsistent with the Law.

### "FRANCHISEE"

If the "Franchisee" is a legal entity (corporation, limited liability company, partnership, etc.) then (i) enter the name of the entity Franchisee in the following space: _____, (ii) each equity owner of the Franchisee must sign below (attach additional sheet if necessary), and (iii) next to the name of the persons that are signing this **Exhibit "H"** Addendum, insert their title within such entity (president, partner, manager, member, etc.). If the Franchisee is not a legal entity at the time of signing, but rather one or more individual persons, then do not fill in the title lines below. **By signing below, the undersigned hereby acknowledge receipt of this Exhibit "H" Addendum.**

**ENTER APPLICABLE STATE OF RESIDENCY FROM ABOVE LIST:** _____

1:　　_____　　_____, 200__
　　　Signature of Franchisee or equity owner if Franchisee is a legal entity　　Date　　　Year

_____　　_____
Printed name of person that signed above　　Title of person that signed above
　　　　　　　　　　　166　　　　　Franchisee's Initials _____

2: _____   _____, 200__
   Signature of Franchisee or equity owner if Franchisee is a legal entity    Date         Year

   _____   _____
   Printed name of person that signed above        Title of person that signed above


3: _____   _____, 200__
   Signature of Franchisee or equity owner if Franchisee is a legal entity    Date         Year

   _____   _____
   Printed name of person that signed above        Title of person that signed above


**"GPFC"**
FOR GOIN' POSTAL FRANCHISE CORPORATION

GOIN' POSTAL FRANCHISE CORPORATION
A Florida Corporation


BY: _____   _____, 200__
    Authorized Signing Officer            *Date        *Year
    *Date of Goin' Postal Franchise Corporation's Counter Signature on Franchise Agreement is
    "Effective Date" of this Exhibit "H" Addendum.

    Print Name of Officer:_____

        Title of Officer:_____


167      Franchisee's Initials ___*EB*___

## EXHIBIT "I"

## TO UNIFORM FRANCHISE DISCLOSURE DOCUMENT

### Goin' Postal Franchise Corporation

### FINANCIAL STATEMENTS

Franchisee's Initials _____ $e\beta$ _____

# GOIN' POSTAL FRANCHISE CORPORATION

Zephyrhills, Florida

Financial Statements

For the Twelve Months Ended
December 31, 2008 and 2007

Judson B. Baggett, CPA, PA          Certified Public Accountants

## GOIN' POSTAL FRANCHISE CORPORATION

Zephyrhills, Florida

Financial Statements
For the Twelve Months Ended
December 31, 2008 and 2007

Franchisee's Initials

GOIN' POSTAL FRANCHISE CORPORATION

Financial Statements
For the Twelve Months Ended
December 31, 2008 and 2007

TABLE OF CONTENTS

Report of Independent Auditor ...........................................…................. 1

Financial Statements:

Balance Sheets ....................................................... 2-3
Statements of Operations............................................... 4
Statements of Stockholders' Equity....................................... 5
Statements of Cash Flows............................................... 6-7
Notes to the Financial Statements...................................... 8-16

Supplementary Information:

Three Year Comparative Financial Statements...................…... 17-21

i

171      Franchisee's Initials

# Judson B. Baggett, CPA, PA
## Certified Public Accountants

Judson B. Baggett, MBA, CPA, CVA, Partner
Marci Reutimann, CPA, Partner

6815 Dairy Road
Zephyrhills, FL 33542
Phone: (813) 788-2155
Fax: (813) 782-8606

### Report of Independent Auditor

Board of Directors and Stockholders
Goin' Postal Franchise Corporation
Zephyrhills, Florida

We have audited the accompanying balance sheets of Goin' Postal Franchise Corporation as of December 31, 2008, and 2007, and the related statements of income, retained earnings, and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the 2008 and 2007 financial statements referred to above present fairly, in all material respects, the financial position of Goin' Postal Franchise Corporation as of December 31, 2008, and 2007, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 3 to the financial statements, the Company changed its method of revenue recognition in 2007.

The accompanying supplementary information is presented for purposes of additional analysis and is not a required part of the basic financial statements. The supplementary information presents comparative financial statements for the years ended December 31, 2008, 2007, and 2006. The financial statements of Goin' Postal Franchise Corporation as of December 31, 2006, were audited by other auditors whose report dated March 20, 2007, expressed an unqualified opinion on those statements. Those financial statements are presented in comparison form; however, the accompanying note disclosures to those financial statements as of December 31, 2006 are not included. As the notes to the financial statements are an integral part of the financial statements, care should be taken when using the accompanying supplementary information.

Judson B. Baggett, CPA, PA
March 12, 2009

Member: American Institute of Certified Public Accountants (AICPA) and Florida Institute of Certified Public Accountants (FICPA);
National Association of Certified Valuation Analysts (NACVA)

172          Franchisee's Initials _____

GOIN' POSTAL FRANCHISE CORPORATION
BALANCE SHEETS
December 31, 2008 and 2007

|  | | December 31 | | |
|---|---|---|---|---|
|  | | 2008 | | 2007 |
| **CURRENT ASSETS** | | | | |
| Cash | $ | 55,584 | $ | 269,482 |
| Accounts Receivable, net | | 15,535 | | 32,861 |
| Pre-paid Expenses | | | | 5,238 |
| Total current assets | | 71,119 | | 307,581 |
| | | | | |
| **PROPERTY AND EQUIPMENT** | | | | |
| NET OF ACCUM. DEPRECIATION | | 1,153,654 | | 227,990 |
| | | | | |
| **OTHER ASSETS** | | | | |
| Employee advances | | 6,945 | | 11,308 |
| Advances due from officer | | | | 202,888 |
| Other assets | | 1,000 | | 1,000 |
| Total other assets | | 7,945 | | 215,196 |
| | | | | |
| **TOTAL ASSETS** | $ | 1,232,718 | $ | 750,767 |

2
See accompanying notes and auditor's report

173        Franchisee's Initials _____

**GOIN' POSTAL FRANCHISE CORPORATION**
BALANCE SHEETS (CONTINUED)
December 31, 2008 and 2007

|  | December 31 | |
|---|---|---|
|  | 2008 | 2007 |
| **CURRENT LIABILITIES** | | |
| Accounts payable and accrued expenses | $ 81,483 | $ 114,115 |
| Line of credit | 104,765 | 96,784 |
| Line of credit - related entity | | |
| Deferred Revenue, franchise fees | 156,800 | 334,500 |
| Deposits | | 3,132 |
| Accrued state and federal income taxes | | 15,115 |
| Current maturities of long term debt | 40,997 | 13,400 |
| Total current liabilities | 384,045 | 577,046 |
| **LONG TERM LIABILITIES** | | |
| Notes Payable, secured by property, net of current portion | 642,116 | |
| Obligation under capital lease, net of current portion | 45,417 | 60,371 |
| Total long term liabilities | 687,533 | 60,371 |
| **STOCKHOLDERS' EQUITY** | | |
| Common Stock: $.000005 par value; 500 million shares authorized; | | |
| 20 million shares issued and outstanding | 100 | 100 |
| Additional paid in capital | 77,752 | 77,752 |
| Retained earnings | 83,288 | 35,498 |
| Total stockholders' equity | 161,140 | 113,350 |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $ 1,232,718 | $ 750,767 |

3
See accompanying notes and auditor's report

Franchisee's Initials _____

**GOIN' POSTAL FRANCHISE CORPORATION**
STATEMENTS OF OPERATIONS
Twelve Months Ended December 31, 2008 and 2007

|  | December 31 | |
|---|---|---|
|  | 2008 | 2007 |
| **REVENUE** | | |
| Franchise fees, net | $ 1,751,995 | $ 3,120,437 |
| Store sales | 1,078,119 | 1,125,697 |
| Other fees | 80,426 | |
| Total Revenue | 2,910,540 | 4,246,134 |
| | | |
| **OPERATING EXPENSES** | | |
| Franchise expenses | 208,252 | 870,964 |
| Cost of sales, store | 789,604 | 730,341 |
| General and administrative expenses | 1,807,414 | 2,437,604 |
| Total Operating Expenses | 2,805,270 | 4,038,909 |
| | | |
| NET INCOME (LOSS) FROM OPERATIONS | 105,270 | 207,225 |
| | | |
| **OTHER INCOME (EXPENSE)** | | |
| Miscellaneous income | 16,919 | 26,005 |
| Interest Income | 206 | 9,284 |
| Gain (Loss) on disposal of equipement | (1,824) | |
| Interest expense | (54,955) | (15,159) |
| Total Other Income (Expense) | (39,654) | 20,130 |
| | | |
| NET INCOME (LOSS) BEFORE TAXES | 65,616 | 227,355 |
| | | |
| **PROVISION FOR INCOME TAX** | | |
| Income tax expense | | (78,898) |
| Benefit due to loss carryforward | | 63,783 |
| Deferred benefit | | |
| Total Income Tax Effect | 0 | (15,115) |
| | | |
| NET INCOME | $ 65,616 | $ 212,240 |
| | | |
| **NET INCOME/(LOSS) PER COMMON SHARE** | | |
| BASIC AND DILUTED | $ 0.003 | $ 0.011 |
| | | |
| **WEIGHTED AVERAGE SHARES OUTSTANDING** | | |
| BASIC AND DILUTED | 20,000,000 | 20,000,000 |

4
See accompanying notes and auditor's report

Franchisee's Initials _____

## GOIN' POSTAL FRANCHISE CORPORATION
### STATEMENTS OF STOCKHOLDERS' EQUITY
### Twelve Months Ended December 31, 2008 and 2007

| | Shares | Amount | Shares | Amount | Additional Paid in Capital | Stock for Future Services | Retained Earnings / (Accumulated Deficit) | Total |
|---|---|---|---|---|---|---|---|---|
| Balance, December 31, 2006 | 1,805,000 | $ 1,805 | 20,000,000 | $ 100 | $ 112,195 | $ (114,000) | $ (174,937) | $ (174,837) |
| Additional paid in capital | | | | | 75,947 | | | 75,947 |
| Recall and retirement of issued preferred stock | (1,805,000) | (1,805) | | | (110,390) | 114,000 | (1,805) | - |
| Net Income, 2007 | | | | | | | 212,240 | 212,240 |
| Balance, December 31, 2007 | | | 20,000,000 | 100 | 77,752 | - | 35,498 | 113,350 |
| Additional paid in capital | | | | | | | | - |
| Distributions to shareholders | | | | | | | (17,826) | (17,826) |
| Net Income, 2008 | | | | | | | 65,616 | 65,616 |
| Balance, December 31, 2008 | 0 | $ - | 20,000,000 | $ 100 | 77,752 | - | 83,288 | $ 161,140 |

See accompanying notes and auditor's report

5

176        Franchisee's Initials _____

**GOIN' POSTAL FRANCHISE CORPORATION**
**STATEMENTS OF CASH FLOWS**
**Twelve Months Ended December 31, 2008 and 2007**

| | December 31 | |
|---|---|---|
| | 2008 | 2007 |
| **Operating Activities** | | |
| Net Income | $ 65,616 | $ 212,240 |
| Adjustments to reconcile net income to cash provided (used) | | |
| by operating activities: | | |
| Depreciation expense | 57,280 | 43,050 |
| (Gain)/Loss on disposal of assets | 1,824 | 3,300 |
| Decrease (Increase) in: | | |
| Accounts receivable and prepaid expenses, net | 22,564 | (23,985) |
| Employee advances | 4,363 | (3,708) |
| Increase (Decrease) in: | | |
| Accounts payable, deposits and accrued expenses | (35,764) | 24,185 |
| Income taxes payable | (15,115) | 15,115 |
| Deferred revenue | (177,700) | (278,500) |
| Total Adjustments | (142,548) | (220,543) |
| Net cash provided (used) by operating activities | (76,932) | (8,303) |
| **Investing Activities:** | | |
| Purchase of property, plant, equipment and improvements | (984,768) | (24,285) |
| Net cash provided (used) by financing activities | (984,768) | (24,285) |
| **Financing Activities:** | | |
| Net proceeds on line of credit | 7,981 | 73,378 |
| Net advances to (collections from) shareholder and officer | 202,888 | (39,824) |
| Payments of long term debt | (25,241) | (15,316) |
| Proceeds from new debt issuance | 680,000 | |
| Distributions to shareholders | (17,826) | |
| Net cash provided by business combination at Jan. 1, 2007 | | 8,246 |
| Net cash provided (used) by financing activities | 847,802 | 26,484 |
| Net increase (decrease) in cash | (213,898) | (6,104) |
| Cash at beginning of year | 269,482 | 275,586 |
| Cash at end of year | $ 55,584 | $ 269,482 |

See next page for supplemental disclosures of cash flow information and non-cash
investing and financing activities

6

See accompanying notes and auditor's report

177          Franchisee's Initials _____

**GOIN' POSTAL FRANCHISE CORPORATION**
STATEMENTS OF CASH FLOWS (CONTINUED)
Twelve Months Ended December 31, 2008 and 2007

Supplemental disclosures of cash flow information and non-cash
Investing and financing activities:

| | | | | |
|---|---|---|---|---|
| Cash paid during period for interest | $ | 54,955 | $ | 15,159 |

On January 1, 2007, the Company acquired the assets and liabilities of two entities related to the
Company through common ownership. In conjunction with the acquisition, the Company acquired
approximately $13,000 in assets and assumed $123,000 in liabilities. The assets and liabilities were
transferred at historical cost.

During June, 2007, a capital lease obligation of $79,940 was incurred when the Company entered
into a lease for new equipment.

During September, 2007, a debt owed to a company related by common stockholders was converted
to additional paid in capital.

During 2006, the Company issued 1,805,000 shares of Series A Preferred Stock, which was valued
at approximately $114,000. During 2007, the Company recalled and retired these shares at par value.

During 2008, the Company paid $12,550 in cash for state and federal income taxes accrued
during the year ending December 31, 2007.

During 2008, the Company purchased land and buildings recorded at cost of $854,200 with
$174,200 of cash and by signing notes payable in the amount of $680,000. These notes are secured
by the purchased real property.

7
See accompanying notes and auditor's report

Franchisee's Initials _____

GOIN' POSTAL FRANCHISE CORPORATION
Notes to Financial Statements

1.    Background Information, Organization, and Basis of Presentation

Goin' Postal Franchise Corporation (the "Company"), a Florida corporation, was incorporated on August 13, 2004. The Company's headquarters is located in Zephyrhills, Florida, and operates under the name "Goin' Postal", which is part of the trademark filed with the United States Patent and Trademark Office. The Company franchises packaging, shipping, and mailing services that utilize a variety of shipping carriers, vendors, and service providers. As of December 31, 2008, the company had 243 open and operating franchised stores throughout the United States, including 39 new stores opened during the year.

On January 1, 2007, the Company acquired the assets and assumed the liabilities of Goin' Postal Zephyrhills, Inc. and Safe Size Greeting, Inc., which are related to the Company through common ownership. In conjunction with the acquisitions, the Company acquired approximately $13,000 in assets and assumed $123,000 in liabilities. The purpose of the acquisitions was to create efficiencies and synergies related to store merchandise sales. The assets and the liabilities were transferred at historical cost. All inter-company transactions and balances are eliminated related to the above entities.

2.    Significant Accounting Policies

The significant accounting policies followed are:

Use of Estimates
The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. The most significant estimate relates to the useful lives of fixed assets. Actual results could differ from those estimates.

Revenue Recognition
Revenue from initial franchise and point of sale fees are recognized when the initial obligations required by the Company and enumerated in the agreements are met. These obligations consist of signed franchise agreement, completed training, and completed point of sale system installation, and all material and operating manuals being provided. A final walk-through or evaluation of the above, which generally coincides with the opening of the store, occurs after all training and other services are complete. The initial franchise fee per franchise is generally $15,000; the Company typically receives the initial fees upon initiation of the agreement. The Company recognizes $10,000 of revenue when all training, point of sale system installation, and materials have been provided. Additional revenue from initial fees is deferred until the final walk-through or evaluation, as previously described. Deferred revenue related to initial franchise fees was approximately $334,500 as of December 31, 2007 and $156,800 as of December 31, 2008.

8

Franchisee's Initials _____

GOIN' POSTAL FRANCHISE CORPORATION
Notes to Financial Statements

2.   Significant Accounting Policies (continued)

Turnkey revenues relate to income the Company receives from respective franchisees for the build-out of the franchisee store. Costs include tangible property such as signs, computer, copiers, and various other build-out costs related to the franchisee's store. The Company recognizes revenue as it is received and costs as incurred. The Company has two stores at December 31, 2007 and at December 31, 2008 for which the build-out has not been completed.

The Company enters into royalty and advertising agreements with the respective franchisees, which are recognized over the life of the agreement. These fees are due monthly; for franchises purchased before 2008 the fees are $200 per month. The monthly fee for a franchise purchased in 2008 is $300, and will increase by 5% each year during the life of that franchise's royalty and advertising agreement.

Store revenue consists of merchandise and shipping services, and is recognized at the time of the transaction.

Fair Value of Financial Instruments
The carrying amount of cash, trade receivables, and trade payables approximates fair value at December 31, 2007 and 2008 because of the short maturity of these instruments. Based on the borrowing rates currently available to the Company for bank loans with similar maturities and similar collateral requirements, the fair value of notes payable and long-term debt, other than related party debt, approximates the carrying amounts at December 31, 2007 and 2008.

Cash
All cash is maintained with major financial institutions in the United States. Deposits may exceed the amount of insurance provided on such deposits. The Company does not believe it is exposed to any significant credit risk on cash and cash equivalents.

Accounts Receivable
The Company provided an allowance for doubtful accounts on franchise fees receivable based on review of the current status of the receivables and management's evaluation of the periodic aging of accounts. The Company charges off accounts receivable against the allowance for doubtful accounts when an account is deemed uncollectible.

In 2008 the Company has elected to record bad debts using the direct write-off method. Generally accepted accounting principles require that the allowance method be used to recognize bad debts; however, the effect of using the direct write-off method is not materially different from the results that would have been obtained under the allowance method.

Property and Equipment
Property and equipment are carried at cost, less accumulated depreciation. Depreciation is calculated using the straight-line method over the estimated useful lives of the respective assets, ranging between 3 and 40 years. Maintenance and repairs are charged to operations when incurred. Betterments and renewals are capitalized. When property and equipment are sold or otherwise disposed of, the asset account and related accumulated depreciation accounts are relieved, and any gain or loss is included in operations.

9

Franchisee's Initials _____

GOIN' POSTAL FRANCHISE CORPORATION
Notes to Financial Statements

2.    Significant Accounting Policies (continued)

Income Taxes

The Company uses Statement of Financial Accounting Standards No. 109, "Accounting for Income Taxes" (SFAS NO. 109), in reporting deferred income taxes. SFAS No. 109 requires the recognition of deferred tax liabilities and assets for the expected future income tax consequences of events that have been recognized in the Company's financial statements. Under this method, deferred tax assets and liabilities are determined based on temporary differences between the financial statements carrying amounts and the tax basis of assets and liabilities using enacted tax rates in effect in the year in which the temporary differences are expected to reverse. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. At the end of 2007 it was determined that the company would elect to be taxed under subchapter S of the Internal Revenue Code. Based on this election, all remaining deferred tax assets and liabilities were considered to have no value.

Beginning January 1, 2008, the Company has elected to be taxed under subchapter S of the Internal Revenue Code. Under subchapter S, the Company will pay no income tax on its earnings; income for tax purposes will be reported directly on the shareholders' tax returns, and all associated tax is paid by the shareholders.

Advertising

Advertising is expensed as incurred. Advertising expenses for the twelve months ended December 31, 2007 and 2008 were approximately $96,584 and $94,085 respectively.

Impairment of Long lived Assets

The Company accounts for long lived asset impairments under SFAS No. 144, "Accounting for the Impairment or Disposal of Long Lived Assets." Consistent with prior guidance, SFAS No. 144 requires a two-step approach for recognizing and measuring the impairment of assets to be held and used. The Company recognizes impairment losses on long-lived assets used in operations when indicators of impairment are present and the undiscounted cash flows estimated to be generated by those assets are less than the assets' carrying amounts. The impairment loss is measured by comparing the fair value of the asset based on discounted future cash flows to its carrying amount. Assets to be sold are classified as discontinued operations and are stated at the lower of the carrying amount of the assets or fair value.

SFAS No. 123R

In December, 2004, the Financial Accounting Standards Board (FASB) issued SFAS No. 123 (Revised 12/2004), "Share-Based Payment" (SFAS No. 123R). This statement requires all share-based payments to employees, including grants of employee stock options, to be recognized as compensation expense in the financial statements based on their fair values. That expense will be recognized over the period during which an employee is required to provide services in exchange for the award, known as the requisite service period (usually the vesting period).

Stock Issued for Future Services

In December, 2006, the Company issued fully vested Series A convertible preferred stock (Series A) to employees and certain consultants (see Note 11). The Company recorded compensation expense in fiscal year 2006 based on the par value of the Series A stock, which approximated the fair value of the stock based on a valuation of the Company at the date the stock was granted. During 2007, all shares of preferred stock were recalled. No compensation expense was recorded in 2007 related to the preferred stock.

10

Franchisee's Initials _____

GOIN' POSTAL FRANCHISE CORPORATION
Notes to Financial Statements

2. Significant Accounting Policies (continued)

Earnings Per Common Share

Basic earnings per common share excludes dilution and is computed by dividing the net earnings (loss) available to common stockholders by the weighted average number of common shares outstanding during the period. Diluted earnings per common share is calculated by dividing net income by the weighted average number of common shares outstanding for the period, adjusted for the diluted effect of common stock using the treasury stock method and the "if converted" method as it relates to convertible preferred stock (see Note 11).

3. Change in Revenue Recognition

Effective September 30, 2007, the Company changed its method of accounting for franchise fee income, recognizing the bulk of the income when all steps for opening the store were completed except for the final walk-through by the Company's representative. Approximately one third of the revenue is deferred until the final walk-through. The Company believes that the new method more accurately reflects periodic results of operations. See also Note 2, Revenue Recognition. The effect of this change was to increase 2007 net income by approximately $350,000.

4. Franchise Revenue

Franchise revenue at December 31 consists of the following:

|  | 2008 | 2007 |
|---|---|---|
| Initial franchise fees | $ 655,300 | $1,715,931 |
| Turnkey sales | 192,000 | 533,311 |
| Point of sale fees | 257,014 | 381,515 |
| Royalty fees | 546,772 | 422,256 |
| Advertising revenue | 511 | |
| Store Transfer Fees | 35,000 | |
| Rate Program | 39,402 | |
| Other revenue | 25,996 | 67,425 |
|  | $1,751,995 | $3,120,438 |

11

Franchisee's Initials 

GOIN' POSTAL FRANCHISE CORPORATION
Notes to Financial Statements

5.    Related Party Transactions

The Company leases its operating facility from the Company's controlling stockholders. Lease payments are $10,000 per month and the lease agreement which commenced December, 2005 continues through December, 2015. Total lease payments to the Company's controlling stockholder amounted to $120,000 for the twelve months ended December 31, 2008 and $120,000 for the twelve months ending December 31, 2007.

Approximate future minimum rental payments to the controlling stockholder under the above non-cancelable operating lease at December 31, 2007, are as follows:

| Period Ending December 31, | |
|---|---|
| 2009 | 120,000 |
| 2010 | 120,000 |
| 2011 | 120,000 |
| 2012 | 120,000 |
| 2013 | 120,000 |
| Thereafter | 240,000 |
| | $ 840,000 |

Advances to officer represent amounts advanced to the president of the Company. Advances to officer amounted to approximately $202,887.93 as of December 31, 2007. These amounts are secured by a promissory note due on demand. Interest is due annually at a blended applicable federal rate. Interest charged during 2007 amounted to $7,736. No advances were made in 2008 and all advances were paid by the officer during 2008.

The Company is related through common ownership to Goin' Postal, Inc. During 2006, Goin' Postal, Inc. advanced the Company funds such that, as of December 31, 2006, the amount due to related entity was $75,947. During 2007, it was decided by the common ownership that the advanced funds would not be paid back but instead the advance would be deemed additional paid in capital for use by the Company.

In addition, Goin' Postal, Inc. issued a $25,000 line of credit to the Company during 2007. Interest was payable monthly at prime plus 2.25 percent. This unsecured line was guaranteed by the controlling stockholder of the Company. At December 31, 2007, all funds loaned to the Company by Goin' Postal, Inc., on this line of credit had been repaid.

The amounts and terms of the above transactions are not necessarily indicative of the amounts and terms that may have been incurred had comparable transactions been entered into with independent parties.

12

183         Franchisee's Initials _____

**GOIN' POSTAL FRANCHISE CORPORATION**
Notes to Financial Statements

6.  **Property and Equipment**

Property and equipment at December 31 consists of:

|                          |   | 2008 | 2007 |
|--------------------------|---|---------:|---------:|
| Equipment and furniture  | $ | 286,166 | $ 164,502 |
| Vehicles                 |   | 74,902 | 72,841 |
| Buildings                |   | 683,363 |  |
| Land                     |   | 170,841 |  |
| Leasehold improvements    |   | 63,240 | 63,240 |
|                          |   | 1,278,512 | 300,583 |
| Accumulated depreciation  |   | (124,858) | (72,593) |
|                          |   | $ 1,153,654 | $ 227,990 |

Property and equipment are carried at cost, less accumulated depreciation. Depreciation is calculated using the straight-line method over the estimated useful lives of the respective assets, ranging between 3 and 40 years.

Property and equipment includes equipment leased under a capital lease with a historical cost of $80,200 and accumulated amortization of $12,000 at December 31, 2008, which is included with accumulated depreciation.

7.  **Lines of Credit**

Lines of credit at December 31 consist of:

|                                                                                                                                                  | 2008 | 2007 |
|--------------------------------------------------------------------------------------------------------------------------------------------------|---------:|---------:|
| $100,000 line of credit from a bank; interest payable monthly at prime plus 3.35% (6.60% at December 31, 2008); unsecured; guaranteed by the controlling stockholder; due on demand | $ 97,774 | $ 58,274 |
| $ 25,000 line of credit from a bank; interest payable monthly At prime plus 9.35% (12.60% at December 31, 2008); Unsecured; guaranteed by the controlling stockholder; due on demand. | 6,991 | 0 |
| $100,000 line of credit from a bank; interest payable monthly at prime plus 0.50%; guaranteed by the controlling stockholder; due on demand | 0 | 38,510 |
|                                                                                                                                                  | $ 104,765 | $ 96,784 |

13

Franchisee's Initials _____

GOIN' POSTAL FRANCHISE CORPORATION
Notes to Financial Statements

8.  Long-Term Debt

Long-term debt at December 31 consists of:

|  | | 2008 | 2007 |
|---|---|---|---|
| Capital lease payable to finance company; monthly payments of $1,738.89 including interest at 11.02%; secured by equipment | $ | 60,371 | 73,771 |
| Promissory note payable; monthly payments of $3,636.85 including interest of 8.0%; final payment due in 2023; secured by real property. | | 375,541 | 0 |
| Promissory note payable; monthly payments of $2,765.12 including interest of 7.4%; final payment due in 2023; secured by real property. | | 292,518 | 0 |
| Less current maturities | | (40,897) | (13,400) |
| | | $ 687,433 | $ 60,371 |

Principal maturities on long-term debt at December 31, 2008 are as follows:

Period Ending
December 31,

| | |
|---|---|
| 2009 | $ 40,997 |
| 2010 | 44,103 |
| 2011 | 48,233 |
| 2012 | 42,086 |
| 2013 | 34,541 |
| Thereafter | 518,470 |
| | $ 728,430 |

9.  Income Taxes

The company has elected to be taxed under subchapter S of the Internal Revenue Code for 2008; therefore, no deferred tax liability or asset has been recorded at December 31, 2007 and 2008 (see also Note 2).

10.  Net Income Per Share

Basic earnings per share are computed by dividing earnings available to common stockholders by the weighted average number of common shares outstanding during the period. Diluted earnings per share reflect per share amounts that would have resulted if dilutive potential preferred stock had been converted into common stock, as well as the potential dilutive effect of common stock options. All outstanding preferred stock had been retired as of December 31, 2007, and all common stock options had been cancelled as of December 31, 2007.

14

Franchisee's Initials _____

GOIN' POSTAL FRANCHISE CORPORATION
Notes to Financial Statements

The following table sets forth the computation of basic and diluted net loss per share at December 31:

|  | 2008 | 2007 |
|---|---|---|
| Numerator: | | |
| Net income (loss) applicable to common shareholders | $65,616 | $212,240 |
| Denominator: | | |
| Weighted average shares outstanding – basic and diluted | 20,000,000 | 20,000,000 |
| Net income (loss) per share applicable to common shareholders – basic and diluted | $ .003 | $ .011 |

11.   Stockholders' Equity

The Company currently has 550,000,000 authorized shares of capital stock, which includes 500,000,000 shares of common stock with a par value of $.000005 per share and 50,000,000 shares of preferred stock with a par value of $.001 per share.

Preferred Stock and Series A Convertible Preferred Stock
On December 6, 2006, the Company's Board of Directors authorized 50,000,000 shares of preferred stock, of which, 1,805,000 were shares of Series A convertible preferred stock ("Series A") with a par value of $.001. The Series A shares are each convertible into five shares of common stock upon the 'conversion event." The conversion event is defined as the Company selling the 400th "Franchise Unit" pursuant to which the Company has received both the paid initial franchise fees associated with such sale and the corresponding executed franchise agreement.   The conversion date deadline was December 31, 2008.   Should the Conversion Event fail to occur on or before the conversion date, or should any holder of any Series A convertible preferred stock cease to be employed by the Company, either as an employee or an independent contractor, the Series A convertible shares must be retired and forfeited to the Company for no consideration. During the 3rd quarter of 2007, the Company recalled and retired all outstanding preferred stock.

Common Stock Options
In January, 2007, the Company adopted a non-qualified stock option plan (the "Plan").   The Company is authorized the issuance of 14,000,000 options to purchase shares of the Company's common stock.   At December 31, 2007 there were no options under the Plan available for grant.  The Company has cancelled all granted options as of December 31, 2007.

15

Franchisee's Initials _____

GOIN' POSTAL FRANCHISE CORPORATION
Notes to Financial Statements

The following table represents stock option activity as of and for the period ended December 31, 2007:

| | Number Of Shares | Weighted Average Exercise Price | Weighted Average Contractual Life | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Options outstanding- December 31, 2006 | | | | |
| Granted | 14,000,000 | $.15 | 9.50 years | 0 |
| Forfeited / expired / Cancelled/ exercised | 14,000,000 | | | |
| Options outstanding- December 31, 2007 | 0 | $.15 | 9.50 years | 0 |
| Options exercisable Outstanding- December 31, 2007 | 0 | $.15 | 9.50 years | 0 |

12. Contingencies

In the normal course of business, the Company may be subject to involvement to legal actions. In the opinion of management and the Company's legal counsel, there are no outstanding matters that will have a material adverse effect on the Company's financial position and results of operations.

16

187            Franchisee's Initials _____

# Supplementary Information

Franchisee's Initials _____

Goin' Postal Franchise Corporation
Supplementary Information
Comparative Balance Sheets

| | 2008 | 2007 | 2006 |
|---|---|---|---|
| **CURRENT ASSETS** | | | |
| Cash | $ 55,584 | $ 269,482 | $ 275,585 |
| Accounts Receivable, net | 15,535 | 32,861 | 16,349 |
| Pre-paid Expenses | | 5,238 | |
| Advances due from officer | | 202,888 | 53,262 |
| Advances from related entities | | | 113,618 |
| Deferred tax asset | | | 3,400 |
| Total current assets | 71,119 | 510,469 | 462,255 |
| | | | |
| **PROPERTY AND EQUIPMENT** | | | |
| NET OF ACCUM. DEPRECIATION | 1,153,654 | 227,990 | 170,115 |
| | | | |
| **OTHER ASSETS** | | | |
| Employee advances | 6,945 | 11,308 | 8,600 |
| Other assets | 1,000 | 1,000 | |
| Total other assets | 7,945 | 12,308 | 8,600 |
| | | | |
| **TOTAL ASSETS** | $ 1,232,718 | $ 750,767 | $ 640,950 |

| | 2007 | 2007 | 2006 |
|---|---|---|---|
| **CURRENT LIABILITIES** | | | |
| Accounts payable and accrued expenses | $ 91,483 | $ 114,115 | $ 90,887 |
| Line of credit | 104,765 | 96,784 | 9,095 |
| Line of credit - related entity | | | 14,311 |
| Due to related entities | | | 75,917 |
| Deferred Revenue, franchise fees | 156,800 | 334,500 | 613,000 |
| Deposits | | 3,132 | |
| Accrual state and federal income taxes | | 15,115 | |
| Current Maturities of long term debt | 40,997 | 13,400 | 1,770 |
| Total current liabilities | 384,045 | 577,046 | 805,010 |
| | | | |
| **LONG TERM LIABILITIES** | | | |
| Deferred Tax Liability | | | 3,400 |
| Obligation under capital lease, net of current portion | 45,417 | 60,371 | |
| Long term debt, net of current portion | 642,116 | | 7,377 |
| Total long term liabilities | 687,533 | 60,371 | 10,777 |
| | | | |
| **STOCKHOLDERS' EQUITY** | | | |
| Common Stocks $.000005 par value; 500 million shares authorized; | | | |
| 20 million shares issued and outstanding | 100 | 100 | 100 |
| Additional paid in capital | 77,752 | 77,752 | |
| Series A convertible preferred stock, $.001 par value, authorized 50 | | | |
| million shares, 1,805,000 shares of Series A convertible preferred | | | |
| stock issued and outstanding | | | 1,805 |
| Additional paid in capital | | | 112,195 |
| Stock for future services | | | (114,000) |
| Retained earnings/(Accumulated deficit) | 83,288 | 35,498 | (174,937) |
| Total stockholders' equity | 161,140 | 113,350 | (174,837) |
| | | | |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $ 1,232,718 | $ 750,767 | $ 640,950 |

17

See auditor's report

Franchisee's Initials _____

Goin' Postal Franchise Corporation
Supplementary Information
Comparative Statements of Operations

|  | 2007 | 2007 | 2006 |
|---|---|---|---|
| **REVENUE** |  |  |  |
| Franchise fees, net | $ 1,751,995 | $ 3,120,437 | $ 1,994,916 |
| Store sales | 1,078,119 | 1,123,697 |  |
| Other fees | 80,426 |  | 242,047 |
| Total Revenue | 2,910,540 | 4,246,134 | 2,236,963 |
| **OPERATING EXPENSES** |  |  |  |
| Franchise expenses | 208,252 | · 870,964 | 707,133 |
| Cost of sales, store | 789,604 | 730,341 |  |
| General and administrative expenses | 1,807,414 | 2,437,604 | 1,632,233 |
| Total Operating Expenses | 2,805,270 | 4,038,909 | 2,339,366 |
| NET INCOME (LOSS) FROM OPERATIONS | 105,270 | 207,225 | (102,403) |
| **OTHER INCOME (EXPENSE)** |  |  |  |
| Miscellaneous Income | 16,919 | 26,006 |  |
| Interest Income | 206 | 9,284 |  |
| Gain (Loss) on disposal of equipment | (1,824) |  | 1,397 |
| Interest Expense | (54,955) | (15,159) | (17,594) |
| Total Other Income (Expense) | (39,654) | 20,130 | (16,197) |
| NET INCOME (LOSS) BEFORE TAXES | 65,616 | 227,355 | (118,600) |
| **PROVISION FOR INCOME TAX** |  |  |  |
| Income tax expense |  | (78,898) |  |
| Benefit due to loss carryforward |  | 63,783 |  |
| Deferred benefit |  |  | 389 |
| Total Income Tax Effect | 0 | (15,115) | 389 |
| NET INCOME | $ 65,616 | $ 212,240 | $ (118,211) |
| **NET INCOME/(LOSS) PER COMMON SHARE** |  |  |  |
| BASIC AND DILUTED | $ 0.003 | $ 0.011 | $ (0.006) |
| **WEIGHTED AVERAGE SHARES OUTSTANDING** |  |  |  |
| BASIC AND DILUTED | 20,000,000 | 20,000,000 | 20,000,000 |

·
▲

18
See auditor's report

Franchisee's Initials  $\mathcal{EB}$

Goin' Postal Franchise Corporation
Supplementary Information
Comparative Statements of Stockholders' Equity

| | Series A Convertible Preferred Stock | | Common Stock | | Additional Paid in Capital | Stock for Future Services | Retained Earnings / (Accumulated Deficit) | Total |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| Balance, December 31, 2005 | 0 | $  - | 20,000,000 | $ 100 | $  - | $  - | $ (56,720) | $ (56,620) |
| Issuance of preferred stock for services | 1,805,000 | 1,805 | | - | 112,195 | (114,000) | | - |
| Net Income, 2006 | | | | | | | (118,211) | (118,211) |
| Balance, December 31, 2006 | 1,805,000 | 1,805 | 20,000,000 | 100 | 112,195 | (114,000) | (174,957) | (174,837) |
| Additional paid in capital | | | | | 75,947 | | | 75,947 |
| Recall and retirement of issued preferred stock  (1,805,000) | (1,805) | | | | (110,390) | 114,000 | (1,805) | - |
| Net Income, 2006 | | | | | | | 212,240 | 212,240 |
| Balance, December 31, 2007 | 0 | $  - | 20,000,000 | 100 | 77,752 | $  - | 35,498 | 113,350 |
| Additional paid in capital | | | | | | | | - |
| Distributions to shareholders | | | | | | | (17,850) | (17,850) |
| Net Income, 2008 | | | | | | | 65,616 | 65,616 |
| Balance, December 31, 2008 | 0 | $  - | 20,000,000 | $ 100 | $ 77,752 | $  - | $ 83,288 | $ 161,140 |

19
See auditor's report

191          Franchisee's Initials _____

Goin' Postal Franchise Corporation
Supplementary Information
Comparative Statements of Cash Flow

|  | 2008 | 2007 | 2006 |
|---|---|---|---|
| **Operating Activities** |  |  |  |
| Net Income | $ 65,616 | $ 212,240 | $ (118,211) |
| Adjustments to reconcile net income to cash provided (used) by operating activities: |  |  |  |
| Depreciation expense | 57,280 | 43,050 | 32,171 |
| (Gain)/Loss on disposal of assets | 1,824 | 3,300 | (1,397) |
| Decrease (Increase) in: |  |  |  |
| Accounts receivable and prepaid expenses, net | 22,564 | (23,985) | 10,580 |
| Employee advances | 4,363 | (3,709) |  |
| Advances and due from officer and related entities |  |  | 1,100 |
| Increase (Decrease) in: |  |  |  |
| Accounts payable and accrued expenses | (35,764) | 24,185 | (23,379) |
| Income taxes payable | (15,115) | 15,115 |  |
| Deferred Revenue | (177,700) | (278,500) | 354,000 |
| Total Adjustments | (142,548) | (220,543) | 373,075 |
| Net cash provided (used) by operating activities | (76,932) | (8,303) | 254,864 |
| **Investing Activities:** |  |  |  |
| Purchase of property, plant, equipment and improvements | (984,768) | (24,285) | (111,080) |
| Net cash provided (used) by financing activities | (984,768) | (24,285) | (111,080) |
| **Financing Activities:** |  |  |  |
| Net proceeds on line of credit | 7,981 | 73,378 | 9,095 |
| Net proceeds on line of credit - related entity |  |  | 14,311 |
| Net advances to (collections from) shareholder and officer | 202,888 | (39,824) | (223) |
| Net advances to (collections from) related entities |  |  | 38,430 |
| Payments of long term debt | (25,241) | (15,316) | (1,113) |
| Proceeds from new debt issuance | 680,000 |  |  |
| Distributions to shareholders | (17,826) |  |  |
| Net cash provided by business combination at Jan 1, 2007 |  | 8,246 |  |
| Net cash provided (used) by financing activities | 847,802 | 26,484 | 60,500 |
| Net increase (decrease) in cash | (213,898) | (6,104) | 204,284 |
| Cash at beginning of year | 269,482 | 275,586 | 71,302 |
| Cash at end of year | $ 55,584 | $ 269,482 | $ 275,586 |

See next page for supplemental disclosures of cash flow information and non-cash
investing and financing activities

See auditor's report

Franchisee's Initials _____

Goin' Postal Franchise Corporation
Supplementary Information
Comparative Statements of Cash Flow (continued)

Supplemental disclosures of cash flow information and non-cash
investing and financing activities:

| | | | | |
|---|---|---|---|---|
| Cash paid during period for interest | $ | 54,955 | $ | 35,159 | $ | 17,593 |

The Company returned a defective printer in 2006 and the remaining accounts payable on the equipment of $59,659 was forgiven by the financing company.

During the year ended December 31, 2006, The Company financed the purchase of equipment for $10,260.

On January 1, 2007, the Company acquired the assets and liabilities of two entities related to the Company through common ownership. In conjunction with the acquisition, the Company acquired approximately $13,000 in assets and assumed $123,000 in liabilities. The assets and liabilities were transferred at historical cost.

During June, 2007, a capital lease obligation of $79,940 was incurred when the Company entered

During September, 2007, a debt owed to a company related by common stockholders was converted to additional paid in capital.

at approximately $114,000. During 2007, the Company recalled and retired these shares at par value.

At January 1, 2005, the Company acquired from a commonly-owned entity $3,609 in accounts receivable, $57,747 in property and equipment, accounts payable of $50,434, and due to officer and related party of $11,332

During 2005, the Company acquired equipment from a related party for $49,382.

During 2008, the Company paid $12,550 in cash for state and federal income taxes accrued during the year ending December 31, 2007.

During 2008, the Company purchased land and buildings recorded at cost of $854,200 with $174,200 of cash and by signing notes payable in the amount of $680,000. These notes are secured by the purchased real property.

21
See auditor's report

193          Franchisee's Initials   EB

# GOIN' POSTAL FRANCHISE CORPORATION

Zephyrhills, Florida

Financial Statements

For the Three Months Ended
March 31, 2009

---

Judson B. Baggett, CPA, PA      Certified Public Accountants

     Franchisee's Initials _____

# GOIN' POSTAL FRANCHISE CORPORATION

Zephyrhills, Florida

Financial Statements
For the Three Months Ended
March 31, 2009

GOIN' POSTAL FRANCHISE CORPORATION

Financial Statements
For the Three Months Ended
March 31, 2009

TABLE OF CONTENTS

Report of Independent Accountant ................................ 1

Financial Statements:

    Balance Sheet ................................................... 2

    Statement of Operations ......................................... 3

    Statement of Stockholders' Equity ............................... 4

    Statement of Cash Flows ......................................... 5

    Notes to the Financial Statements............................. 6-11

i

Franchisee's Initials _____

# *Judson B. Baggett, CPA, PA*
## **Certified Public Accountants**

Judson B. Baggett, MBA, CPA, CVA, Partner
Marci Reutimann, CPA, Partner

6816 Dairy Road
Zephyrhills, FL 33542
Phone: (813) 788-2155
Fax: (813) 782-8606

## Report of Independent Certified Public Accountant

Board of Directors and Stockholders
Goin' Postal Franchise Corporation
Zephyrhills, Florida

We have reviewed the accompanying balance sheet of Goin' Postal Franchise Corporation as of March 31, 2009, and the related statements of operations, stockholders' equity, and cash flows for the three months then ended, in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants. All information included in these financial statements is the representation of the management of Goin' Postal Franchise Corporation.

A review consists principally of inquiries of company personnel and analytical procedures applied to financial data. It is substantially less in scope than an audit in accordance with generally accepted auditing standards, the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

Based on our review, we are not aware of any material modifications that should be made to the accompanying financial statements in order for them to be in conformity with generally accepted accounting principles.

Judson B. Baggett, CPA, PA
April 24, 2009

1

Franchisee's Initials _____

## GOIN' POSTAL FRANCHISE CORPORATION
### BALANCE SHEET
### March 31, 2009

ASSETS

|  |  | March 31, 2009 |
|---|---|---|
| **CURRENT ASSETS** |  |  |
| Cash | $ | 73,943 |
| Accounts receivable |  | 6,172 |
| Advances due from officer |  | 125,698 |
| Total current assets |  | 205,813 |
|  |  |  |
| **PROPERTY AND EQUIPMENT** |  |  |
| NET OF ACCUM. DEPRECIATION |  | 1,131,362 |
|  |  |  |
| **OTHER ASSETS** |  |  |
| Other assets |  | 1,000 |
| Employee advances |  | 6,945 |
| Total other assets |  | 7,945 |
|  |  |  |
| **TOTAL ASSETS** | $ | 1,345,120 |

LIABILITIES AND STOCKHOLDERS' EQUITY

|  |  | March 31, 2009 |
|---|---|---|
| **CURRENT LIABILITIES** |  |  |
| Accounts payable and accrued expenses | $ | 97,217 |
| Line of credit |  | 217,351 |
| Deferred revenue, franchise fees |  | 178,600 |
| Current maturities of long term debt & capital lease |  | 41,923 |
| Total current liabilities |  | 535,091 |
|  |  |  |
| **LONG TERM LIABILITIES** |  |  |
| Long term debt, mortgages, net of current portion |  | 635,128 |
| Obligation under capital lease, net of current portion |  | 41,415 |
| Total long term liabilities |  | 676,543 |
|  |  |  |
| **STOCKHOLDERS' EQUITY** |  |  |
| Common Stock: $.000005 par value; 500 million shares authorized; |  |  |
| 20 million shares issued and outstanding |  | 100 |
| Additional paid in capital |  | 77,752 |
| Retained earnings |  | 55,634 |
| Total stockholders' equity |  | 133,486 |
|  |  |  |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $ | 1,345,120 |

2

See accompanying notes and accountants' report

Franchisee's Initials ____

## GOIN' POSTAL FRANCHISE CORPORATION
### STATEMENT OF OPERATIONS
### For the Three Months Ended March 31, 2009

|  | March 31, 2009 |
|---|---|
| **REVENUE** | |
| Franchise fees, net | $ 289,962 |
| Store sales | 243,733 |
| Rents | 11,140 |
| Other fees | 12,520 |
| Total Revenue | 557,355 |
| | |
| **OPERATING EXPENSES** | |
| Franchise expenses | 21,787 |
| Cost of sales, store | 169,026 |
| General and administrative expenses | 384,674 |
| Total Operating Expenses | 575,487 |
| | |
| **NET INCOME (LOSS) FROM OPERATIONS** | (18,132) |
| | |
| **OTHER INCOME (EXPENSE)** | |
| Miscellaneous Income | 14,335 |
| Interest Income | 373 |
| Gain (Loss) on disposal of equipement | (198) |
| Interest Expense | (16,296) |
| Total Other Income (Expense) | (1,786) |
| | |
| **NET INCOME** | $ (19,918) |
| | |
| **NET INCOME/(LOSS) PER COMMON SHARE** | |
| **BASIC AND DILUTED** | $ (0.001) |
| | |
| **WEIGHTED AVERAGE SHARES OUTSTANDING** | |
| **BASIC AND DILUTED** | 20,000,000 |

3
See accompanying notes and accountants' report

Franchisee's Initials

**GOIN' POSTAL FRANCHISE CORPORATION**
**STATEMENT OF STOCKHOLDERS' EQUITY**
**For the Three Months Ended March 31, 2009**

|  | Common Stock | | Additional | Retained | |
|---|---|---|---|---|---|
|  | Shares | Amount | Paid in Capital | Earnings | Total |
| Balance, December 31, 2008 | 20,000,000 | $ 100 | $ 77,752 | $ 83,288 | $ 161,140 |
| Distributions to Shareholders |  |  |  | (7,736) | (7,736) |
| Net Income, three months ended March 31, 2009 |  |  |  | (19,918) | (19,918) |
| Balance, March 31, 2009 | 20,000,000 | $ 100 | $ 77,752 | $ 55,634 | $ 133,486 |

4
See accompanying notes and accountants' report

Franchisee's Initials

### GOIN' POSTAL FRANCHISE CORPORATION
### STATEMENT OF CASH FLOWS
### For the Three Months Ended March 31, 2009

|  | March 31, 2009 |
|---|---|
| **Operating Activities** | |
| Net income | $ (19,918) |
| Adjustments to reconcile net income to cash provided (used) | |
| by operating activities: | |
| Depreciation expense | 16,068 |
| Loss on sale of equipment | 198 |
| Decrease (Increase) in: | |
| Accounts receivable and prepaid expenses, net | 9,363 |
| Increase (Decrease) in: | |
| Accounts payable and accrued expenses | 15,734 |
| Income taxes payable | - |
| Deferred Revenue | 21,800 |
| Total Adjustments | 63,163 |
| Net cash provided (used) by operating activities | 43,245 |
| **Investing Activities:** | |
| Advances to Officer and Shareholder | (125,698) |
| Sale of property, plant, equipment and improvements | 10,222 |
| Purchase of property, plant, equipment and improvements | (4,196) |
| Net cash provided (used) by financing activities | (119,672) |
| **Financing Activities:** | |
| Net proceeds on line of credit | 112,586 |
| Payments of long term debt | (10,064) |
| Distributions to shareholders | (7,736) |
| Net cash provided (used) by financing activities | 94,786 |
| Net increase (decrease) in cash | 18,359 |
| Cash at beginning of year | 55,584 |
| Cash at March 31, 2009 | $ 73,943 |

Supplemental disclosures of cash flow information and non-cash
investing and financing activities:

| | |
|---|---|
| Cash paid during period for interest | $ 15,696 |

5
See accompanying notes and accountants' report

Franchisee's Initials _____

## GOIN' POSTAL FRANCHISE CORPORATION
### Notes to Financial Statements
### As of and For the Three Months Ended March 31, 2009

### 1.   Background Information, Organization, and Basis of Presentation

Goin' Postal Franchise Corporation (the "Company"), a Florida corporation, was incorporated on August 13, 2004. The Company's headquarters is located in Zephyrhills, Florida, and operates under the name "Goin' Postal", which is part of the trademark filed with the United States Patent and Trademark Office. The Company franchises packaging, shipping, and mailing services that utilize a variety of shipping carriers, vendors, and service providers. As of March 31, 2009, the company had 246 open and operating franchised stores throughout the United States.

### 2.   Significant Accounting Policies

The significant accounting policies followed are:

#### Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. The most significant estimate relates to the allowance for doubtful accounts. Actual results could differ from those estimates.

#### Revenue Recognition

Revenue from initial franchise and point of sale fees are recognized when the initial obligations required by the Company and enumerated in the agreements are met. These obligations consist of signed franchise agreement, completed training, and completed point of sale system installation, and all material and operating manuals being provided. A final walk-through or evaluation of the above, which generally coincides with the opening of the store, occurs after all training and other services are complete. The initial franchise fee per franchise is generally \$15,000; the Company typically receives the initial fees upon initiation of the agreement. The Company recognizes \$10,000 of revenue when all training, point of sale system installation, and materials have been provided. Additional revenue from initial fees is deferred until the final walk-through or evaluation, as previously described. Deferred revenue related to initial franchise fees was approximately \$178,600 as of March 31, 2009.

Turnkey revenues relate to income the Company receives from respective franchisees for the build-out of the franchisee store. Costs include tangible property such as signs, computer, copiers, and various other build-out costs related to the franchisee's store. The Company recognizes revenue as it is received and costs as incurred. The Company has two stores at March 31, 2009 for which the build-out has not been completed.

The Company enters into royalty and advertising agreements with the respective franchisees, which are recognized over the life of the agreement. The monthly fee for a franchise purchased in 2009 is \$315, which will increase by 5% each year during the life of that franchise's royalty and advertising agreement.

Store revenue consists of merchandise and shipping services, and is recognized at the time of the transaction.

6

Franchisee's Initials

## GOIN' POSTAL FRANCHISE CORPORATION
### Notes to Financial Statements
### As of and For the Three Months Ended March 31, 2009

2.      **Significant Accounting Policies (continued)**

**Fair Value of Financial Instruments**
The carrying amount of cash, trade receivables, and trade payables approximates fair value at March 31, 2009 because of the short maturity of these instruments. Based on the borrowing rates currently available to the Company for bank loans with similar maturities and similar collateral requirements, the fair value of notes payable and long-term debt, other than related party debt, approximates the carrying amounts at March 31, 2009.

**Cash**
The Company considers deposits that can be redeemed on demand and investments that have original maturities of less than three months, when purchased, to be cash equivalents. All cash is maintained with major financial institutions in the United States. Deposits may exceed the amount of insurance provided on such deposits. The Company does not believe it is exposed to any significant credit risk on cash and cash equivalents.

**Accounts Receivable**
In 2008 the Company elected to record bad debts using the direct write-off method. Generally accepted accounting principles require that the allowance method be used to recognize bad debts; however, the effect of using the direct write-off method is not materially different from the results that would have been obtained under the allowance method.

**Property and Equipment**
Property and equipment are carried at cost, less accumulated depreciation. Depreciation is calculated using the straight-line method over the estimated useful lives of the respective assets, ranging between 3 and 40 years. Maintenance and repairs are charged to operations when incurred. Betterments and renewals are capitalized. When property and equipment is sold or otherwise disposed of, the asset account and related accumulated depreciation account are relieved, and any gain or loss is included in operations.

**Income Taxes**
Beginning in 2008, the Company has elected to be taxed under sub-chapter S of the Revenue Code. Under these provisions, the Company does not pay federal or state income taxes on its taxable income. Instead, the stockholders are liable for individual federal income taxes on their respective shares of the Company's taxable income.

**Sales and Use Tax**
Included in operating expenses is Florida sales tax of $634 charged for franchise sale items.

**Advertising**
Advertising is expensed as incurred. Advertising expense for the six months ended March 31, 2009 was approximately $31,508.

**Impairment of Long Lived Assets**
The Company accounts for long lived asset impairments under SFAS No. 144, "Accounting for the Impairment or Disposal of Long Lived Assets." Consistent with prior guidance, SFAS No. 144 requires a two-step approach for recognizing and measuring the impairment of assets to be held and used. The Company recognizes impairment losses on long lived assets used in operations when indicators of impairment are present and the undiscounted cash flows estimated to be generated by those assets are less than the assets' carrying amounts. The impairment loss is measured by comparing the fair value of the asset based on discounted future cash flows to its carrying amount. Assets to be sold are classified as discontinued operations and are stated at the lower of the carrying amount of the assets or fair value.

7

Franchisee's Initials 

GOIN' POSTAL FRANCHISE CORPORATION
Notes to Financial Statements
As of and For the Three Months Ended March 31, 2009

2.    Significant Accounting Policies (continued)

Earnings Per Common Share
Basic earnings per common share excludes dilution and is computed by dividing the net earnings (loss) available to common stockholders by the weighted average number of common shares outstanding during the period. Diluted earnings per common share is calculated by dividing net income by the weighted average number of common shares outstanding for the period, adjusted for the diluted effect of common stock using the treasury stock method and the "if converted" method as it relates to convertible preferred stock.

3.    Franchise Revenue

Franchise revenue at March 31, 2009 consists of the following:

| | |
|---|---:|
| Initial franchise fees | $ 71,800 |
| Point of sale fees | 32,114 |
| Royalty fees | 138,710 |
| Other revenue | 47,338 |
| | $289,962 |

4.    Related Party Transactions

The Company leases its operating facility from the Company's controlling stockholder. Lease payments are $1,000 per month and the lease agreement which commenced January 2009 continues through December 2015. Total lease payments to the Company's controlling stockholder amounted to $3,000 for the three months ended March 31, 2009.

Approximate future minimum rental payments to the controlling stockholder under the above non-cancelable operating lease at March 31, 2009, are as follows:

| Period Ending March 31, | |
|---|---:|
| 2010 | $ 12,000 |
| 2011 | 12,000 |
| 2012 | 12,000 |
| 2013 | 12,000 |
| 2014 | 12,000 |
| Thereafter | 21,000 |
| | $ 81,000 |

Advances to officer represent amounts advanced to the president of the Company. Advances to officer amounted to approximately $125,698 as of March 31, 2009. These amounts are secured by a promissory note due on demand. Interest is due annually at a blended applicable federal rate.

The amounts and terms of the above transactions are not necessarily indicative of the amounts and terms that may have been incurred had comparable transactions been entered into with independent parties.

8

Franchisee's Initials 

GOIN' POSTAL FRANCHISE CORPORATION
Notes to Financial Statements
As of and For the Three Months Ended March 31, 2009

5.   Property and Equipment

Property and equipment at March 31, 2009 consists of:

| | |
|---|---:|
| Equipment and furniture | $  276,639 |
| Buildings | 683,363 |
| Land | 170,841 |
| Vehicles | 77,402 |
| Leasehold improvements | 63,240 |
| | 1,271,485 |
| Accumulated depreciation | (140,123) |
| | $ 1,131,362 |

Depreciation expense for the period was $16,068.

6.   Lines of Credit

Lines of credit at March 31, 2009 consist of:

| | |
|---|---:|
| $100,000 line of credit from a bank; interest payable monthly at prime (3.25% at March 31, 2009); unsecured; guaranteed by the controlling stockholder; due on demand | $ 100,000 |
| $ 25,000 line of credit from a bank; interest payable monthly At prime plus 9.35% (12.60% at March 31, 2009); Unsecured; guaranteed by the controlling stockholder; due on demand | 19,858 |
| $100,000 line of credit from a bank; interest payable monthly at prime plus 0.50% (3.75% at March 31, 2009); guaranteed by the controlling stockholder; due on demand | 97,493 |
| | $ 217,351 |

9

Franchisee's Initials _____

## GOIN' POSTAL FRANCHISE CORPORATION
### Notes to Financial Statements
### As of and For the Three Months Ended March 31, 2009

7. **Obligation Under Capital Lease**

The Company's property under capital lease, which is included in property and equipment, requires monthly payments of $1,738, including an effective interest rate of approximately 11% per annum through June 2012.

Future minimum lease payments under capital lease at March 31, 2009 are as follows:

| Period Ending March 31, | |
|---|---|
| 2010 | $ 20,867 |
| 2011 | 20,867 |
| 2012 | 20,867 |
| June, 2012 | 5,217 |
| Total lease payments | 67,818 |
| Less amount representing interest | 11,033 |
| Present value of minimum lease payments | 56,785 |
| Less current maturities | 15,370 |
| | $ 41,415 |

8. **Long Term Debt**

Long term debt consists of two notes payable secured by property.

| | |
|---|---|
| $300,000 note payable to bank; secured by building and land located in Zephyrhills, Florida; interest rate of 7.3% | $ 289,590 |
| $380,000 note payable to a bank; secured by building and land located in Zephyrhills, Florida; interest rate of 7.91% | 372,092 |
| | $ 661,682 |

Loan maturities for each of the five years following March 31, 2009, are as follows:

| Period Ending March 31, | |
|---|---|
| 2010 | $ 26,554 |
| 2011 | 28,679 |
| 2012 | 30,975 |
| 2013 | 33,456 |
| 2014 | 36,135 |
| Thereafter | 505,883 |
| Total payments | $ 661,682 |

10

Franchisee's Initials _____

## GOIN' POSTAL FRANCHISE CORPORATION
### Notes to Financial Statements
### As of and For the Three Months Ended March 31, 2009

**9. Stockholders' Equity**

The Company currently has 550,000,000 authorized shares of capital stock, which includes 500,000,000 shares of common stock with a par value of $.000005 per share and 50,000,000 million shares of preferred stock with a par value of $.001 per share. Currently, 20,000,000 shares of common stock are issued and outstanding; no shares of preferred stock are issued or outstanding.

**10. Contingencies**

In the normal course of business, the Company may be subject to involvement to legal actions. In the opinion of management and the Company's legal counsel, there are no outstanding matters that will have a material adverse effect on the Company's financial position and results of operations.

11

207                Franchisee's Initials _____

GOIN' POSTAL FRANCHISE CORPORATION
Notes to Financial Statements

5.     Related Party Transactions

The Company leases its operating facility from the Company's controlling stockholders.  Lease payments are $10,000 per month and the lease agreement which commenced December, 2005 continues through December, 2015.  Total lease payments to the Company's controlling stockholder amounted to $120,000 for the twelve months ended December 31, 2007 and $120,000 for the twelve months ending December 31, 2006.

Approximate future minimum rental payments to the controlling stockholder under the above non-cancelable operating lease at December 31, 2007, are as follows:

| Period Ending December 31, | |
|---|---|
| 2008 | 120,000 |
| 2009 | 120,000 |
| 2010 | 120,000 |
| 2011 | 120,000 |
| 2012 | 120,000 |
| Thereafter | 360,000 |
| | $ 960,000 |

Advances to officer represent amounts advanced to the president of the Company.  Advances to officer amounted to approximately $202,887.93 as of December 31, 2007.  These amounts are secured by a promissory note due on demand.  Interest is due annually at a blended applicable federal rate.  Interest charged during 2007 amounted to $7,736, which was calculated using a blended rate of 5.02%.  Advances due from officer amounted to $53,262 at December 31, 2006; advances made in 2006 were unsecured.

The Company is related through common ownership to Goin' Postal, Inc.  During 2006, Goin' Postal, Inc. advanced the Company funds such that, as of December 31, 2006, the amount due to related entity was $75,947.  During 2007, it was decided by the common ownership that the advanced funds would not be paid back but instead the advance would be deemed additional paid in capital for use by the Company.

In addition, Goin' Postal, Inc. issued a $25,000 line of credit to the Company during 2007.  Interest was payable monthly at prime plus 2.25 percent.  This unsecured line was guaranteed by the controlling stockholder of the Company.  At December 31, 2007, all funds loaned to the Company by Goin' Postal, Inc., on this line of credit had been repaid.

Advances from related entities at December 31, 2006 represent accounts receivable due from Goin' Postal Zephyrhills, Inc., a commonly-owned related corporation.

The amounts and terms of the above transactions are not necessarily indicative of the amounts and terms that may have been incurred had comparable transactions been entered into with independent parties.

12

Franchisees Initials: _EH_

GOIN' POSTAL FRANCHISE CORPORATION
Notes to Financial Statements

6.   **Property and Equipment**

Property and equipment at December 31 consists of:

|  | 2007 | 2006 |
|---|---|---|
| Equipment and furniture | $ 164,502 | 63,260 |
| Vehicles | 72,841 | 82,541 |
| Leasehold improvements | 63,240 | 55,056 |
|  | 300,583 | 200,857 |
| Accumulated depreciation | (72,593) | (30,742) |
|  | $ 227,990 | 170,115 |

7.   **Lines of Credit**

Lines of credit at December 31 consist of:

|  | 2007 | 2006 |
|---|---|---|
| $100,000 line of credit to bank; interest payable monthly at prime plus 3.35% | $       0 | $ 9,095 |
| $100,000 line of credit from a bank; interest payable monthly at prime plus 3.35% (10.85% at December 31, 2007); unsecured; guaranteed by the controlling stockholder; due on demand | 58,274 | 0 |
| $100,000 line of credit from a bank; interest payable monthly at prime plus 0.50% (8.00% at December 31, 2007); guaranteed by the controlling stockholder; due on demand | 38,510 | 0 |
|  | $ 96,784 | $ 9,095 |

8.   **Long-Term Debt**

Long-term debt at December 31 consists of:

|  | 2007 | 2006 |
|---|---|---|
| Installment note payable to finance company; monthly payments of $218 including interest at 10.26%; due April 2011; secured by equipment | $        0 | $ 9,147 |
| Capital lease payable to finance company; monthly payments of $1,738.89 including interest at 11.02%; secured by equipment | 73,771 | 0 |
| Less current maturities | (13,400) | (1,770) |
|  | $ 60,371 | $ 7,377 |

Principal maturities on long-term debt at December 31, 2007 are as follows:

Period Ending
December 31,

| | |
|---|---|
| 2008 | $ 13,400 |
| 2009 | 14,954 |
| 2010 | 16,688 |
| 2011 | 18,623 |
| 2012 | 10,106 |
|  | $ 73,771 |

13

Franchisees Initials: ER

GOIN' POSTAL FRANCHISE CORPORATION
Notes to Financial Statements

9.    Income Taxes

Deferred taxes consist of the following at December 31:

|  | 2007 | 2006 |
|---|---|---|
| Current | | |
| Deferred tax assets | | |
| Allowance for doubtful accounts | $ 0 | $3,400 |
| Current deferred tax assets, net | $ 0 | $3,400 |
| | | |
| Non-current deferred tax assets (liabilities) | | |
| Net operating loss carry-forward | $ 0 | $67,200 |
| Valuation allowance | | (63,000) |
| Depreciation | 0 | (7,600) |
| Non-current deferred tax liability, net | $ 0 | $(3,400) |

The Company previously recorded a full valuation allowance against the deferred tax asset attributable to the net operating loss carry-forward. However, due to the increase in income in the current year, the full value of the carry-forward was realized. The company has elected to be taxed under subchapter S of the Internal Revenue Code for 2008; therefore, no deferred tax liability or asset has been recorded at December 31, 2007 (see Note 1).

10.    Net Income Per Share

Basic earnings per share are computed by dividing earnings available to common stockholders by the weighted average number of common shares outstanding during the period.  Diluted earnings per share reflect per share amounts that would have resulted if dilutive potential preferred stock had been converted into common stock, as well as the potential dilutive effect of common stock options. All outstanding preferred stock had been retired as of December 31, 2007, and all common stock options had been cancelled as of December 31, 2007.

The following table sets forth the computation of basic and diluted net loss per share at December 31:

|  | 2007 | 2006 |
|---|---|---|
| Numerator: | | |
| Net income (loss) applicable to common shareholders | $212,240 | $(118,211) |
| | | |
| Denominator: | | |
| Weighted average shares outstanding – basic and diluted | 20,000,000 | 20,000,000 |
| | | |
| Net income (loss) per share applicable to common shareholders – basic and diluted | $(.011) | $(.006) |

14

117

Franchisees Initials: _ER_

### GOIN' POSTAL FRANCHISE CORPORATION
#### Notes to Financial Statements

**11.   Stockholders' Equity**

The Company currently has 550,000,000 authorized shares of capital stock, which includes 500,000,000 shares of common stock with a par value of $.000005 per share and 50,000,000 million shares of preferred stock with a par value of $.001 per share.

*Preferred Stock and Series A Convertible Preferred Stock*

On December 6, 2006, the Company's Board of Directors authorized 50,000,000 shares of preferred stock, of which, 1,805,000 were shares of Series A convertible preferred stock ("Series A") with a par value of $.001. The Series A shares are each convertible into five shares of common stock upon the "conversion event." The conversion event is defined as the Company selling the 400th "Franchise Unit" pursuant to which the Company has received both the paid initial franchise fees associated with such sale and the corresponding executed franchise agreement. The conversion date deadline is December 31, 2008. Should the Conversion Event fail to occur on or before the conversion date, or should any holder of any Series A convertible preferred stock cease to be employed by the Company, either as an employee or an independent contractor, the Series A convertible shares must be retired and forfeited to the Company for no consideration. During the 3rd quarter of 2007, the Company recalled and retired all outstanding preferred stock.

*Common Stock Options*

In January, 2007, the Company adopted a non-qualified stock option plan (the "Plan"). The Company is authorized the issuance of 14,000,000 options to purchase shares of the Company's common stock. At December 31, 2007 there were no options under the Plan available for grant. The Company has cancelled all granted options as of December 31, 2007.

The following table represents stock option activity as of and for the period ended December 31, 2007:

|  | Number Of Shares | Weighted Average Exercise Price | Weighted Average Contractual Life | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Options outstanding- December 31, 2006 |  |  |  |  |
| Granted          14,000,000 | 14,000,000 | $.15 | 9.50 years | 0 |
| Forfeited / expired / Cancelled/ exercised | 14,000,000 |  |  |  |
| Options outstanding- December 31, 2007 | 0 | $.15 | 9.50 years | 0 |
| Options exercisable Outstanding- December 31, 2007 | 0 | $.15 | 9.50 years | 0 |

**12.   Contingencies**

In the normal course of business, the Company may be subject to involvement in legal actions. In the opinion of management and the Company's legal counsel, there are no outstanding matters that will have a material adverse effect on the Company's financial position and results of operations.

15

118

Franchisees Initials:

Supplementary Information

Franchisees Initials:

Goin' Postal Franchise Corporation
Supplementary Information
Comparative Balance Sheets

| | 2007 | | 2006 | | 2005 |
|---|---|---|---|---|---|
| **CURRENT ASSETS** | | | | | |
| Cash | $ 260,482 | $ | 275,586 | $ | 71,302 |
| Accounts Receivable, net | 32,661 | | 16,369 | | 26,949 |
| Pre-paid Expenses | 5,238 | | | | |
| Advances due from officer | 202,888 | | 53,262 | | 53,036 |
| Advances from related entities | | | 113,618 | | 113,554 |
| Deferred tax asset | | | 3,400 | | 3,400 |
| Total current assets | 510,469 | | 462,235 | | 268,241 |
| | | | | | |
| **PROPERTY AND EQUIPMENT** | | | | | |
| NET OF ACCUM. DEPRECIATION | 227,950 | | 170,115 | | 139,210 |
| | | | | | |
| **OTHER ASSETS** | | | | | |
| Employee advances | 11,308 | | 8,600 | | 9,700 |
| Other assets | 1,000 | | | | |
| Total other assets | 12,308 | | 8,600 | | 9,700 |
| | | | | | |
| **TOTAL ASSETS** | $ 750,707 | $ | 640,950 | $ | 417,153 |

| | 2007 | | 2006 | | 2005 |
|---|---|---|---|---|---|
| **CURRENT LIABILITIES** | | | | | |
| Accounts payable and accrued expenses | $ 114,115 | $ | 90,887 | $ | 173,926 |
| Line of credit | 96,784 | | 9,693 | | |
| Line of credit - related entity | | | 14,511 | | |
| Due to related entities | | | 75,947 | | 37,453 |
| Deferred Revenue, franchise fees | 334,500 | | 613,000 | | 259,000 |
| Deposits | 3,132 | | | | |
| Accrued state and federal income taxes | 15,115 | | | | |
| Current Maturities of long term debt | 13,400 | | 1,770 | | |
| Total current liabilities | 577,046 | | 805,010 | | 470,379 |
| | | | | | |
| **LONG TERM LIABILITIES** | | | | | |
| Deferred Tax Liability | | | 3,400 | | 3,400 |
| Obligation under capital lease, net of current portion | 60,371 | | | | |
| Long term debt, net of current portion | | | 7,377 | | |
| Total long term liabilities | 60,371 | | 10,777 | | 3,400 |
| | | | | | |
| **STOCKHOLDERS' EQUITY** | | | | | |
| Common Stock $.000005 par value 500 million shares authorized; | | | | | |
| 20 million shares issued and outstanding | 100 | | 100 | | 100 |
| Additional paid in capital | 77,752 | | | | |
| Series A convertible preferred stock, $.001 par value, authorized 50 | | | | | |
| million shares, 1,805,000 shares of Series A convertible preferred | | | | | |
| stock issued and outstanding | | | 1,805 | | |
| Additional paid in capital | | | 112,195 | | |
| Stock for future services | | | (114,000) | | |
| Retained earnings/(Accumulated deficit) | 35,488 | | (176,937) | | (56,726) |
| Total stockholders' equity | 113,350 | | (176,837) | | (56,626) |
| | | | | | |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $ 750,707 | $ | 640,950 | $ | 417,153 |

16
See auditor's report

Franchisees Initials:

Goin' Postal Franchise Corporation
Supplementary Information
Comparative Statements of Operations

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| **REVENUE** | | | |
| Franchise fees, net | $ 3,120,437 | $ 1,994,916 | $ 1,018,236 |
| Store sales | 1,125,697 | | |
| Other fees | | 242,047 | 72,161 |
| Total Revenue | 4,246,134 | 2,236,963 | 1,090,397 |
| **OPERATING EXPENSES** | | | |
| Franchise expenses | 870,964 | 707,133 | 406,575 |
| Cost of sales, store | 730,341 | | |
| General and administrative expenses | 2,437,604 | 1,632,233 | 740,378 |
| Total Operating Expenses | 4,038,909 | 2,339,366 | 1,146,953 |
| NET INCOME (LOSS) FROM OPERATIONS | 207,225 | (102,403) | (56,556) |
| **OTHER INCOME (EXPENSE)** | | | |
| Miscellaneous Income | 26,006 | | |
| Interest Income | 9,284 | | |
| Gain (Loss) on disposal of equipement | | 1,397 | |
| Interest Expense | (15,159) | (17,594) | |
| Total Other Income (Expense) | 20,130 | (16,197) | 0 |
| NET INCOME (LOSS) BEFORE TAXES | 227,355 | (118,600) | (56,556) |
| **PROVISION FOR INCOME TAX** | | | |
| Income tax expense | (78,898) | | (170) |
| Benefit due to loss carryforward | 63,783 | | |
| Deferred benefit | | 389 | |
| Total Income Tax Effect | (15,115) | 389 | (170) |
| NET INCOME | $ 212,240 | $ (118,211) | $ (56,726) |
| **NET INCOME/(LOSS) PER COMMON SHARE** | | | |
| BASIC AND DILUTED | $ 0.011 | $ (0.006) | $ (0.002) |
| **WEIGHTED AVERAGE SHARES OUTSTANDING** | | | |
| BASIC AND DILUTED | 20,000,000 | 20,000,000 | 20,000,000 |

17
See auditor's report

Franchisees Initials:

**Gaint' Postal Franchise Corporation**
Supplementary Information
Comparative Statements of Stockholders' Equity

| | Shares | Amount | Shares | Amount | Additional Paid in Capital | Stock for Future Services | Retained Earnings / (Accumulated Deficit) | Total |
|---|---|---|---|---|---|---|---|---|
| Balance , December 31, 2004 | 0 | $ - | 100 | $ 100 | $ - | $ - | $ - | $ 100 |
| Common stock split - 200,000:1 | | | 19,999,900 | | | | | |
| Net Income, 2005 | | | | | | | (56,726) | (56,726) |
| Balance, December 31, 2005 | | - | 20,000,000 | 100 | - | - | (56,726) | (56,626) |
| Issuance of preferred stock for services | 1,805,000 | 1,805 | | | 112,195 | (114,000) | | - |
| Net Income, 2006 | | | | | | | (118,211) | (118,211) |
| Balance, December 31, 2006 | 1,805,000 | 1,805 | 20,000,000 | 100 | 112,195 | (114,000) | (174,937) | (174,837) |
| Additional paid in capital | | | | | 75,947 | | | 75,947 |
| Recall and retirement of issued preferred stock | (1,805,000) | (1,805) | | | (110,390) | 114,000 | (1,805) | - |
| Net Income, 2007 | | | | | | | 212,240 | 212,240 |
| Balance, December 31, 2007 | 0 | $ - | 20,000,000 | $ 100 | $ 77,752 | $ - | $ 35,498 | $ 113,350 |

122

Franchisees Initials:

Goin' Postal Franchise Corporation
Supplementary Information
Comparative Statements of Cash Flow

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| **Operating Activities** | | | |
| Net Income | $ 212,240 | $ (118,211) | $ (36,726) |
| Adjustments to reconcile net income to cash provided (used) | | | |
| by operating activities: | | | |
| Depreciation expense | 43,050 | 32,171 | 3,052 |
| Provision for doubtful accounts | | | 9,100 |
| (Gain)/Loss on disposal of assets | 3,300 | (1,397) | |
| Decrease (Increase) in: | | | |
| Accounts receivable and prepaid expenses, net | (23,985) | 10,580 | (32,440) |
| Employee advances | (3,708) | | |
| Advances and due from officer and related entities | | 1,100 | (9,700) |
| Increase (Decrease) in: | | | |
| Accounts payable and accrued expenses | 24,185 | (23,379) | 123,492 |
| Income taxes payable | 15,115 | | |
| Deferred Revenue | (278,500) | 354,000 | 259,000 |
| Total Adjustments | (220,543) | 373,075 | 352,504 |
| Net cash provided (used) by operating activities | (8,303) | 254,864 | 295,778 |
| **Investing Activities** | | | |
| Purchase of property, plant, equipment and improvements | (24,285) | (111,080) | (84,515) |
| Net cash provided (used) by financing activities | (24,285) | (111,080) | (84,515) |
| **Financing Activities:** | | | |
| Net proceeds on line of credit | 73,378 | 9,095 | |
| Net proceeds no line of credit - related entity | | 14,311 | |
| Net advances to (collections from) shareholder and officer | (39,824) | (223) | (62,416) |
| Net advances to (collections from) related entities | | 38,430 | (77,645) |
| Payments of long term debt | (15,316) | (1,113) | |
| Issuance of common stock | | | 100 |
| Net cash provided by business combination at Jan 1, 2007 | 8,246 | | |
| Net cash provided (used) by financing activities | 26,484 | 60,500 | (139,961) |
| Net Increase (decrease) in cash | (6,104) | 204,284 | 71,302 |
| Cash at beginning of year | 275,586 | 71,302 | - |
| Cash at end of year | $ 269,482 | $ 275,586 | $ 71,302 |

See next page for supplemental disclosures of cash flow information and non-cash
investing and financing activities

19
See auditor's report

123

Franchisees Initials:

Goin' Postal Franchise Corporation
Supplementary Information
Comparative Statements of Cash Flow (continued)

Supplemental disclosures of cash flow information and non-cash
investing and financing activities:

Cash paid during period for interest        $      15,159      $      17,593      $            -

The Company returned a defective printer in 2006 and the remaining accounts payable on the equipment
of $59,659 was forgiven by the financing company.

During the year ended December 31, 2006, The Company financed the purchase of equipment
for $10,260.

On January 1, 2007, the Company acquired the assets and liabilities of two entities related to the
Company through common ownership. In conjunction with the acquisition, the Company acquired
approximately $13,000 in assets and assumed $123,000 in liabilities. The assets and liabilities were
transferred at historical cost.

During June, 2007, a capital lease obligation of $79,940 was incurred when the Company entered

During September, 2007, a debt owed to a company related by common stockholders was converted
to additional paid in capital.

at approximately $114,000. During 2007, the Company recalled and retired these shares at par value.

At January 1, 2005, the Company acquired from a commonly-owned entity $3,609 in accounts receivable,
$57,747 in property and equipment, accounts payable of $50,434, and due to officer and related party
of $11,332

During 2005, the Company acquired equipment from a related party for $49,382.

20
See auditor's report

Franchisees Initials:

## GOIN' POSTAL FRANCHISE CORPORATION

Zephyrhills, Florida

Financial Statements
For the Eight Months Ended
August 31, 2008

125

Franchisees Initials:

GOIN' POSTAL FRANCHISE CORPORATION

Financial Statements
For the Eight Months Ended
August 31, 2008

TABLE OF CONTENTS

Report of Independent Accountant ...................................... 1

Financial Statements:

    Balance Sheet ........................................................ 2

    Statement of Operations................................................ 3

    Statement of Stockholders' Equity ................................... 4

    Statement of Cash Flows ............................................. 5

    Notes to the Financial Statements................................... 6-11

i

Franchisees Initials: _ER_

# Judson B. Baggett, CPA, PA
**Certified Public Accountants**

Judson B. Baggett, MBA, CPA, CVA, Partner
Marci Reutimann, CPA, Partner

6815 Dairy Road
Zephyrhills, FL 33542
Phone: (813) 788-2155
Fax: (813) 782-8508

### Report of Independent Certified Public Accountant

Board of Directors and Stockholders
Goin' Postal Franchise Corporation
Zephyrhills, Florida

We have reviewed the accompanying balance sheet of Goin' Postal Franchise Corporation as of August 31, 2008, and the related statements of operations, stockholders' equity, and cash flows for the eight months then ended, in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants. All information included in these financial statements is the representation of the management of Goin' Postal Franchise Corporation.

A review consists principally of inquiries of company personnel and analytical procedures applied to financial data. It is substantially less in scope than an audit in accordance with generally accepted auditing standards, the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

Based on our review, we are not aware of any material modifications that should be made to the accompanying financial statements in order for them to be in conformity with generally accepted accounting principles.

Judson B. Baggett, CPA, PA
Judson B. Baggett, CPA, PA
October 6, 2008

1

127

Franchisees Initials:

**GOIN' POSTAL FRANCHISE CORPORATION**
BALANCE SHEET
August 31, 2008
ASSETS

|  | August 31, 2008 |
|---|---|
| **CURRENT ASSETS** | |
| Cash | $ 138,586 |
| Accounts receivable, net | 94,722 |
| Pre-paid expenses | 12,148 |
| Advances due from officer | 98,204 |
| Total current assets | 343,660 |
| | |
| **PROPERTY AND EQUIPMENT** | |
| NET OF ACCUM. DEPRECIATION | 1,045,326 |
| | |
| **OTHER ASSETS** | |
| Employee advances | 11,308 |
| Other assets | 872 |
| Total other assets | 12,180 |
| | |
| **TOTAL ASSETS** | $ 1,401,166 |

**LIABILITIES AND STOCKHOLDERS' EQUITY**

|  | August 31, 2008 |
|---|---|
| **CURRENT LIABILITIES** | |
| Accounts payable and accrued expenses | $ 100,950 |
| Line of credit | 192,781 |
| Deferred revenue, franchise fees | 80,000 |
| Deposits | 3,132 |
| Current maturities of long term debt | 39,800 |
| Total current liabilities | 416,663 |
| | |
| **LONG TERM LIABILITIES** | |
| Long term debt, mortgages | 650,922 |
| Obligation under capital lease, net of current portion | 50,585 |
| Total long term liabilities | 701,507 |
| | |
| **STOCKHOLDERS' EQUITY** | |
| Common Stock $.000005 par value; 500 million shares authorized; | |
| 20 million shares issued and outstanding | 100 |
| Additional paid in capital | 77,752 |
| Retained earnings | 205,144 |
| Total stockholders' equity | 282,996 |
| | |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $ 1,401,166 |

2

See accompanying notes and accountants' report

Franchisees Initials:

**GOIN' POSTAL FRANCHISE CORPORATION**
STATEMENT OF OPERATIONS
Eight Months Ended August 31, 2008

|  | August 31, 2008 |
|---|---|
| **REVENUE** | |
| Franchise fees, net | $ 1,346,120 |
| Store sales | 745,595 |
| Other fees | 213,235 |
| Total Revenue | 2,304,950 |
| | |
| **OPERATING EXPENSES** | |
| Franchise expenses | 157,647 |
| Cost of sales, store | 535,392 |
| General and administrative expenses | 1,430,571 |
| Total Operating Expenses | 2,123,610 |
| | |
| NET INCOME (LOSS) FROM OPERATIONS | 181,340 |
| | |
| **OTHER INCOME (EXPENSE)** | |
| Miscellaneous Income | 4,971 |
| Interest Income | 146 |
| Gain (Loss) on disposal of equipement | 0 |
| Interest Expense | (16,811) |
| Total Other Income (Expense) | (11,694) |
| | |
| NET INCOME | $ 169,646 |
| | |
| NET INCOME/(LOSS) PER COMMON SHARE | |
| BASIC AND DILUTED | $ 0.008 |
| | |
| WEIGHTED AVERAGE SHARES OUTSTANDING | |
| BASIC AND DILUTED | 20,000,000 |

3
See accompanying notes and accountants' report

Franchisees Initials:

**GOIN' POSTAL FRANCHISE CORPORATION**
**STATEMENT OF STOCKHOLDERS' EQUITY**
**Eight Months Ended August 31, 2008**

| | Common Stock | | Additional | Retained | |
| | Shares | Amount | Paid in Capital | Earnings | Total |
|---|---|---|---|---|---|
| Balance, December 31, 2007 | 20,000,000 | $ 100 | $ 77,752 | $ 35,498 | $ 113,350 |
| Additional paid in capital | | | - | | - |
| Net Income, eight months ended August 31, 2008 | | | | 169,646 | 169,646 |
| Balance, August 31, 2008 | 20,000,000 | $ 100 | $ 77,752 | $ 205,144 | $ 282,996 |

See accompanying notes and accountants' report

4

130

Franchisees Initials:

## GOIN' POSTAL FRANCHISE CORPORATION
### STATEMENT OF CASH FLOWS
### Eight Months Ended August 31, 2008

|  | August 31, 2008 |
|---|---|
| **Operating Activities** | |
| Net income | $ 169,646 |
| Adjustments to reconcile net income to cash provided (used) by operating activities: | |
| Depreciation expense | 36,871 |
| Decrease (Increase) in: | |
| Accounts receivable and prepaid expenses, net | (68,642) |
| Increase (Decrease) in: | |
| Accounts payable and accrued expenses | (13,165) |
| Income taxes payable | (15,115) |
| Deferred Revenue | (254,500) |
| Total Adjustments | (314,551) |
| Net cash provided (used) by operating activities | (144,905) |
| **Investing Activities:** | |
| Collections from shareholder and officer | 104,684 |
| Purchase of property, plant, equipment and improvements | (854,208) |
| Net cash provided (used) by financing activities | (749,524) |
| **Financing Activities:** | |
| Net proceeds on line of credit | 95,997 |
| Proceeds from long-term loans | 680,000 |
| Payments of long term debt | (12,464) |
| Net cash provided (used) by financing activities | 763,533 |
| Net increase (decrease) in cash | (130,896) |
| Cash at beginning of year | 269,482 |
| Cash at end of year | $ 138,586 |
| | |
| Supplemental disclosures of cash flow information and non-cash investing and financing activities: | |
| Cash paid during period for interest | $ 15,803 |

5
See accompanying notes and accountants' report

131

Franchisees Initials: 

GOIN' POSTAL FRANCHISE CORPORATION
Notes to Financial Statements
As of and For the Eight Months Ended August 31, 2008

1.   Background Information, Organization, and Basis of Presentation

Goin' Postal Franchise Corporation (the "Company"), a Florida corporation, was incorporated on August 13, 2004. The Company's headquarters is located in Zephyrhills, Florida, and operates under the name "Goin' Postal", which is part of the trademark filed with the United States Patent and Trademark Office. The Company franchises packaging, shipping, and mailing services that utilize a variety of shipping carriers, vendors, and service providers. As of August 31, 2008, the company had 246 open and operating franchised stores throughout the United States.

2.   Significant Accounting Policies

The significant accounting policies followed are:

Use of Estimates
The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. The most significant estimate relates to the allowance for doubtful accounts. Actual results could differ from those estimates.

Revenue Recognition
Revenue from initial franchise and point of sale fees are recognized when the initial obligations required by the Company and enumerated in the agreements are met. These obligations consist of signed franchise agreement, completed training, and completed point of sale system installation, and all material and operating manuals being provided. A final walk-through or evaluation of the above, which generally coincides with the opening of the store, occurs after all training and other services are complete. The initial franchise fee per franchise is generally $15,000; the Company typically receives the initial fees upon initiation of the agreement. The Company recognizes $10,000 of revenue when all training, point of sale system installation, and materials have been provided. Additional revenue from initial fees is deferred until the final walk-through or evaluation, as previously described. Deferred revenue related to initial franchise fees was approximately $80,000 as of August 31, 2008.

Turnkey revenues relate to income the Company receives from respective franchisees for the build-out of the franchisee store. Costs include tangible property such as signs, computers, copiers, and various other build-out costs related to the franchisee's store. The Company recognizes revenue as it is received and costs as incurred.

The Company enters into royalty and advertising agreements with the respective franchisees, which are recognized over the life of the agreement, and are a fixed monthly amount of $200 per franchisee.

Store revenue consists of merchandise and shipping services, and is recognized at the time of the transaction.

6

Franchisees Initials:

GOIN' POSTAL FRANCHISE CORPORATION
Notes to Financial Statements
As of and For the Eight Months Ended August 31, 2008

2.   Significant Accounting Policies (continued)

Fair Value of Financial Instruments

The carrying amount of cash, trade receivables, and trade payables approximates fair value at August 31, 2008 because of the short maturity of these instruments. Based on the borrowing rates currently available to the Company for bank loans with similar maturities and similar collateral requirements, the fair value of notes payable and long-term debt, other than related party debt, approximates the carrying amounts at August 31, 2008.

Cash

The Company considers deposits that can be redeemed on demand and investments that have original maturities of less than three months, when purchased, to be cash equivalents. All cash is maintained with major financial institutions in the United States. Deposits may exceed the amount of insurance provided on such deposits. The Company does not believe it is exposed to any significant credit risk on cash and cash equivalents.

Accounts Receivable

The Company provides an allowance for doubtful accounts on franchise fees receivable based on review of the current status of the receivables and management's evaluation of the periodic aging of accounts. The Company charges off accounts receivable against the allowance for doubtful accounts when an account is deemed uncollectible. The Company determined that an allowance for doubtful accounts of $109,500 at August 31, 2008 is adequate.

Property and Equipment

Property and equipment are carried at cost, less accumulated depreciation. Depreciation is calculated using the straight-line method over the estimated useful lives of the respective assets, ranging between 3 and 40 years. Maintenance and repairs are charged to operations when incurred. Betterments and renewals are capitalized. When property and equipment are sold or otherwise disposed of, the asset account and related accumulated depreciating accounts are relieved, and any gain or loss is included in operations.

Income Taxes

Beginning in 2008, the Company has elected to be taxed under sub-chapter S of the Revenue Code. Under these provisions, the Company does not pay federal or state income taxes on its taxable income. Instead, the stockholders are liable for individual federal income taxes on their respective shares of the Company's taxable income.

Advertising

Advertising is expensed as incurred.   Advertising expense for the six months ended August 31, 2008 was approximately $51,180.

Impairment of Long Lived Assets

The Company accounts for long lived asset impairments under SFAS No. 144, "Accounting for the Impairment or Disposal of Long Lived Assets." Consistent with prior guidance, SFAS No. 144 requires a two-step approach for recognizing and measuring the impairment of assets to be held and used. The Company recognizes impairment losses on long lived assets used in operations when indicators of impairment are present and the undiscounted cash flows estimated to be generated by those assets are less than the assets' carrying amounts. The impairment loss is measured by comparing the fair value of the asset based on discounted future cash flows to its carrying amount. Assets to be sold are classified as discontinued operations and are stated at the lower of the carrying amount of the assets or fair value.

7

Franchisees Initials:

GOIN' POSTAL FRANCHISE CORPORATION
Notes to Financial Statements
As of and For the Eight Months Ended August 31, 2008

2.   Significant Accounting Policies (continued)

Earnings Per Common Share
Basic earnings per common share excludes dilution and is computed by dividing the net earnings (loss) available to common stockholders by the weighted average number of common shares outstanding during the period.  Diluted earnings per common share is calculated by dividing net income by the weighted average number of common shares outstanding for the period, adjusted for the diluted effect of common stock using the treasury stock method and the "if converted" method as it relates to convertible preferred stock.

Recently Issued Accounting Pronouncements
In July 2006, the FASB issued FIN No. 48, "Accounting for Uncertainty for Income Taxes," which clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with SFAS No. 109, "Accounting for Income Taxes."  FIN No. 48 provides guidance on the financial statements recognition and measurement of a tax position taken or expected to be taken in a tax return.  FIN No. 48 also provides guidance on recognizing, classification, interest and penalties, accounting in interim periods, disclosures, and transition.  FIN No. 48 was effective for fiscal years beginning after December 15, 2006.  The adoption of FIN No. 48 did not materially impact the financial position or results of operations of the Company.

In September 2006, the FASB issued SFAS No. 157, "Fair Value Measurements."  SFAS No. 157 clarifies the principle that fair value should be based on the assumptions market participants would use when pricing an asset or liability and establishes a fair value hierarchy that prioritizes the information used to develop those assumptions.  Under the Standard, fair value measurements would be separately disclosed by levels within the fair value hierarchy.  SFAS No. 157 is effective for financial statements issued for fiscal years beginning after November 15, 2007 and interim periods within those fiscal years.  The Adoption of FIN 157 did not materially impact the financial position or results of operations of the Company.

3.   Franchise Revenue

Franchise revenue at August 31, 2008 consists of the following:

| Initial franchise fees | $318,700 |
|---|---|
| Turnkey sales | 192,000 |
| Point of sale fees | 132,522 |
| Royalty fees | 373,980 |
| Other revenue | 528,918 |
| | $1,346,120 |

8

Franchisees Initials

GOIN' POSTAL FRANCHISE CORPORATION
Notes to Financial Statements
As of and For the Eight Months Ended August 31, 2008

4. **Related Party Transactions**

The Company leases its operating facility from the Company's controlling stockholder. Lease payments are $10,000 per month and the lease agreement which commenced December 2005 continues through December 2015. Total lease payments to the Company's controlling stockholder amounted to $30,000 for the eight months ended August 31, 2008.

Approximate future minimum rental payments to the controlling stockholder under the above non-cancelable operating lease at August 31, 2008, are as follows:

| Period Ending August 31 | |
|---|---|
| 2009 | $ 120,000 |
| 2010 | 120,000 |
| 2011 | 120,000 |
| 2012 | 120,000 |
| 2013 | 120,000 |
| Thereafter | 160,000 |
| | $ 760,000 |

Advances to officer represent amounts advanced to the president of the Company. Advances to officer amounted to approximately $98,204 as of August 31, 2008. These amounts are secured by a promissory note due on demand. Interest is due annually at a blended applicable federal rate. During the year, $104,684 was paid back to the Company.

The amounts and terms of the above transactions are not necessarily indicative of the amounts and terms that may have been incurred had comparable transactions been entered into with independent parties.

5. **Property and Equipment**

Property and equipment at August 31, 2008 consists of:

| | |
|---|---|
| Equipment and furniture | $ 163,505 |
| Buildings | 684,363 |
| Land | 170,841 |
| Vehicles | 72,841 |
| Leasehold improvements | 63,240 |
| | 1,154,790 |
| Accumulated depreciation | (109,464) |
| | $ 1,046,326 |

Depreciation expense for the period was $36,858.

9

Franchisees Initials:

GOIN' POSTAL FRANCHISE CORPORATION
Notes to Financial Statements
As of and For the Eight Months Ended August 31, 2008

6.   Lines of Credit

Lines of credit at August 31, 2008 consist of:

| | |
|---|---|
| $100,000 line of credit from a bank; interest payable monthly at prime plus 0.50% (5.50% at August 31, 2008); guaranteed by the controlling stockholder; due on demand | $ 58,249 |
| $300,000 line of credit from a bank; interest payable monthly at prime (5.00% at August 31, 2008); guaranteed by the controlling stockholder; due on demand | 134,532 |
| | $192,781 |

7.   Obligation Under Capital Lease

The Company's property under capital lease, which is included in property and equipment, requires monthly payments of $1,738, including an effective interest rate of approximately 11% per annum through June 2012.

Future minimum lease payments under capital lease at August 31, 2008 are as follows:

| Period Ending August 31, | |
|---|---|
| 2009 | $ 20,867 |
| 2010 | 20,867 |
| 2011 | 20,867 |
| 2012 | 17,389 |
| Total lease payments | 79,990 |
| Less amount representing interest | 14,988 |
| Present value of minimum lease payments | 65,002 |
| Less current maturities | 14,417 |
| | $ 50,585 |

8.   Long Term Debt

Long term debt consists of two notes payable secured by property.

| | |
|---|---|
| $300,000 note payable to bank; secured by building and land located in Zephyrhills, Florida; interest rate of 7.3% | $ 296,306 |
| $380,000 note payable to a bank; secured by building and land located in Zephyrhills, Florida; interest rate of 7.91% | 380,000 |
| | $ 676,306 |

10

136

Franchisees Initials: EIC

GOIN' POSTAL FRANCHISE CORPORATION
Notes to Financial Statements
As of and For the Eight Months Ended August 31, 2008

8.   Long Term Debt (continued)

Loan maturities for each of the five years following August 31, 2008, are as follows:

| Period Ending August 31, | |
|---|---|
| 2009 | $ 25,383 |
| 2010 | 27,415 |
| 2011 | 29,610 |
| 2012 | 31,980 |
| 2013 | 34,541 |
| Thereafter | 527,376 |
| Total payments | 676,306 |

9.   Stockholders' Equity

The Company currently has 550,000,000 authorized shares of capital stock, which includes 500,000,000 shares of common stock with a par value of $.000005 per share and 50,000,000 million shares of preferred stock with a par value of $.001 per share. Currently, 20,000,000 shares of common stock are issued and outstanding; no shares of preferred stock are issued or outstanding.

9.   Contingencies

In the normal course of business, the Company may be subject to involvement to legal actions.  In the opinion of management and the Company's legal counsel, there are no outstanding matters that will have a material adverse effect on the Company's financial position and results of operations.

11

Franchisees Initials:

## EXHIBIT "J" TO UNIFORM FRANCHISE DISCLOSURE DOCUMENT

### GOIN' POSTAL TURN-KEY STORE AGREEMENT

THIS AGREEMENT IS ENTERED INTO EFFECTIVE ON THE DATE OF FRANCHISOR'S SIGNATURE APPEARING AT THE END OF THIS AGREEMENT (THE **"EFFECTIVE DATE"**), BY AND BETWEEN GOIN' POSTAL FRANCHISE CORPORATION, A FLORIDA CORPORATION, WHOSE PRINCIPAL ADDRESS IS 4941 4TH STREET, ZEPHYRHILLS, FLORIDA 33542 (HEREINAFTER REFERRED TO AS "GPFC" OR SOMETIMES REFERRED TO AS "FRANCHISOR") AND THE PERSON OR PERSONS OR LEGAL ENTITY LISTED BELOW DESCRIBED AS "FRANCHISEE" (HEREINAFTER REFERRED TO AS "FRANCHISEE", WHICH, FOR PURPOSES OF THE OBLIGATIONS OF FRANCHISEE SET FORTH IN THIS AGREEMENT, SHALL INCLUDE EACH AND EVERY INDIVIDUAL SIGNING ON BEHALF OF FRANCHISEE HEREINBELOW).

FRANCHISOR (**"GPFC"**):   GOIN' POSTAL FRANCHISE CORPORATION, A FLORIDA CORPORATION

FRANCHISEE:   FULL LEGAL NAME [*should be the same entity/individuals listed in **Exhibit "C"** to the Disclosure Document, Part II, Franchise Ownership Information Form]

_____

_____

APPROXIMATE DESIRED LOCATION OF FRANCHISEE'S GOIN' POSTAL STORE (THE **"LOCATION"**):

Please provide as much detail; as possible, especially if you already have a location picked out.

_____
(street address)

_____
(city)                              (state)                         (zip code)

THIS TURN-KEY STORE AGREEMENT IS ENTIRELY OPTIONAL. BY EXECUTING THIS AGREEMENT AND PAYING THE ADDITIONAL "TURN-KEY FEE", GPFC WILL SET-UP AND ESTABLISH YOUR STORE, READY FOR YOU TO OPEN AFTER YOU COMPLETE BOTH YOUR CLASSROOM TRAINING AT GPFC's HEADQUARTERS IN ZEPHYRHILLS, FLORIDA AND YOUR ON-SITE TRAINING AT YOUR STORE.

Franchisee's Initials _____

## RECITALS

**WHEREAS,** Franchisee has signed a Franchise Agreement and has paid the initial franchise fee and costs for two Point of Sale Systems required for the purchase of a Goin' Postal franchise; and

**WHEREAS,** GPFC has the rights to determine the approved location of the Franchisee's Goin' Postal Store; and

**WHEREAS,** GPFC has the right to define the design, layout, color schemes and other appearance factors of the Franchisee's Goin' Postal Store; and

**WHEREAS,** Franchisee desires GPFC to assist in finding and securing a location for Franchisee's Store within the area of the Location and to also assist with the build-out, set up and establishment of Franchisee's Store to get it ready to open for business.

NOW THEREFORE, IN CONSIDERATION OF THE FOREGOING, THE FEES AND OTHER SUMS PAYABLE BY FRANCHISEE AND THE MUTUAL COVENANTS CONTAINED IN THIS AGREEMENT, THE PARTIES AGREE AS FOLLOWS:

## 1.  SECURING LOCATION FOR FRANCHISEE'S STORE

### 1.1  Location Development

GPFC will perform the following steps to establish and secure a location for the Franchisee's Store within the designated Location chosen by Franchisee:

a. Once Franchisee has submitted to GPFC in writing a specific area for the store Location as set forth on the first page (the document title page) of this Agreement, GPFC will begin the process of finding and securing a specific location for Franchisee's Store within that area.

b. Using Franchisee's desired Location as a starting point, GPFC will attempt to locate an available retail space suitable for use as a Goin' Postal Shipping Store. GPFC will make use of brokers in the general vicinity of the Location to locate the required space.  Franchisee may also visit the local area and help locate a site where Franchisee desires to locate the Store, and Franchisee may provide GPFC with any leads or possibilities they discover.  If Franchisee wishes to have their Store in a specific location, GPFC will use this location as the basis from which to proceed.

c. A GPFC representative will visit the selected location to evaluate its suitability.  GPFC recommends that the Franchisee is present for this site inspection. GPFC does not warrant or guarantee that any selected location will result in the success of Franchisee's Store.  Franchisee will be required to sign an acceptance acknowledgment once a site has been chosen.

d. Once the location is approved as the site for Franchisee's Store, GPFC will proceed with lease negotiations through use of the services of an independent real estate professional.  GPFC will make its best efforts to negotiate a lease favorable to the Franchisee, but GPFC is not liable for any lease deficiencies or unfavorable lease terms. GPFC does not act as an attorney or other professional advisor, and Franchisee is solely responsible for procuring the services of an attorney or other professional to advise and counsel Franchisee on the merits (or lack thereof) of the lease Franchisee will be presented for execution for the premises selected for Franchisee's Store location. All lease negotiations will be made using Franchisee as the signer and Franchisee's credit as the basis for negotiations.  The Franchisee is

Franchisee's Initials _____ 𝓔𝓑 _____

also permitted to negotiate their own lease with the landlord for the location, but GPFC will not be involved in Franchisee/Landlord negotiations.

e.   Once an acceptable lease has been negotiated, it will be presented to Franchisee for signing and Franchisee will sign the lease.  GPFC will conclude once Franchisee signs such lease that Franchisee's attorney or other professional advisor advised Franchisee that the lease was acceptable, or that Franchisee elected not to utilize the services of a professional advisor.

f.   If Franchisee fails to sign the lease for the selected premises, Franchisee will be solely responsible for finding an alternate location, and negotiating and signing the lease on a location of their choice.

g.   GPFC will pay the initial upfront advance rents (i.e., first and last month) and lease deposits required under the lease to secure the selected premises for Franchisee's Store location.  Real estate costs vary widely from area to area, and GPFC will inform Franchisee of the anticipated expenses as soon as information on prevailing lease costs is known.  Franchisee will be solely responsible for all further and ongoing rent and other monetary obligations under the applicable lease.

h.   Unless and until Franchisee has a signed lease for the specific location chosen by Franchisee for Franchisee's Store, neither a Territory for Franchisee's Store nor any rights of Franchisee to claim or possess any Territory (protected or otherwise) shall exist.

## 2.   BUSINESS SET-UP SERVICES

The following services will be performed on Franchisee's behalf using Franchisee's credit and personal information for the establishment of accounts:

2.1   If Franchisee desires to own and operate its Store as a corporation, GPFC will provide basic incorporation services for Franchisee through the use of a recognized service such as BizFilings, Inc.  This service will include forming a corporation for the Franchisee in the state of Franchisee's residency, obtaining a Federal Employer Identification Number (FEIN) and a Sales Tax number, if applicable. Franchisee must supply all required information and sign all documents required for obtaining these items, and Franchisee will be solely responsible for ordering a corporate book, preparing bylaws and minutes, issuing stock, and performing other organizational formalities.

2.2   GPFC will initiate, the necessary contacts to establish required utility accounts on Franchisee's behalf and in Franchisee's name including electricity, telephone, gas, garbage, water and sewer.  GPFC will pay the initial upfront deposits to establish these accounts.  Franchisee must sign all necessary documents to set up those accounts.

2.3   GPFC will initiate the necessary contacts to procure in Franchisee's name basic liability and hazard insurance from a local insurance carrier for Franchisee's Store, and GPFC will pay the first month's premium payment. Franchisee will be required to sign all applications and provide all required information.

2.4   GPFC will initiate the necessary contacts to procure in Franchisee's name any city or county business/occupational licenses for Franchisee's Store, and will pay the required license fees.  Franchisee will be required to sign all applications and provide all required information.

3.    **CONSTRUCTION OF STORE**

3.1    **Store Design.**  GPFC will design Franchisee's Store using GPFC's standard layout, adjusted as necessary for the actual dimensions of the space.

3.2    **Store Build-Out.**  GPFC will pay the costs of materials and furnishings, the costs to obtain local permits (as necessary) and the costs to procure a licensed contractor to build-out Franchisee's Store interior to GPFC's Standards and Specifications.  The materials and furnishings budget and contractor budget GPFC has factored into its costs for a Turn-Key Franchise Package are based upon the leased premises being already supplied as a 1,200 square foot "vanilla box".  A vanilla box includes finished drywall, concrete floor, drop ceiling, lighting, HVAC (with associated delivery systems), electrical switches and outlets and handicap accessible restroom.  If a location is chosen that does not meet the vanilla box requirement, Franchisee will be solely responsible for all costs incurred to bring the location up to vanilla box condition.  The Store furniture, flooring and decorating package is also based on a Store size of 1200 square feet.  If the location is larger and requires more furniture and flooring, Franchisee will be responsible for these extra costs.  Franchisee will be informed by GPFC of an estimate of any additional costs which GPFC determines to be necessary under this Section 3.2 prior to the time Franchisee will sign any lease for the Location of Franchisee's Store.

3.3    **Included Services.**  GPFC will provide all materials, labor, and permits (within the limits of its agreed responsibility reflected in the attached **Exhibit "A"**) necessary to ready the Franchisee's Store to open for business.  These services will include the following:

- Carpet and tile
- Painting and decorating
- Wall units with lighting
- Three place Counter and cash wrap
- Slat-wall
- Rear Wall
- Box shelves and storage
- 2 units of mailboxes
- Packaging table and area
- Peanut hopper
- Shelves
- Interior signage

Should Franchisee wish to install more than two sections of mailboxes, Franchisee will be responsible for additional expenses incurred.  The total build-out budget allocation is based on a Store of approximately 1200 square feet.  Stores of much larger sizes may incur additional expenses payable solely by Franchisee.

3.4    **Store Appearance.**  Franchisee's Store will be delivered to Franchisee with the interior renovations in an "as new" condition, ready for business, clean and fully stocked with the items of supplies, furniture, equipment and inventory set forth in the  table  of  included  items  and responsibility limits attached hereto as **Exhibit "A"** and included herein by this reference.

3.5    **Exterior Signage.**  GPFC will pay for furnishing one exterior sign for Franchisee's Store. Signage will be designed based on lease requirements, local ordinances, the existing appearance of the Store location, and GPFC's Standards and Specifications for sign appearance.  GPFC will pay up to $500 for panels for any existing pylon or monument roadside sign for the plaza or strip center where Franchisee's Store is located.

Franchisee's Initials ___

4.   **OTHER SERVICES AND PRODUCTS**

4.1   **Copier.**  GPFC will purchase a Konica Minolta network ready color copier capable of producing 25 pages per minute, with an automatic duplexing document feeder, hole punch unit and booklet finisher. Franchisee may at its sole cost sign up for a maintenance agreement from Konica Minolta at the then current pricing which will provide free supplies and maintenance for the machine.

4.2   **Other.**  Within the specified limits reflected in the attached **Exhibit "A"**, GPFC will furnish or provide the other items set forth in said **Exhibit "A"**.

5.   **FEES AND OTHER PAYMENTS**

5.1   Franchisee shall, in accordance with the following, pay to GPFC the following fees:

a.   A turn-key store fee of $102,000.00 shall be due and payable by Franchisee to GPFC on the date of the execution of this Agreement.  This fee is separate from the Initial Franchise Fee and is solely for the development of the Franchisee's Store by GPFC as an extra service.  This fee, together with the $15,000.00 for the Initial Franchise Fee, shall cover all costs involved with the development of the Franchisee's Store in accordance with the various included items as delineated on **Exhibit "A"** attached hereto, except to the extent Franchisee's personal desires or Store size or condition factors cause additional expenses and costs to be incurred.

b.   In the event of overages or excess expenses incurred for the above items and services, GPFC will make payments on behalf of Franchisee and invoice Franchisee immediately via email.  Payment of any overages or excess costs will be due immediately, and GPFC will not make any more expenditures until all such overages and/or excess costs are fully satisfied.  Franchisee may, or GPFC may require Franchisee to, place a credit card on file with GPFC for immediate payment of these outstanding amounts, or establish an electronic funds transfer payment arrangement with GPFC for these overages or excess costs.

c.   This Agreement will only be accepted when submitted with full payment of the required turn-key store fee, a fully executed Goin' Postal Franchise Agreement and full payment of the additional $15,000.00 for the Initial Franchise Fee. The Franchise Agreement and Turn-Key Store Agreement are separate agreements, and the payments under each agreement must be made separately, one payment of $15,000.00, and another separate payment of $102,000.00.

5.2   **Method of Payment**

a.   Franchisee shall pay the initial turn-key store fee of $102,000.00 due with this Agreement by check.  Additional fees for overages may be paid via credit card or electronic funds transfer arrangements.

5.3   **Travel Expenses**

GPFC will pay the travel expenses for its representative(s) incurred in performing the various services in establishing Franchisee's Store, including the costs for GPFC's representative(s) training visit to Franchisee's Store for the Franchisee's Store opening week. Franchisee is responsible for Franchisee's own travel expenses to visit Zephyrhills, Florida for training as set forth in the UFDD and Franchise Agreement.

5.4   **Delinquencies Owed to GPFC.**  If Franchisee fails to pay to GPFC the entire amount of any payment due to GPFC hereunder promptly when due, Franchisee shall be deemed to

be in default of Franchisee's Franchise Agreement and all progress on the establishment of Franchisee's Store shall cease until such time as full payment is made.

## 6.   LIMITATIONS

6.1   The table set forth on the attached **Exhibit "A"** provides a detailed listing of GPFC's responsibilities with respect to a Turn-Key Franchise Package toward its establishment of a Franchisee's Store under this Turn-Key Store Agreement (several of the entries, such as "Paper Clips", reference the number of start up packages you will receive which include a various number of such items, as opposed to the actual number of the listed items themselves).  Any deviations which the Franchisee wishes to make to their Store from those reflected in the **Exhibit "A"** table are the Franchisee's sole responsibility and will be at the  Franchisee's sole cost and expense.  The Franchisee must provide GPFC with either a credit card account authorization or with an electronic funds transfer arrangement, as GPFC chooses, so that any overages incurred above and beyond those to which GPFC has agreed to be responsible as set forth on the attached **Exhibit "A"** may be appropriately paid as they are incurred.  The  Franchisee must be available to sign any and all documents required as part of this Turn-Key Store Agreement, and GPFC does not act as an agent, partner, power of attorney or other representative for or on behalf of any Franchisee.  Many of the cost allocations for the items reflected in the **Exhibit "A"** table may be higher than those budgeted by GPFC in arriving at the $102,000.00 turn-key store fee as a result of the particular credit standing of Franchisee or as a result of other conditions or circumstances beyond the control of GPFC. Franchisee will be responsible and will be charged for overages resulting from conditions of Franchisee's Store different from those upon which the **Exhibit "A"** budget was established, such as the total costs to build out an oversized Store larger than the anticipated 1,200 square foot size Store or one which was not delivered by the landlord or owner as a "vanilla box", and for any additional equipment, furniture or furnishings which Franchisee orders beyond those to which GPFC has agreed to provide under this Agreement.

## 7.   GOVERNING LAW AND DISPUTE RESOLUTION

7.1   Validity, Choice of Law, Venue and Jurisdiction

a.   This Agreement shall become valid and effective when counter-executed and accepted by GPFC. The Effective Date of this Agreement shall be the date when signed and accepted by GPFC. This Agreement shall be deemed made and entered into in the State of Florida and shall be governed and construed under and in accordance with the laws of the State of Florida without giving effect to any conflict of laws.

b.   Exclusive venue and jurisdiction of any suit arising hereunder shall lie within the courts of the State of Florida, located in Tampa, Florida or within the courts of the United States of America located within the Middle District of Florida.

7.2   Mediation

a.   Subject to the limitation provided in the last sentence of this Section 7.2(a), and subject to Section 7.2(b), before either party may initiate suit or action against the other, the parties pledge to first attempt to resolve the controversy or claim arising out of or relating to this Agreement (a "Dispute") pursuant to mediation conducted in accordance with the Commercial Mediation Rules of The American Arbitration Association, unless the parties agree on alternative rules and a mediator within 15 days after either party first gives notice of such Dispute (the "Mediation Notice"). Mediation shall be conducted at GPFC's Headquarters or at the office of GPFC's attorney, at the option of GPFC.  The fees and expenses charged by the mediator

shall be shared equally by the parties. The mediator shall be disqualified as a witness, expert or counsel for any party with respect to the Dispute and any related matter. Mediation is a compromise negotiation and shall constitute privileged communications under Florida and other applicable laws. The entire mediation process shall be confidential and the conduct, statements, promises, offers, views, and opinions of the mediator and the parties shall not be discoverable or admissible in any legal proceeding for any purpose; provided, however, that evidence that is otherwise discoverable or admissible shall not be excluded from discovery as a result of its use in the mediation. Mediation shall be deemed completed 30 days after the date of the Mediation Notice unless extended by mutual consent of the parties.

b.　GPFC shall not be required to attempt to first mediate a controversy or claim against Franchisee through mediation as set forth in Section 7.2(a) if such claim or controversy concerns an allegation or allegations by GPFC that Franchisee has violated (or threatens to violate or poses an imminent risk of violating) any of GPFC's federally protected intellectual property rights in the Marks, in the Method, in the Store Set-Up Manual, in the Operations Manual, in the GP Rate Pro Software, or in any of GPFC's other intellectual properties, in which case GPFC shall reserve (and hereby reserves) the right to immediately seek injunctive relief, civil damages, ex parte seizure and other available remedies within the courts of the State of Florida or United States of America located within Tampa, Florida or the Middle District of Florida, as the case may be.

7.3　GPFC may be granted injunctive relief without the necessity of a bond, but upon notice; provided no prior notice shall be required in the event Franchisee counterfeits the Marks or the Method and GPFC pursues available ex-parte remedies.

7.4　IN ALL CASES EXCEPT WHERE EXPRESSLY PROHIBITED BY APPLICABLE STATUTORY LAW, FRANCHISEE AND GPFC EACH WAIVES ANY RIGHT TO A TRIAL BY JURY.

7.5　If GPFC institutes any action at law or in equity against Franchisee to secure or protect GPFC's rights under or to enforce this Agreement, in addition to any judgment entered in its favor, GPFC shall be entitled to recover such reasonable attorneys' fees and costs as may be allowed by the court, together with court costs and expenses of litigation.

7.6　**To the extent the UFDD of GPFC pursuant to which this Agreement has been executed included a state-specific Addendum as Exhibit "H" which contained additions, modifications or other changes to this Agreement mandated by the laws of the State of residency of Franchisee (hereinafter any such state-specific Addendum being referred to as the "Applicable State-Specific Addendum"), such Applicable State-Specific Addendum is incorporated herein and shall, to the extent required by the laws of the State of Franchisee's residency, supersede and take precedence over any contrary, conflicting or inconsistent provisions herein.**

## 8.　SEVERABILITY AND CONSTRUCTION

8.1　Every part of this Agreement will be considered severable as set forth below.

a.　If, after application of any Applicable State-Specific Addendum, a court of competent jurisdiction declares any provision of this Agreement (or any exhibit or other document referred to herein) pertaining to the subject matters referenced in Section 8.1(b) to be invalid or unenforceable, but such provision could be rendered valid and enforceable if modified, then Franchisee and GPFC hereby agree that

such provision shall be deemed modified to the extent required to make it valid and enforceable to the fullest extent under applicable state law and public policy.

b.   The subject matters that are made subject to Section 8.1(a) are any provisions of this Agreement (or any exhibit or other document referred to herein) pertaining to (i) termination of this Agreement, (ii) non-renewal of this Agreement, (iii) designation of jurisdiction and venue for dispute resolution proceedings, (iv) waivers of right to a jury trial, (v) "choice of law" provisions that specify which state's law would apply in a dispute resolution proceeding, (vi) certain types of mandatory franchisee "releases" or "waivers", and (vii) any other provision that is governed by any Applicable State-Specific Addendum or is otherwise inconsistent with a valid and applicable state law that was specifically intended to protect the rights of franchisees.

c.   If a mediator, arbitrator or court of competent jurisdiction declares any provision of this Agreement (or any exhibit or other document referred to herein), other than the provisions corresponding to the subject matters referenced in Section 8.1(b), to be invalid or unenforceable, but such provision could be rendered valid if modified, then Franchisee and GPFC hereby agree that GPFC shall have the right, in its sole discretion, to modify such invalid or unenforceable provision(s) to the extent necessary to render such provision(s) valid and enforceable, including, without limitation, the right to delete the provision in its entirety.

d.   Should any provision of this Agreement be found invalid or unenforceable as presented in the above provisions of this Section 8.1, the remainder of this Agreement shall in no way be affected and shall remain valid and enforceable for all purposes, both parties hereto declaring that they would have executed this Agreement without inclusion of such provision. In the event that such total or partial invalidity or unenforceability of any provision of this Agreement exists only with respect to the laws of a particular jurisdiction, this Section 8.1 shall operate only upon such provision to the extent that the laws of such jurisdiction are applicable to such provision. Each party shall execute and deliver to the other any further documents that may be reasonably required to effectuate fully the provisions hereof.

8.2   This Agreement and all other agreements and writings referred to herein or executed in connection herewith, including but not limited to the exhibits, the Franchise Agreement, the Non-Competition and Non-Solicitation Agreement, the UFDD, the Store Set-Up Manual, the GPFC Operations Manual, and the Standards and Specifications referred to herein, contain the entire agreement of the parties pertaining to the subject matter hereof and no prior or contemporaneous representations, inducements, promises, or agreements, oral or otherwise, between the parties not set forth herein shall be of any force and effect. The terms of all Exhibits hereto and, to the extent not inconsistent with or contrary to the provisions hereof, all agreements and writings referred to herein, including in particular, but not limited to, GPFC's UFDD (and all supplements and amendments thereto made by GPFC throughout the Term), are hereby incorporated into and made a part of this Agreement as if the same had been set forth in full herein.

## 9.   MISCELLANEOUS

9.1   This Agreement may be executed in any number of counterparts and copies, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

Franchisee's Initials _____

9.2     The submission of this Agreement does not constitute an offer or acceptance by GPFC and this Agreement shall not be deemed valid, effective or binding upon GPFC until such time as GPFC accepts it and it is signed by an authorized officer on behalf of GPFC.

9.3     Franchisee and its Owners jointly and severally acknowledge that they have carefully read and understand this Agreement and all other related documents to be executed concurrently or in conjunction herewith, that they have had the opportunity to consult with legal counsel, accountants and financial advisors in connection with entering into this Agreement, that they understand the nature of this Agreement, and that they intend to comply herewith and to be bound hereby.  Franchisee and its Owners and Managers signing below, if any, represent, warrant and covenant that they received a copy of GPFC's current Franchise Disclosure Document at least fourteen (14) calendar days before any of them signed this Agreement or paid any money to GPFC, that they read and reviewed a copy of GPFC's current Franchise Disclosure Document in its entirety, and that this Agreement which has been signed by each of them is in all material respects identical to that Turn-Key Store Agreement which was attached as Exhibit "J" to the specific copy of GPFC's current Franchise Disclosure Document which was so received, read and reviewed; and to the extent any material alterations were unilaterally made by GPFC to this Agreement as compared to the Turn-Key Store Agreement which was attached as **Exhibit "J"** to the specific GPFC Franchise Disclosure Document each of them received, read and reviewed, they received and reviewed a copy of this Agreement at least seven (7) calendar days before any of them signed this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed effective as of the date of counter execution by GPFC's authorized signing officer shown as follows:

## "FRANCHISEE"

If the "Franchisee" is a legal entity (corporation, limited liability company, partnership, etc.) then (i) enter the name of the entity Franchisee in the following space: _____, (ii) each equity owner of the Franchisee must sign below (attach additional sheet if necessary), and (iii) next to the name of the persons that are signing this Agreement, insert their title within such entity (president, partner, manager, member, etc.).  If the Franchisee is not a legal entity at the time of signing, but rather one or more individual persons, then do not fill in the title lines below.

1:      _____  _____, 200___
        Signature of Franchisee or equity owner if Franchisee is a legal entity   Date              Year

        _____
        Printed name of person that signed above

        _____
        Title of person that signed above

2:      _____  _____, 200___
        Signature of Franchisee or equity owner if Franchisee is a legal entity   Date              Year

        _____
        Printed name of person that signed above

        _____
        Title of person that signed above

**"GPFC"**
**F**OR GOIN' POSTAL **F**RANCHISE CORPORATION

GOIN' POSTAL FRANCHISE CORPORATION
A Florida Corporation

BY: _____ _____, 200__
     Authorized Signing Officer          *Date     *Year
     *Date of Goin' Postal Franchise Corporation's Counter Signature Is "Effective Date" of this Turn-Key Store Agreement

Print Name of Officer:_____

217       Franchisee's Initials _____

## EXHIBIT "A" TO TURN-KEY STORE AGREEMENT
## LIST OF INCLUDED ITEMS RESPONSIBILITY

| | | |
|---|---|---|
| Franchise Fee | Standard Franchise Fee | 1 |
| Point of Sale systems | Two complete Point of sale systems | 2 |
| Rent & Deposits | We will pay the rent and deposits for the first month, last month, and security deposit to the extent required to commence possession and use of premises. Turn-Key Franchisee is solely responsible for all further rent obligations and other payments due under lease | 1 |
| Utility deposits | We will pay upfront utility deposits for telephone, electricity, gas, water, sewer and garbage | 1 |
| Insurance | Liability Insurance first monthly premium payment or deposit. Turn-Key Franchisee responsible for all additional premiums and other payments | 1 |
| Incorporation | Basic Incorporation and EIN number | 1 |
| Licenses* | City Business Licenses etc. | 1 |
| Build out | Carpet, tile, pre-fabricated fixture walls, counters, shelves, islands, mailboxes, display lighting.  This is based on a vanilla box.  If your location needs structural walls, HVAC, bathrooms, ceilings etc you will be responsible for these costs. | 1 |
| Contractor | | 1 |
| Sign | | 1 |
| Permits | | 1 |
| Copier – Color | | 1 |
| Fax | | 1 |
| Laminator | | 1 |
| Phone System | | 1 |
| Printers | All necessary printers | 1 |
| Furniture (desks, filing) | Desk, Filing cabinets etc. | 1 |
| Pitney Bowes Machine | 1 months lease payment and 1 postage refill | 1 |
| Various Salaries | All GPFC salaries to establish location | 1 |
| Packaging Office Supplies Stock | Panes, paper, tape, knives, CDs etc. | 1 |
| Greeting Cards/Gifts | Cards, racks and various gift wrap items. | 1 |
| Boxes | Startup package | 1 |
| Stamps | Startup package | 1 |
| Retail Office Supplies | Start-up package of ink, toner and other office supplies inventory | 1 |
| GPFC Travel expenses | Location selection, buildout, reps visit. Turn-Key Franchisee responsible for travel expenses to Zephyrhills and all related accommodations. | 1 |
| 48" Steel Rule | | 1 |
| 3 Tier Plastic Display | | 1 |
| Utility Knives | | 4 |
| Tape Measurers | | 2 |
| Stamp Drawer | | 1 |
| Foam Mounting Tape | | 2 |
| Business Cards | | 1 |
| Card Holders | | 3 |
| Stapler | | 1 |
| Hole Punch | | 1 |
| Receipt Spikes | | 2 |
| Pouches starter kit | | 1 |

Franchisee's Initials _____

| Item | Qty |
|---|---|
| Scotch Tape | 2 |
| Paper | 1 |
| Scissors | 2 |
| Markers | 1 |
| Tape Guns | 2 |
| Bubble Mailers | 1 |
| Power Strips | 3 |
| Pens | 1 |
| Paper Clips | 1 |
| Set Up Box | 100 |
| Slawall Hooks 6" | 50 |
| Slatwall Brackets | 24 |
| | |
| Counter Wall Sign | 1 |
| Window Sign | 1 |
| 15' Banner | 1 |
| 1 set mugs | 1 |
| Shirts | 6 |
| Stamp Set | 1 |
| 1000 Shipping Forms | 1 |
| Printed Shirts | 3 |
| Lifesize Running Guy | 1 |
| | |
| Digital Camera | 1 |
| Photo Printer | 1 |
| Photo Passport Software | 1 |
| | |
| Thermal Label Printer | 1 |
| 150lb Scale | 2 |

Franchisee's Initials _____

termination of the Franchise Agreement or any other agreement between GPFC and Franchisee or any release of Franchisee of any of its obligations thereunder.

This is an irrevocable, unconditional and absolute guaranty of payment and performance, not of collection, and the undersigned Guarantors agree that his, her, or their liability under this Continuing Personal Guaranty will be immediate and will not be contingent upon the exercise or enforceability by GPFC of whatever remedies it may have against the Franchisee or others.

The undersigned agree that any current or future indebtedness by Franchisee to any of the undersigned Guarantors will always be subordinate to any indebtedness or obligations owed by Franchisee to GPFC.

The undersigned Guarantors further agree that as long as the Franchisee owes any money to GPFC, the Franchisee will not pay and the undersigned will not accept payment of any part of any indebtedness owed by Franchisee to any of the undersigned Guarantors, either directly or indirectly, without the consent of GPFC.

Each of the undersigned Guarantors further agree to be personally bound by and to perform the obligations, and to refrain from performing all acts prohibited by, all of the provisions of the Franchise Agreement, including, in particular, but without limitation to, the provisions of Section 14 (Franchisee's Obligations Upon Expiration and/or Termination) and that certain Non-Competition and Non-Solicitation Agreement between GPFC and Franchisee. The undersigned Guarantors consent to be bound by the provisions of Article 20 of the Franchise Agreement for purposes of resolving any dispute or controversy arising out of or in connection with the undersigned's alleged performance of or failure to perform the obligations of Franchisee under the Franchise Agreement and/or Non-Competition and Non-Solicitation Agreement.

In connection with any litigation to determine or enforce the undersigned Guarantors' liability under this Continuing Personal Guaranty, each of the undersigned Guarantors expressly waive his or her right to trial by jury and agree to pay all costs and expenses incurred by GPFC in such proceedings, including reasonable attorneys' fees.

If this Continuing Personal Guaranty is signed by more than one individual, each person signing this Continuing Personal Guaranty below will be jointly and severally liable for all obligations created in this Continuing Personal Guarnty. This Continuing Personal Guaranty is a continuing personal guaranty and it shall remain in full force and effect during and after the term of the Franchise Agreement, including any renewals or extensions thereof, until all obligations arising out of and under the Franchise Agreement, including all renewals and extensions, owed by Franchisee to GPFC are fully paid and satisfied.

Should any one or more provisions of this Continuing Personal Guaranty be determined to be illegal, invalid, or unenforceable, all other provisions shall nevertheless remain effective. This Continuing Personal Guaranty shall inure to the benefit of and bind, as the case may require, GPFC, its successors and assigns, and all heirs, legal representatives, successors and assigns of each of the undersigned Guarantors. Each of the undersigned Guarantors specifically acknowledge that he or she has read all the terms of this Continuing Personal Guaranty, have received a true copy of it, and agree to be fully bound by its terms.

"Guarantor"

Signature: _Eric Browne_
Print Name: _Eric S. Browne_
Soc. Sec. #: _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_
Home Address: _535 St. James Court_
_Lawrenceville GA 30044_
Date: _11/1/09_

221          Franchisee's Initials _EB_

"Guarantor"

Signature: _Eric Brown_
Print Name: _ERIC BROWNG_
Soc. Sec. #: _627 24 0598_
Home Address: _535 St JAMES Court_

Date: _11/04/02_

"Guarantor"

Signature: _____
Print Name: _____
Soc. Sec. #: _____
Home Address: _____
_____
Date: _____

222        Franchisee's Initials _____ EvB

RECEIPT

This Disclosure Document summarizes certain provisions of The Franchise Agreement and other information in plain language. Read this Disclosure Document and all agreements carefully.

If Goin' Postal Franchise Corporation offers you a franchise, it must provide this Disclosure Document to you 14 calendar-days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale.  See  the bracketed provisions in bold print which follow immediately after this paragraph to determine whether your State requires delivery of these materials sooner than the referenced 14 calendar-day period.

**[Maryland, New York and Rhode Island require Goin' Postal Franchise Corporation to provide this Disclosure Document to you at the earlier of the first personal meeting or 10 business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship.]**

**[Michigan, Oregon and Washington require Goin' Postal Franchise Corporation to provide this Disclosure Document to you at least 10 business days before the execution of any binding franchise or other agreement of the payment of any consideration, whichever occurs first.]**

If Goin' Postal Franchise Corporation does not deliver this Disclosure Document on time or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and, if applicable, to your State agency on **Exhibit "E"** to this Disclosure Document.

The name, principal business address, and telephone number of each "franchise seller" offering the franchise are as follows: Marcus Price, CEO and M.J. Price, President; 4941 4th Street, Zephyrhills, Florida 33542, (813) 782-1500

The Issuance Date of this Disclosure Document in your particular State is reflected in the **State Effective Date Exhibit** which follows immediately after the State Cover Page. The Effective Date of this Disclosure Document in your State may be different than the March 21, 2008 Issuance Date applicable in States which do not require registration.

Goin' Postal Franchise Corporation, authorizes Robert W. Bible, Jr., Esq., Lopez & Kelly, P.A., 4600 W. Cypress Street, Suite 500, Tampa, Florida 33607 to receive service of process (i.e. service of summons or litigation pleadings) for Goin' Postal Franchise Corporation in the State of Florida. **Your State may require that we designate an agent in your State who is authorized to receive service of process in connection with actions arising under your State's laws.  See Exhibit "E" attached to this Disclosure Document (if applicable) to determine if we have appointed an agent authorized to receive process in your State.  Goin' Postal Franchise Corporation authorizes the respective designated agents identified on Exhibit "E" to receive service of process for it in the particular identified State.**

I received on the date appearing adjacent to my signature below a Franchise Disclosure Document of Goin' Postal Franchise Corporation dated as of the applicable Issuance Date/Effective Date set forth in the State Effective Date Exhibit which follows immediately after the State Cover Page, which included the Exhibits (Exhibits "A" through "K") listed below:

| | | |
|---|---|---|
| A. | Franchise Agreement | Exhibit "A" |
| B. | Non-Competition and Non-Solicitation Agreement | Exhibit "B" |
| C. | Personal Data Disclosure/Franchisee Ownership Information Form | Exhibit "C" |
| D. | Credit Card and Designated Account Authorization Form | Exhibit "D" |
| E. | Listing of State Administrators, and Agents for Service of Process | Exhibit "E" |
| F. | Pre-Approved Products and Services | Exhibit "F" |
| G. | Instructions | Exhibit "G" |
| H. | State Specific Addendum (as applicable) | Exhibit "H" |

138

Franchisees Initials: _____

I.    Financial Statements                                              Exhibit "I"

*[signature]*

Franchisee Signature

Print Name of Franchisee:    *[handwritten] L lwr Deh*

[if a corporation, etc., print name of entity]
Print Name of Person signing as or for Franchisee: ____ *9 Hwe / M*
Print Title, if any: _____
**NOTE: See Exhibit "G" Instructions for Returning the Receipt .**

*[handwritten] 7 - /- O 9*

Date You Received UFDD
[Do Not Leave Blank]

*[handwritten]*
ATTN  Macks - From  Steve Declar
813 782 1599

139                    Franchisees Initials: *[handwritten initials]*

## EXHIBIT "K" TO UNIFORM FRANCHISE DISCLOSURE DOCUMENT

### CONTINUING PERSONAL GUARANTY

Each of the undersigned (the "Guarantor(s)"), in order to induce Goin' Postal Franchise Corporation, a Florida corporation ("GPFC") to enter into that certain Goin' Postal Franchise Agreement dated _November 1_, 20_09_ ("Franchise Agreement") by and between GPFC and _Eric Browne_ ("Franchisee"), hereby jointly and severally, unconditionally, absolutely and unequivocally personally guaranty to GPFC, its successors, or its assigns, prompt full payment and performance of all obligations of Franchisee to GPFC which are or may become due and owing to GPFC, including, but not limited to, all obligations arising out of the Franchise Agreement or any other agreement between GPFC and Franchisee, including any and all extensions or renewals of such Franchise Agreement and other agreements, in the same manner as if those agreements were signed between GPFC and the undersigned Guarantors directly. Such obligations include, but are not limited to, Royalty Fees, Marketing Fees, software update fees and any and all other obligations now or hereafter due to GPFC or hereafter incurred by Franchisee in favor of GPFC.

The undersigned Guarantor(s) expressly waive: (a) notice of the acceptance by GPFC for the benefit of Franchisee; (b) all presentments, demands for performance, notices of non-performance, protests, and all other notices, including but not limited to, notices of protest, dishonor, any default, partial payment or non-payment of all or any part of the obligations guaranteed hereunder, and the existence, creation, or incurring of new or additional obligations guaranteed hereunder; (c) any right to require GPFC to proceed against Franchisee or any other persons, to proceed against or exhaust any security held by GPFC or any other person for the obligations guaranteed hereunder or to pursue any other remedy in GPFC's power whatsoever; (d) any defense arising by reason of the invalidity, illegality or lack of enforceability of the obligations guaranteed hereunder or any part thereof, or by reason of any incapacity, lack of authority, death, disability, or other defense of Franchisee or any other person, or by reason of the failure of GPFC to file or enforce a claim against the estate (in administration, bankruptcy or any other proceeding) of Franchisee or any other person, or by reason of the cessation from any cause whatsoever of the liability of Franchisee or any other person with respect to all or any part of the obligations guaranteed hereunder, or by reason of any act or omission of GPFC or others which directly or indirectly results in a discharge or release of Franchisee or any other person or any obligations guaranteed hereunder or any security therefore, whether by operation of law or otherwise; (e) any defense arising by reason of GPFC's failure to obtain, perfect, or maintain a perfected or prior security interest in, lien or encumbrance upon, any property of Franchisee or any other person, or by reason of any interest of GPFC in any property, whether as owner thereof or the holder of a security interest therein or lien or encumbrance thereon, being invalidated, avoided, declared void, fraudulent or preferential or otherwise set aside, or by reason of any impairment of GPFC of any right, recourse or collateral; (f) any right to require GPFC to marshal any assets in favor of the undersigned Guarantors; (g) any defense based upon any failure of GPFC to give Franchisee or the undersigned Guarantors notice of any sale or other disposition of any property securing any or all of the obligations guaranteed hereunder or any guaranty thereof, or any defect in any notice that may be given in connection with any sale or other disposition of any such property, or any failure of GPFC to comply with any provision of applicable law in enforcing any security interest in or lien upon any such property, including any failure by GPFC to dispose of any such property in a commercially reasonable manner; and (h) any defense based upon or arising out of any bankruptcy, insolvency, reorganization, arrangement, re-adjustment of debt, liquidation or dissolution proceeding commenced by or against Franchisee or any other person, including any discharge of, or bar against collecting, any of the obligations guaranteed hereunder (including any interest thereon), in or as a result of any such proceeding.

This Continuing Personal Guaranty will not be affected by the modification, extension, or renewal of the Franchise Agreement or any other agreement between GPFC and Franchisee, the granting of an extension of time for payment by GPFC to Franchisee of any obligation guaranteed hereunder, or any

# Exhibit
# "D"





Case 8:15-cv-02583-JSM-EAJ   Document 1   Filed 11/03/15   Page 274 of 278 PageID 274

https://scontent-atl3-1.xx.fbcdn.net/hphotos-xlf1/v/t1.0-9/11999055_695494420581746_...   10/22/2015

# Exhibit

## "E"



Goin' Postal Franchise Corporation
4941 4th Street
Zephyrhills, FL 33542
Ph: 813-782-1500
Fax: 813-782-1599

September 23, 2014

Gwinnett Postal and Shipping
3545 Cruse Road, Suite 309-C
Lawrenceville, GA 30044

Re: Infringement of Trademark Rights of Goin' Postal Franchise Corporation

## **DEMAND FOR IMMEDIATE CEASE AND DESIST**

Dear Sir or Madam:

I am the chief in-house counsel for Goin' Postal Franchise Corporation and an attorney representing Goin' Postal Franchise Corporation with its intellectual property rights. It has come to our attention that you are in violation of our trademark rights, service mark rights, trade names, protected good will and reputation for your use of Goin' Postal trademarks and associated marks, methods and other intellectual property. This letter serves as Goin' Postal Franchise Corporation's demand that you cease and desist any and all use of our intellectual property immediately. You should forward this letter to your attorney upon receipt.

Goin' Postal Franchise Corporation is a Florida corporation which was incorporated in Florida on August 13, 2004. We maintain our principal place of business and corporate headquarters at 4941 4th Street in Zephyrhills, Florida 33542. We conduct business under the name Goin' Postal, which is part of the trademarks/service marks our predecessor, Zephyr Brands, Inc. (formerly known as Goin' Postal, Inc.) registered and filed for registration with the United States Patent and Trademark Office and which we purchased from Goin' Postal, Inc. in January, 2007. Goin' Postal Stores ("Stores") are retail service businesses which offer packaging, shipping and mailing services and various office services, all provided through a variety of carriers, vendors and service providers. Among the office services provided are fax, copying, notary and the sale of office supplies. Goin' Postal Stores are targeted at both business and private customers. With Goin' Postal's relationship with the major carriers, The United States Post Office, and various freight companies, Goin' Postal Stores

can offer a wide variety of options for consumers. As a result of efforts by Goin' Postal Franchise Corporation, customers and the general public have come to recognize Goin' Postal as an established and successful business.

Attached as Exhibit "A" is a copy of our federally registered and protected trademark. Attached as Exhibit "B" are photographs of your use of a sign that is obviously the same mark, altered only by the replacement of the letter O in the word "Goin'" with the letter W to produce the word "Gwin." The font, design, layout, colors and color scheme, placement of the American flag as well as our registered slogan "Your friendly neighborhood shipping center" are all present and identical to our protected mark in every way. There is no question that this sign originated from a former Goin' Postal franchise.

Your infringement of our trademark rights has already caused confusion in the market. On September 22, 2015, a customer contacted us to tell us about your store. This customer, who frequently patrons one of our authorized stores, clearly recognized the sign you are using as our registered trademark. This presumably represents a small fraction of consumers who are confused but never take the time to contact Goin' Postal and report the confusion caused by your use of our marks.

Goin' Postal Franchise Corporation has several options under state, federal and common law to enforce its legal rights in its Marks. If Goin' Postal Franchise were to file a lawsuit against you, it would be entitled to seek: (1) preliminary and permanent injunctions; (2) actual monetary damages; (3) disgorging of any profits you have realized through your use of the Marks; (4) reimbursement of attorney's fees required to prosecute a lawsuit against you; (5) monetary damages for damage to Goin' Postal Franchise Corporation's goodwill in the market; and (6) other damages in law and equity. Please be advised that Goin' Postal Franchise Corporation will undertake all appropriate steps to protect its Marks and its associated goodwill.

Despite our well established and indisputable legal rights to prosecute a lawsuit against you, you can avoid legal action by working with us to achieve one of the following settlements:

1. You can become an authorized Goin' Postal franchisee. You change the name of your business to "Goin' Postal" via a d/b/a registration with your Secretary of State, and use our proper marks and sign a franchise agreement. We will waive your fees but you will be bound by the terms of the franchise agreement and be obligated to monthly royalties. In the future if your store sells it will have to sell as a Goin' Postal.

**or**

2. You can immediately cease and desist from any and all infringing activity including but not limited to the use of our Marks, color scheme, décor and any other identifiable association to Goin' Postal Franchise stores that may or does cause confusion of association with Goin' Postal Franchise Association. While your official business name of Gwinnett Postal is not likely to cause confusion and would therefore not be a problem, the shortened Gwin Postal is confusingly similar to Goin' Postal and cannot be advertised to the general public without infringing upon our marks.

You are hereby put on Notice that Goin' Postal Franchise will proceed with legal action if it has not received a response from you or your attorney within ten (10) business days from your receipt of this letter. <u>Please govern yourself accordingly.</u>

If you or your attorney have any questions, please feel free to contact me.

Sincerely,


Marty Beurmann, Esq.
Chief In-House Counsel
Goin' Postal Franchise Corporation
(813) 782-1500
4941 4th Street
Zephyrhills, FL 33542